**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JEROME DUVALL, et al.,** | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civil Action No. JFM-94-2541** |
| **PARRIS N. GLENDENING, et al.,** | * | |
| **Defendants.** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**BRIEF IN SUPPORT OF MOTION TO RESTORE THE MEDICAL AND PHYSICAL
PLANT PROVISIONS OF THE 1993 CONSENT DECREE TO THE ACTIVE DOCKET
AND TO SCHEDULE APPROPRIATE FURTHER PROCEEDINGS**

**I.      INTRODUCTION**

The Baltimore City Detention Center ("BCDC") is an institution in crisis.  Thousands of

men, women and children, most of whom have not been convicted of any crime, are exposed to

dangerous conditions.  BCDC routinely ignores detainees' urgent and critical health care needs.

The facility is also plagued with physical plant deficiencies, resulting in an unsafe and unsanitary

living environment.  Because these conditions also violate the Consent Decree previously entered

in this case, Plaintiffs request that this Court reopen this matter to enforce those provisions of the

decree with which Defendants are in non-compliance.

**A.      Procedural Background**

On July 9, 1993, by consent of the parties, the Court entered a revised and consolidated

Decree that sets forth the obligations of the State of Maryland with regard to conditions of

confinement at the Baltimore City Detention Center ("BCDC").  <u>See</u> 1993 Revised Consolidated

Decree, July 9, 1993 ("1993 Consent Decree").  Subsequently, also by consent of the parties, the

1

Court placed this case on its inactive docket.  Order, Jan. 7, 1999.  On August 16, 2002, the

Plaintiffs filed an emergency motion seeking to reopen the case and also seeking injunctive

relief, including a temporary restraining order, with regard to the risk of heat injury for those

confined at the Women's Detention Center ("WDC"), a facility that is part of the BCDC.  This

Court granted the requested temporary restraining order that day, and the parties subsequently

entered into a Consent Order approved by the Court.  Consent Order, August 22, 2002.  That

order recites that "[t]his case is reopened and restored to the active docket in order to address

current conditions of confinement at WDC and for the purpose of resolving all issues related to

plaintiffs' motion for a preliminary injunction (filed August 16, 2002)."  Id. at 1.

        Plaintiffs now seek to reopen the case further to address medical and physical plant

problems within both the WDC and the Men's Detention Center ("MDC").  Specifically,

Plaintiffs seek to enforce the medical and physical plant provisions of the 1993 Consent Decree,

including the intake provision (§ III.D.1)[1] and the provision requiring that certain health care

standards be maintained in the BCDC (§ IV.B).[2]  Plaintiffs further seek to enforce the provisions

related to sanitation and facility maintenance (§§ III.F, III.H., III.I & IV.A).[3]  Because Defendants

---

        [1]  This provision requires, inter alia, that (1) a classification intake interview be conducted
by a qualified interviewer within 48 hours of a detainee's admission in order to classify the
detainee properly and to allow for detection, diagnosis and treatment of special needs; and (2)
that "[a]ppropriate mental health treatment . . . be afforded to each inmate who suffers from
mental illness."  1993 Consent Decree at 11-12.

        [2]  This provision requires that "[h]ealth care services, staffing and facilities at the
Detention Center shall, at a minimum, comply in all respects with the current standards for health
care services and health care facilities in jails and with the evaluations and recommendations of
the National Commission on Correctional Health Care (NCCHC)."  Id. at 19.

        [3]  These provisions require, inter alia, that detainees be provided with means of keeping
themselves, their clothing and their living space clean; that plumbing, heating and lighting be

2

have failed to comply with these provisions, Plaintiffs request that the Court restore the 1993

Consent Decree to the active docket and establish an appropriate schedule for discovery and the

designation of issues for a hearing on compliance and enforcement.

### B.      Factual Background

The BCDC, a state-run facility since 1991, includes a complex of several buildings,

including MDC and WDC.[4]  BCDC currently houses over 3000 people.  Annually, there are

nearly 45,000 admissions to the facility, and that number is growing.  Nearly 90 percent of those

admitted to BCDC are pre-trial detainees.

Prior to admission to BCDC, arrestees are processed through the Baltimore City Central

Booking and Intake Center ("CBIC").  An arrest booking officer processes the arrestee and is

responsible for conducting an intake medical screening.  According to policy, detainees with

serious medical needs should be evaluated and treated immediately, and those with chronic

conditions should be scheduled for regular follow-up appointments.  After booking, some

detainees are temporarily housed in CBIC, while others, including all females, are admitted

directly to BCDC.  Within fourteen days of arrest, each detainee should be given a complete

physical.  At any point during detention, a detainee with an acute medical need is supposed to be

able to put in a sick call slip to be seen by medical personnel.  Detainees who file such sick call

---

maintained in good working order; that detainees have appropriate and adequate lighting,
ventilation, water supply, bedding, clothing, toilet facilities, and general hygiene; and that
detainees be provided sanitary and palatable food meeting health standards.  Id. at 14-16.

[4]  The BCDC also includes the Wyatt Building, Annex Building, and Jail Industries
Building.

slips should be seen within 48 hours, or 72 hours if the request is made on a weekend.  Detainees

with sudden emergency conditions are supposed to have access to immediate medical attention.

Although Plaintiffs have not yet had the benefit of discovery, evidence of non-compliance

with the medical and physical plant provisions of the 1993 Consent Decree abounds.  Recently

the Department of Justice ("DOJ") performed an intensive investigation into conditions of

confinement at BCDC, pursuant to its statutory authority under the Civil Rights of

Institutionalized Persons Act, 42 U.S.C. § 1997.  See Letter Report from Assistant Attorney

General for Civil Rights Ralph F. Boyd, Jr. to Governor Parris N. Glendening, Aug. 13, 2002

("DOJ Report"), Attachment A.  The DOJ found that "persons confined suffer harm or the risk of

harm from deficiencies in the facility's fire safety protections, medical care, mental health care,

sanitation, opportunity to exercise and protection of juveniles" and that these conditions violated

the constitutional rights of detainees.  Id. at 1-2.[5]

---

[5]     Pursuant to Fed. R. Evid. 803(8), factual findings resulting from a government
investigation made pursuant to authority granted by law are admissible in civil cases, as an
exception to the hearsay rule, unless the sources of information or other circumstances indicate a
lack of trustworthiness.  The factual findings in the Department of Justice letter, as noted in the
letter itself, result from the authority granted the Department of Justice in 42 U.S.C. § 1997 and
42 U.S.C. § 14141.  Indeed, 42 U.S.C. § 1997b requires the Attorney General to inform the
Governor or the Chief Executive Officer of the appropriate State or political subdivision of the
"supporting facts" that give rise to the "egregious or flagrant conditions" that deprive persons
residing in various kinds of institutions, including detention facilities, of rights protected under
the Constitution.  See 42 U.S.C. §§ 1997a & 1997(1)(B)(ii).
        Moreover, the findings in the letter are admissible, even though they contain ultimate
conclusions regarding the unconstitutionality of conditions in the BCDC.  See Beech Aircraft
Corp. v. Rainey, 488 U.S. 153, 169-170 (1988) (adopting a "broad approach to admissibility"
under Rule 803(8) and holding that portions of investigatory reports otherwise admissible are not
inadmissible merely because they state a conclusion or opinion); see also Distaff, Inc. v.
Springfield Contracting Corp., 984 F.2d 108, 111-12 (4th Cir. 1993) (reversing and remanding for
reconsideration district court's exclusion of government report on the theory that the inability to
cross-examine the author of report could be a ground for exclusion under Rule 803(8)); Gentile
v. Co. of Suffolk, 926 F.2d 142, 151-52 (2d Cir. 1991) (upholding admissibility of report by

Plaintiffs have conducted their own investigation into conditions of confinement at BCDC and have independently confirmed the findings of the DOJ Report.  This brief includes information summarized from interviews and, when possible, medical records regarding dozens of detainees demonstrating that the unconstitutional conditions condemned by the DOJ have not been remedied.  In particular, the BCDC fails to provide reliable medical screening; fails to assure that detainees' requests for medical care are prioritized so that urgent needs are promptly addressed; fails to assure that detainees are referred to a medical practitioner qualified to address the relevant medical concerns in a reasonable period of time; fails to assure that serious medical needs are appropriately addressed even if a detainee manages to gain access to a qualified medical practitioner; fails to assure that necessary medications are prescribed or continued without interruption; fails to assure that ordered treatment is reliably delivered; fails to execute individual treatment plans for persons with chronic medical needs;fails to supervise persons undergoing drug withdrawal and provide necessary treatment during the withdrawal process; and fails to provide prompt and necessary dental treatment.

