IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME DUVALL, *et al.*,

    *Plaintiffs*,

    v.

    Civil Action No. ELH-94-2541

MARTIN O'MALLEY,
Governor of Maryland, *et al.*,

    *Defendants*.

**MEMORANDUM OPINION**

The Court must resolve a motion for attorney's fees that arises from an extraordinarily long-running class action filed by detainees at the Baltimore City Detention Center ("BCDC"), challenging the conditions of confinement in that institution. The present civil action is a consolidation of two actions that began in 1971, *see Collins v. Schoonfield*, Civ. No. K-71-500 (D. Md.), and in 1976, *see Duvall v. Lee*, Civ. No. K-76-1255 (D. Md.). The plaintiffs in the present action are "that class of persons . . . who are now or who will in the future be confined to the Baltimore City Detention Center." ECF 423-2 at 4–5. The current defendants are "the persons holding the following Maryland state offices: Governor, Secretary of Public Safety and Correctional Services, Commissioner of Pretrial Detention and Services, Commissioner of Corrections, and the Warden of the Detention Center." *Id.* at 5.[1]

The protracted litigation has a tortured procedural history. At several stages of the litigation, the parties entered into consent decrees, consent orders, and court-approved settlement agreements resolving various aspects of the case. These include a 1978 Consent Decree (ECF

---

[1] Earlier in the litigation, several officials of the City of Baltimore were also defendants.

423-1); a 1993 Consolidated Consent Decree (sometimes referred to as the "1993 Decree"), dated July 9, 1993 (ECF 423-2);[2] a 2002 Consent Order (ECF 423-3); a 2009 Partial Settlement Agreement ("PSA," ECF 374-1), approved by Order dated April 6, 2010 (ECF 394); and a 2012 Partial Settlement Agreement Amendment ("PSA Amendment," ECF 447-1, approved by Order dated May 9, 2012 (ECF 465). These decrees, orders, and agreements provided for continuing monitoring by plaintiffs and the Court with respect to certain aspects of the operation of BCDC and the conditions of confinement at the facility.

The case was initially assigned to the late Judge Frank A. Kaufman. Judge J. Frederick Motz presided over the litigation from 1993 until July 2011, when the case was reassigned to me. *See* ECF 419.[3]

All of the pending substantive matters have been settled by the parties. The only issue that is now the subject of contested litigation is plaintiffs' motion under Fed. R. Civ. P. 54(d)(2) for an award of attorney's fees for their work "in defense of the [1993] Consolidated Consent Decree," spanning from December 2003 through the 2012 PSA Amendment. ECF 467-1 at 1-2. The Court granted plaintiffs' unopposed motion to bifurcate the issue of whether defendants are liable for plaintiffs' attorney's fees from the issue of the amount of an award, if any. *See* ECF 466, ECF 468. Now pending is plaintiffs' "Motion for Determination that Defendants are Liable for Plaintiffs' Attorneys' Fees" ("Motion") (ECF 467).[4] The Motion has been fully briefed,[5] and

---

[2] Plaintiffs refer to the 1993 Decree as the "Revised Consent Decree." *See, e.g.*, ECF 467-1 at 1.

[3] At the time, it seemed as if I had begun to read a very long book by starting with the last chapter.

[4] The Motion was previously resolved. Although the case had been reassigned to me in July 2011, Judge Motz agreed to resolve the attorneys' fees issue due to his familiarity with the

no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will

deny the Motion.

**Factual Background**

The factual background of this litigation was summarized as of 1993 by Judge Kaufman

in the 1993 Consolidated Consent Decree. He wrote, ECF 423-2 at 1–4 (underlines in original,

italics added for emphasis):

> This is a consolidation of two separate class action suits initiated by inmates involving the conditions of confinement at the Baltimore City Jail, now known as the Baltimore City Detention Center. The first suit, <u>Collins v. Schoonfield</u>, Civil No. 71-500-K, was filed in 1971 and related to the conditions of confinement in the Jail. On May 15, 1972, the Court issued an opinion, reported at 344 F. Supp. 257 (D. Md. 1972), finding that many of the conditions shown at trial involved violations of the inmates' constitutionally protected rights. Interim Decree I was entered on July 27, 1972, setting forth specific standards of confinement with respect to various areas of Jail administration. The standards with respect to the delivery of medical services were covered in Interim Decree II entered on December 13, 1972.

> The second suit, originally captioned <u>Duvall v. Lee</u>, Civil No. K-76-1255, was filed in 1976 and related to overcrowding and its effect on the conditions of confinement in the Jail. The <u>Duvall</u> case first resulted in a "Partial Agreement Among the Parties", approved by the Court on November 23, 1977, which was a short term plan for the immediate reduction of the Jail's population. Subsequently, the parties entered into Consent Agreement II, which was approved by the Court and adopted as its decree on July 13, 1978. [Consent Agreement II set forth various standards relating to inmate housing].

---

history of the litigation. To that end, he issued a Memorandum and Order denying the Motion on December 10, 2012 (ECF 487 & 488). Thereafter, Judge Motz recalled that the case had been reassigned to me after he recused himself due to "the possible involvement of [Judge Motz's] daughter in participating in decisions about improvements made at the Baltimore City Detention Center." ECF 491 at 1. Accordingly, Judge Motz vacated his ruling on the Motion. *See* ECF 495. I have considered the Motion *de novo*, without deference to Judge Motz's vacated ruling.

