IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME DUVALL, *et al.*,

    *Plaintiffs,*

v.

                            Civil Action No. ELH-94-2541

MARTIN O'MALLEY,
Governor of Maryland, *et al.*,

    *Defendants.*

**MEMORANDUM OPINION**

This litigation is now in its fifth decade.  Hopefully, the case is drawing to an end.

The Court has before it "Plaintiffs' Motion For Approval Of Settlement Agreement As Amended," filed on June 21, 2016 (ECF 571), supported by a memorandum (ECF 571-1) and exhibits, and as corrected on June 27, 2016 (ECF 572) (collectively, the "Motion").  These submissions pertain to a long-running class action initiated by detainees at the Baltimore City Detention Center ("BCDC"),[1] challenging conditions of confinement.  The Settlement Agreement is docketed at ECF 541-2, and the modification to it, titled "First Amendment to Settlement Agreement" ("Amendment"), is docketed at ECF 572-2 and ECF 571-3 (redlined version).[2]  An earlier, pre-Amendment "Motion For Final Approval of Settlement Agreement" is docketed at ECF 552, filed on March 24, 2016.

---

[1] BCDC is now operated by the State of Maryland.  At the inception of the case, the institution was known as the Baltimore City Jail, and it was operated by the City of Baltimore,

[2] Unless otherwise noted, I shall refer to the Settlement Agreement and the Amendment collectively as the "Settlement Agreement" or the "Agreement."

The plaintiffs consist of "that class of persons . . . who are now or who will in the future be confined to the Baltimore City Detention Center."  ECF 423-2 at 4–5.  The defendants "are the persons holding the following Maryland state offices: Governor, Secretary of [the Department of] Public Safety and Correctional Services, Commissioner of Pretrial Detention and Services, Commissioner of Corrections, and the Warden of the Detention Center."  *Id.* at 5 (hereinafter, the "Defendants").[3]

"BCDC" is defined in ¶ 3 of the Amendment to the Settlement Agreement.  The Amendment was necessitated by the closure in September 2015 of the Men's Detention Center, which was previously part of BCDC, and the anticipated closure in 2016 and/or 2017 of the Women's Detention Center, the Annex, and the Wyatt Building.  Therefore, the parties have amended the Agreement so as to extend the coverage of most of the provisions in the Settlement Agreement to pretrial detainees at the Baltimore Central Booking and Intake Center ("BCBIC").  As explained by plaintiffs' counsel at the hearing on June 28, 2016, detainees at BCBIC will now be covered by the Agreement, with the exception of those provisions pertaining to the physical plant of BCDC set forth in § III(B) of the Agreement.

The Motion includes an uncontested request for attorneys' fees submitted by plaintiffs' lawyers as part of the proposed Agreement.  *See* ECF 541-1 at 24-33; ECF 541-2 at 19.  The request for attorneys' fees is supported, *inter alia*, by the Declaration of Elizabeth Alexander, Esquire, who became involved in the case in 2002, when she was Director of the American Civil Liberties Union Foundation ("ACLU") National Prison Project ("NPP").  *See*  ECF 541-4.  It is also supported by the Declaration of David Fathi, Esquire, who has been the Director of the NPP

---

[3] Earlier in the litigation, several officials of the City of Baltimore were also defendants.

since 2001.  ECF 541-5.  And, Debra Gardner, Legal Director of the Public Justice Center since 2000, has also provided a Declaration.  ECF 541-6.

In anticipation of filing the Motion, on December 23, 2015, the parties filed a "Consent Motion for Preliminary Approval of Settlement Agreement and Proposed Notice to the Class" ("Preliminary Motion," ECF 541), along with a legal memorandum (ECF 541-1) and several exhibits.  By Order dated January 4, 2016 (ECF 545), I granted the Preliminary Motion and approved the proposed notice to the class.

In regard to the Motion, the Court held a class action fairness hearing in open court on April 15, 2016.  Because of issues that arose at the hearing, largely concerning the closure of the Men's Detention Center and the impending closure of other buildings that are part of BCDC, the hearing was continued until June 28, 2016.

## I.    Factual Background

This case is a consolidation of two cases filed in the 1970's:  *Collins v. Schoonfield*, K-71-500 (D. Md.), filed in 1971, and *Duvall v. Lee*, K-76-1255 (D. Md.), filed in 1976.  The protracted litigation has a tortured procedural history.

The case was initially assigned to the late Judge Frank A. Kaufman.  Thereafter, from 1993 until mid 2011, Judge J. Frederick Motz presided over the litigation.  In July 2011, the case was reassigned to me.  *See* ECF 419.

At various stages of the litigation, the parties entered into consent decrees; consent orders were issued, along with court-approved settlement agreements resolving various aspects of the case; and the case was closed subject to reopening.  The proceedings included a 1978 Consent Decree (ECF 423-1); a 1993 Revised Consolidated Consent Decree dated July 9, 1993

(sometimes referred to as the "1993 Decree" or the "Revised Consent Decree") (ECF 423-2);

administrative closure in 1998 (ECF 70); an Order to restore the case to the active docket in 2002

(ECF 84); a 2002 Consent Order (ECF 84; *see also* ECF 423-3); an Order in 2004 to restore the

case to the active docket (ECF 196); a 2009 Partial Settlement Agreement ("PSA," ECF 374-1),

approved by Order dated April 6, 2010 (ECF 394); and a 2012 Partial Settlement Agreement

Amendment ("PSA Amendment," ECF 447-1), which was approved by Order dated May 9, 2012

(ECF 465).   In general, these agreements, decrees, and orders provided for continuing

monitoring by plaintiffs (and the Court) with respect to certain aspects of the operation of BCDC

and the conditions of confinement at the facility.

