IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME DUVALL, *et al.*,
    *Plaintiffs*,

    v.                                                      Civil Action No. ELH-94-2541

LAWRENCE HOGAN, JR., *et al.*,
    *Defendants.*

**MEMORANDUM OPINION**

This litigation, which has endured for nearly six decades, concerns the health, welfare, and safety of pretrial detainees held at the Baltimore City Detention ("BCDC"), challenging the conditions of their confinement.[1]  Plaintiffs consist of a class of individuals detained at a portion of BCDC known as the Baltimore City Booking and Intake Center ("BCBIC").[2]  The current defendants are Lawrence J. Hogan, Jr., the Governor of Maryland; Robert L. Green, the Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); and Michael Resnick, Esquire, the Commissioner of the Maryland Division of Pretrial Detention and Services ("DPDS").  *See* ECF 655 at 1.

---

[1] According to the docket, in 1994, in case JFM-76-1255, the Clerk was directed to open the matter as a new case, beginning with pleading number 619, and to close case JFM-76-1255. *See* ECF 1.  The case was initially assigned to the late Judge Frank A. Kaufman.  Thereafter, from 1993 until mid-2011, Judge J. Frederick Motz presided over the litigation.  In July 2011, the case was reassigned to me.  *See* ECF 419.  I recount some of the "tortured procedural history" of the case in my Memorandum Opinion of June 28, 2016.  ECF 575.

[2] Plaintiffs refer to the facility as the Baltimore City Detention Center, or "BCDC."  *See* ECF 645-1 at 1.  I shall use "BCBIC," consistent with defendants' nomenclature.  *See* ECF 657-1.

At one time, BCDC consisted of several structures, such as the Jail Industries Building, the Wyatt Building, the Women's Detention Center, the Annex, and the Men's Detention Center. *See* ECF 572-1, ¶ 1.  However, according to defense counsel, some structures have since been razed or renovated and renamed.

Over the years, the case has resulted in numerous consent decrees, settlement agreements, and orders.[3]  It has been closed and reopened on various occasions, too frequent to recount.  The most recent Settlement Agreement dates from November 2015, and is docketed at ECF 541-2.  And, the modification to it, titled "First Amendment to Settlement Agreement" ("Amendment"), was signed in June 2016, and is docketed at ECF 572-2.  In general, the Court's orders provide for continued monitoring of certain aspects of the operation of BCDC and the conditions of confinement at the facility.

This Memorandum Opinion addresses plaintiffs' "Emergency Motion For Relief From Risk Of Injury And Death From COVID-19," filed on April 9, 2020.  ECF 645.  The motion is supported by a memorandum of law (ECF 645-1) (collectively, the "Motion") and eight exhibits.  ECF 645-2 to ECF 645-9.  In the Motion, plaintiffs assert that defendants have failed to implement adequate measures at BCBIC to mitigate the risk posed by the COVID-19 virus,[4] a highly contagious and sometimes fatal illness.  *See* ECF 645-1 at 9-11.  According to plaintiffs, the measures implemented at BCBIC fail to comply with the Settlement Agreement and violate plaintiffs' constitutional rights.  *Id.* at 11-14.  Plaintiffs seek various forms of relief including, *inter alia*, an order compelling the release of detainees from BCBIC, with priority given to those at heightened risk of experiencing severe complications from COVID-19.  *Id.* at 16.

On April 10, 2020, the parties agreed to hold the Motion in abeyance pending mediation with Magistrate Judge Timothy Sullivan.  ECF 647.  Judge Sullivan held a telephone conference

---

[3] The "tortured procedural history" of this case is recounted in the Court's Memorandum Opinion of June 28, 2016.  ECF 575.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

with the parties on April 13 and again on May 19, 2019.  ECF 648; ECF 651.  Ultimately, however, the parties were unable to reach an agreement.

Thereafter, on May 20, 2020, plaintiffs renewed their emergency Motion.  ECF 652.  It is supported by a memorandum (ECF 652-1) (collectively, the "Supplemental Motion") and four exhibits.  ECF 652-2 to ECF 652-5.  I shall refer to the Motion and the Supplemental Motion collectively as the "Motion."  The Court lifted the stay on May 21, 2020, and ordered defendants to respond by May 28, 2020.  ECF 653.  Defendants' response is docketed at ECF 655.  On June 2, 2020, defendants supplemented their response.  *See* ECF 657 (the "Opposition").[5]  Defendants also submitted nine exhibits with their Opposition.  ECF 657-1 to ECF 657-9.  Plaintiffs replied on June 4, 2020 (ECF 660) and submitted four additional exhibits.  ECF 660-1 to ECF 660-4.

The Court scheduled a hearing for June 8, 2020.  ECF 656.  However, it was postponed to allow further settlement discussions among the parties.  Because those discussions were not successful in resolving the case, the Court scheduled a video hearing for June 16, 2020.  ECF 661.[6]

Notwithstanding the briefing schedule set forth in an Order of May 21, 2020 (ECF 653), both sides submitted exhibits on the eve of the hearing.  Defendants submitted a response to plaintiffs' Supplemental Motion (ECF 662), which appears similar to an earlier submission, along with 50 exhibits totaling more than 150 pages.  ECF 662-1 to ECF 662-50.  And, plaintiffs filed ten more exhibits.  ECF 663-2 to ECF 663-9; ECF 667; ECF 667-1.

---

[5] The submission docketed at ECF 655 appears to be identical to that which is docketed at ECF 657.

[6] Due to the COVID-19 pandemic, the Courthouse is currently closed to the public.

The Court held a lengthy video hearing on June 16, 2020, as scheduled, at which argument was presented. After the hearing, defendants submitted another exhibit. ECF 669. For the reasons that follow, I shall deny the Motion (ECF 645, ECF 652).

## I.   Background

### A.  COVID-19 Generally

Without a doubt, the COVID-19 pandemic is the worst public health crisis the country has experienced since 1918. The novel coronavirus is a "serious disease." ECF 645-7 (Declaration of Chris Beyrer, M.D., M.P.H.), ¶ 11. The virus is "fully adapted to human to human spread" and is highly infectious; a newly infected person is estimated to infect, on average, 3 additional persons. *Id.* ¶¶ 19, 20. According to plaintiffs' expert, Dr. Chris Beyrer, a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, the "attack rate," which measures the proportion of people exposed to the virus who develop COVID-19, is estimated at 20 to 30 percent, and may be as high as 80 percent in some settings, such as correctional facilities and nursing homes. *Id.* ¶ 21.