The BCDC also fails to maintain necessary sanitation throughout the facility; fails to maintain plumbing and other equipment in working order; fails to provide safe and sanitary food operations; fails to provide necessary laundry services; fails to control vermin infestations; and fails to provide proper ventilation and lighting.  All of these conditions violate specific provisions of the 1993 Consent Decree.

---

Temporary Commission of Investigation of the State of New York concluding that the County District Attorney's Office and the Police Department had systematically mismanaged their offices and tolerated employee misconduct).

II.    **DEFENDANTS HAVE FAILED TO COMPLY WITH THE HEALTH CARE PROVISIONS OF THE 1993 CONSENT DECREE**

    A.    **The Plain Language of the Health Care Provisions Requires Compliance with NCCHC Standards.**

The plain language of the health care provisions in § IV.B of the 1993 Consent Decree requires Defendants to "comply in all respects with the current standards for health care services and health care facilities in jails and with the evaluations and recommendations of the National Commission on Correctional Health Care[.]"  Notably, this provision requires that Defendants must both meet the current standards promulgated by the NCCHC and actually comply with NCCHC evaluations that determine whether the facility may be accredited.  Accordingly, accreditation, by itself, is insufficient.  If this requirement were satisfied simply by NCCHC accreditation, then the first requirement that the BCDC comply with the Standards would lack any independent meaning.[6]

Allowing Defendants to satisfy the requirement of compliance with the NCCHC Standards simply by passing an evaluation by NCCHC would accordingly violate the familiar rule of contract construction "that a document should be read to give effect to all its provisions and to render them consistent with each other."  <u>Mastrobuono v. Shearson Lehman Hutton, Co.</u>,

---

[6] The BCDC is currently accredited by the NCCHC, following an initial investigation that demonstrated non-compliance with a number of provisions.  Indeed, the NCCHC accredited the BCDC during the entire period that the Department of Justice, as discussed below, was discovering critical constitutional violations regarding health care.  Similarly, Defendants admitted the existence of a constitutional violation regarding exposure of medically vulnerable women to heat injury at a time that the NCCHC had accredited the facility.  <u>Compare</u> NCCHC Standard J-13 (requiring that detainees receive health care in a clean, safe and healthy environment) (Attachment B at 17) <u>to</u> Consent Order, Aug. 22, 2002 at 2 (consenting to finding that conditions at the WDC meet the standards for imposition of relief pursuant to 18 U.S.C. § 3626(a), the Prison Litigation Reform Act, which requires an actual violation of rights before a court can order any injunctive relief in cases involving prison or jail conditions of confinement).

514 U.S. 52, 63 (1995); <u>see</u> <u>also</u> <u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1127 (4th Cir.

1993) ("Contract terms must be construed to give meaning and effect to every part of the

contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage")

(citations omitted).

Moreover, to allow accreditation by NCCHC to substitute for compliance with the

NCCHC Standards would imply a new term in the Consent Decree by transferring the

determination of compliance with the provision from the Court to another agency. The Court's

independent evaluation of the degree to which the Standards have been met is particularly

important because federal courts have frequently recognized that accreditation by agencies such as

the NCCHC does not guarantee the existence of constitutional standards. <u>See</u> <u>Ruiz v. Johnson</u>, 37

F. Supp. 2d 855, 924 (S.D. Tex. 1999), <u>rev'd and remanded on other grounds sub nom. Ruiz v.</u>

<u>United States</u>, 243 F.3d 941 (5th Cir. 2001) ("One of the recurring themes of the evidence

presented in the hearing was that constitutional policies do not necessarily ensure constitutional

practices. While NCCHC accreditation does bolster defendants' claims that its medical care

system is functioning constitutionally, the accreditation simply cannot be dispositive of such a

conclusion"); <u>Wyatt ex rel. Rawlins v. Poundstone</u>, 985 F. Supp. 1356, 1429 (M.D. Ala. 1997)

(stating that accreditation by Joint Commission on Health Care Organizations ("JCAHO") is not

equivalent to, or a substitute for, compliance with either the consent decree at issue or with

minimal constitutional standards); <u>Robbins v. Budke</u>, 739 F. Supp. 1479, 1481 (D. N.M. 1990)

(stating that accreditation by JCAHO "is by no means an assurance that abuse and neglect of

patients does not take place in an institution, or that patients' constitutional and statutory rights

are being protected"); <u>LaMarca v. Turner</u>, 662 F. Supp. 647, 655 (S.D. Fla. 1987) (stating that

accreditation by the American Correctional Association (ACA) has "virtually no significance" to lawsuit because accredited prisons have been found unconstitutional by the courts); <u>Boulies v. Ricketts</u>, 518 F. Supp. 687, 689 (D. Colo. 1981) (rejecting argument that accreditation by ACA entitled defendants to summary judgment on claim of constitutional inadequacy of law library as "simply ludicrous"); <u>Russell v. Johnson</u>, 2003 Dist. LEXIS 8576, 4 (N.D. Miss. 2003) (stating that ACA accreditation neither mooted constitutional challenge to conditions on death row, nor showed that the conditions met constitutional standards) (copy in Appendix).

      **B.**      <u>**The BCDC Fails to Comply with the Applicable NCCHC Standards.**</u>

Current NCCHC Standards require, among other things, that all detainees be provided appropriate initial medical screening immediately upon arrival at the jail and with a full health assessment within fourteen days; that detainees be afforded appropriate daily access to non-emergency medical care; that sick call be available to detainees; that pharmaceutical services meet the needs of the detainees; that ordered care be received; that treatment plans for patients with special needs be carried out; that appropriate medical supervision and treatment for intoxicated detainees and detainees undergoing withdrawal be provided; that dental services not limited to extractions be provided; and that the BCDC provide a safe and healthful environment, including sanitation in food preparation and service.  Plaintiffs set forth below the specific NCCHC Standards that BCDC violates.

      1.      <u>The BCDC Fails to Comply with NCCHC Standard J-34, Daily Handling of Non-Emergency Medical Requests</u>.

This NCCHC Standard requires that all detainees be provided the daily opportunity to request medical assistance; that their requests be received and acted upon by qualified medical

personnel; and that, where indicated, these requests are followed by appropriate triage[7] and treatment.  See Attachment B at 46-47.  This is the provision of the NCCHC Standards that incorporates the overarching constitutional requirement that detainees receive access to necessary health care.  The BCDC is failing to meet this Standard on a number of levels: detainee requests are frequently not acted upon by medical staff or access is unreasonably delayed; detainees are not evaluated by a qualified medical provider; and orders for care are either delayed or not carried out at all.

As the DOJ Report found, not all detainees with medical complaints are getting to sick call for treatment; others are waiting too long for sick call; and at times if detainees do see a medical practitioner, ordered care is delayed or not given at all.  Attachment A at 12-13.  In addition, "nurses sometimes practice outside the scope of their training and licensure, by failing to refer patients with serious symptoms for evaluation by a medical practitioner," id. at 11, and the medical staff places detainees at risk of serious harm by failing to have symptoms evaluated by the appropriate level of medical staff.  Id. at 12.  The DOJ also concluded that "BCDC fails to deliver adequate mental health care to its residents who need such services.  Specifically, BCDC does not provide adequate access to medication, access to care, and suicide prevention." Id. at 17.

The cases of numerous detainees investigated by the Plaintiffs confirm the failures found by the DOJ investigation.  Some examples are set forth below:

---

[7]  The glossary to the NCCHC Standards defines "triage" as "the sorting out and classification of inmate-patient health complaints to determine priority of need and proper place of health care."  See Attachment B at 26.

Detainee 1[8]

Detainee 1 illustrates the multiple ways in which the BCDC fails to meet NCCHC

Standard J-34.  She had several critical health problems, yet she was unable to gain staff's

attention when she needed it.  Even when she did gain the attention of staff, that attention did not

result in appropriate diagnosis and treatment, as required by the NCCHC Standard.

Detainee 1 was noted on intake in March 28, 2003 to have a history of hypertension and

heroin addiction, as well as a dental problem.  Her weight was listed as 239 and her height as 5'0"

on her undated and unsigned intake physical.  Two days later, Detainee 1 complained of chest

pains and requested medications to assist in drug withdrawal.  Her blood pressure was reported as

196/146, indicating very severe hypertension.  She was given medications by the nurse pursuant to

orders.  She was referred to another practitioner, but did not see one until April 1.

In April, she was seen several times, apparently always by nurses, for complaints of chest

pain.  Detainee 1 complained of foot swelling in a sick call request stamped received on April 29.