[5] Defendants filed an Opposition ("Opp.," ECF 471), and plaintiffs filed a Reply (ECF 474). With leave of court, *see* ECF 476, defendants also filed a Surreply (ECF 477). *See also* ECF 475-2.

After the City moved for modifications, the provisions of the decrees in the two cases, with same changes, were combined into a single Consolidated Decree which was entered by the Court with the consent of the parties on April 24, 1981.  In 1984, some new changes in the decree were made by consent. . . . Most importantly, these changes permitted limited double-celling in the Male Detention Center and set a separate capacity limit for each housing section in the Jail, including all sections not covered by the 1981 decree.  In addition, a number of suits by individual inmates were consolidated with the class actions.

[Additional modifications were made over the next several years].

The parties agreed to a revised decree in 1988 which was intended as a replacement for the 1984 decree and was designed to reorganize and simplify the decree's provisions and to bring all previous decrees and agreements together into one document.

On July 1, 1991, the State, pursuant to House Bill No. 1059, 1991 Laws of Md. Ch. 59, created the Division of Pre-Trial Detention and Services and assumed the control, regulation and administration of the Baltimore City Jail under the name The Baltimore City Detention Center.  *The revisions set forth in this 1993 Decree incorporate the modifications requested by the State in recognition of the State's assumption from Baltimore City for the day to day operation and administration of the Baltimore City Detention Center.*

The 1993 Consolidated Consent Decree lists as its purpose to "eliminate and to prevent overcrowding the Detention Center and to ensure that the inmates are not subjected to living conditions, the totality of which can reasonably be expected to violate the standards of human decency required by the Eighth Amendment or by any other provision of the Constitution of the United States."  *Id.* at 7.  Judge Kaufman also stated, *id.*:

[T]his Court is specifically not ruling that each of the provisions of this Decree is per se required by the Constitution of the United States.  Thus, while many of the provisions of this Decree are identical with, or modify provisions included in previous decrees appropriately entered by this Court in the *Collins* and *Duvall* cases, it is noted that the Plaintiffs may not be entitled, as a matter of law, to obtain the precise relief embodied in each of the Decree's provisions.

Furthermore, it should be noted that, while the Defendants have agreed to the entry of this Decree, they do not admit to violating any constitutional or other rule, standard, or law.

Following the entry of the 1993 Decree, litigation remained relatively dormant until after the passage in 1996 of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.  The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits," *Porter v. Nussle*, 534 U.S. 516, 524 (2002), and "to oust the federal judiciary from day-to-day prison management." *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997); *see* 141 Cong. Rec. S. 14316–17 (daily ed. Sept. 26, 1995) (statement of Sen. Abraham) ("No longer, then, will we have consent decrees . . . under which judges control the prisons literally for decades.").  As to this latter goal, the PLRA includes a provision allowing a defendant to obtain relief from pre-existing consent decrees that failed to meet the new standards of the PLRA.  In particular, the PLRA entitles a defendant to "the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(b)(2).

In October 1997, in accordance with this provision, the defendants moved to terminate the 1993 Decree.  ECF 56.  Pursuant to 18 U.S.C. § 3626(e)(2), Judge Motz entered a stay of the 1993 Decree while the motion to terminate was pending.  ECF 60.  However, Judge Motz never ruled on the motion to terminate.  Rather, in January 1999, after briefing by both parties, Judge Motz administratively "terminated" the motion to terminate, subject to its being reopened on request, and administratively closed the case, subject to its being reopened at the request of any party at any time.  ECF 74.  The stay remained in effect indefinitely.

The most recent phase of the litigation began in December 2003, when plaintiffs filed a "Motion to Restore the Medical and Physical Plant Provisions of the [1993 Consolidated] Consent Decree to the Active Docket and to Schedule Appropriate Further Proceedings" (ECF 128), along with a memorandum in support (ECF 129) (collectively, "Motion to Restore").[6] The Motion to Restore described "dangerous conditions" at BCDC and averred that the conditions "violate the Consent Decree previously entered in this case." ECF 129 at 1. Plaintiffs asked the Court to "reopen this matter to enforce those provisions of the decree with which Defendants are in non-compliance." *Id.* In particular, as the title of the Motion to Restore suggested, plaintiffs sought "to enforce the medical and physical plant provisions of the 1993 Consent Decree, including the intake provision and the provision requiring that certain health care standards be maintained in the BCDC. Plaintiffs further [sought] to enforce the provisions related to sanitation and facility maintenance." *Id.* at 2 (citations omitted).