The early factual background of this litigation was summarized by Judge Kaufman in the

1993 Decree.  The 1993 Decree is almost 30 pages in length.  Judge Kaufman wrote, in part,

ECF 423-2 at 1–4 (underlining in original, italics added for emphasis):

I.   PREAMBLE

A.  History of Cases

This is a consolidation of two separate class action suits initiated by
inmates involving the conditions of confinement at the Baltimore City Jail, now
known as the Baltimore City Detention Center.   The first suit, Collins v.
Schoonfield, Civil No. 71-500-K, was filed in 1971 and related to the conditions
of confinement in the Jail. On May 15, 1972, the Court issued an opinion,
reported at 344 F. Supp. 257 (D. Md. 1972), finding that many of the conditions
shown at trial involved violations of the inmates' constitutionally protected rights.
Interim Decree I was entered on July 27, 1972, setting forth specific standards of
confinement with respect to various areas of Jail administration.   The standards
with respect to the delivery of medical services were covered in Interim Decree II
entered on December 13, 1972.

The second suit, originally captioned Duvall v. Lee, Civil No. K-76-1255,
was filed in 1976 and related to overcrowding and its effect on the conditions of
confinement in the Jail. The Duvall case first resulted in a "Partial Agreement
Among the Parties", approved by the Court on November 23, 1977, which was a

short term plan for the immediate reduction of the Jail's population. Subsequently, the parties entered into Consent Agreement II, which was approved by the Court and adopted as its decree on July 13, 1978.  [Consent Agreement II set forth various standards relating to inmate housing and services].

After the City moved for modifications, the provisions of the decrees in the two cases, with same changes, were combined into a single Consolidated Decree which was entered by the Court with the consent of the parties on April 24, 1981.  In 1984, some new changes in the decree were made by consent. . . .  Most importantly, these changes permitted limited double-celling in the Male Detention Center and set a separate capacity limit for each housing section in the Jail, including all sections not covered by the 1981 decree.  In addition, a number of suits by individual inmates were consolidated with the class actions.

[Additional modifications were made over the next several years].

The parties agreed to a revised decree in 1988 which was intended as a replacement for the 1984 decree and was designed to reorganize and simplify the decree's provisions and to bring all previous decrees and agreements together into one document.

B.  State assumes control

On July 1, 1991, the State, pursuant to House Bill No. 1059, 1991 Laws of Md. Ch. 59, created the Division of Pre-Trial Detention and Services and assumed the control, regulation and administration of the Baltimore City Jail under the name The Baltimore City Detention Center.  *The revisions set forth in this 1993 Decree incorporate the modifications requested by the State in recognition of the State's assumption from Baltimore City for the day to day operation and administration of the Baltimore City Detention Center. . . .*

The 1993 Decree lists as its purpose "to eliminate and to prevent overcrowding the Detention Center and to ensure that the inmates are not subjected to living conditions, the totality of which can reasonably be expected to violate the standards of human decency required by the Eighth Amendment or by any other provision of the Constitution of the United States."  *Id.* at 7.

Judge Kaufman also stated, *id.* at 27:

[T]his Court is specifically not ruling that each of the provisions of this Decree is per se required by the Constitution of the United States.  Thus, while many of the provisions of this Decree are identical with, or modify provisions included in

- 5 -

previous decrees appropriately entered by this Court in the *Collins* and *Duvall* cases, it is noted that the Plaintiffs may not be entitled, as a matter of law, to obtain the precise relief embodied in each of the Decree's provisions.

Furthermore, it should be noted that, while the Defendants have agreed to the entry of this Decree, they do not admit to violating any constitutional or other rule, standard, or law.

Following the entry of the 1993 Decree, litigation remained relatively dormant until after the passage in 1996 of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits," *Porter v. Nussle*, 534 U.S. 516, 524 (2002), and "to oust the federal judiciary from day-to-day prison management." *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997); *see* 141 Cong. Rec. S. 14316–17 (daily ed. Sept. 26, 1995) (statement of Sen. Abraham) ("No longer, then, will we have consent decrees . . . under which judges control the prisons literally for decades."). As to this latter goal, the PLRA includes a provision allowing a defendant to obtain relief from preexisting consent decrees that failed to meet the new standards of the PLRA. In particular, the PLRA entitles a defendant to "the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2).

In accordance with this provision, in October 1997, the defendants moved to terminate the 1993 Decree. ECF 56. Pursuant to 18 U.S.C. § 3626(e)(2), Judge Motz entered a stay of the 1993 Decree while the motion to terminate was pending. ECF 60. In January 1999, after briefing by both sides, Judge Motz administratively "terminated" the motion to terminate, subject

to its being reopened on request.  ECF 74.  He also administratively closed the case, subject to its being reopened at the request of any party at any time.  *Id.*  The stay remained in effect indefinitely.

On August 16, 2002, the plaintiffs filed an emergency motion seeking to reopen the case and also seeking injunctive relief, including a temporary restraining order, with regard to the risk of heat injury for those confined at the Women's Detention Center, a facility that is part of the BCDC.  *See* ECF 76.  The Court (Davis, J.) granted the temporary restraining order that day. ECF 80.  The parties subsequently entered into a Consent Order approved by the Court to reopen the case.  ECF 84 (Motz, J.).

In December 2003, plaintiffs filed a "Motion to Restore the Medical and Physical Plant Provisions of the [1993] Consent Decree to the Active Docket and to Schedule Appropriate Further Proceedings" (ECF 128), along with a memorandum in support (ECF 129) (collectively, "Motion to Restore").  The Motion to Restore described "dangerous conditions" at BCDC and averred that the conditions "violate the Consent Decree previously entered in this case."  ECF 129 at 1.  Plaintiffs asked the Court to "reopen this matter to enforce those provisions of the decree with which Defendants are in non-compliance," such as maintenance of certain health care standards at BCDC.  *Id.*  Further, plaintiffs sought "to enforce the provisions related to sanitation and facility maintenance."  *Id.* at 2 (citations omitted).

Defendants opposed the Motion to Restore, arguing that the reopening of the case should be governed by the same standards as a motion to terminate under the PLRA, as the effect was the same: continuation by a federal court of prospective relief in a state prison conditions of confinement case.  *See* ECF 135 at 1–2.  And, defendants averred that the plaintiffs "do not

allege, nor can they establish, that the relief sought meets this strict standard." *Id.* at 2.   After plaintiffs filed a reply brief (ECF 142), Judge Motz advised the parties that "the issue would best be framed by the defendants filing [a] renewed motion to terminate." *See* ECF 148.