COVID-19 can cause severe complications and death. *Id.* ¶¶ 11-13. Fatality rates increase with age and underlying health conditions, such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. *Id.* ¶¶ 5, 16-17;  *see Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, Ctrs. For Disease Control & Prevention (May 14, 2020), https://bit.ly/2WBcB16. [7]  Moreover, due to disparate access to health care and higher incidence of certain preexisting medical conditions, African Americans are contracting the disease and dying from it at alarmingly higher rates than the general

---

[7] I may take judicial notice of facts in the public record. Fed. R. Evid. 201.

population.  *See Maria Godoy, What Do Coronavirus Racial Disparities Look Like State By State?* NPR (May 30, 2020 6:00 a.m.), https://n.pr/2UEpQN7.

Currently, there is no vaccine and no known cure for COVID-19.  ECF 645-7, ¶ 11.  Therefore, the  Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission, such as social distancing and mask wearing.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba.   In addition, the CDC advises vigilant hygiene practices, including hand-washing and disinfecting frequently touched surfaces.  *Id.*  Dr. Beyrer considers social distancing, which entails "avoiding human contact, and staying at least six feet away from other people," to be the "best way" to slow the spread of the virus.  ECF 645-7, ¶ 22.

In recognition of the threat posed by this highly infectious and dangerous virus, the World Health Organization ("WHO") declared COVID-19 a global pandemic.  *See* WHO Director-General's opening remarks at the mission briefing on COVID-19, WORLD HEALTH ORG. (March 12, 2020), https://bit.ly/2XWdodD.   The next day, President Trump declared a national emergency.  *See* The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/3flFu8i.   And, on March 30, 2020, Governor Hogan issued a "shelter-in-place" order, directing the citizenry of Maryland to remain at home except to conduct essential activities.  *See* Order of The Governor, No. 20-03-20-01 (Mar. 30, 2020),  https://bit.ly/37qyjsI.  Although Governor Hogan lifted the order on May 13, 2020, we have not returned to life as we have known it.  Social distancing and face masks are the new normal.  Many businesses, schools, places of worship, and centers of community life remain shuttered or have reopened with restrictions.

Despite the efforts to thwart the spread of the virus, the virus has proven to be highly contagious.  As of June 12, 2020, COVID-19 has infected over 2 million Americans and caused more than 113,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/3fhvqNf (last accessed June 12, 2020).  In Baltimore, nearly 300 people have died and over 6,000 have become sick.  *Id.*

### B.  COVID-19 in the Penal Setting

Given the difficulty of practicing social distancing in jails and prisons, the COVID-19 pandemic poses an acute challenge for incarcerated persons.  *See* ECF 645-7, ¶ 24.  As the New York Times recently noted, cases of the novel coronavirus "have soared in recent weeks" in prisons and jails "across the United States . . . ."  Timothy Williams *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgHZ.

The WHO has recognized that incarcerated people "are likely to be more vulnerable to the coronavirus disease (COVID-19) outbreak than the general population because of the confined conditions in which they live together for prolonged periods of time."  ECF 645-5 (Preparedness, prevention and control of COVID-19 in prisons and other places of detention, WORLD HEALTH ORG. (Mar. 15, 2020)) at 9.  Similarly, the CDC has observed that because incarcerated people "live, work, eat, study, and recreate within congregate environments," it will be difficult to stop the spread of COVID-19 once it enters a facility.  ECF 645-5 (Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 23, 2020)) at 3.

Other features common to correctional facilities, besides the inability to social distance, heighten the risk of viral outbreaks, including insufficient ventilation; shared toilet, shower, and

eating environments; and limits on the opportunity to maintain personal hygiene.  ECF 645-7, ¶ 26. In addition, facilities such as BCBIC frequently have high rates of population turnover, which increases the risk that, if a person infected with COVID-19 is not identified during the intake process, the disease may spread silently within the population, resulting in multiple new infections.  *Id.* ¶ 27.

To mitigate these risks, on March 23, 2020, the CDC issued guidance for officials operating detention facilities to help stop the spread of COVID-19.  ECF 645-5. The guidance instructs correctional facilities to implement "social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."  *Id.* at 12.  Indeed, social distancing "is a cornerstone of reducing transmission of respiratory diseases such as COVID-19" in jail environments.  *Id.* at 4.  If feasible, the CDC recommends moving bunks to allow for 6 feet or more space in all directions. *Id.* at 12.  If not possible, the CDC advises having inmates sleep head to foot to increase the distance between them.  *Id.*  Further, the CDC instructs correctional facilities to implement a host of other precautions, including screening and quarantining all new entrants; minimizing the movement of inmates; posting signage; isolating inmates who display symptoms of COVID-19; and frequent disinfection of public spaces.  *See id.* at 9-27. In addition, the CDC guidelines advise facilities to ensure that detainees are provided sufficient stocks of hygiene supplies and personal protective equipment.  *Id.* at 11.

Given the risks posed by COVID-19 to incarcerated individuals, along with the difficulties containing an outbreak, Dr. Beyrer opines that "outbreaks of COVID-19 among the U.S. jail and prison populations are highly likely."  ECF 645-7, ¶ 34.  Therefore, Dr. Beyrer

advises that "releasing as many inmates as possible" is an "important" measure to protect the health of inmates, correctional staff, and the community as a whole. *Id.*

### C. Conditions at BCBIC

BCBIC consists of three towers located at 300 East Madison Street in Baltimore. *See* ECF 657-3 (Diagram). The first floor houses administrative offices, the second floor is the intake center, and the third through fifth floors include housing at different levels of security, including dorm-style housing. *Id.*; *see also* ECF 666-3. The facility has the beds to house approximately 916 detainees—658 for men and 258 for women. ECF 657-5 (Resnick Declaration), ¶ 2.[8] *But see* ECF 675-3 (identifying 948 beds at BCBIC).