When she was seen on May 2 in response to that request, she received a diagnosis of uncontrolled

hypertension and was to return in two weeks.  When she returned on May 16, however, it was

because of a sinus infection.  The physician's assistant who saw her did not address her

hypertension, although her blood pressure was still greatly elevated at 160/100.[9]

Despite her continued high blood pressure, an EKG ordered for her at intake was never

performed, even though her record also includes orders for EKGs on June 11, April 9, April 2,

---

[8]  Plaintiffs will provide Defendants with a key to the identity of the detainees discussed
in this brief.

[9]  She filed a sick call request on June 4 regarding vision problems.  Vision problems in
the presence of high blood pressure can indicate a medical emergency.

and April 1.[10]  Moreover, an intake order for blood and urine tests was not carried out, and she did not receive blood or urine tests until June 2003.

On May 6, she complained of dental pain.  She was seen at sick call on May 15 for this complaint and referred to dental services.  There is a dental form in the record dated May 15 indicating that her medical history was reviewed by the dentist, and she signed a consent to treatment form on that date indicating that she had agreed to a treatment plan, but she had received no dental treatment during her stay as of August 13, 2003.[11]

Detainee 2

On approximately April 24, 2003, Detainee 2 felt something in her ear.  She told a correctional officer that there was a bump and some swelling.  The officer called the medical clinic, but the clinic did not initially answer.  For the next several days, Detainee 2 complained repeatedly to various correctional officers.  She could not hear properly and her throat was swollen.

When Detainee 2 was finally taken to the medical clinic on April 28, the nurse told her that the ear machine was broken so the nurse could not examine her ear.  Detainee 2 was sent from that clinic to the Fourth Floor medical clinic, where a nurse said the ear looked as if it had been bitten, and returned her to the first medical clinic.  The nurse at the first clinic told her that a doctor would see her the next day.  The next morning, she was not called for an appointment.  A

---

[10]  A note in her record for March 30, 2003 indicates that the EKG was malfunctioning.

[11]  Although she had numerous risk factors for diabetes, symptoms of diabetes such as excessive thirst and urination, and several abnormal test results suggesting a high risk of diabetes, there is no indication that she was given patient education to reduce her risk factors. There are no progress notes or other indications of treatment after June 2003, and a discharge sheet on August 13, 2003 wrongly indicates that there were no abnormal laboratory test results.

correctional officer called the clinic, but no one answered and Detainee 2 was not seen that day.
After repeated calls by correctional officers the next day, Detainee 2 was seen by a nurse who told
her that she would be seen by a doctor the following day.

That night Detainee 2 woke up because pus was running down her face.  Late that night,
she was taken to the medical clinic, where a nurse gave her tylenol and told her to keep a warm
compress on her ear.  The following morning, Detainee 2 had her ear cleaned but did not see a
doctor.  Later that day, she finally saw a doctor, who had to lance the ear.[12]

In addition, Detainee 2's medical records indicate that she requested a Pap smear on
December 23, 2002.  A physician's assistant referred her to intake regarding this request on
January 21, 2003.  There are no orders for a Pap smear in her records.

Detainee 3

At the time Detainee 3 was admitted to the BCDC on December 24, 2002, he was
experiencing a discharge from his penis.  From previous experience, he recognized that he
probably had non-gonorrheal ureteritis, a sexually-transmitted disease.  Staff ordered antibiotics
and an HIV test while he was in CBIC, but there are no records that he received them.  He signed
up for sick call on February 20, 2003 stating that he thought he had a sexually-transmitted disease
and was given an antibiotic on February 26.

He was seen again by a physician's assistant on March 18 as a result of another sick call
request about the problem.  The physician's assistant referred him to the doctor, but did not

-----

[12]  Detainee 2's ordeal is strikingly similar to the DOJ findings that correctional staff at
the WDC were frequently told by medical staff that the health unit was too busy and that
correctional staff could not send a detainee to the medical clinic, regardless of the detainee's
level of discomfort.  Attachment A at 13.

actually treat him and there is no indication that he saw a doctor as a result of that referral. Between March 18 and June 18 he did not see any health care providers about the problem despite three additional sick call requests describing his penile discharge.[13]  When he was finally seen, he was once again prescribed two antibiotics.  There are no medication administration records indicating that these antibiotics were actually received.

Detainee 4

After Detainee 4 filed a sick call slip on May 26, 2003 asking for assistance with chest and throat pain, he was seen by a nurse on June 2 and given Tylenol without examination of his chest or throat.  On June 4 he saw a physician's assistant who diagnosed bronchitis and prescribed an antibiotic.

Detainee 5

Detainee 5 was confined at BCDC from October 2002 through February 2003, with a second stay beginning on May 1, 2003.  He was unable to obtain the colostomy bags he needs for self-care for four days, so he used toilet paper to attempt to control excretion of fecal matter; the use of toilet paper led to a rash around his stoma (a surgically-created opening for excretion of fecal matter following bowel surgery).

While at the BCDC, he broke a metal rod in his arm.  Although the progress notes for June 3 indicate a plan to obtain an x-ray of the arm, there is no actual order for an x-ray in the file and no follow-up regarding the broken rod.  At the time of his interview on June 5, his arm was swollen and throbbing.  On June 27, there was an order for a wrist support, but no indication that the wrist support had been given to the patient.

---

[13]  His next sick call requests were dated April 11, May 8, and May 29.

Detainee 5 has a history of urethral stents.  On June 10 and June 13 he filed sick call request for complaints of blood in his urine and pain upon urination.  He did not see a nurse until June 19.  There is no record that he saw any other medical provider for these complaints until June 23, 2003, and no orders for laboratory testing of his urine in the record.

Detainee 6

Detainee 6 is HIV-positive.  Despite his request for treatment on June 19, 2003 there is no indication that any laboratory work had been done as of July 7 and his HIV status was not added to his problem list.  Although the progress notes for June 25 indicate a plan to prescribe antibiotics for acute sinusitis, there is no actual order for antibiotics and no record of any administration of antibiotics.

Detainee 6's medical records also include a number of complaints for a tooth abscess, but there are no indications that he ever saw a dentist.  One of his sick call requests, dated May 10, 2003, indicates that he had started an antibiotic prescription for the abscess one day prior to entering the jail on May 4, and that pus was coming from the tooth.  The nurse who saw him on May 14 gave him Tylenol, but did not note a referral.  The nurse also did not note a mouth examination, but simply recorded complaints of headache and toothache and signs and symptoms of a cold.  A physician counter-signed the order that day.

Detainee 7

Detainee 7 filed a sick call slip complaining of chest pain on March 22, 2003 and was not seen until March 28, when a nurse saw him without referring him to another practitioner.  On April 29, 2003 he put in another request for sick call for chest pain, nasal congestion, and stomach aches.

On May 5, 2003 he was listed as a no-show for medical attention, with no indication that staff

attempted to determine why he was not brought to the clinic for examination.

Detainee 8

Prior to admission on April 17, 2003, Detainee 8 had taken Lithium and Sinequan for bi-

polar disorder.  She told staff about her medication needs at screening, but was not referred to

mental health.  She put in a sick call slip, but did not receive psychotropic medication until after

she saw a psychiatrist and a prescription was written on May 12.  She finally received treatment

after complaints to a lawyer.

Detainee 9

Detainee 9 arrived at BCDC on May 13, 2003.  She had previously been taking anti-viral

medications for HIV infection.  She was told by staff that she would not be given any medications

until her blood work was completed.  Not until more than three weeks after she entered the BCDC

do her medical records contain a progress note indicating an intention to obtain her current

treatment records.[14]  There is also a progress note on June 25 that the laboratory tests ordered on

June 5 were not yet done.  There was another order for blood work on June 25, 2003, although that

order was not specific as to what laboratory work was ordered.  The laboratory report related to

that order was dated June 27, 2003, and it does not include the t-cell count, viral load or a lipid

---

[14]  The DOJ Report notes the following: "The treatment of HIV-positive individuals is
also of concern.  We noted records in which patients' medication was halted while the facility
awaited medical records or awaited approval of nonformulary medications.  Because of the risk
that patients may develop resistance to HIV drugs, lengthy interruption of medications is
especially problematic.  One HIV positive individual experienced seizures for the first time, but a
nurse never referred her to a higher level practitioner."  Attachment A at 16.

profile, all of which were ordered on June 5.[15]   Medical staff did not review the report until July 8,

2003.  There are no viral load studies in her medical record as of July 15, the date it was supplied

to Plaintiffs.  Without her HIV medications, Detainee 9 experienced night sweats, elevated

temperatures and headaches.

Detainee 9's medical records also indicate that a laboratory reported an abnormal Pap smear

on June 9, which was not reviewed by staff until June 27.  No action is noted in the file as a result

of the abnormal test result.