Defendants opposed the Motion to Restore, arguing that the reopening of the case should be governed by the same standards as a motion to terminate under the PLRA, as the effect was the same: continuation by a federal court of prospective relief in a state prison conditions of confinement case. *See* ECF 135 at 1–2. And, defendants averred that the plaintiffs "do not allege, nor can they establish, that the relief sought meets this strict standard." *Id.* at 2. After

_____

[6] On August 16, 2002, the plaintiffs filed an emergency motion seeking to reopen the case and also seeking injunctive relief, including a temporary restraining order, with regard to the risk of heat injury for those confined at the Women's Detention Center ("WDC"), a facility that is part of the BCDC. This Court granted the requested temporary restraining order that day, and the parties subsequently entered into a Consent Order approved by the Court. The State paid plaintiffs' attorney's fees incurred in the dispute. *See* Surreply at 6 n.1. The issues currently before the Court are independent of those resolved in 2002.

plaintiffs filed a reply brief, ECF 142, Judge Motz advised the parties that "the issue would best be framed by the defendants filing [a] renewed motion to terminate." *See* ECF 148.

Soon thereafter, in April 2004, defendants filed a "Renewed Motion to Terminate [the 1993 Consolidated] Consent Decree" ("Motion to Terminate," ECF 148). In their Motion to Terminate, defendants argued that "current conditions at BCDC are constitutional," ECF 148 at 8, and that the 1993 Decree does not satisfy the standards established by the PLRA for the continuation of prospective relief. *Id.* at 20–38. The Motion to Terminate was fully briefed and was argued to Judge Motz in August 2004. On August 30, 2004, Judge Motz issued an Order (ECF 196) granting plaintiffs' Motion to Restore and holding in abeyance defendants' Motion to Terminate.[7] Judge Motz later explained that this course of action was intended to allow plaintiffs to build an evidentiary record through discovery that would allow the Court to determine whether to terminate the 1993 Decree. *See* ECF 217.

A lengthy period of discovery and settlement negotiations ensued. In August 2009, the parties achieved the PSA, *see* ECF 374, resolving "all the areas in dispute with the exception of the method of protecting from heat injury detainees with high security or high-medium security classifications." ECF 374-1 ¶ 5. Pursuant to the class action settlement approval requirements of Fed. R. Civ. P. 23(e), the Court approved the PSA on April 6, 2010. *See* ECF 394. In July 2011, while the parties continued to negotiate in an attempt to resolve the remaining heat injury issue, Judge Motz disqualified himself from the case and it was reassigned to me. *See* ECF 419.

---

[7] Judge Motz initially denied defendants' motion, without prejudice, but later granted a "Motion for Consideration of Rule 60(b) Relief" (ECF 205), on the ground that denying the motion without prejudice had been a "technical error." ECF 217. Instead, he held the Motion to Terminate Consent Decree in abeyance. ECF 230.

On May 9, 2012, I approved the parties' PSA Amendment, which resolved the heat injury issue. ECF 465.

Plaintiffs now seek attorney's fees for "their activities in defense of the [1993 Decree]," including "their Motion to Reopen in December 2003 and their Opposition to Defendants' Renewed Motion for Termination in 2004, as well as their time negotiating the PSA and PSA Amendment on behalf of the class." Memo at 1–2. Claiming that they are the "prevailing parties" and are entitled to reasonable fees and costs, plaintiffs predicate their Motion on the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, and the Prison Litigation Reform Act, 42 U.S.C. § 1997e. According to plaintiffs, most of the remedial provisions in the PSA and PSA Amendment "have antecedents in the findings of unconstitutionality in the *Collins* litigation decree and in the *Duvall* Order." ECF 467-1 at 9. They assert that they obtained the status of "prevailing party" through the *Collins* and *Duvall* decisions and subsequent interim decrees, and that the status continued in the 1993 Decree "by virtue of its adoption by the Court." ECF 467-1 at 14.

Defendants counter that any findings of violations of law applied to officials of the City of Baltimore, and occurred more than a decade before July 1991. At that time, the State, pursuant to legislation, assumed control of the Baltimore City Jail, and the institution in issue became the Baltimore City Detention Center. Opp. at 9. Thus, the defendants claim, *inter alia*, that the State is not responsible for any violations of law committed by the City. *Id*. In addition, they contend that the 1993 Decree superseded all prior judgments in the case, *see* Surreply at 1–2, and that plaintiffs are not prevailing parties for purposes of their fee petition. Opp. at 19.

Additional facts are included in the Discussion.

## Discussion

### I.

"As a general matter, a litigant must pay its own attorneys' fees in the absence of a statutory or enforceable contractual provision allowing fees to be awarded to a prevailing party." *EEOC v. Propak Logistics, Inc.*, ____ F.3d ____, No. 13-1687, slip op. at 10 (4th Cir. Mar. 25, 2014). Congress has enacted two statutes that govern entitlement to attorney's fees in prison civil rights litigation. The first, the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988(b), is a general statute applicable to most civil rights litigation in federal court. The second, the PLRA, 42 U.S.C. § 1997e(d), limits the availability of § 1988 fees in prison civil rights litigation.

### A.

Title 42 U.S.C. § 1988, provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." *See generally Hensley v. Eckerhart*, 461 U.S. 424, 426 (1983). The term "prevailing party" is a statutory term of art. In order to be a "prevailing party," a plaintiff must achieve a "material alteration of the legal relationship of the parties" and there must be "judicial *imprimatur* on the change." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 604–05 (2001); *see Grissom v. The Mills Corp.*, 549 F.3d 313, 318 (4th Cir. 2008).