Soon thereafter, in April 2004, defendants filed a "Renewed Motion to Terminate [the 1993] Consent Decree" ("Motion to Terminate," ECF 148).   In their Motion to Terminate, defendants argued that "current conditions at BCDC are constitutional" (ECF 148 at 8), and that the 1993 Decree does not satisfy the standards established by the PLRA for the continuation of prospective relief. *Id.* at 20–38.   After briefing, the Motion to Terminate was argued to Judge Motz in August 2004.   On August 30, 2004, Judge Motz issued an Order (ECF 196) granting plaintiffs' Motion to Restore and denying defendants' Motion to Terminate.   However, on November 1, 2014, Judge Motz granted a "Motion for Consideration of Rule 60(b) Relief" (ECF 205), in which he determined to allow plaintiffs to build an evidentiary record through discovery, which would then allow the Court to determine whether to terminate the 1993 Decree. *See* ECF 217.   Thus, Judge Motz held in abeyance the Motion to Terminate (ECF 148). *See* ECF 217.

A lengthy period of discovery and settlement negotiations ensued.   In August 2009, the parties achieved the PSA (*see* ECF 374), resolving "all the areas in dispute with the exception of the method of protecting from heat injury detainees with high security or high-medium security classifications."   ECF 374-1 ¶ 5.   Pursuant to the class action settlement approval requirements of Fed. R. Civ. P. 23(e), the Court approved the PSA on April 6, 2010. *See* ECF 394.

In July 2011, while the parties continued to negotiate in an attempt to resolve the remaining heat injury issue, the case was reassigned to me. *See* ECF 419.   By Order of May 9,

2012 (ECF 465), I approved the parties' Motion for Approval of First Amendment to the PSA, as amended, which resolved the heat injury issue.  *See*  ECF 446; ECF 447; ECF 458.[4]

In June 2013, the parties consented to an extension of the monitoring period that was part of the PSA (ECF 497), which I approved.  ECF 498.  Another consent motion for extension of the monitoring was filed in April 2014 (ECF 501), which I approved.  ECF 502.  A similar consent motion followed in December 2014 (ECF 504), which I also approved.  ECF 505.

Plaintiffs moved to reopen the case on June 2, 2015.  ECF 511.  It was supported by a legal memorandum that exceeded 100 pages (ECF 511-1) (collectively, the "Motion to Reopen") and over 60 exhibits.  *See* ECF 513; ECF 517.  In general, the Motion to Reopen recounted in detail a host of problems at BCDC, some of which are mentioned below.  I granted the Motion to Reopen on June 2, 2015.  ECF 516.  The parties subsequently engaged in settlement negotiations, which culminated in the Motion pending before this Court.  *See* ECF 552; ECF 571; ECF 572.

## II.      The Settlement Agreement

The Settlement Agreement is about 24 single-spaced pages in length.  It provides comprehensive relief to a broad class of detainees at BCDC, and as defined in the Amendment. ECF 572-1, Amendment, ¶ 1.  Due to the length of the Agreement, I will summarize the key provisions.

### A. Medical and Mental Health Claims

1. *Medication Provisions*

---

[4] With consent of the parties, then Magistrate Judge Paul Grimm conducted the fairness hearing on April 17, 2012.  *See* ECF 448; ECF 461.

Plaintiffs' Motion to Reopen (ECF 511; ECF 511-1) included evidence of failures to continue necessary medications for detainees, both at the time detainees enter BCDC and when prescriptions expire. *Id.* at 8-16. The Settlement Agreement addresses these issues by committing defendants to provide screening by a registered nurse within four hours of arrival at Baltimore Central Booking and Intake Center and to provide a physical assessment and medications reported by the detainee within 24 hours, if their interruption would pose a risk to the detainee; in the absence of a determination by appropriate medical staff that continuation of the medication is not medically appropriate; or the Division of Pretrial Detention and Services is unable timely to obtain the medication, despite reasonable efforts. The detainee's medical record must reflect the actions taken by staff related to these requirements. *See* ECF 541-2, Settlement Agreement, ¶ 17. The Settlement Agreement also requires that, where appropriate, medications must be continued without interruption, in the absence of a clinical judgment to change the prescription, and requires documentation of medication administration. *Id.* at ¶ 19.a. Similarly, the Settlement Agreement addresses the lack of appropriate documentation of medication administration. *Id.* at ¶ 19.b.

2. *Development, Updating, and Execution of a Plan of Care and Related Issues*

According to plaintiffs, the absence of a "plan of care for detainees has been a major source of medical errors and failures." ECF 541-1 at 5-6; ECF 511 at 18-19, 29-30. The Settlement Agreement addresses these concerns by defining the contents of a "Plan of Care," establishing timing requirements for the development of plans of care, providing for prompt updating of them, mandating their execution, and providing that plans of care shall be available to all medical staff as a standardized part of each medical record. *See* ECF 541-2, Settlement

Agreement, ¶ 18; *see also id.,* ¶ 25.f (containing similar requirements for the mental health plan of care).

Moreover, the Plan of Care requirements mandate actual execution of necessary treatment within appropriate times (*see* Settlement Agreement, ¶¶ 18.d & 19.f ), and that medical staff take action to respond to test results.  *Id.,* ¶ 19.e.  In addition, patients with chronic medical needs must be provided with specialist care.  *See id.* ¶ 22.b (addressing the requirement for specialty care, including a requirement that members of the class are referred to specialists as medically necessary and setting time limits on the process for review of specialist referrals), *see also id.,* ¶¶ 22.a, 22.c, 22.d. Moreover, the Settlement Agreement requires that a Plan of Care must be developed within seven days of the detainee's admission into BCBIC. *Id.,* ¶ 18.c.

3. *Treatment of Disabilities*

The Settlement Agreement addresses concerns about housing and other accommodations for persons with disabilities.  *See* Settlement Agreement ¶ 20.b (providing for coordination between custody and medical staff for the provision of accommodations); ¶ 21; (addressing issues regarding persons); ¶ 21.a (mandating the timely delivery of medical supplies).  The related issues of proper treatment for open sores, including proper surveillance for Methicillin-resistant *Staphylococcus aureus* ("MRSA") infections, are addressed in the requirement in Settlement Agreement ¶ 19.f that testing for MRSA and other diagnostic concerns be conducted in appropriate timeframes.