The number of detainees has varied considerably over the past several months. On May 1, 2020, BCBIC held 555 detainees. ECF 652-4 (5/1/2020 email from Assistant Attorney General Laura Mullaly) at 33. That number increased to 688 individuals on May 27, 2020. *Id.* According to the most recent tally offered by the parties on June 16, 2020, BCBIC currently houses 647 detainees.

The first case of COVID-19 at BCBIC was reported in early May. *See* ECF 660 at 1. By May 18, 2020, there were 23 reported cases. ECF 660, ¶ 4. At the hearing, plaintiffs' counsel reported that as of June 16, 2020, 35 detainees, 34 staff members, and 17 vendors had tested positive for the virus, with one staff death and no detainee deaths. *See also COVID-19 Update: Case Count*, MD. DEP'T OF PUBLIC SAFETY & CORR. SERVS., https://bit.ly/37qyjsI (last accessed June 15, 2020) (reporting similar numbers). Based on this data, plaintiffs assert that it is

---

[8] In addition to pretrial detainees, a small number of the individuals at BCBIC are serving short sentences. Because most of the individuals are pretrial detainees, however, I shall refer to the individuals collectively as detainees.

"evident that COVID-19 is not contained at BCBIC and is rapidly spreading" among the detainee population.  ECF 660-1 (Dr. Beyrer Supplemental Declaration), ¶ 4.

Dr. Michael Puisis is the independent medical monitor for BCBIC, designated pursuant to the Settlement Agreement to ensure compliance with its terms.  On March 26, 2020, he wrote to counsel for plaintiffs and defendants regarding measures that could be implemented at BCBIC to prevent the transmission of COVID-19, stating, ECF 645-9 at 2: "In a big sense, I strongly recommend depopulation of the jail to the extent that it is safe to release inmates. The jail can't be made safe with respect to current public health recommendations regarding social distancing and sanitation."  Beyond reducing the population, Dr. Puisis advised that BCBIC screen all arrestees; isolating symptomatic detainees; feeding detainees in their cells rather than the dining halls; screening vulnerable detainees every shift; sanitizing surfaces twice per shift; and providing detainees with hygiene supplies.  *Id.* at 2-5.

Frederick Abello is the Warden of BCBIC.  ECF 657-4 (Abello Declaration), ¶ 1.  He has outlined in detail the various measures implemented by the Commissioner of DPDS and the Secretary of DPSCS to abate and control the spread of the virus at BCBIC, consistent with suggestions from the CDC and Dr. Puisis.  *Id.* ¶ 3.  These measures include, *id.* ¶¶ 4-8:

- In an effort to limit the movement of detainees, social visits, attorney contact visits, inmate programs, outside non-emergency medical transports, and court transports have been suspended.

- Correctional staff have been assigned to specific housing units, rather than on a rotating scheduling.

- Each employee receives a temperature check and is required to complete a symptoms-based questionnaire prior to the start of his or her shift, based on recommendations from the CDC and the Maryland Department of Health.

- Signage has been posted in all housing units in both Spanish and English describing the virus's symptoms and indicating how detainees can reduce

the risk of transmission.  In addition to the bulletins, detainees have received education from the medical contractor's infection control coordinator on risk prevention and social distancing.[9]

- All detainees are provided with free soap and shampoo on Tuesdays and Fridays. Hand sanitizer has been placed on every floor of every housing unit.[10]  Each detainee's towel, issued upon commitment, is regularly washed and dried.

- Each new detainee is issued a mask. By the end of May 2020, every detainee was to be equipped with two masks.  Further, correctional and medical staff have received face shields and gowns and provided training on donning personal protective equipment.

- Detainee workers sanitize common areas, showers, and bathrooms twice per day using germicidal cleaner.  Any detainee who wishes to clean his cell or bunk area is provided cleaning supplies upon request.

- Bunk beds in dormitory areas are spaced 5'6 feet apart.  According to Mr. Abello, there is "insufficient space to place these beds 6 feet or greater apart."  However, in an effort to increase social distancing, detainees are advised to sleep with their head opposite to the feet of the detainee in the adjoining bunk.[11]

- Male detainees spend the first 14 days in quarantine before they are placed in the general population.  If the detainee in intake is placed in a double cell, he keeps the same cellmate throughout the process. Each quarantine cell is cleaned before a new detainee is assigned.  The quarantine process, which unfolds over four phases, involves temperature checks twice per day.

- BCBIC has created a quarantine housing unit for infected detainees. Detainees housed in this unit are monitored twice per day by medical staff and remain there for at least 14 days.

- BCBIC has established a unit for male detainee workers and those at heightened risk of experiencing complications from COVID-19.  These

---

[9] Examples of the signage are docketed at ECF 657-4 at 8-15.

[10] Initially, the hand sanitizer was nonalcohol based.  But, at the hearing, defendants' counsel informed the Court that BCBIC recently began to use alcohol-based hand sanitizer.

[11] Images of the bunks are docketed at ECF 663-2 and ECF 663-3 .

detainees receive twice-daily temperature checks and other medical monitoring.

Universal COVID-19 testing was not available at BCBIC prior to June 15, 2020.  *See* ECF 657-6 (Declaration of Zakaria Shaikh, M.P.H., M.B.A.), ¶¶ 3-5.[12]  Nonetheless, defendants maintain that "[n]either medical nor societal standards presently require universal testing for COVID-19."   ECF 657-8 (Declaration of Sharon Baucom, M.D.), ¶ 3.[13]   In any event, defendants' counsel advised the Court that all BCBIC detainees were tested for COVID-19 on June 15, 2020.  *See* ECF 669 (Resnick's Third Declaration).  And, according to Resnick, the DPDS Commissioner, prevalence testing for asymptomatic detainees began at BCBIC on June 15 and continued through June 18, 2020.  *Id.*  He also asserts that the testing of symptomatic detainees has been "ongoing."  *Id.*

In accordance with recommendations by Dr. Puisis, on June 1, 2020, DPDS established the "Health Monitoring Facility ("HMF"), a 30-bed dormitory for housing detainees who are positive for COVID-19 but who are medically stable.  *Id.* ¶ 7; *see* ECF 657-5, ¶ 4.  According to a DPDS policy issued on June 15, 2020, detainees isolated at the HMF receive education on the virus and PPE usage; have access to video family visitation; and are checked twice daily.  *See* ECF 662-20 (Standard Operating Procedures for HMF, June 15, 2020, at 1-4).  All detainees who spend time at HMF receive a virtual medical appointment within ten business days of discharge.  *Id.*  The beds are not double-bunked and are placed more than 6 feet apart.  *Id.*; *see* ECF 657-5 at 8-9 (photos of HMF).  The HMF is monitored by sixty correctional staff in three shifts, with 8 medical employees per shift.  *See* ECF 657-5, ¶ 7.