Prior to admission, she had also been diagnosed with bi-polar disorder and was receiving

psychotropic medications.  She was referred to a psychiatrist at the time of her entrance physical on

May 15, but that referral did not take place until June 30, despite a sick call request form in which

she reported that she had become paranoid and that she needed her medication.  She was

experiencing symptoms including crying spells, depression and insomnia.

Detainee 10

Detainee 10 came into the BCDC on March 25, 2003.  When he first arrived at the CBIC,

he complained of a cracked tooth that was very painful.  The next day he filed a sick call request.

On April 4, 2003, he saw a nurse who diagnosed a dental abscess, gave him a seven-day supply of

penicillin, and referred him to a dentist.  As of June 17, he still had not seen a dentist, although he

had long since finished the antibiotic and his tooth still throbbed.

---

[15]   Detainee 9 has been HIV-positive for eleven years and her most recent t-cell count
before incarceration was self-reported as 538.  Lipid tests are particularly important for HIV-
positive patients because anti-virals for HIV can have the side-effect of producing hyperlipidemia
and other metabolism problems.

Detainee 11

Detainee 11 came into the BCDC in July 2002.  He has a bullet in his back about two

inches from his spine.  He reported the bullet in his booking screening but it was not mentioned in

his intake physical.  On November 16, 2002 he filed a sick call request complaining of pain in his

back from the bullet.  He received no response to this request until December 6.  At that time, he

saw a nurse who referred him to a physician's assistant.

On December 16, he saw the physician's assistant, who wrote a request for a surgical

consult.  An x-ray report of February 13, 2003 confirmed that the bullet is next to a rib in his back.

After the x-ray, he filed several additional sick call requests continuing to complain about the

bullet, but the consistent response from staff was that he had been referred for a surgical consult.

As of May 14, 2003, he was still confined in the BCDC and, despite the passage of six months, the

surgical consultation had not taken place.

Detainee 12

After admission to BCDC on February 12, 2003, Detainee 12 experienced symptoms of

methadone withdrawal, including vomiting, diarrhea, and body aches.  He could not sleep and had

trouble eating.  While still in CBIC, he filed a sick call request asking to see a psychiatrist because

of feelings of depression.  Although a nurse told him that he would see a psychiatrist, he still had

not been seen by a psychiatrist when he was transferred to MDC.  He filed another sick call request

and two weeks later he filed a third request.  At the time of his interview in mid-May 2003, he still

had not seen a psychiatrist and he was still depressed, unable to sleep, and tired all the time.

Detainee 12's medical records indicate that on March 7, 2003 he was referred to mental

health services for evaluation but there are no subsequent documents indicating such an evaluation

in his records.  The medical records also indicate that he received one dose of clonidine to assist in withdrawal on February 19, 2003, although he entered the facility a week earlier.

Detainee 13

Detainee 13 was admitted to BCDC on or about October 5, 2003.  Her intake physical examination form indicates that she was feeling anxious and depressed, that she had a history of anxiety and depression, and that she needed a psychological consultation.  On October 11, 2003, she put in a sick call request stating  "Need to see the psychiatrist (URGENT) Fe[el] like I want to kill myself."   Approximately two days later, she was seen for a mental status evaluation, and referred to a psychiatrist with a request that the appointment be scheduled as soon as possible. Notwithstanding the referral, and several other sick call requests from Detainee 13, there is no indication that she was seen by a psychiatrist until early November, when she appeared paranoid and was diagnosed with a major depressive disorder.

Detainee 14

On November 9, 2002, Detainee 14 put in a sick call request indicating that he had a sexually transmitted disease and that he needed to be seen immediately for pain in his genitals.  He was not called for an appointment for eleven days, at which point he was marked as a "no-show" with no indication of why he was not brought to his appointment or any follow-up plan.  On November 26, Detainee 14 put in another sick call slip for genital pain, indicating that he was experiencing a burning sensation on urination.  He was then not seen for two weeks, at which point he was referred to a physician's assistant.  He did not see the physician's assistant until December 13.  He subsequently filed another sick call request indicating that the medications ordered by the

physician's assistant were not working.  The physician's assistant did not see the patient, but simply wrote that he had been evaluated and treated on December 13.

Detainee 15

Detainee 15 filed a sick call request on or about June 29, 2003 asking to see a psychiatrist for complaints of depression.  On July 11, when she had not been seen, she put in a second request.  She was finally seen by a nurse about a week later, at which time she reported that she had previously attempted suicide and had been referred to a psychiatrist at that time.  Detainee 15 was not evaluated by a psychiatrist until August 23.

Detainee 16

Although Detainee 16 spent three days in the infirmary for back pain, the x-ray that the doctor ordered on May 21 never took place.

Detainee 17

Detainee 17 complained on April 6 and April 9, 2003 of a painful boil on his hand.  He was not seen by a nurse until April 16 and did not receive any treatment until he was seen by a physician's assistant on April 21, when he received an antibiotic.

> 2.     The BCDC Fails to Comply with NCCHC Standard J-35, Sick Call.

While this standard overlaps substantially with Standard J-34, discussed above, it focuses on the specific requirement that sick call be conducted by a physician or other qualified health personnel and be available to each detainee.  The discussion by NCCHC in connection with this standard notes the following:

> Sick call provides inmates with an opportunity to have their
> requests evaluated by health personnel and responded to in a
> reasonable time.  While it is difficult to give precise time limits,

> as a rule, non-emergency requests should be triaged within 24 hours
> and the inmate seen by a qualified health care professional at sick
> call within the next 24 hours (72 on weekends); and, when
> necessary, a referral is made for the inmate to see a physician
> within a week of the original complaint.

Attachment B at 47-48 (emphasis omitted).  Defendants are failing to meet Standard

J-35 because sick call is not actually available to detainees within a reasonable period of time.

As noted above, the Department of Justice Report noted that detainees are waiting too long for sick

call:

> Sick call completion is also a large problem.  While triage logs
> reflected that those inmates seen in sick call were generally seen
> within 48 to 72 hours of their complaint, we also understood
> from both inmates and staff that many inmates with complaints
> were never seen in sick call, or that they waited excessively long
> periods of time.  Health care staff reported that some inmates on
> their scheduled sick call list were never brought to sick call, and
> that when they tried to contact correctional staff they were told that
> due to insufficient staff or other reasons the inmate would not be
> brought to sick call. Inmates reported having to put in more than
> one request to be seen, or to wait periods of up to one month to be
> seen by medical staff.  Correctional staff reported that inmates
> sometimes had to wait up to 10 days to be seen.  Thus, it appears
> that not all inmates with medical complaints are actually getting
> to sick call for treatment, and others must wait too long to be
> seen.

Attachment A at 12.  Numerous recent detainees confirm that these violations still exist.  Among

the detainees who were unable to use the sick call system to gain access to health care in a

reasonable time were the following: Detainee 4 (filed sick call slip for chest and throat pain; did

not receive treatment for nine days, at which point he was diagnosed with bronchitis and required

an antibiotic); Detainee 18 (filed sick call slip for leg pain and rash related to gunshot wound in

leg; not seen by nurse for about a week); Detainee 7 (filed sick call slip complaining of chest pain

and was not seen by a nurse until six days later); Detainee 8 (took several weeks from time sick call slip filed to time received psychotropic medications for her mental disorder); Detainee 3 (over three month delay from the time that he complained of a recurrent infection in his penis before he received treatment); Detainee 12 (was not seen by psychiatrist despite several sick call slips requesting medical attention for depression symptoms); Detainee 11 (requested medical care for several months until he finally saw a physician's assistant for pain resulting from bullet in his lower back) and Detainee 19 (a seven-months pregnant detainee filed a sick call request on September 1, 2003 complaining of "real bad" swelling of her hands and feet, which can be a symptom of a serious complication of pregnancy, but she was not seen until September when a nurse referred her to a scheduled obstetrical examination; the nurse did not record vital signs or other physical examination; when Detainee 19 complained again of hand swelling on September 23, she was not seen until October 14 when the nurse saw her and indicated that she would be admitted to the maternity ward; no examination or vital signs were recorded).

> 3.     The BCDC Fails to Comply with NCCHC Standard J-26, Pharmaceuticals.