The requirement that the change in the parties' legal relationship be judicially sanctioned protects against "an award of attorney's fees when the merits of the plaintiff's case remain unresolved—when, for all one knows, the defendant only abandoned the fray because the cost of litigation—either financial or in terms of public relations—would be too great." *Buckhannon*,

532 U.S. at 617 (Scalia, J., concurring). Applying this rule, the *Buckhannon* Court held that the plaintiff was not entitled to attorney's fees when the state legislature enacted two bills that mooted his claims. *Id.* at 609. Likewise, the *Buckhannon* Court noted that private settlements generally do not entitle a plaintiff to attorney's fees because they lack "the judicial approval and oversight involved in consent decrees." *Id.* at 604 n.7; *see Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 279 (4th Cir. 2002).

Courts have interpreted the "prevailing party" requirement of 42 U.S.C. § 1988 to allow the collection of fees for "post-judgment monitoring of a consent decree," even though the monitoring itself typically does not result in subsequent judicial relief. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986); *see Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 622 (6th Cir. 2013); *Balla v. Idaho*, 677 F.3d 910, 917 (9th Cir. 2012). Similarly—and of critical importance here—the Fourth Circuit established in *Plyler v. Evatt*, 902 F.2d 273 (4th Cir. 1990), that a plaintiff is entitled to attorney's fees for certain types of post-decree litigation seeking to "preserve [the] fruits" of a prior consent decree, even if the plaintiff is ultimately unsuccessful in the post-decree litigation.

*Plyler*, like the case *sub judice*, arose out of prisoner civil rights litigation. In 1982, South Carolina inmates brought a class action against the South Carolina Department of Corrections ("SCDC"), complaining of overcrowded conditions in South Carolina prisons. *Id.* at 276. In 1986, the court issued a consent decree, "outlining comprehensive reforms of South Carolina's prison system, to take effect in stages over the following five years." *Id.* But, just one year after the consent decree was entered, the SCDC moved for a permanent modification of the consent decree to allow "'double-celling' of inmates at some new prison facilities, in

violation of express terms of the decree." *Id.* The SCDC ultimately prevailed, obtaining the requested modification. *Id.*[8] Thereafter, the plaintiffs filed a motion for attorney's fees—both for the work expended in connection with the original consent decree and for the work expended in unsuccessfully resisting the modification. The district court awarded attorney's fees to plaintiffs for both aspects of the litigation. The defendants appealed from the order awarding attorney's fees, specifically challenging the award of fees for work in the post-decree litigation. *Id.* at 276–77.

The Fourth Circuit affirmed the award of attorney's fees for the post-decree litigation. It reasoned that the plaintiffs' work in resisting the modification "was directed toward the protection of rights originally and unambiguously vindicated in the consent decree." *Id.* at 280. Thus, *Plyler* appeared to establish the rule that when a plaintiff engages in subsequent litigation to "preserve [the] fruits" of a prior consent decree, he may also collect attorney's fees for that post-decree litigation, even if he did not "prevail" in the post-decree litigation.[9] The court concluded that the district court did not err in ruling that the matters at issue in the post-decree litigation "were so intertwined with the original claims that attorneys' fees for work on those proceedings should be awarded as to a still 'prevailing party.'" *Id.*

Four years later, the Fourth Circuit decided *Arvinger v. Mayor & City Council of Baltimore*, 31 F.3d 196 (4th Cir. 1994), which circumscribed the reach of *Plyler*. In *Arvinger*,

---

[8] The district court denied the modification, but the Fourth Circuit reversed, reasoning that "[a]lthough double-celling will be contrary to a specific term of the consent decree, the prisoners have received the essence of their bargain" because all other terms of the decree had been met, and, more significantly, "the general conditions of confinement now not only meet, but exceed constitutional requirements." *Plyler v. Evatt*, 846 F.2d 208, 212–13 (4th Cir. 1988).

[9] The *Plyler* Court also noted as relevant that the plaintiff class "had no option but to incur the related costs; plaintiffs' counsel were under clear obligation to make the defensive effort." *Id.* at 281.

the plaintiff alleged that the City of Baltimore breached a settlement agreement that had resolved a prior civil rights suit arising from the plaintiff's termination from employment. *Id*. at 197–199. In the initial civil rights action, the plaintiff obtained reinstatement, back pay, and attorney's fees. *Id*. at 200. The second suit was initiated to enforce the agreement obtained in the first action. *Id*. Following trial, the district court ruled in favor of the City. *Id*. at 199. Despite the plaintiff's loss in the second round of litigation, the plaintiff filed a motion for attorney's fees. Relying on *Plyler*, the plaintiff argued that, because he was the "prevailing party" in the initial suit, he was entitled to attorney's fees for his efforts to "preserve the fruits" of the settlement agreement. *Id.* at 199–200.[10] The district court agreed and awarded attorney's fees, but the Fourth Circuit reversed.