4. *Availability of the Medical Record*

Problems with the availability of medical records during sick call encounters is addressed in ¶ 24 of the Settlement Agreement.

5. *Initial Medical Screening*

Problems regarding initial screening are comprehensively addressed in ¶ 17 of the Settlement Agreement. These requirements include specification that a decision to accept or reject a detainee for admission to BCBIC must occur whenever a detainee is held there for four continuous hours, and that any detainee accepted for admission who reports a prescription medication or an urgent medical need must be evaluated by a physician or mid-level provider (a nurse practitioner or physician assistant) within 24 hours.

In addition, detainees reporting use of psychotropic medications or otherwise demonstrating an urgent mental health need will receive a mental health evaluation within 24 hours, and detainees accepted for admission who report prescribed medication that, if interrupted, would affect their health must be provided with that medication within 24 hours of reporting, unless it is not medically appropriate or Defendants are unable to obtain a particular medication within that period, despite reasonable efforts. *See* Settlement Agreement ¶ 17.

The provisions of ¶ 22 of the Settlement Agreement address timely review of requests for specialist appointments, while ¶ 23 requires sets timelines for sick call responses. The timeliness of core mental health services is governed by ¶ 25.

6. *Timeliness of Response to Sick Call Requests*

Issues with respect to delayed responses to sick call requests are addressed in the Settlement Agreement, which requires daily opportunity to request health care. Settlement Agreement, ¶ 23.a; registered nurse triage of requests with 24 hours of receipt (*id.*, ¶ 23.b); and medical encounters with an appropriate medical staff member within 48 hours, or 72 hours on a weekend. *Id.,* ¶ 23.c.

7. *Missed Medical Appointments*

The responsibility of Defendants to implement coordination policies between custody and medical staff regarding emergency transport is addressed in Settlement Agreement ¶ 20.a.

8. *Timely and Appropriate Psychiatric Evaluations*

The Settlement Agreement mandates timely and appropriate care in response to psychiatric matters and requests for review of medication needs.  For example, it requires a reduction in times for follow-up for mental health appointments when a bridge order is denied (Settlement Agreement ¶ 25.b); it requires routine mental health appointments at least every ninety days for those diagnosed with a chronic mental health problem (*id.*, ¶ 25.d); and it requires that urgent psychiatric evaluations take place within 24 hours (*id.*, ¶ 25.c). In addition, sick call request responses are required within specific appropriate time frames, for both mental health problems and medical problems, pursuant to Settlement Agreement ¶ 23.  Those who are prescribed psychotropic medications must be seen face-to-face by a psychiatrist or psychiatric nurse practitioner at least every ninety days. *See* ¶ 25.d.

## B.  Physical Plant Claims

The PSA contained several provisions addressing problems with the physical plant of BCDC, and these are also addressed in the Settlement Agreement.  They pertain to unreasonable risk of heat injury (Settlement Agreement ¶ 20.e.,f., & g.); failure to provide accessible living and personal hygiene areas for persons with disabilities (*id.*, ¶ 21.a); vermin control (*id.*, ¶ 26.b); maintenance of the structure and fixtures (*id.*, ¶ 26.c); and housekeeping and sanitation (*id.*, ¶ 26).  To assure compliance, the Settlement Agreement involves the assistance of monitors with expertise in ensuring a meaningful program of physical plant maintenance.

1. *Protection from Heat Injury*

Plaintiffs produced evidence of failures to maintain the rooftop ventilation fans or the fans within the housing units, and failures to keep the air exhaust systems clean and working, resulting in excessive heat and humidity in the facilities.  ECF 511 at 72-74, 81.

The Settlement Agreement obligates defendants to ensure that detainees medically classified as H1, *i.e.*, at high risk for heat injury, are actually housed in housing units intended for H1 use.[5] Settlement Agreement, ¶ 20.e. Further, it requires that, to the extent possible, only housing units that actually maintain compliant temperatures be used for housing H1 detainees. *Id*., ¶¶ 20. e, f & g. Custody staff are specifically required to ensure that detainees classified H1 are transferred to H1 housing. *Id.,* ¶ 20.b.  And, the requirement for the maintenance and repair of equipment and fixtures necessary to maintain sanitation and safety requires the maintenance of the ventilation system and fans. *See* Settlement Agreement, ¶ 26.c.

2. *Provision of Accessible Living Areas and Facilities for Personal Hygiene*

The Settlement Agreement ensures that persons with disabilities, including temporary disabilities, are provided with appropriate housing, showers, and toileting facilities to accommodate their disabilities. *See* Settlement Agreement, ¶ 21.a.

3. *Maintenance of Equipment and Fixtures*

Paragraph 26(c) of the Settlement Agreement concerns problems of maintenance and repair of plumbing and flooding prevention; replacement of non-functional lighting; maintenance of shower walls and floors; provision of safe and sanitary laundry services; and maintenance of other critical systems, including the electrical system, ventilation, and elevators, by requiring

---

[5] "H1" is defined in ¶ 8 of the Settlement Agreement.

implementation of a system that provides maintenance and repair sufficient to ensure sanitation and the functioning of necessary equipment and fixtures.  Moreover, the use of a monitor, who will be on-site at intervals throughout the monitoring period, will facilitate compliance.

4. *Implementation of Effective Sanitation and Housekeeping Practices*

Paragraph 26.a of the Settlement Agreement concerns sanitation and housekeeping measures, pertaining to serious problems with mold and pervasive sanitation failures produced by failures to follow what plaintiffs' sanitation expert called "basic cleaning and sanitation standards." ECF 511 at 88-91.   These problems are addressed by the requirement in ¶ 26.a that Defendants implement an effective housekeeping program "that includes training and supervision of cleaning within the housing units." *Id.*

5. *Prevention of Vermin Infestation and the Spread of Disease-Causing Organisms*

The Settlement Agreement commits Defendants to control the pervasive rodent problem at BCDC. *See* Settlement Agreement, ¶ 26.b.