---

[12] Shaikh is Chief of Health Strategy and Operations at DPDS.

[13] Dr. Baucom is the Director of Clinical Services for DPSCS.

## II.     The Parties' Arguments

Plaintiffs assert that defendants have failed to take adequate measures to prevent and control an outbreak of COVID-19, in violation of the Settlement Agreement and the Due Process Clause of the Fourteenth Amendment to the Constitution.  ECF 645-1 at 11-18; ECF 652-1 at 5-9.  They acknowledge that defendants have "taken some steps" to protect BCBIC detainees from COVID-19, but plaintiffs maintain that these measures are "ineffective and in some cases counterproductive."  ECF 660 at 6.

For instance, plaintiffs contend that temperature checks and symptom screening of staff are an ineffective strategy to curb the spread of the virus because these efforts cannot capture contagious, asymptomatic carriers.  *Id.* at 6 (citing ECF 660-1, ¶ 6).  Spacing the beds five-and-a-half feet apart, plaintiffs argue, is insufficient to permit social distancing.  *Id.* (citing ECF 660-1, ¶ 8).  With respect to the HMF, plaintiffs argue that once its 30 beds are filled, it is not clear how BCBIC will quarantine and treat additional infected detainees.  *Id.* (citing ECF 660-1, ¶ 11).  And, at the hearing, plaintiffs' counsel asserted that housing medically vulnerable detainees in the same unit of detainee workers has increased the risk of serious illness and death.

Plaintiffs pursue relief under two distinct theories.  First, plaintiffs argue that the COVID-19 pandemic "has the potential to cause significant and life-threatening barriers to medical and mental health care and Defendants' ability to comply with the Settlement Agreement."  ECF 645-1 at 11.  In particular, plaintiffs contend that defendants have failed to comply with certain provisions of the Settlement Agreement, which dictate that BCBIC inmates receive medical care and mental health services within a specified timeframe.  *Id.* at 11 & n.10.  They urge the Court to order the release of BCBIC detainees, pursuant to its "plenary power" to enforce the Settlement Agreement.  *See* ECF 645-1 at 11; *see also* ECF 660 at 7-8.

Second, plaintiffs argue that, in light of the pandemic, the conditions of their confinement violate the Fourteenth Amendment to the Constitution.  ECF 645-1 at 12-15; ECF 660 at 7-11. Specifically, plaintiffs contend that defendants have been deliberately indifferent to the serious risk that COVID-19 poses to them.  And, given that this case predates the enactment of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.,* plaintiffs contend that the exhaustion provisions of the PLRA do not apply here.  ECF 660 at 11-12.

In response, defendants insist that plaintiffs' requested relief is foreclosed by State and federal law.  First, defendants argue that neither the Governor nor the DPDS Commissioner has authority under State law to release individuals who have been ordered detained by judges of Maryland courts.  *See* ECF 567 at 3-5.  Second, with respect to federal law, defendants assert that plaintiffs' Motion is not ripe for review because they have not exhausted their administrative remedies, as required by the PLRA.  ECF 567 at 14.  And, on the merits, defendants maintain that plaintiffs ignore the "extensive and well-documented changes" that have been made at BCBIC in accordance with recommendations of the CDC and the Maryland Department of Health.  *Id.* at 3.  Although defendants fail to address the Court's authority under the Settlement Agreement, they argue strenuously that plaintiffs' constitutional claim of deliberate indifference is without merit.  *Id.* at 16-21.

At the hearing on June 16, 2020, plaintiffs acknowledged that defendants had implemented many of measures that they originally requested in their Proposed Order (ECF 645-10), filed on April 9, 2020, including monitoring vulnerable detainees, sanitizing public areas regularly, and providing detainees with soap and towels.  However, plaintiffs maintained that defendants needed to do more to satisfy the Settlement Agreement and the Constitution.

Specifically, plaintiffs urged the Court to order defendants to ensure detainees could practice social distancing at all times, formulate a plan to release detainees, conduct universal testing regularly, and produce a written plan concerning the monitoring and treatment of vulnerable detainees. *See* ECF 645-10.

### III.    Discussion

### A.  The PLRA

I begin with defendants' contention that the PLRA bars consideration of plaintiffs' Motion.   The PLRA applies to all "prospective relief in *any* civil action brought with respect to prison conditions . . . ."  18 U.S.C. § 3626(a)(1) (emphasis added).  This includes actions brought by pretrial detainees challenging conditions of their detention.  *See id.* § 3626(g)(3) (defining "prisoner" to include "any person subject to . . . detention . . . who is accused of . . . violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program").

The PLRA requires detainees to seek administrative relief before petitioning a federal court for recourse.  Specifically, the PLRA provides, in pertinent part, *id.* § 1997e(a):

> No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement, but rather an affirmative defense to be pleaded and proven by defendants.  *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  Stated otherwise, although an inmate need not demonstrate exhaustion in his complaint, exhaustion is mandatory in the sense that a court must enforce the rule if properly asserted.  *See Bock*, 549 U.S. at 220.

14

Exhaustion under the PLRA serves two goals. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). First, exhaustion respects administrative agencies by allowing prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Bock*, 549 U.S. at 219; *see also Woodford*, 548 U.S. at 89. Second, exhaustion promotes administrative efficiency; it may "reduce the number of inmate suits" and, at a minimum "improve[s] the quality of suits that are filed by producing a useful administrative record." *Bock*, 549 U.S. at 219; *see also Woodford*, 548 U.S. at 89.