This Standard requires pharmaceutical services that "are sufficient to meet the needs of the jail," including compliance with all applicable regulations; appropriate procurement, dispensation, distribution, accounting, administration and disposal of pharmaceuticals; maintenance of necessary records; automatic stop orders; and a method of notifying the practitioner of the impending expiration of a drug order. See Attachment B at 33-34. Again, the DOJ Report documents the failure to comply with this standard. Detainees who at the time of admission are taking psychotropic medications are at particular risk because they frequently do not receive their prescribed medications in a timely fashion. Indeed, a staff member estimated that 25% of the

detainees admitted to the Mental Health Unit of the MDC experienced problems due to the

discontinuation of medication at the time of detention.  Discontinuation of psychotropic

medications can have physiological effects as well as contribute to mental decompensation.  DOJ

Report at 17.  The DOJ Report notes parallel problems with the continuation of other medications:

> Finally, inmates who come in to the facility on medications
> experience serious delays in restarting those medications,
> including medications needed to control asthma, seizures, mental
> illness, HIV and blood clotting.  In the meantime, they may
> experience withdrawal symptoms and/or re-experience the
> symptoms of their illnesses.  The failure to provide medications
> in a timely manner is a serious deficiency in care at this facility.

Id. at 18.

Once again, the Plaintiffs' investigation has documented that Defendants' failures continue.

Among the detainees whose medications were interrupted or never provided are: Detainee 9 (anti-

viral medications for HIV were interrupted for over a month until she left the jail, with the result

that she experienced fevers, headaches and night sweats); Detainee 8 (delay of almost a month in

receipt of psychotropic medication); Detainee 3 (delay of months in obtaining antibiotic for

sexually transmitted disease); Detainee 20 (delay of months in prescription of a new medication for

mood disorder after allergic reaction to Prozac); Detainee 21 (interruption in hypertension

medication after detainee transferred from CBIC to MDC despite the fact that he was experiencing

methadone withdrawal and dangerously high blood pressure); Detainee 6 (unable to get asthma

pocket inhaler refilled); Detainee 22 (after a two-week delay in x-raying and casting her broken

arm, she was unable to receive pain medication for another week).

4.      The BCDC Fails to Comply with NCCHC Standard J-42, Continuity of
Care.

This Standard requires that actual practice evidence continuity of care from admission to

the jail through discharge from it, including referral to community resources when indicated.

Attachment B at 53.  At multiple points, the DOJ Report notes findings regarding the non-receipt

of ordered care.  For example, in some cases in which a nurse determined that a detainee needed to

be seen by another medical or mental health practitioner, the detainee did not receive the care

recommended.  Attachment A at 9.  Although by policy all detainees whose receiving screening is

positive are mandated to be screened by a nurse within an hour, in many cases that screening did

not take place.  The DOJ Report cites cases in which the failure to provide ordered care caused

harm, including a case in which a physician ordered re-evaluation of a detainee with asthma, but

the re-evaluation did not occur, and the detainee died of an acute asthma attack when his inhaler

failed to work because of overuse "due to lack of appropriate treatment and follow-up."  Id. at 15.

In another case, a woman committed suicide after a physician's order regarding suicide precautions

was not followed.  Id. at 19; see also id. at 13 (failure to follow up order regarding infected stab

wound).

Plaintiffs' investigation documented that these failures of continuity of care continue, as set

forth in the examples below.  Detainee 22 was arrested on June 10, 2003.  On the evening of June

19, 2003 she slipped and fell in the shower while using the bathroom.  She went to the medical

clinic, where a nurse examined her arm and sent her to a doctor.  The doctor ordered an x-ray on

Friday, June 20.  When she went to get an x-ray, staff told her that x-rays were only performed on

Tuesdays and Thursdays.  She was next called to x-ray on Thursday, July 3.  After the x-ray, her

arm was found to be broken and that evening she received a cast.  Even with the cast on, she was still in pain but she was denied pain medicine for her broken arm until July 11.

Detainee 23 came into the BCDC on July 20, 2003.  The physical examination form on July 22 noted that she was pregnant and had a history of an ectopic pregnancy.  The only treatment plan was a referral to an obstetrician; referral to a chronic care clinic is checked no.  Following an episode of vaginal bleeding, she reported that correctional officers refused to bring her to the medical clinic and she had to walk up several flights of steps to the medical clinic, assisted only by other detainees.  She was admitted to the infirmary from August 5 through 8.  There is no indication that an obstetrician saw her during the infirmary stay, or at any time during her jail stay prior to her admission to Mercy Hospital for a miscarriage on August 23.  Laboratory tests on August 11 indicated that she was anemic; the staff member who reviewed the report indicated that follow-up should occur in a chronic care clinic even though she was not enrolled in a chronic care clinic.

Similarly, the medical records for Detainee 5 show that the staff intended to obtain an x-ray of his arm to check on a broken metal rod, there is no actual order for an x-ray and no follow-up regarding the broken rod.  Although Detainee 1's medical record documents serious medical problems, including uncontrolled hypertension, heroin addiction, hyperglycemia and obesity, ordered blood work was not performed for months and there is no indication that an ordered EKG was ever performed.  A referral to a psychiatrist had not taken place for Detainee 9 for six weeks, despite the fact that she had become very paranoid and needed medications.  Detainee 10 was given antibiotics for a dental problem pending a dental referral, but never actually saw a dentist.

Detainee 11 was referred for surgery for a bullet near his spine but never seen by a surgeon despite more than six months in the BCDC after the referral.

     5.    The BCDC Fails to Comply with NCCHC Standard J-49, Special Needs Treatment Plans.

This Standard requires that patients with special needs, including the chronically ill, those with communicable diseases, frail elderly detainees and prisoners, the terminally ill, those with special mental health needs, and the developmentally disabled have written, individual treatment plans that include medication, diagnostic testing, the frequency of follow-up for medical evaluation, and adjustment of treatment modalities, among other things.  Attachment B at 63.

The DOJ Report notes that treatment for patients with chronic diseases at the BCDC "is not provided on a regularly occurring schedule, medications are frequently not ordered or delivered, recordkeeping is poor, and records do not show timely lab work or physician response to lab reports in some cases."  DOJ Report at 15.  The Report particularly singled out the failures to treat patients with asthma and HIV infection appropriately, noting two preventable deaths from asthma, and interruptions in medications for patients with HIV, which pose the threat of rendering the patient's medications ineffective through the development of resistance.  Id. at 15-16.

Plaintiffs' investigation again confirmed the results of the Department of Justice investigation.  Numerous detainees with chronic diseases who required treatment plans were denied appropriate treatment, including Detainee 19 (pregnant detainee given no treatment during heroin detoxification; was seen by an obstetrician a total of three times between July 11 and October 24 despite drug addiction during pregnancy, complaints of swelling in her hands and feet, and due date of November 14); Detainee 23 (delay in pregnancy examinations; experienced

miscarriage); Detainee 5 (unable to obtain necessary medical supplies for his colostomy needs);

Detainee 6 (no action taken in response to information that he was HIV-positive); Detainee 1

(months of delay in performing ordered blood work; ordered EKG never performed despite

uncontrolled hypertension); Detainee 9 (pursuant to policy, staff denied her a continuation of her

HIV medications pending completion of blood work; then staff delayed completion of blood work,

resulting in patient experiencing fevers and night sweats).

> 6.    The BCDC Fails to Comply with NCCHC Standard J-52, Intoxication and Withdrawal.

This Standard requires that detainees experiencing severe intoxication or withdrawal are

immediately transferred to a licensed acute facility.  It also requires that persons at risk for

progression to more severe levels of intoxication or withdrawal are kept under constant observation

by qualified health professionals or health-trained correctional officers.  See Attachment B at 67.

The DOJ Report notes the failures of Defendants to provide necessary services for those

undergoing withdrawal from use of alcohol or other drugs:

> Our review also revealed that inmates experiencing or with the
> potential to experience detoxification often do not receive the
> treatment or supervision necessary for safe withdrawal from drugs
> or alcohol.  We observed one inmate who had arrived at the
> facility at 5 a.m. and reported experiencing opiate withdrawal.
> At noon she was just seeing a triage nurse for the first time, and
> had not been provided any medical attention or treatment for
> withdrawal.  A large number of inmates reported to us that they
> experienced withdrawal from drugs or alcohol at the facility
> without any supportive measures, despite reporting symptoms
> to health care staff and requesting treatment.  Our conversations
> with health care staff confirmed that while they have stock
> medications available for treating drug withdrawal, they rarely
> use them.
>
> File review revealed many cases in which inmates who were

likely candidates for withdrawal did not receive sufficient
supervision.  For example, an inmate who was eight months
pregnant reported a history of daily heroin use.  While she
received a history and physical one day after arrival at the
facility, it took three more days for her to see an OB/GYN.
Heroin withdrawal in a pregnant woman can have quite
harmful results for a fetus, and it appeared that insufficient
attention was paid to this risk.

Attachment A at 10-11.