The Fourth Circuit considered whether the plaintiff was a prevailing party even though "he obtained no relief from the court through a judgment, consent decree, or settlement." *Id*. at 200. In the Fourth Circuit's view, the plaintiff's second suit was "based on new facts that arose following [the subject matter of the initial suit], and it is based on different legal theories, essentially arising from alleged violations of the settlement agreement." *Id.* (citing *Willie M. v. Hunt*, 732 F.2d 383 (4th Cir. 1984)). Whereas the subsequent litigation in *Plyler* "revisited the merits of the first, applying the same substantive standards of the Eighth Amendment that were applied in the first," the subsequent litigation in *Arvinger* was based on "operative facts and legal theories [that] were distinctly different" than the initial civil rights suit. *Id.* at 202. The *Arvinger* Court set forth the following standard, *id.*:

_____

[10] All parties agreed that the plaintiff was the prevailing party in the initial civil rights action. *See Arvinger*, 31 F.3d at 200. It is unclear whether the settlement agreement plaintiff obtained would have made him a "prevailing party" under the standard later adopted by the Supreme Court in *Buckhannon*.

- 12 -

Thus, when subsequent litigation seeks to enforce or interpret a settlement agreement or consent decree, involving facts and principles different from those considered in the underlying litigation, the second is not considered "inextricably intermingled" with the first. On the other hand, a subsequent litigation initiated against the successful party to modify or "replay" the issues of the first litigation may be so intermingled. *Plyler* applies to carry forward prevailing party status only in this latter circumstance, and only then when the plaintiffs are forced to litigate to preserve the relief originally obtained.

As will be discussed below, plaintiffs argue that the work for which they seek fees falls into the latter category; they claim that their status as "prevailing parties" in the prior litigation remained with them as they litigated their Motion to Reopen and defendants' Motion for Termination, as well as the time plaintiffs spent negotiating the PSA and PSA Amendment.

B.

In prison litigation, "prevailing parties" under 42 U.S.C. § 1988 must satisfy additional requirements before becoming entitled to attorney's fees. The PLRA, 42 U.S.C. § 1997e(d), provides, *id.* (emphasis added):

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that--

(A) the fee was directly and reasonably incurred in proving *an actual violation* of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
(ii) the fee was directly and reasonably incurred in *enforcing the relief ordered for the violation*.

Several courts have recognized that the PLRA in general, and § 1997e(d) in particular, "'is not a paragon of clarity.'" *Cody v. Hillard*, 304 F.3d 767, 776 (8th Cir. 2002) (quoting

*Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 654 (1st Cir. 1997)).  In *Cody*, the Eighth

Circuit aptly described the interpretive problem posed by § 1997e(d), 304 F.3d at 776:

> The language of subsection (B)(ii) envisions that fees will sometimes be available
> for legal work that "enforc[es] . . . relief" ordered for constitutional violations.
> Yet (B)(ii) is connected by an "and" to subsection (A), which authorizes only fees
> that are "incurred in proving" a violation.  Read in isolation, subsection (A) might
> be thought to forbid any fees for legal work done to enforce previously
> established relief.  One would not ordinarily say that a lawyer performing such
> work is "proving" a violation.

The courts that have addressed this seeming inconsistency have come to the same

conclusion, with which I agree:  Under the PLRA, attorney's fees can be awarded only if the

prisoner "prov[es] an actual violation" of his federally protected rights.  42 U.S.C.

§ 1997e(d)(1)(A).  "Once a violation has been proven, later work is compensable if it is 'directly

and reasonably incurred in enforcing the relief ordered'" for that violation.  *Cody*, 304 F.3d at

776 (quoting 42 U.S.C. § 1997e(d)(1)(B)(ii)); *accord Webb v. Ada Cnty.*, 285 F.3d 829, 834 (9th

Cir. 2002).  This reading produces a reasonable result, and it ensures that subsection (B)(ii) is not

rendered superfluous.

The PLRA's requirement of an "actual violation" limits the circumstances under which a

prevailing party may obtain an award of attorney's fees.  For example, an inmate who obtains a

*preliminary* injunction may qualify as a "prevailing party" under 42 U.S.C. § 1988, but does not

qualify for attorney's fees under the PLRA because the "preliminary injunction did not

affirmatively establish that the State actually violated his protected rights."  *Kimbrough v.

California*, 609 F.3d 1027, 1032 (9th Cir. 2010).  Likewise, a party who obtains relief via a

consent decree—and therefore would be a prevailing party under 42 U.S.C. § 1988—is only

entitled to attorney's fees under the PLRA if the consent decree includes a finding or admission of a violation of federally protected rights.

## II.

In accordance with the foregoing, plaintiffs must establish both that they are "prevailing parties" and that the fees they seek were expended to prove an "actual violation" of a federally protected right or to enforce the relief ordered for that violation. In my view, plaintiffs are not entitled to attorney's fees for two independent reasons. First, they were not "prevailing parties" in the litigation for which they seek a fee award, either under 42 U.S.C. § 1988 or *Plyler*. Second, even if they were prevailing parties, the fee they seek was not "directly and reasonably incurred in enforcing the relief ordered" for an "actual violation" of federal law. *See* PLRA, 42 U.S.C. § 1997e(d).