## C.  Mechanisms to Implement Reform

As the parties explain, they "spent substantial time developing effective mechanisms to produce the changes that both parties desire." ECF 541-1 at 15.   Notably, the Settlement Agreement satisfies the requirements of the PLRA, set forth in 18 U.S.C. § 3626(a)(1)(A). This ensures that the parties have the appropriate incentives and tools to achieve compliance in the minimum amount of time, and, according to the parties, "it is this feature that permits the Settlement Agreement to contemplate the dismissal of the entire *Duvall* litigation, after many decades, within four years or less." *Id.* at 15-16.

In addition, the Settlement Agreement creates a structure to move the litigation toward closure through mechanisms to assist Defendants in achieving compliance with the Settlement Agreement.  As the parties recognize, "[o]ne of the most important of these mechanisms is the designation of Monitors with professional training and experience in evaluation and supervision of correctional programs in the areas covered by the agreement."  *Id.* at 16.  Three Monitors are designated under the Settlement Agreement, all with seemingly impressive credentials, as set forth at ECF 541-1 at 16-17.   At the hearing on June 28, 2016, plaintiffs' counsel highlighted the experience and utility of the monitors.

### III.    Class Actions

Fed. R. Civ. P. 23 permits a class action lawsuit to be settled or compromised with the express approval of the court, after 1) requisite notice of the settlement is given to the plaintiff class; 2) the parties file a statement identifying any settlement agreement; 3) the court holds a hearing if the settlement would bind class members; 4) the court determines that the settlement is "fair, reasonable, and adequate," and 5) any objections of the plaintiff class to the settlement are received and considered by the court and the parties.  *See* Rule 23(e)(1) – (5).

The "primary concern" of Rule 23(e) is the "protection of class members whose rights may not have been given adequate consideration during the settlement negotiations."  *In re Jiffy Lube Securities Litigation v. Ernst & Young,* 927 F.2d 155, 158 (4th Cir. 1991).  Due Process "requires that their interests be adequately represented."  *Id.*  Notably, "[u]nder Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (internal citation omitted).

"To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation." ANNOTATED MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 at 487 (2011). Courts have enumerated several factors to guide the trial courts in this assessment. "By far the most important factor is a comparison of the terms of the proposed settlement with the likely recovery that plaintiffs would realize if they were successful at trial." *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006); *accord Pigford v. Glickman*, 206 F.3d 1212, 1217-18 (D.C. Cir. 2000) ("The district court's role in reviewing the decree is to protect the interests of absent class members, and that is done primarily by evaluating the terms of the settlement in relation to the strength of their case."). In addition, a "fair" settlement lacks collusion among the parties, and is reached as a result of "good-faith bargaining at arm's length." *In re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305, 315 (D. Md. 1979) (citing *Percodani v. Riker-Maxson Corp.,* 50 F.R.D. 473, 477 (S.D.N.Y. 1970)).

The Fourth Circuit has articulated several factors relating to both fairness and adequacy. *See In re Jiffy Lube Securities Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991). Specifically, with respect to fairness, the *Jiffy Lube* Court enumerated four factors, 927 F.2d at 159:

> (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant] area of . . . class action litigation.

As to adequacy, the *Jiffy Lube* Court articulated five factors for consideration, *id.*:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of

recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

I shall discuss each of these factors, in turn.

### 1. Fairness Factors 1 and 2

As indicated, the history of this case dates to the 1970's. Most recently, the Court reopened the litigation in 2015, after plaintiffs asserted continuing constitutional violations of the rights of detainees. ECF 511-1; ECF 516. The latest Settlement Agreement, as amended, was proposed by the parties only after Defendants provided extensive informal discovery, including copies of prior compliance audits, and plaintiffs' counsel conducted a broad investigation into conditions of confinement at BCDC.

The lawyers represent that the investigation included physical access to the jail for plaintiffs' experts; interviews with members of the plaintiff class; an assessment of BCDC detainee deaths; a review of the medical, medication; and mental health records of selected class members; an appraisal of the physical condition of the jail; and consultations with relevant experts. ECF 541-1; ECF 511-1. Therefore, a substantial body of fact-based evidence was produced and reviewed by the parties by the time of negotiation, making the dispute ripe for mediation. ECF 511-1.

Moreover, there is no indication of collusion. To the contrary, the Agreement and the Amendment are the product of intense negotiations, aided by United States Magistrate Judge Timothy Sullivan, who devoted considerable time and effort in helping counsel to bring the case to a resolution. Indeed, in their submissions and in open court, counsel for both sides publicly expressed their profound gratitude to Judge Sullivan for his invaluable assistance in helping to resolve the parties' disputes.

### 2.  Fairness Factors 3 and 4

According to the parties, the mediation consumed 40 hours. ECF 541-1. Additional time and efforts were expended as a result of issues that emerged at the initial class action fairness hearing held on April 15, 2016.  Counsel for the parties also engaged in direct discussions outside of the mediation sessions, exchanged multiple drafts and edits of the proposed Settlement Agreement and the amendment, and provided position statements in response to the mediator's questions.  *Id*.; *see also* ECF 571; ECF 571-1.  In the course of mediation, the parties consulted with their clients and experts, who helped to clarify the litigation options of the parties.  ECF 541-1.  Notably, attorneys' fees were not negotiated until after the terms of the Settlement Agreement were established.  *Id.*  Significantly, plaintiffs did not increase their fee request, despite the considerable time expended in negotiating the Amendment.

Additionally, counsel for the parties are experienced litigators as to conditions of confinement claims.  Stuart M. Nathan, one of the defense attorneys, has represented the Department for over 30 years, serves as its principal counsel, has litigated many civil rights claims, and has significant prior experience with *Duvall*.  *Id.*  Elizabeth Alexander, David Fathi, and Debra Gardner are experienced civil rights litigators who have brought conditions of confinement claims both locally and nationally through the American Civil Liberties Union Foundation National Prison Project. ECF 541-4; ECF 541-5; ECF 541-6. Ms. Gardner has litigated prior class action cases. *Id.*  And, Ms. Alexander represented plaintiffs in prior iterations of *Duvall.* ECF 541-4.