The "mandatory" language of PLRA's exhaustion requirement does not allow for judicially created exceptions. *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1857 (2016); *See Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). That said, the text of § 1997(e) only requires an inmate to pursue the administrative process to the extent such remedies are "available." Consequently, although an inmate must exhaust available remedies, he need not exhaust ones that are unavailable. *See Ross*, 136 S. Ct. at 1858; *see also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.").

A remedy is not "available"—and therefore exhaustion is not required—when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859-60 (internal quotation marks omitted).

I am satisfied that the PLRA does not compel the Court to reject plaintiffs' Motion. For starters, the PLRA's exhaustion requirement does not apply to plaintiffs' claims predicated on

the Settlement Agreement.  As plaintiffs observe, by its plain text, § 1997(e) requires exhaustion before "an action" can be "brought" under federal law.  ECF 660 at 11.  To the extent that plaintiffs seek to vindicate violations of the Settlement Agreement, the Motion is not a discrete "action.  Instead, plaintiffs' contention that the conditions at BCBIC violate the terms of the Settlement Agreement is the continuation of a single, ongoing lawsuit that was initiated well before the enactment of the PLRA. *See Action*, BLACK'S LAW DICTIONARY (11th ed. 2019) (describing an "action" as a civil or criminal proceeding that terminates in a judgment); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (observing that federal courts  have broad remedial power to ensure compliance of a consent decree); *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 833 (4th Cir. 2005) (recognizing that courts have "inherent" power to modify a consent decree).  Therefore, the PLRA's exhaustion requirement does not apply to plaintiffs' claims brought under the Settlement Agreement. *See Baxley v. Jividen*, No. 3:18-1526, 2020 WL 1802935, at *3 (S.D. W. Va. April 8, 2020) (declining to apply PLRA exhaustion to claims challenging prison's response to COVID-19 asserted in a lawsuit that was properly exhausted and initiated prior to the pandemic); *Clark v. California*, 739 F. Supp. 2d 1168, 1232 (N.D. Cal. 2010) (refusing to apply the PLRA to a class action suit that predated the PLRA).

Even assuming, *arguendo*, that plaintiffs' constitutional claims are subject to the PLRA, exhaustion would not be required because administrative relief is unavailable.  First, DPDS's administrative grievance process does not allow a detainee to request his or her release, which is the relief that plaintiffs seek.  *See* ECF 657-9 (DPDS No. 180-1 Grievance Policy (June 20, 2008)) at 5 (specifying that "Grievable Issues" are those "regarding conditions of confinement, actions of staff, [and] services received" and "may not be submitted" to challenge "terms of court

commitment orders"). Thus, in this case administrative exhaustion is a "dead end."

Moreover, DPDS's four-step grievance procedure contains no deadlines and therefore fails to assure that an inmate's grievance will be reviewed by DPDS before the inmate is affected by COVID-19. *See Valentine v. Collier*, ___ U.S. ___, 140 S. Ct. 1598 at 1600-01 (2020) (mem.) (statement of Sotomayor and Ginsburg, JJ., regarding the denial of application to vacate stay; suggesting that administrative remedies may be unavailable in light of a "rapidly spreading pandemic like COVID-19"); *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) ("If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available."); *accord Cameron v. Bouchard*, 2020 WL 2569868, at *22 (E.D. Mich. May 21, 2020), *stayed*, ___ F. App'x ___, 2020 WL 3100187 (6th Cir. June 11, 2020). *But see Valentine v. Collier*, 956 F.3d 797, 805 (5th Cir. 2020). Indeed, although defendants' counsel argued at the hearing that none of the plaintiffs had filed a grievance, defendants have put forth no evidence to establish that detainees at BCBIC are able to lodge grievances or that DPDS is processing such complaints.

In sum, the Motion does not falter for lack of administrative exhaustion.

## B.  The Governor's Authority

Defendants contend that the Court cannot order Governor Hogan to release detainees because he lacks the requisite authority under Maryland law. This contention lacks merit.

Pursuant to Maryland Code (2018 Repl. Vol.), § 14-3A-03(d)(1) of the Public Safety Article ("P.S."), once the Governor proclaims a public health emergency, he "may order the evacuation, closing, or decontamination of any facility." Further, under P.S. § 14-107(d)(1)(i), the Governor can "suspend the effect of any statute or rule or regulation of an agency of the State

or a political subdivision," and P.S. § 14-107(d)(1)(ii) permits the Governor to "direct and compel the evacuation of all or part of the population from a stricken or threatened area in the State" if he deems it necessary to protect the public health.

Governor Hogan declared a state of emergency as a result of the COVID-19 pandemic on March 5, 2020. *See* Declaration of State of Emergency and Existence of Catastrophic Health Emergency—COVID-19 (Mar. 5, 2020). Exercising his emergency powers, Governor Hogan ordered DPSCS Secretary Robert Green to release eligible inmates to mandatory supervision or home confinement. *See* ECF 660-3 (Order of the Governor, No. 20-04-18-01 (Apr. 18, 2020)). And, Secretary Green heeded the directive. Between March 13 and June 2, 2020, 309 inmates were released, either through mandatory supervision or early parole. *See* ECF 657 at 4.

Defendants resist the conclusion that the Court could order Governor Hogan to direct the release of detainees, asserting that detainees, unlike prisoners, are committed to pretrial detention by court order. Therefore, defendants' counsel maintained at the hearing that if the Court issued such an order, it would expose Governor Hogan to contempt of court and intrude on separation of powers. Defendants' distinction does not hold water.

Convicted persons, like detainees, are held pursuant to a court order. And, like convicted persons, the task of housing, feeding, and caring for detainees falls to DPSCS, not to the judges of the State courts. It follows that if Governor Hogan has the authority to release inmates who are sentenced, as defendants recognize, then he also has such authority as to pretrial detainees. And, at the very least, Governor Hogan plainly has such authority as to those persons at BCBIC who are serving short sentences.

Accordingly, the Court is satisfied that Governor Hogan could, if he desired, order the release of persons held at BCBIC. And, even assuming, *arguendo*, that Governor Hogan could

18

not release detainees from BCBIC, absent a State court order, the Supremacy Clause, U.S. Const. Art. 6, cl. 2, empowers this Court to rectify unconstitutional prison conditions, including by enjoining State officials. *See, e.g*., *Brown v. Plata*, 493 U.S. 131 (2011).