_____The failure of Defendants to provide medical care during drug withdrawal continues, as

illustrated by the cases of Detainee 1 (no treatment plan for monitoring drug withdrawal for

detainee with uncontrolled blood pressure);  Detainee 24 (not treated for heroin withdrawal; told by

correctional officer that withdrawal is not treated); Detainee 19 (given no treatment despite

pregnancy and fact that nursing screening noted that she had used heroin the day before entry into

BCDC); Detainee 25 (noted on her intake screening to be under the influence of drugs or alcohol;

on methadone maintenance with a history of seizure disorder and one month pregnant; not treated

for withdrawal until after she experienced seizure); Detainee 16 (although her nursing screening of

May 8, 2003 noted that she was enrolled in a methadone treatment program, she was not given a

treatment plan or other follow-up for drug withdrawal); Detainee 21 (although his entry nursing

screening and physical examination note that he was in methadone treatment when he came to the

BCDC and that he had a highly abnormal blood pressure of 155/111, there is no other blood

pressure recording in his record, let alone any evidence of the medical observation that he should

have received).

_____7.        The BCDC fails to comply with NCCHC Standard J-40, Dental Treatment.

This Standard requires, among other things, that dental services not be limited to extractions. See Attachment B at 51.  Not a single detainee interviewed by Plaintiffs, including many who had serious dental problems, had received any treatment other than an extraction, if the detainee was lucky enough to receive any treatment at all.  Indeed, although intake physicals frequently note that detainees have cavities, these notations do not result in dental referrals.  For example, the medical record for Detainee 12 noted "multiple missing teeth and multiple caries," in his physical examination but did not refer him to the dentist.  Examples of detainees who were denied necessary dental care include Detainee 6 (HIV-positive detainee with tooth abscess saw dentist two weeks after filing sick call request; received antibiotics but no other treatment); Detainee 2 (medical records indicate that she filed a sick call request for a broken tooth on January 9, 2003; she was seen on January 15, 2003 and given motrin; the tooth was not extracted until February 25, 2003; on March 29 she complained that she was unable to eat because of an erupting tooth; she was seen on April 3, 2003 and given Tylenol; on April 30 she asked that an infected tooth be pulled, complaining of persistent pain and a swollen face; she was scheduled for an appointment for June 3); Detainee 10 (was told during the booking process that he could not gain access to the dentist for a cracked and very painful tooth except by filing a sick call request; was given motrin and penicillin for tooth without seeing a dentist; referred to dentist in early April; had finished the antibiotics but not seen a dentist as of June 17, 2003).

## III.   DEFENDANTS HAVE FAILED TO COMPLY WITH THE CONSENT DECREE PROVISION REQUIRING INTAKE SCREENING OR WITH RELATED NCCHC STANDARDS

The Consent Decree, in §III.D.1 at page 11, requires that a classification intake interview of each detainee be carried out by qualified, trained, and properly supervised interviewers within 48

28

hours of the detainee's admission to the BCDC.  These interviews are to allow for the detection,

diagnosis, and treatment of detainees with special needs.[16]  Moreover, the NCCHC Standards

elucidate the requirements of the Consent Decree.  NCCHC Standard J-30 requires that a receiving

screening be performed by health-trained or qualified health care personnel on all detainees

immediately upon arrival at the jail system.  Health care information, including any history of

infectious disease; mental health problems; medications; dental problems; and drug use including

problems related to drug withdrawal, must be recorded on a standardized form.  When clinically

indicated, there must be an immediate referral to an appropriate health care service.  See

Attachment B at 41-42.[17]

The DOJ Report documents that neither the requirements of the Consent Decree nor the

requirements of the NCCHC Standard have been met:

> The screening and assessment process is insufficient to ensure
> that inmates receive necessary medical care in the first few days
> of their stay at the facility. . . .  The booking screen is intended to

---

[16]  As currently organized, the initial medical screening interview is by policy to be conducted at the CBIC.  Although the CBIC is administratively separate from the BCDC, if the CBIC were adequately performing its screening function in a manner consistent with the requirements of the Consent Decree, the BCDC's obligations under the Consent Decree would be satisfied.  For the reasons given in text, however, the CBIC is not fulfilling that screening function.  Notwithstanding those failures, the BCDC relies on the CBIC screening and does not re-screen detainees arriving from CBIC within 48 hours.  Accordingly, the BCDC is in violation of the Consent Decree, and the Court has the authority to require compliance with the Consent Decree, even if Defendants choose to satisfy the commands of the Consent Decree by providing the required services at another facility.  See Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1347 (1st Cir. 1991) ("And, as previously noted, the court may direct that outside facilities be used temporarily or permanently to house patients and/or to offer services not provided by the Hospital if this is the only way to ensure compliance at the Hospital itself with the stipulation").

[17]  The discussion section related to this Standard states that it is "extremely important for screeners to explore fully the inmate's suicide and alcohol or other drug (AOD) withdrawal potential."  Attachment B at 43.

> determine whether the inmate needs prompt medical attention,
> but the system fails to collect accurate information to guide
> future use.

Attachment A at 7-8.  Part of the failure to collect accurate information results from the failure of

some correctional officers to perform the screening correctly.  The DOJ Report notes observations

that some correctional officers fill in the answer on the computer screen before the detainee

answers, skip asking some questions altogether, and record answers contrary to what the detainee

says.  There is no confidentiality in the booking process, with the result that some detainees will

not answer the screening questions truthfully.  Moreover, in 65% of the cases, no booking

screening was even in the file, or the form was not correctly completed.  Id. at 8.

Exemplifying the inadequacies of the booking screening, the DOJ Report describes the

circumstances of a detainee who died after being in custody only 24 hours:

> His pretrial services information printout indicates that he had
> a ten-year daily heroin addiction and high blood pressure
> and his officer screening indicated that he was on medication
> for high blood pressure.  Despite this information available
> to the detention center, this inmate's medical record has no
> indication of contact with a health professional during his stay
> at the facility.  He died of cardiovascular disease, complicated
> by vomiting and diarrhea, which may have been the result of
> detoxification from drugs.  These and other records reveal that
> the booking screen process does not sufficiently identify those
> who need medical attention or observation, nor sufficiently
> trigger medical care when needed.

Id. at 9.

Although by policy all detainees whose receiving screening is positive are to be screened by

a nurse within an hour, in many cases that screening did not take place.  In addition, those

detainees whose answers were recorded incorrectly, who did not feel comfortable giving truthful

answers about medical conditions in a non-confidential setting,[18] or whose booking officers failed

to ask the proper questions might have to wait until the scheduled nursing screen,[19] three to seven

days later, in order to see a medical practitioner.  Id.

Plaintiffs' investigation has confirmed the findings of the DOJ Report.  Detainees with

chronic or acute health problems have been unable to obtain needed medical attention despite

reporting their condition during screening.  In many cases, the booking screening is absent from the

medical records, so there is no indication that the detainee received any medical screening for days,

let alone an immediate screening as required by the NCCHC Standard.  For example, Detainee 26

came into the CBIC on April 23, 2003 but did not have a receiving screening recorded until April

29.  Detainee 18 arrived on December 6, 2002 but had his first reported medical screening on

December 14.  At that screening, he reported his need for his hypertension medication; by that time

his blood pressure had reached 162/96.  Detainee 27 arrived at CBIC on October 11, 2002 but had

no recorded medical screening until October 17.  Detainee 28 arrived on March 3, 2003 but had no

recorded medical screening until March 22, 2003.

Even when detainees receive medical screening, that screening does not reliably result in

necessary medical care.  Detainee 26, one of the detainees whose medical record lacks a booking

screening, was in the midst of a prescription for antibiotics for gonorrhea when he was admitted.

Although this information was recorded at his first medical screening, nothing was done to provide

---

[18]  Detainee 6 did not tell staff at the initial medical screening that he was HIV-positive because he was concerned that he would be treated badly by jail staff and other detainees if his medical status were known.

[19]  In fact, many of the records lack nursing screens.  In the absence of a nursing screen, a detainee could go for two weeks or longer without medical evaluation.  Id. at 10.

him with antibiotics.  Although Detainee 1 told the booking officer about her heroin addiction, but she was not given appropriate treatment and experienced dangerously high blood pressure levels as well as vomiting, shakes, cold sweats, and diarrhea.  By the time she received medical attention, her blood pressure was dangerously high.  Detainee 9 reported during booking that she was HIV-positive, had bi-polar disorder and had received medications for both conditions.  More than a month later, she was still not receiving any anti-viral medications or medications for her bi-polar disorder.  Detainee 24 reported at the booking screen that she was prescribed medications for a psychiatric condition and had engaged in self-mutilation.  The next day, she had a physical examination in which she reported a history of paranoid schizophrenia, bi-polar disorder, and self-mutilation.  Until she saw a psychiatrist almost two weeks later and was diagnosed with mental disorders, she did not receive her psychotropic medications.  During that period, she reported hearing voices, seeing shadows, fearing people, and feeling suicidal.  Detainee 21 had a booking screening listing multiple medical problems including high blood pressure, yet he did not receive a nursing screen until six days later at which point his blood pressure was a dangerous 155/111.  Notwithstanding that blood pressure, the nurse checked that he should have routine medical processing.[20]

The failures of the screening process are mirrored in the failures to perform a full health assessment within fourteen days of arrival.[21]  Under NCCHC Standard J-33, this health assessment

---

[20]  The receiving screening form itself checks that "abnormal vital signs should be immediately referred for clinical evaluation."