## A.

As discussed, in order to be "prevailing parties," plaintiffs must have obtained a "material alteration of the legal relationship of the parties" with "judicial *imprimatur* on the change." *Buckhannon*, 532 U.S. at 604–05. Defendants correctly argue, without objection from the plaintiffs, that the PSA and PSA Amendment lack the necessary judicial *imprimatur* to render plaintiffs "prevailing parties." The PSA and PSA Amendment are mere settlement agreements; they are not judicially enforceable orders. Notably, each expressly states that it "is not a consent decree and the parties do not intend it to be construed as such"; that it "does not operate as an adjudication of the merits of the litigation"; and that "[t]he Court's approval . . . is sought only to comply with the provisions of Fed. R. Civ. P. 23(e) and not to convert this . . . into a consent decree." ECF 374-2 ¶¶ 6, 7; ECF 447-1 ¶¶ 1, 2. Moreover, the PSA and PSA Amendment are

not directly enforceable by the Court. Rather, the only remedy for noncompliance with the PSA and the PSA Amendment is for plaintiffs to "file an appropriate motion to reopen the case," which simply restores the parties to the posture they were in before the PSA and PSA Amendment were agreed upon. ECF 374-2 ¶ 124. Thus, the PSA and PSA Amendment are not "judicially sanctioned" in the manner required for an award of attorney's fees under 42 U.S.C. § 1988.

Unable to rely on the PSA itself as the basis for "prevailing party" status, plaintiffs instead stake their claim to *Plyler*. Analogizing to *Plyler*, plaintiffs claim that they were prevailing parties in the litigation leading to the 1993 Consolidated Consent Decree and that the proceedings beginning in 2003 were in defense of the 1993 Decree and to preserve its fruits. Thus, plaintiffs argue that the "prevailing party" status they obtained earlier in the litigation persisted throughout the litigation and negotiations leading to the PSA and PSA Amendment.

For two reasons, I disagree with plaintiffs. First, the work for which plaintiffs seek attorney's fees was not aimed at "preserving the fruits" of the 1993 Decree, for the simple reason that the 1993 Decree was no longer bearing fruit when the relevant work commenced. As discussed, in October 1997 Judge Motz entered a stay of the 1993 Decree, pursuant to 18 U.S.C. § 3626(e)(2), which provides:

> (2) Any motion to modify or terminate prospective relief made under subsection (b) shall operate as a stay during the period--
> > (A)(i) beginning on the 30th day after such motion is filed . . . [and] . . .
> > (B) ending on the date the court enters a final order ruling on the motion.

No final ruling has ever been entered on the motion to terminate the 1993 Decree. Thus, the stay entered by Judge Motz has remained in effect since its inception, and the provisions of the 1993 Decree accordingly have been unenforceable. Plaintiffs' post-2003 litigation activity

could not have been aimed at "preserving the fruits" of the 1993 Decree because the 1993 Decree had been ineffectual for six years.

Second, the issues that were litigated from 2003 to 2012 were based on different facts and different legal issues than those that formed the basis of the decisions in *Collins* and *Duvall* and of the agreement leading to the 1993 Decree. In this respect, the present case is closer to *Arvinger* than to *Plyler*. The prior litigation concerned (1) whether, in the 1970s, the conditions at the city-operated Baltimore City Jail violated the inmates' constitutionally protected rights, and (2) what protections were necessary to ensure the continued constitutionality of conditions at BCDC once the State took control. The litigation that forms the basis of plaintiffs' fee request was not a mere "replay" of that prior litigation. *See Arvinger*, 31 F.3d at 200. Rather, the recent litigation concerned (1) whether the PLRA required termination of the 1993 Decree and (2) whether the conditions in 2003 at BCDC violated the terms of the 1993 Decree. *See* ECF 129. Accordingly, this case is controlled by *Arvinger*'s statement that "prevailing party" status does not carry forward when "subsequent litigation seeks to enforce or interpret a . . . consent decree, involving facts and principles different from those considered in the underlying litigation." *Arvinger*, 31 F.3d at 202.

A closer look at *Plyler* and *Arvinger* confirms this conclusion. In *Plyler*, the defendants sought to modify a consent decree a mere 14 months after it was entered. The modification was necessary because of "an unanticipated increase in prison population" that undermined the factual predicates for the relief granted in the consent decree. *Plyler*, 846 F.2d at 211. In other words, the facts underlying the finding of a constitutional violation were unchanged and unargued; the defendants simply sought to modify the remedy. *Id.* Thus, the post-decree

litigation in *Plyler* truly was a "replay" of the prior litigation as far as the constitutional issues were concerned; the only change related to a factual assumption that had turned out to be inaccurate.[11] Because of the vast overlap between the prior and subsequent litigation, the Fourth Circuit concluded that plaintiffs were the "prevailing parties" throughout, even though they were unsuccessful in resisting the resulting modification.

*Arvinger* and the case *sub judice* followed a different path. As in *Arvinger*, plaintiffs here initially secured judicially sanctioned relief and then later pursued a claim that the opposing party was not living up to its end of the bargain. However, neither the plaintiff in *Arvinger* nor the plaintiffs here achieved a result in the subsequent litigation that, standing alone, would entitle them to "prevailing party" status. Both the plaintiff in *Arvinger* and plaintiffs here invoked *Plyler* in an attempt to carry forward their "prevailing party" status from the prior litigation. It follows that plaintiffs here, like the plaintiff in *Arvinger*, are not entitled to attorney's fees. *See Arvinger*, 31 F.3d at 202 ("Even though the parties to the second litigation were largely the same as the parties to the first, the operative facts and legal theories were distinctly different.").