I am satisfied that the Settlement Agreement, as amended, satisfies the four "fairness" factors established in *Jiffy Lube.*  Therefore, I turn to the adequacy factors.

### 1. Adequacy Factors 1 and 2

There is no admission of liability by Defendants in the Settlement Agreement, as amended. *See id.,* ¶50. Nonetheless, the broad investigation conducted by plaintiffs' counsel, the opinions of plaintiffs' experts as informally conveyed to the Defendants, the undisputed facts, and the history of the conditions of confinement litigation at BCDC demonstrate the relative strength of plaintiffs' position prior to engaging in mediation.

### 2. Adequacy Factors 3 and 4

The parties agree that a trial or pretrial hearings would be lengthy, and that the attorneys' fees, expert witness fees, and other costs connected with trial or pretrial hearings would increase substantially should the Court decline to approve the Settlement Agreement.  In this regard, I note that I had set aside seven court days just for consideration of plaintiffs' motion for preliminary injunction. *See* ECF 519 (Order); ECF 541-1.  And, it is believed that a trial would take several weeks.

However, the solvency of the defendants and the likelihood of recovery of a litigated judgment is not at issue.  This is because the case was brought against State officials seeking injunctive relief, rather than damages to be distributed to members of the class.

### 2. Adequacy Factor 5

Consistent with the Court's Order (ECF 545), notice of this lawsuit was provided to thousands of adult men and women at BCDC and to a small number of juveniles who are detained at BCDC. *See* ECF 544-1; ECF 545-1.  Notices in both English and Spanish were posted in housing units and/or individually delivered to arrestees processed at Baltimore Booking

- 20 -

and Intake Center, and to individuals removed from the general population of BCDC since January 11, 2016. *Id.*

The parties had agreed to extend the notice period to March 31, 2016. Yet, only two responses were filed with the Court about the settlement. ECF 546; ECF 547. Both of these responses pertained to conditions of confinement that are addressed in the Settlement Agreement.

I agree with the arguments set forth by plaintiffs at ECF 571-1 at 5-8, explaining why further notice is not needed in order for the Court to approve the Amendment. Among other things, the Amendment serves to *increase* the "scope of coverage by the expansion of the number of pretrial detainees who will be guaranteed services for their medical and mental health needs while confined at BCBIC." *Id.* at 5-6. Because the Amendment does not remove any benefits to detainees, I agree with plaintiffs that the notice previously provided before execution of the Amendment is legally sufficient.

Even without final approval by the Court, and in an apparent sign of good faith, the Defendants took significant steps toward compliance with the terms of the initial Settlement Agreement. Prior to the filing of the parties' Consent Motion, the Secretary of the Department of Public Safety and Correctional Services appointed Brenda Shell as the Baltimore Pretrial Compliance Monitor, under ¶ 27 of the Settlement Agreement. Ms. Shell has spent most of her career at the Division of Pretrial Detention and Services, and currently is its Commissioner. Her sole responsibility is to investigate *Duvall* complaints and issues, manage *Duvall* compliance, and report such compliance or non-compliance to the Secretary.

Ms. Shell also scheduled visits to BCDC by the three compliance monitors described in the Settlement Agreement.  ECF 541-2, ¶ 32; ECF 539-1, ¶32.  They are Michael Puisis, DO, for medical matters; Raymond Patterson, M.D., D.F.A.P.A. for mental health provisions; and Mehdi Azimi, Ph.D., for physical plant provisions.  *Id.*

In addition, Sharon Baucom, M.D., Medical Director of the Department, appointed a Departmental nurse to serve as a liaison between the Department and the medical, psychiatric, and pharmaceutical contractors. In order to address the needs of the aging BCDC physical plant, the Department contracted with CGL, a facilities management company. CGL has begun to examine and assess the BCDC physical plant and operating systems, establishing a process to track repairs and conduct preventive maintenance of all aspects of the physical plant.  ECF 552 at 8-9.

These measures demonstrate Defendants' commitment to addressing the many issues raised in the litigation.  In my view, the adequacy factors weigh squarely in favor of approval of the Settlement Agreement.

As required by the Prison Litigation Reform Act, I am satisfied that, as stipulated by the parties in ¶ 51 of the Settlement Agreement (ECF 541-2), the Settlement Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A), in that it is narrowly drawn, extends no further than necessary to correct the violation of federal rights, and is the least intrusive means necessary to correct the violation of the federal rights of the plaintiffs.

The PLRA also requires the Court to give substantial weight to any adverse impact on public safety or the operation of the BCDC. The record shows that this relief is narrowly drawn and limited to address the specific constitutional violations supported by the record, as shown by

the evidence submitted in connection with Plaintiffs' Motion to Reopen of June 2, 2015 (ECF 511), as well as Defendants' decision not to file a response to that motion but rather to engage in the settlement discussions that produced the Settlement Agreement, as amended.

Moreover, Defendants' full involvement in the development of the Settlement Agreement provides substantial assurance that the relief is the least intrusive means necessary to correct the violations. As the parties state in ECF 571-1 at 10: "Correcting the constitutional violations with regard to medical and mental health care, as well as living conditions, will have no negative impact on public safety or the safe operation of BCDC and other affected facilities operated by the State; the facilities will be safer and more orderly when this relief is fully implemented, and the general public will have far more assurance that its system of justice operates fairly and within the bounds of the Constitution."

## IV.    Attorneys' Fees

Pursuant to Fed. R. Civ. P. 23(h) and 54(d)(2),[6] and § 47 of the Settlement Agreement, plaintiffs ask the Court to approve the award of attorneys' fees related to the Settlement Agreement, as amended.  The fees were negotiated by the parties as a result of court-ordered mediation conducted by Judge Sullivan who, as noted, ably facilitated the resolution of the case. The requested fee award is authorized by Rule 23(h), which provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."

The Agreement awards plaintiffs' counsel $450,000 in full satisfaction of their claim for attorneys' fees and costs for work that culminated in the Settlement Agreement and the

---

[6] Plaintiffs rely on Rules 23(e) and 54(b).  *See* ECF 571-1 at 8.