### C. The Settlement Agreement

Plaintiffs maintain that the Settlement Agreement affords them the relief that they seek, and that they are thus seeking to enforce it. They assert that defendants "have failed to take effective steps to protect the health and safety of the hundreds of persons currently detained in BCBIC in light of the COVID19 pandemic" and this failure violates the Settlement Agreement. ECF 547-1 at 9. In particular, plaintiffs surmise that once COVI-19 penetrates BCBIC, the "demand for medical care will explode," preventing defendants from providing timely medical treatment as required by the Settlement Agreement. ECF 547-1 at 12.

In the Motion, plaintiffs contend that defendants have violated or will violate the following provisions of the Settlement Agreement, *id.* at 12 & n.10 (citing ECF 541-2 at 3-10):

- ¶ 17(b): "The Commissioner shall ensure that any plaintiff who reports during intake screening that he or she is currently prescribed medication for medical condition, or who presents with an urgent medical need, shall receive a physical assessment by a Clinician within 24 hours of the intake screening, or sooner if clinically indicated."[14]

- ¶ 18(c): "The Commissioner shall promulgate and implement policy and procedure to ensure that initial diagnosis and identification of Ongoing Conditions, along with any elements of a Plan of Care that do not require development at chronic care clinics or through specialist referral, shall be conducted and entered into the EMR within seven days of the plaintiff's admission, or sooner if clinically indicated."

- ¶ 19(e)(i): "The Commissioner shall promulgate and implement policy and procedure requiring a Clinician to . . . . document review of critical or other serious abnormal values, and any action taken as a result of that review, within 24 hours of the testing results becoming available, or sooner if

---

[14] In the Motion, plaintiffs incorrectly identify this provision at Paragraph 18(b), but it is found in Paragraph 17(b). ECF 645-1 at 12.

clinically indicated, provided that review may be documented by a RN based on telephonic consultation with a Clinician."

- ¶ 23(a)-(b): "The Commissioner shall promulgate and implement policy and procedure" that "shall provide that plaintiffs are referred to specialists as medically necessary and that the process for review and approval of specialty consultation does not take more than 48 hours for urgent care and five business days for routine care."

At the hearing, plaintiffs' counsel changed horses midstream. There, they argued that defendants' failure to provide single-cell housing to medically vulnerable detainees violates Paragraph 21(a) of the Settlement Agreement, which requires the Commissioner to craft a policy to ensure detainees with disabilities receive "special accommodations," including appropriate housing. *See* ECF 541-2 at 6, 9. And, they asserted that defendants' refusal to test all new arrestees violates Paragraph 19(f), which requires the Commissioner to implement a policy to ensure that lab testing is conducted "within timeframes consistent with the urgency of the test and the capacity of appropriately functioning laboratories."

Even assuming that the provisions of the Settlement Agreement encompass the unforeseen pandemic, there is no evidence in the record to establish that BCBIC has fallen short of its obligations under the Settlement Agreement. Besides offering speculation, plaintiffs have put forth no facts that would enable the Court to find that the provisions they have cited have, in fact, been violated. For instance, there is no evidence to suggest that defendants are not screening arrestees at intake for medical concerns. Similarly, plaintiffs do not contend that they are not receiving routine medical care or that the results of COVID-19 tests are languishing. Although defendants concede that they are not testing all new arrestees, Provision 19(f) qualifies that testing is contingent on the "capacity" of labs to perform the tests.

Indeed, if anything, the evidence suggests that defendants are complying with these provisions of the Settlement Agreement. For instance, defendants represent that all arrestees are

screened for COVID-19 symptoms at intake and are quarantined for 14 days.  ECF 657-4, ¶ 6. Those detainees in general population who exhibit symptoms are quarantined and are monitored by medical staff twice per day.  *Id.* ¶ 7.  Vulnerable detainees are housed in a special unit and receive temperature checks twice per day, along with medical monitoring.  *Id.* ¶ 8.  Defendants have created a plan for treating sick detainees, including creating the HMF. And, it appears that defendants have begun universal testing of detainees at BCBIC.

Accordingly, plaintiffs' speculative argument that COVID-19 has resulted or will result in violations of the Settlement Agreement does not serve as a basis to grant injunctive relief.

### D.  Due Process Claim

Plaintiffs' constitutional claim fares no better.

As noted, plaintiffs assert that defendants acted with deliberate indifference towards the serious risk that COVID-19 poses to them, in violation of the Due Process Clause of the Fourteenth Amendment.  ECF 645-1 at 12-15; ECF 660 at 7-10.  Plaintiffs' claim arises under the Fourteenth Amendment because plaintiffs are pretrial detainees, and the Eighth Amendment governs claims lodged by convicted prisoners.  *See*, *e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 990-91 (4th Cir. 1992).  However, this is a distinction without a difference, as the constitutional analysis under the Eighth and Fourteenth Amendments is coterminous.  *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 n.6 (4th Cir. 2017).  Given that the constitutional protections afforded to pretrial detainees under the Fourteenth Amendment are coextensive with those provided to convicted prisoners under the Eighth Amendment, I shall refer to cases under the Eighth Amendment in analyzing the contentions.

Because incarceration deprives a person of his basic freedoms, the Eighth and Fourteenth

Amendments impose affirmative obligations on correctional officials to "ensure humane conditions of confinement" and to "'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted); *accord Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (acknowledging that the Eighth Amendment imposes "certain basic duties on prison officials," such as requiring "reasonable measures to guarantee the safety of the inmates"). These constitutional obligations extend to protecting detainees from "future harm," including serious communicable diseases. *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see id.* at 35 (concluding that inmate had alleged plausible Eighth Amendment violation based on exposure to environmental tobacco smoke); *see also Heyer*, 849 F.3d at 210 (concluding that plaintiff sufficiently alleged that the absence of a sign language interpreter during medical interaction exposed him to substantial risk of serious harm, in violation of Eighth Amendment).

In *Farmer*, 511 U.S. 825, the Supreme Court explained that a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828. There, the Court set forth a two-prong framework to evaluate whether a correctional official acted with "deliberate indifference" to a serious harm such the conduct violates the Constitution. *Id.* at 834. The first inquiry is objective, while the second is subjective. *Id.*; *see Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019); *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017).