[21]  By policy, men receive a history and physical at the CBIC but women and girls receive assessments at the WDC; boys receive these services at the MDC.  For the same reasons given in note 16, supra, the fact that the failures take place at the CBIC does not relieve the BCDC of the responsibility to provide the services for the men.

requires, among other things, a review of the receiving screening data and collection of additional

data to complete the medical, dental and mental health histories; tests to detect communicable

diseases; a physical examination including comments regarding mental status and dental screening;

a review of the findings and identification of problems by a physician; and initiation of therapy

where appropriate.  See Attachment B at 45.

The DOJ Report indicates that in fact these required physical examinations are sometimes

delayed for as long as 28 days.  Attachment A at 10.  Moreover, the DOJ Report noted the

following:

> In addition to delay, the history and physical procedures are also
> flawed in ways that can be dangerous for inmates. . . . Our chart
> review indicated that many records had histories with insufficient
> information recorded in the file.
>
> Interviews with medical staff revealed that in the Women's
> Detention Center, medical staffing is insufficient to perform
> complete histories and physicals with the care and time necessary
> for them to be completed properly.

Id.

Again, Plaintiffs' investigation substantiates the problems found by the Department of

Justice and demonstrates that these problems have not been addressed.  The detainees discussed

above, whose medical problems should have been addressed at the intake screening, were equally

unsuccessful in obtaining care through the subsequent nurse screening or the physical examination.

In addition, new failures of care occur at the point of the history and physical examination.  For

example, when Detainee 8 had her receiving screening on April 18, 2003, the screener reported

that she suffered from depression and was prescribed Sinequan.  On April 26, Detainee 8 wrote an

"urgent" sick call request noting her bi-polar condition and begged for immediate medication.  She

did not receive a prescription for Lithium until May 12, after complaints to a lawyer.  At the time

that prescription was ordered, she still had not even received a physical examination, which did not

take place until May 15 — almost exactly a month since she had entered the facility.

The physician's assistant who performed Detainee 12's physical examination noted that he

had last taken methadone on the date of entry into CBIC, and noted that he was undergoing opiate

withdrawal, but made no orders regarding medical observation of the withdrawal process, even

though Detainee 12 had a history of endocarditis.

Finally, on this point, the failure to provide appropriate medical assessment that culminates

in the initiation of appropriate therapy also violates NCCHC Standard J-39, which requires a

mental health evaluation by qualified mental health personnel within fourteen days of admission.

This evaluation must include, among other elements, a history of hospitalization and outpatient

treatment; current psychotropic medication; suicidal ideation and history of suicidal behavior;

alcohol and other drug use, special education placement, history of cerebral trauma or seizures; and

emotional response to incarceration.  See Attachment B at 50-51.  In fact, Defendants' approach to

mental health encourages detainees to conceal suicidal ideation.

> We were also concerned about the lack of sensitivity to mental
> health needs.  For example, an inmate indicated that he had
> thought about suicide in the past and might be feeling suicidal
> currently.  The nurse told the inmate, "If you say that, they will
> strip you naked, put you into a room and send you to mental
> health."  He then said he was not suicidal.  Such an approach
> could allow a suicidal inmate to be placed in the general
> population without proper mental health attention and precautions
> to protect him from self-harm.

Attachment A at 10.  Plaintiffs also confirmed this problem; Detainee 24 is a paranoid

schizophrenic who went through withdrawal from heroin while at the BCDC.  After about a week

34

of not getting her medications, she began to hear voices and see shadows, and she was afraid of everyone.  Significantly, she also reported that she attempted to hide her suicidal feelings because she feared being stripped of clothing and placed in a cold cell.

## IV.   DEFENDANTS HAVE FAILED TO COMPLY WITH THE PHYSICAL PLANT PROVISIONS OF THE CONSENT DECREE

Several overlapping provisions of the 1993 Consent Decree govern physical plant and sanitation issues at BCDC.  Section III.F.2 governs sanitation and provides that "hot and cold water, soap or cleaning substitutes, and appropriate facilities, shall be made available to inmates to keep themselves, their clothing, and their living space clean."  1993 Consent Decree at 14.  Section IV.A.3 similarly provides that "sanitation in the kitchen, food service, and designated eating areas shall be inspected and comply with"§ IV.B, the provision of the 1993 Consent Decree requiring compliance with NCCHC Standards.[22]  Similarly, § III.H.1 governs maintenance and requires Defendants to make reasonable efforts to maintain the sinks, toilets and showers; ventilation; and heating and hot water systems in good working order at all times.  Id. at 14-15.  Finally, § III.I provides that all detainees "are entitled to appropriate and adequate lighting, ventilation, water supply, bedding, clothing, toilet facilities and general hygiene."  Id. at 15.  To that end, BCDC must make all reasonable efforts to "provide inmates with sanitary toilet facilities, drinking water and showers, sinks and other facilities for cleaning themselves, their living space and their clothing, and an adequate supply of clean running water of proper temperatures. . . "  Despite these

---

[22]   In turn, the relevant NCCHC Standards are J-13, Environmental Health and Safety, which requires a "safe and sanitary jail environment," and J-14, Kitchen Sanitation and Food Handlers, which requires that areas used in food preparation and service be kept clean and sanitary.  See Attachment B at 17, 19.

requirements, both the DOJ Report and recent evidence collected from current and former detainees demonstrate that BCDC is an unsanitary and unhealthy environment.

### A.      BCDC Fails  to Provide Adequate Plumbing and Means of Personal Hygiene

The BCDC's failures to maintain proper plumbing are pervasive and pose a serious danger to detainees' health.  The DOJ Report documents the many problems, including that vacuum breakers, which are critical to proper sanitation because they prevent contaminated water from entering the potable water supply, are missing throughout the facility.  The DOJ Report also notes that broken toilets were observed throughout the facility; water in showers was either too hot or too cold for safety and hygiene purposes; and there were also broken sinks and non-functioning drains. Showers throughout were dirty and mildewed, and some units had insufficient numbers of showers and sinks.  Attachment A at 21.

The findings of the DOJ are corroborated by recent detainees.  Indeed, events this year at the WDC have demonstrated that the plumbing in this facility is on the verge of collapse.  The toilets in S dormitory at WDC have backed up repeatedly.  On one occasion in the Spring of 2003, a backed-up toilet caused the shower drain to clog.  The shower drain stank and was not fixed for four or five days.  Detainee 31.  In addition, there was a leak in a pipe in the hallway near S Dormitory, causing about half an inch of water to spread down the hallway for about fifteen feet. No sign was put up marking the dangers of a wet floor.  The problem was not fixed until another detainee fell and hurt her arm.

Dormitory A in WDC also flooded on June 24, 2003; when the detainees returned from the gymnasium, water covered the floor.  Detainee 1.  The ceiling in L Dormitory was leaking water and threatening to collapse.  Defendants' Weekly Status Report for September 3, 2003 notes in its

cover letter that the sewage system in WDC Dormitories A, B, C, and D flooded from August 30

through September 1, 2003.  Women held in the affected dormitories tried to use bed sheets and

trash cans to clean up the sewage-contaminated water.  The leak persisted long enough that a

portion of the ceiling collapsed, causing more sewage in the dormitory and overwhelming the

detainees with the stench.  A few weeks ago, the ceiling collapsed outside C dormitory.  Detainee

40.  As reported by staff during the Court's inspection of the WDC on December 5, 2003, two days

earlier another sewage problem had required the overnight evacuation of two dormitories.

 Conditions are little better in the MDC.  For example, after Detainee 7's toilet clogged in

March 2003, he had to wait four days for it to be fixed.  By the time it was fixed, there were gnats

around the toilet and the toilet smelled of defecation.  During this time, he was fed in his cell, in

close proximity to the broken toilet.  The sinks in MDC also frequently clog, with the result that

detainees have no ability to wash their hands.  For detainees such as 29, 5 and 30, who must eat

and use the toilet in their cells, this condition produces an unhealthy and disgusting environment.