To be sure, plaintiffs here have a stronger argument than did the plaintiff in *Arvinger*. Whereas the subsequent litigation in *Arvinger* was essentially a breach of contract claim without a constitutional dimension, the subsequent litigation here had a constitutional flavor in the sense that the PLRA's requirements for continuation of a consent decree incorporate constitutional standards. And, whereas the plaintiff in *Arvinger* failed to obtain any relief in his second lawsuit, plaintiffs here secured the PSA and PSA Amendment. Nonetheless, the recent litigation

---

[11] Indeed, defendants sought the modification under a provision in the consent decree which provided that, "if the predictions proved to be inaccurate, the Court shall order immediate relief, which may include population reductions, release or transfer of prisoners . . . or other appropriate relief." *Plyler*, 846 F.2d at 211.

in this matter was not a mere "replay" of the litigation that took place 30 years prior. Rather, it involved new facts, new defendants, and new legal issues. Indeed, the key legal issue—the effect of the PLRA on the 1993 Decree—could not possibly have been previously litigated because the PLRA had not yet been passed. In these circumstances, plaintiffs may not avail themselves of the rule established in *Plyler*.

This is not to say that plaintiffs can never be "prevailing parties" when they seek to enforce consent decrees that were entered several years ago. But, they must become "prevailing parties" the traditional way—by securing a judicially sanctioned alteration in the legal relationship of the parties. Plaintiffs have not done that here. Therefore, they are not "prevailing parties" entitled to attorney's fees under 42 U.S.C. § 1998.[12]

## B.

Even if plaintiffs were entitled to "prevailing party" status, they still could not satisfy the requirements of the PLRA because the fees they seek were not "directly and reasonably incurred in proving an actual violation" of plaintiffs' rights or "directly and reasonably incurred in enforcing the relief ordered for the violation." 42 U.S.C. §§ 1997e(d)(1)(A)–(B).

As an initial matter, the fees plaintiffs seek were not incurred in "proving an actual violation." 42 U.S.C. § 1997e(d)(1)(A). As discussed, the PSA expressly provides that "[i]t

---

[12] In their Reply, plaintiffs make several arguments to combat what they characterize as "Defendants' unstated premise . . . that an official defendant who represents a different governmental entity than some of the original defendants is by virtue of that fact relieved of responsibility for fees." Reply at 10. And, they cite numerous cases decided under § 1988 in which fees were awarded against successor or intervening defendants. *Id.* at 6–10. However, my decision that plaintiffs are not "prevailing parties" under § 1988 in the litigation for which they seek fees does not depend on the "unstated premise" identified by plaintiffs. Rather, my decision is based on the fact that the litigation that forms the basis of plaintiffs' fee request was not a mere "replay" of that prior litigation in the case, irrespective of who the defendants were at any point in the litigation. Thus, I need not address plaintiffs' several arguments on this point.

does not operate as an adjudication of the merits of the litigation," ECF 374-1 ¶ 6, and that it is not "an admission of liability of or by any party." *Id.* ¶ 8. Thus, in the post-2003 litigation, plaintiffs did not prove any "actual violation."

Plaintiffs' fees also were not "directly and reasonably incurred in enforcing the relief ordered" for an "actual violation." 42 U.S.C. § 1997e(d)(1)(B). Plaintiffs characterize their post-2003 efforts as an attempt to enforce the 1993 Decree, but those efforts fail to satisfy the PLRA's standard because the 1993 Decree disclaims any finding of an "actual violation." It states, ECF 423-2 at 27:

> [T]his Court is specifically not ruling that each of the provisions of this Decree is per se required by the Constitution of the United States. . . . Plaintiffs may not be entitled, as a matter of law, to obtain the precise relief embodied in each of the Decree's provisions.
>
> Furthermore, it should be noted that, while the Defendants have agreed to the entry of this Decree, they do not admit to violating any constitutional or other rule, standard, or law.

Because the Court made no finding of an actual violation of plaintiffs' rights, and because defendants admitted none, post-litigation efforts to enforce the 1993 Decree do not satisfy the PLRA's requirement that the work for which fees are sought be expended in enforcing the relief ordered for an "actual violation."

Unable to satisfy the PLRA with reference to the PSA or the 1993 Decree, plaintiffs stretch back to the 1970s in an attempt to tie their recent efforts to the findings of actual violations in *Collins* and *Duvall*. In plaintiffs' view, all they must show is that "at some point in the history of the case there was a court finding that the plaintiff's federal constitutional or statutory rights were violated." *Id.* at 4. Plaintiffs' reading is undoubtedly overbroad, as it ignores the PLRA's direction that the work for which fees are sought must be "directly" incurred

in enforcing the relief ordered for an actual violation. The nub of the issue, then, is whether plaintiffs' post-2003 work on the case was expended in an effort to "directly" enforce the relief ordered for the 1970s constitutional violations at the Baltimore City Jail.