Amendment.  *See* Settlement Agreement ¶ 47a.  As noted, although additional time was expended by plaintiffs' counsel to reach agreement as to the Amendment, there is no increase in their request for fees.  *See* ECF 571-1 at 8-10.

The Settlement Agreement provides for a maximum of $100,000 in additional attorneys' fees, over a four-year period (¶ 47c.), aside from possible other attorneys' fees that might be awarded by the Court as a result of motions for enforcement of the Settlement Agreement.  *See* Settlement Agreement, ¶47.  In particular, the total of $450,000 is a fraction of the actual fees incurred.  Ms. Alexander's Declaration claims actual fees and costs of $406.553.10.  ECF 541-4.  Mr. Fathi claims actual fees and costs of $493,789.50.  And, Ms. Gardner claims actual fees and costs of $613,940.64.  All of the lawyers have provided a description of their services and rates, as well as examples of fee awards in similar cases in other jurisdictions.  *See, e.g.*, ECF 541-5.[7]

The Settlement Agreement's provision regarding attorneys' fees is reasonable and warrants approval, for the reasons set forth in ECF 541-1 and ECF 571-1.

In a class action, "[t]here are two methods commonly used for calculating an attorney's fee award: the lodestar method and the 'percentage of recovery' method." *Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 481 (D. Md. 2014) (footnote omitted). The lodestar method determines the appropriate fee award by multiplying the reasonable hourly rate by the number of hours reasonably expended.  *McAfee v. Boczar,* 738 F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23,

---

[7] The declarations of Elizabeth Alexander, Debra Gardner, and David C. Fathi contain the breakdown of fees into the categories required by the Local Rules. These declarations also explain that counsel have exercised billing judgment and written off hours of compensable time. But, counsel did not submit the voluminous records of their litigation activities in connection with this case.  Given Judge Sullivan's involvement and careful review of the issue, I see no need for counsel to submit their actual billing records.  The length of the record and the obvious volume of work speak for themselves.

2014); *Grissom v. The Mills Corp.,* 549 F.3d 313, 320 (4th Cir. 2008). There is "a strong presumption that the lodestar number represents a reasonable attorney's fee." *McAfee*, 738 F.3d at 88-89) (internal quotation marks omitted).

In *McAfee*, a § 1983 case, the Court said, 738 F.3d at 88:

> The proper calculation of an attorney's fee award involves a three-step process. First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

The *Johnson* factors are as follows: (1) the time and labor expended; 2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the  legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.  *McAfee*, 738 F.3d at 88 n.5.[8]

---

[8] As Judge Chasanow noted in *Corral v. Montgomery Co.*, 91 F. Supp. 3d 702, 713 n. 4, the Supreme Court seemed to question the *Johnson* approach in *Perdue v. Kenny A.,* 559 U.S. 542, 551-52 (2010), describing it as an "alternative" to the lodestar method and explaining that it provides too little guidance for district courts and places too much emphasis on subjective considerations.  The Supreme Court said, *id.* at 551: "[T]he lodestar method is readily administrable, and unlike the *Johnson* approach, the lodestar calculation is objective, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably

The *Johnson* factors are considered "'in conjunction with the lodestar methodology' and, 'to the extent that any of these factors already has been incorporated into the lodestar analysis, [it does] not consider that factor a second time.'" *Dorsey v. TGT Consulting, LLC*, CCB-10-92 2014 WL 458999, at *2 (D. Md. Feb. 4, 2014) (quoting *E. Assoc. Coal Corp. v. Dir., Office of Workers' Comp. Program*, 724 F.3d 561, 570, 570 n.5 (4th Cir. 2013)); *see also*, *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983) ("[M]any of the [*Johnson*] factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.").

The burden rests with the fee applicant to establish the reasonableness of a requested rate. *McAfee* 738 F.3d at 244 (*citing Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)); *see also Corral v. Montgomery Co.*, 91 F. Supp. 3d 702 (D. Md. 2015). "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious … case." *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

"The Supreme Court has indulged a 'strong presumption'" that the "lodestar" amount, as defined by the Court in *Hensley*, 461 U.S. at 434, "represents a reasonable attorney's fee." *McAfee*, 738 F.3d at 88–89; *see also Perdue*, 559 U.S. at 552. The lodestar amount is equal to counsel's "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008). Because the lodestar calculation relies on "objective" standards, *i.e.*, "the prevailing market rates in the relevant community," and what the

predictable results." (internal citations omitted). Nonetheless, "the *Johnson* factors, as opposed to the *Johnson* method, are still relevant in informing the court's determination of a reasonable fee and a reasonable hourly rate"; "[*Perdue*] cautions against using a strict *Johnson* approach as the primary basis for determining reasonable attorneys' fees, but nowhere calls into question the idea of using relevant *Johnson* factors in helping to come to a reasonable fee." *Spencer v. Cent. Servs., LLC,* No. CCB–10–3469, 2012 WL 142978, at **5–6 (D. Md. Jan. 13, 2012) (internal quotations marks and citations omitted).

attorney would have received from "a paying client who was billed by the hour in a comparable case" (*id.* at 551), the standard "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue*, 559 U.S. at 552.

The movant "bears the burden of documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.  Notably, counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id.* at 434.  "'Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.'"  *Id.* (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc) (emphasis in *Copeland*)).  The movant also bears the burden to show that any upward adjustment to the lodestar amount is necessary.  *See e.g.*, *Blum v. Stenson*, 465 U.S. 886, 898 (1984).

After consideration of the lodestar amount and any appropriate adjustments, the Court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones," and "award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *McAfee*, 738 F.3d at 88 (citations omitted); *see also Grissom*, 549 F.3d at 313 (same); *Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 243 (4th Cir. 2010) (affirming application of same analysis to fees awarded under FLSA).

In undertaking this analysis, I am mindful that the Supreme Court has said that the lodestar method produces presumptively reasonable fee awards, and is "readily administrable." *Perdue*, 559 U.S. at 551 (citing *Dague*, 505 U.S. at 566; *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 610 (2001)).  And, I also recognize that the

Supreme Court has said that trial courts "need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Thus, trial courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id*.