Under the objective element, the plaintiff must establish "a substantial risk of serious harm." *Farmer*, U.S. at 834. The Fourth Circuit has clarified that a "sufficiently serious" deprivation is one that is "extreme—meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of serious harm

resulting from exposure to the challenged conditions.'"  *Porter*, 923 F.3d at 355 (internal

quotation marks, ellipses, and citation omitted); *see also Scinto v. Stansberry*, 841 F.3d 219, 225

(4th Cir. 2016); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

To satisfy the subjective element, the plaintiff must show that the prison official acted

with "a 'sufficiently culpable state of mind.'"  *Farmer*, 511 U.S. at 834 (citation omitted).  In the

context of a claim concerning conditions of confinement, the defendant must have acted with

"deliberate indifference" towards the risk of serious harm, *id.* at 834, which is akin to "recklessly

disregarding that risk."  *Id.*  A defendant acts with reckless disregard when he "knows of and

disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists and

he must also draw the inference." *Id.* at 837.  The Fourth Circuit has said: "True subjective

recklessness requires knowledge both of the general risk, and also that the conduct is

inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see*

*Scinto*, 841 F.3d at 226; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *Anderson v.*

*Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir.

2014).

Deliberate indifference is an "exacting standard."  *Lightsey*, 775 F.3d at 178; *see id.*

(explaining that run-of-the-mill medical malpractice does not amount to deliberate indifference);

*see Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) (observing that the deliberate

indifference standard is a "very high").  That said, the deliberate indifference standard demands

more than "is satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 835; *see King v.*

*Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).  A plaintiff can meet the subjective knowledge

requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019); *Scinto*, 841 F.3d at 225.  And, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk."  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995).

Relevant here, the Supreme Court recognized in *Farmer*, 511 U.S. at 844, that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  That is so because the Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping dangerous [people] in safe custody under humane conditions."  *Id.* at 845 (citations and quotation marks omitted).  Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard.  *Id.*; *see, e.g.*, *Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not).

Against this doctrinal backdrop, plaintiffs' claim makes it out of the starting gate but not across the finish line.  As to the harm analysis, defendants contend that plaintiffs have failed to establish a risk of serious harm because they have "not produced evidence of a serious or significant physical or emotional injury resulting from the alleged conditions."  ECF 657 at 19. This contention "taxes the credulity of the credulous."  *Maryland v. King*, 569 U.S. 435, 466

(2013) (Scalia, J., dissenting).  The deliberate indifference standard does not require plaintiffs to show that they have, in fact, suffered harm.  Instead, plaintiffs need only establish that they are "incarcerated under conditions posing a substantial *risk* of serious harm."  *Farmer*, 511 U.S. at 834 (emphasis added); *see Heyer*, 849 F.3d at 210 ("An actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury.").

And, it is beyond dispute that COVID-19 poses a risk of serious or fatal harm to detainees at BCBIC.  *See, e.g.*, *Swain v. Junior*, ___ F.3d ___, 2020 WL 3167628, at *5 (11th Cir. June 15, 2020) (noting that defendants "wisely" conceded that COVID-19 satisfies the objective prong of the deliberate indifference standard); *Wilson v. Williams*, ___ F.3d ___, 2020 WL 3056217, at *7 (6th Cir. June 9, 2020) (concluding that COVID-19 "easily" satisfies the first prong of the deliberate indifference standard); *Valentine*, 956 F.3d at 802 (stating that there is "no doubt" that COVID-19 poses a risk of serious harm).  Indeed, the virus's infection and fatality rates nationally—and at BCBIC specifically—underscore the real threat that it poses to detainees and staff alike.  Further, given the dormitory-style housing in portions of BCBID, it is likely that the virus will continue to spread through the general population, causing sickness and possibly death.   In sum, plaintiffs have adduced sufficient evidence that the COVID-19 pandemic, in conjunction with their incarceration, places them at substantial risk of serious harm.

Regarding the subjective prong, defendants do not contend that they are unaware of COVID-19, either generally or at BCBIC.  Indeed, more than 60 detainees and staff members have tested positive for the virus and one staff member has died.  *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("[A court] may infer the existence of this subjective state of mind from the fact that the risk of harm is so obvious.").  And, defendants acknowledge these dangers, as evidenced by the various steps they have taken at BCBIC to mitigate the virus.  *See Wilson*, 2020 WL

3056217, at *8; *Valentine*, 956 F.3d at 801.  Therefore, the deliberate indifference inquiry reduces to whether defendants' response to COVID-19 was reasonable.  *Farmer*, 511 U.S. at 844.

Based on the evidence in the record, plaintiffs cannot demonstrate that defendants have been deliberately indifferent to plaintiffs' health and safety.  As recounted above, defendants have gone to extraordinary lengths to implement precautionary measures at BCBIC that align with the CDC's COVID-19 guidelines and the recommendations of medical professionals. These measures include posting bulletins to educate detainees on the symptoms of COVID-19; canceling visitation; providing all inmates with masks, soap, towels, and alcohol-based hand sanitizer; equipping staff with PPE; cleaning common areas twice per shift; performing frequent temperature checks; quarantining new detainees; isolating infected individuals in a separate unit; and, on at least one occasion, testing all detainees and staff.  Notably, other courts, both in the Fourth Circuit and elsewhere, have found that similar actions taken by correctional officials constituted a reasonable response to the unforeseen, rapidly evolving COVID-19 pandemic.  *See Swain*, 2020 WL 3167628, at *5; *Wilson*, 2020 WL 3056217, at *7; *Valentine*, 956 F.3d at 802; *Hallinan v. Scarantino*, No. 5:20-HC-2088-FL, 2020 WL 3105094, at *16 (E.D.N.C. June 11, 2020).

Plaintiffs' specific attacks on various components of BCBIC's virus mitigation strategy do not undermine my conclusion that defendants are not deliberately indifferent.  First, plaintiffs urge the Court to find that defendants' reluctance to place BCBIC detainees on home confinement or supervised release amounts to deliberate indifference.