The showers can also be unsafe or unsanitary.[23]

The failure to provide adequate water and plumbing supplies is directly related to yet

another violation of the 1993 Consent Decree, the failure to assure that detainees have appropriate

laundry facilities.  As the DOJ observed, many detainees wash their clothes in toilets in their cells

because "they do not have time to wash their clothes in a utility sink and also shower and take care

of other needs during their very limited out-of-cell time."  Attachment A at 22.  The laundry is not

---

[23]  Detainee 26 experienced a scalding hot shower.

done on a reliable schedule (Detainee 31, Detainee 32, and Detainee 33) and that the linens came

back from the laundry with stains and are obviously contaminated.[24]   Detainee 27; Detainee 9.

For personal clothing, the detainees have no meaningful alternative to handwashing their

laundry in sinks, showers and toilets.  Detainees washed their clothing in whatever was available,

including sinks,[25] toilets,[26] showers,[27] plastic-lined garbage cans,[28] and plastic bags.[29]  Detainees are

also threatened with discipline and with losing their property if they attempt to dry their clothing.

Detainee 34 and Detainee 9.

B.     **BCDC Has Unsanitary Food Preparation and Service**

The lack of sanitation in food preparation and service also puts the health of detainees at

risk.  The DOJ Report notes that the "food service operation at BCDC does not meet sanitation

standards and puts residents at risk of developing food borne illness."  Attachment A at 20.  It

further notes that food was being improperly stored, such as placement of trays of food placed on

top of garbage.  There were numerous examples of food stored at unsafe temperatures, which could

lead to bacterial growth.  The floors and walls of the MDC are not properly sealed, allowing insects

---

[24]  BCDC has experienced a number of cases of staphylococcal infections.  These infections occur when a break in the skin allows the bacteria to enter the body.  Staphylococcal bacteria can spread from person to person by direct contact and by contact with contaminated clothing and linens.

[25] Detainee 5 and Detainee 34.

[26]  Detainee 32, Detainee 29, Detainee 5, and Detainee 30.

[27]  Detainee 5, Detainee 35, Detainee 9 and Detainee 33.

[28]  Detainee 33.

[29]  Detainee 9.

and cockroaches to enter.  There was evidence of cockroaches and rodents throughout the MDC

kitchen, including live roaches in the dishwashing equipment.  Food utensils, trays and food

preparation equipment are not always sanitized as required and some dishwashers do not reach

proper temperatures for sanitation.  Id. at 20-21.

Again, the findings of the DOJ are corroborated by the detainees.  The detainees are

continually exposed to unsanitary and often disgusting conditions.  For example, Detainee 36 has

seen insects on her cellmate's food tray and rodent droppings on other detainees' food trays.

Detainee 37 observed food trays left on the floor of his cell while he and other detainees were at

recreation, even though mice came and went through the vents into the cells.  Detainee 30 was

given a fish patty to eat that was still frozen and uncooked.  Detainee 28, while he worked in the

kitchen, saw mice, black gnats, and other insects including cockroaches; he saw baked chicken

come out of the oven with what he recognized as mice feces on top and baked into it.[30]  Detainee 2

worked with the food trays and saw cockroaches on food trays almost every day; after a cockroach

was crawling around on a food tray, an officer told her just to knock it off.  Detainee 38 bit into an

insect in his food, which made him choke.  Also, on several occasions, he has found hair in his

food.  Detainee 1 observed in mid-June 2003 that all the dinner food trays had to be taken back

because of a problem with rodents.  Detainee 9, a former kitchen worker, saw cockroaches and rats

on the food but was still required to serve the food.

### C.      BCDC Has Rodent and Insect Infestation

Indeed, rodents, insects and other vermin are another common and well-documented

problem at the BCDC.  According to the DOJ Report, there was "evidence of roaches and rodents

---

[30]  The chicken was not served.

throughout the kitchen in the Men's Detention Center, including live roaches in the dishwashing equipment." Attachment A at 20. Similarly, DOJ investigators "found roach droppings, spiders and gnats in residence areas throughout the facility" and reported that many parts of BCDC were not treated for rodents. Id. at 20-21.

Many recent detainees also reported encounters with spiders, rodents and gnats, and some detainees have been bitten by vermin. For example, Detainee 2 experienced an infection caused by an insect crawling into her ear. The pus-filled infection eventually had to be lanced. Other detainees, such as Detainee 36, have reported itching from the bites of black gnats. Detainee 6 reported that the gnats were heaviest in the blankets and that the bites sometimes bleed.

The need for control of vermin is particularly acute because many detainees, particularly the men, must eat in their cells with no separation between the toilet and where they eat, providing a source of food for vermin and facilitating the spread of disease. Other detainees have frequently noted the severe infestations of rodents and other vermin, including Detainee 35 (has seen insects and mice in his bed and a mouse in his cellmate's shoe; cockroaches are continually in his cell); Detainee 30 (has observed mice on the tiers and roaches and flies in the showers); Detainee 1 (a few days prior to her interview, killed a mouse in her shoe); Detainee 9 (has seen insects on food and cockroaches on food trays; when she worked in the kitchen saw roaches and rodents in food); Detainee 39 (saw mice in his cell frequently and could hear mice in the cell at night); Detainee 33 (saw mice three or four times a day); Detainee 41 (there were many mice in his dormitory; he personally killed two mice in the dormitory); Detainee 29 (frequently observed mice in his cell at the MDC); Detainee 34 (saw mice and cockroaches every day); Detainee 27 (dead mice in the walls of the dining room caused smell; saw both mice and cockroaches at MDC); Detainee 37 (has

complained to staff regarding bug bites and mice who come and go in the vents; detainees are not allowed to block the vents at the bottom of the cell door, even though food trays are left on the floor when trays are delivered while the unit is at recreation).

### D.  BCDC Fails to Provide Ventilation and Lighting

The BCDC lacks proper ventilation to prevent disease transmission and control odor; some areas have no ventilation, and the ventilation problems interact with the heating system as well as other conditions at the facility to produce unhealthy conditions.  Attachment A at 21.  The ventilation deficiencies violate § III.I.1 of the Consent Decree, requiring appropriate and adequate ventilation.

Defendants' own reports substantiate the critical deficiencies in ventilation at the WDC, noting that the original building was poorly designed and does not meet modern building standards; problems in the original design and non-functional exhaust systems contribute to excessive heat build-up within the facility; building automatic temperature controls may be malfunctioning; a lack of maintenance has contributed to the state of disrepair; dirty and clogged air devices were present throughout; and some areas designed for air-conditioning were not being cooled, because of a non-functional compressor and poor original design.  Preliminary HVAC Analysis, Women's Detention Center, Sept. 9, 2002.

Indeed, the facility was so poorly designed that even after air conditioners were added to a number of dormitories, these nominally air-conditioned dormitories continued to experience heat-alert level temperatures, including a reading of over 97 degrees with a relative humidity of 41%.  Defs.' Weekly Status Report, July 11, 2003.  Although Defendants to their credit have requested funds to air-condition the WDC, this project will at best not begin until the summer of 2004, so it

is likely that heat alert level temperatures will continue to place women at unreasonable risk of heat injury for at least part of the summer.

Adequate lighting is also lacking in the facility.  Attachment A at 21.  The failure to provide proper lighting violates §III.I.1 of the Consent Decree, requiring proper lighting.  The BCDC also poses a safety threat because of exposed wires, frayed power cords and other electrical shock hazards.  Attachment A at 21.  This condition violates the requirement of § III.F.1 that the facility comply with the state building code regarding electric hazards.

## V.    <u>CONCLUSION</u>

The appalling circumstances set forth above indicate that Defendants are not in compliance with the 1993 Consent Decree.  Plaintiffs accordingly request that the Court restore this case to the active docket to the extent necessary for enforcement of the indicated provisions of the 1993 Consent Decree.  Plaintiffs further request that the Court establish an appropriate schedule for discovery and the designation of issues for a hearing on compliance and enforcement.

Respectfully submitted,

_____
Frank Dunbaugh
744 Holly Drive North
Annapolis, Maryland 21401
410-974-0555
410-757-2921 (fax)

_____
Elizabeth Alexander
National Prison Project of the ACLU
733 15th Street, N.W., Suite 620
Washington, D.C.

202-393-4930
202-393-4931 (fax)

_____

Wendy Hess
Public Justice Center
500 E. Lexington St.
Baltimore, MD 21202
410-625-9409
410-625-9423 (fax)

_____

Deborah Jeon
American Civil Liberties Union Foundation
Meadow Mill at Woodberry
3600 Clipper Mill Road, Suite 350
Baltimore, Maryland 21211
410-889-8555
410-366-7838 (fax)

Dated: December 18, 2003

_____

_____