The PLRA does not provide a definition for the term "directly." Thus, in interpreting the PLRA, I "must begin with . . . the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (internal quotation marks omitted). The term "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "transmitted back and forth without an intermediary," or "operating or guided without digression or obstruction." *Webster's Third New International Dictionary* 640; *see Millennium Inorganic Chemicals Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 13-1194, slip op. at 14–15 (4th Cir. Feb. 20, 2014) (relying on *Webster's* for definition of "direct"); *see generally Taniguchi v. Kan Pac. Saipan, Ltd.*, ___ U.S. ___, 132 S. Ct. 1997 (2012) (relying extensively on dictionaries to determine meaning of term not defined in statute). Although none of these definitions neatly fit the present circumstances, the definitions make clear that for fees to be "directly" incurred in enforcing relief for an actual violation, the line between the work performed and the actual violation must be a straight one, without digression or interruption.

In my view, too much time has passed and circumstances have changed too drastically for the post-2003 litigation to be viewed as "directly" enforcing the relief ordered for the actual violations found in *Collins* and *Duvall*. The violations found in *Collins* and *Duvall* occurred in the 1970s, when BCDC was an entity known as the Baltimore City Jail, operated by the City of Baltimore. The violations in those cases occurred under the watch of the City and were largely

tied to overcrowding at the facility. The litigation produced a series of consent decrees and subsequent modifications that culminated in a 1988 Revised Decree, which was "was designed to reorganize and simplify the decree's provisions and to bring all previous decrees and agreements together into one document." ECF 423-2 at 3.

The landscape changed dramatically when, in 1991, the State of Maryland "assumed the control, regulation and administration of the Baltimore City Jail under the name The Baltimore City Detention Center." ECF 423-2 at 4. The change in control was effectuated by the General Assembly in Chapter 59 of the 1991 Laws of Maryland. *See* ECF 471-1. In Chapter 59, the Maryland legislature repealed Baltimore City's right to "own, regulate and control a jail," provided for the establishment of new State offices, including a Commissioner of Pretrial Detention and Services, a Deputy Commissioner of Pretrial Detention and Services, and a Warden and Assistant Wardens. *Id.* The law expressly required the termination of all officers and employees of the Baltimore City Jail. *Id.* In short, the change was not in name only. To the contrary, it resulted in a wholesale transformation in the operation of the facility.

Thereafter, plaintiffs and the State negotiated and agreed to the 1993 Decree. The 1993 Decree, by its terms, was not a remedy for then-existing violations of prisoners' constitutional rights, nor was it a remedy for the violations that had been found in *Collins* and *Duvall*. Rather, the 1993 Decree was a prophylactic measure aimed at preventing the development of conditions at the now state-run facility "which can reasonably be expected to violate the standards of human decency required by the Eighth Amendment." ECF 423-2 at 7. In entering the 1993 Decree, Judge Kaufman observed that "this Court is specifically not ruling that each of the provisions of this Decree is *per se* required by the Constitution of the United States." *Id.* at 27. And, he

acknowledged that the State did "not admit to violating any constitutional or other rule, standard, or law." *Id.* In view of this, the 1993 Decree simply was not the "relief ordered" for the City's 1970s violations of plaintiffs' constitutional rights.

Plaintiffs attempt to clear this hurdle by pointing out that the *Duvall* case "was filed against . . . state defendants as well as city defendants . . . because the State of Maryland was confining sentenced prisoners in the jail, thus overcrowding it to the extent that conditions of confinement continued to violate constitutional norms." Reply at 5. However, plaintiffs' suggestion that their recent litigation activity was aimed at enforcing an actual violation by the State in the 1970s is without merit because (1) the 1970s litigation produced no finding of an actual constitutional violation by the State, *see, e.g.*, ECF 467-3 ("It is the duty of the City of Baltimore to operate the Baltimore City Jail in accordance with the Constitution of the United States."); and (2) the post-2003 litigation did not include any allegation that BCDC was unconstitutionally overcrowded, *see* ECF 129. Moreover, the fact that the original suit was filed against State defendants does nothing to undermine my conclusions that circumstances at BCDC have changed dramatically since the 1970s and that the 1993 Decree was not aimed at remedying the violations present in 1970.

In view of this, plaintiffs' post-2003 efforts cannot reasonably be viewed as "direct" efforts to enforce the relief ordered in *Collins* and *Duvall.* A more accurate characterization is that the post-2003 litigation sought to resuscitate an ineffectual consent decree that was based upon court-ordered relief for 1970s constitutional violations. In other words, the line between the post-2003 litigation and the actual violations is not a direct one. As a result, plaintiffs are not entitled to attorney's fees under the PLRA for their work from 2003 to 2012.

**Conclusion**

Because plaintiffs were not the prevailing parties in the litigation for which they seek a fee award and, alternatively, because the fees they seek were not directly incurred in enforcing relief ordered for an actual violation of their rights, plaintiffs' "Motion for Determination that Defendants are Liable for Plaintiffs' Attorneys' Fees" will be denied. An Order follows.

Date: April 7, 2014                                    _____/s/_____
                                                              Ellen Lipton Hollander
                                                              United States District Judge