When the fee agreement was negotiated, the fees provision applicable to a § 1983 challenge to prison and jail conditions of confinement capped rates for lawyers at $213 per hour.[9] The PLRA states that the hourly rate must be limited to 150 percent of the rate established pursuant to 18 U.S.C. § 3006A. *See* 42 U.S.C. § 1997e(d). This statutory provision, known as the Criminal Justice Act, establishes the mechanism for setting rates for court-appointed counsel in criminal cases in the federal courts. Specifically, at the relevant time, the rate authorized by the Judicial Conference for the payment of court-appointed counsel was $142 per hour, the authorized rate for attorneys' fees under the PLRA is 150 percent of that rate, and this resulted in the rate cap used by the parties of $213 per hour. *See Perez v. Cate*, 632 F.3d 553, 558 (9th Cir. 2011). All three plaintiffs' lawyers used the rate of $213 per hour in their submissions. *See* ECF 541-4 at 7; ECF 541-5 at 2 ¶ 6; ECF 541-6 at ¶ 4.

The PLRA does not establish a cap on rates for paralegal time. *Perez*, 632 F.3d at 557-58. Thus, the Public Justice Center has used its standard hourly rate of $150 for its paralegals and law clerks, and the NPP has used an hourly rate of $160. *See Rules and Guidelines for Determining Lodestar Attorneys' Fees in Certain Cases* (Appendix B to the Local Rules of the U.S. District Court for the District of Maryland). The NPP's rate of $160 per hour for law clerks and paralegals is slightly higher than the rate set forth in the Local Rules of this Court. However,

---

[9] The hourly rate increased to $216 in January 2016. Plaintiffs have not sought an increase based on the current rate.

it appears consistent with prevailing market rates in the District of Columbia.  Fathi Dec., ¶ 6.
And, in light of the fact that plaintiffs seek only a small fraction of the lodestar amount, this
small difference is immaterial.

The attorneys were also affected in their ability to take on new work.  *See*, *e.g.*, ECF 541-
4.  And, they substantially reduced the number of hours for which they seek compensation.  Mr.
Fathi, for example, wrote off over 300 hours.  *See* ECF 541-5 at 2 ¶ 7.  The Public Justice Center
expended more than 3,500 hours of time on this case.  ECF 541-6 at 2 ¶ 3.

The lodestar calculation confirms the reasonableness of the requested fee award.  As
indicated, the lodestar amount is calculated by multiplying "the number of hours reasonably
expended on litigation by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  The lodestar also
takes into account the twelve factors set forth in *Johnson*, 488 F.2d at 717-19.

A.  **The lodestar yields a fair and reasonable attorneys' fees**

Employing the hourly rate of $213 yields the following lodestar for plaintiffs' counsel, as
of their submission in ECF 541 on December 23, 2015:

**Law Offices of Elizabeth Alexander**

Hours 1908.7

Fees $406,553.10

Costs $2,811.92

Total $409,365.02

**Public Justice Center**

Hours 2096.5

Fees $613,940.64

Costs $16,221.92

Total $630,162.56

**ACLU National Prison Project**

Hours 2,410.40

Fees $493,789.50

Costs $16,650.96

Total $510,440.46

**Total Fees: $1,514,283.20**

**Total Costs: $35,684.80**

The lodestar amount is $1,514,283.20. However, plaintiffs have agreed to settle their fee claim for $450,000, or approximately 30% of the lodestar amount, with the prospect of an additional $100,000 over four more years.

**1. Time and labor required.** Representing thousands of detainees in a case involving medical care, mental health care, and environmental health and safety has required thousands of hours of time and labor over the course of more than a dozen years.

**2. Novelty and difficulty of the issues.** Although most of the issues in this case are not particularly novel, representing detainees presents a number of difficult issues, particularly in light of the many restrictions imposed by the Prison Litigation Reform Act.

**3. Skill requisite to perform legal services properly.** Both class actions and prison and jail conditions litigation are recognized as complex and specialized areas of the law in which counsel must have considerable skill in order to competently represent their clients.

**4. Preclusion of employment.** Undertaking a massive class action, such as the case at bar, over so many years, necessarily imposes significant limitations on the other cases an attorney is able to take on.

**5. Customary fee or rates.** As discussed, *supra*, the PLRA caps hourly rates at a level below the market rates for experienced counsel.

**6. Whether the fee is fixed or contingent**. The fee in this case is entirely contingent; if plaintiffs' counsel had not succeeded in achieving significant relief for the class, they would not have recovered anything.  They assumed a large risk, with no reward, for countless years.

**7. Time limitations imposed by the client or circumstances.** This factor has little application to the case at bar, except the urgency associated with addressing extreme and deteriorating conditions in BCDC.

**8. Amount in controversy and results obtained.** Issues of safety and human dignity were at issue.  As discussed, counsel have obtained excellent results for the plaintiff class.

**9. Experience, reputation, and ability of attorneys.** As set forth in the declarations of Elizabeth Alexander, Debra Gardner, and David C. Fathi, plaintiffs' counsel are highly experienced in class action and prison conditions litigation.

**10. Undesirability of the case.** Representation of prisoners and jail detainees is considered by many attorneys to be highly undesirable because of the unpopularity and impoverishment of the clients, the contingent nature of payment, and the many restrictions imposed by the PLRA.

**11. Nature and length of the professional relationship with the client.** Plaintiffs' counsel have represented the class in this case for more than twelve years.

**12. Awards in similar cases.** As set forth in the Declaration of David C. Fathi, the lodestar amount is in line with or far lower than fee awards and settlements in similar cases. *See* ECF 541-5 at ¶¶ 9-10 (citing fee awards of $1.46 million and $4.8 million in jail conditions cases).

Under the lodestar method and the *Johnson* factors, I am satisfied that the award of fees in this case is reasonable.  In light of the foregoing, and because no objections have been made, I will grant Class Counsel's "Application for an Award of Attorney's Fees and Expenses."

### V.      Conclusion

For the reasons set forth above, I shall approve the Settlement Agreement and the Amendment.  I shall also grant the requested attorneys' fees.  Separate orders follow.


Date: June  28, 2016                                     _____/s/_____
                                                                           Ellen Lipton Hollander
                                                                           United States District Judge