To be sure, it is troubling that the population at BCBIC has increased over the past month, because "social distancing is 'a cornerstone of reducing transmission of respiratory

disease.'"   *Wilson*, 2020 WL 3056217, at *13 (citation omitted).   And, it does not require medical expertise to conclude that a swift reduction of the jail population would be a prudent public health measure, because it would help to facilitate social distancing.   But, as other courts have recently explained in closely analogous cases, the law does not require correctional officers to utilize every tool in the toolkit when addressing a serious risk of harm.   *See Wilson*, 2020 WL 3056217, at *11 (rejecting petitioners' contention that BOP was deliberately indifferent to COVID-19 because it could use compassionate release to reduce prison population); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004); *Brown*, 240 F.3d at 390-91; *Grayso*n, 195 F.3d at 695.

Plaintiffs focus, *inter alia*, on the distance between bunk beds, which are spaced less than six feet apart, thereby precluding the ability of inmates to accomplish social distancing. However, the inability of detainees to practice social distancing at all times does not, without more, demonstrate that defendants have deliberately disregarded these risks. *See Swain*, 2020 WL 3167628, at *7 ("Failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference."); *see* ECF 645-5 at 12 (CDC acknowledging that social distancing strategies "will need to be tailored to the individual space in the facility" and that "[n]ot all strategies will be feasible in all facilities").

*Hallinan*, 2020 WL 3105094, concerning FCC Butner, is informative.   There, the petitioners sought injunctive relief, claiming that the respondents failed to control the spread of COVID-19.   The court observed that the prison is overcrowded and "thus social distancing is impossible."   *Id.* at *14.   At FCI Butner-Low, for example, 150 inmates reside in a dormitory unit.   *Id.*   The dormitories are large rooms, divided into cubicles, and inmates "sleep within six feet of each other."   *Id.* at *6.   Some inmates sleep in halls or along walls, where other inmates

pass by. *Id.* The court observed, however, that respondents implemented measures to ameliorate the risk, such as increased cleaning, use of masks, and limited movement within the facility. *Id.* at *14. And, the court underscored that the Eighth Amendment "does not require [prison] officials to take all conceivable steps to prevent the spread of COVID-19, provided their response to the virus remains reasonable." *Id.* at *16.

Here, although defendants are unable to move the bunk beds, they have taken other measures recommended by the CDC to facilitate social distancing. These include educating detainees on the importance of the practice, instructing detainees to sleep head-to-feet, suspending programming, providing masks to detainees, and removing vulnerable detainees from the general population. *See id.* (CDC recommending these measures); ECF 657-4, ¶ 4-8. These actions do not reflect deliberate indifference. Rather, the conduct reflects a considered response to an unforeseen pandemic, within the physical limitations inherent in the correctional facility. Notably, other courts have declined to find that the inability to ensure socially-distant bunking amounts to deliberate indifference to the threat of COVID-19, particularly where prison officials took other steps, such as encouraging prisoners to sleep head-to-foot. *See Swain*, 2020 WL 3167628, at *8; *Hallinan*, 2020 WL 3105094, at *14.

Similarly, the lack of universal testing does not indicate a constitutional deprivation. For one thing, the CDC guidelines do not currently recommend universal testing. Regardless, it appears that BCBIC tested all BCBIC detainees on June 15, 2020. ECF 669. And, there is no dispute that detainees who display symptoms of COVID-19 promptly receive a test. Thus, here too, defendants' efforts concerning testing hardly suggest that they have disregarded the severe risk presented by COVID-19. *See Hallinan*, 2020 WL 3105094, at *16 (rejecting absence of universal testing as evidence of deliberate indifference).

28

Plaintiffs' Motion boils down to the belief that reducing the population at BCBIC is the *only* way to reduce the spread of the virus.  Yet, as the Supreme Court explained in *Farmer*, 511 U.S. 825, the deliberate indifference standard does not hinge on whether the actions taken by prison officials actually prevent the contemplated harms.  *See id.* at 844 (explaining that a prison official who responds "reasonably to the risk" is not liable "even if the harm ultimately was not adverted").   Put differently, the Constitution demands that correctional officers undertake reasonable measures to protect detainees and inmates; it does not dictate that those efforts be efficacious.  *Swain*, 2020 WL 3167628, at *7 (finding that the district court erred in concluding that detainees had likely established deliberate indifference based on the increasing rate of COVID-19 infections); *Wilson*, 2020 WL 3056217, at *10 (same).

There can be no dispute that defendants have implemented numerous public health measures at BCBIC to abate the risks presented by COVID-19.  *Compare Seth v. McDough*, PX-20-1028, 2020 WL 2571168 (D. Md. May 21, 2020) (as to a case "in its infancy," *id.* at *1, granting TRO requiring, *inter alia*, a plan for care of high risk detainees where correctional officials had failed to respond to the pandemic), *appeal docketed* No. 20-6776 (4th Cir. May 27, 2020).

In sum, defendants' failure to reduce the population of BCBIC does not establish that defendants have acted with deliberate indifference.  *Farmer*, 511 U.S. at 840.

## IV.    Conclusion

It is impossible to put in words the myriad ways that COVID-19 has deeply affected our lives.  For those confined against their will, the pandemic presents serious if not severe hardships over which the detainees have no control.  At the hearing, plaintiffs' counsel urged the Court to remember "'that a society's worth can be judged by taking stock of its prisons,'" particularly in

times of crisis.  (quoting *Valentine*, 140 S. Ct. at 16001).  I could not agree more.  Indeed, when the government "takes a person into its custody and holds him there against his will, the Constitution imposes upon him a corresponding duty to assume some responsibility for his safety and general well-being."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189-199-200 (1989).  That constitutional obligation does not yield in times of crisis.

Ultimately, the evidence presented to the Court demonstrates a concerted, deliberate effort on the part of defendants to safeguard the health and welfare of the Maryland citizens in their charge.  Certainly, defendants can—indeed, they should—do more to facilitate social distancing at BCBIC, including reducing the detainee population.   But, at this juncture, plaintiffs have not established that defendants' response to the pandemic violates either the Settlement Agreement or the Constitution.  Accordingly, I shall deny the Motion.

An Order follows, consistent with this Memorandum Opinion.

Date:   June 19, 2020                              _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge