IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEROME DUVALL, *et al.*,
    *Plaintiffs*,

    v.                                                                    Civil Action No. ELH-94-2541

LAWRENCE HOGAN, JR., *et al.*,
    *Defendants*.

## MEMORANDUM OPINION

This Memorandum Opinion addresses "Plaintiffs' Motion For Enforcement And Further Relief" (ECF 675) and "Plaintiffs Renewed Motion For Enforcement And Further Relief." ECF 702. These motions are supported by memoranda (ECF 675-1; ECF 702-1) and numerous exhibits. They pertain to ongoing litigation concerning the health, welfare, and safety of pretrial detainees at the Baltimore City Detention ("BCDC"). The litigation has endured for nearly six decades.[1]

Plaintiffs consist of a class of individuals detained at a portion of BCDC known as the Baltimore City Booking and Intake Center ("BCBIC"). The defendants have changed over time. Currently, they are Lawrence J. Hogan, Jr., the Governor of Maryland; Robert L. Green, the Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); and Michael R. Resnick, Esquire, the Commissioner (the "Commissioner") of the Maryland Division of Pretrial Detention and Services ("DPDS"). *See* ECF 709 at 1.

---

[1] The case was opened in 1976 and initially assigned to the late Judge Frank A. Kaufman. *See* case 76-1255. In 1994, the Clerk was directed to close case 76-1255 and to open case 94-2541 as a new matter. *See* ECF 1. From 1993 until mid-2011, Judge J. Frederick Motz presided over the litigation. In July 2011, the case was reassigned to me. *See* ECF 419.

Because of the age of the case, many filings are not electronically available. The filings became electronically available as of October 16, 2002, with ECF 89 in case 94-2541.

Over the years, the case has resulted in countless court orders, as well as multiple settlement agreements.[2]  The case has been closed and reopened on occasions too frequent to recount.  Several of the Court's orders provide for continued monitoring of certain aspects of the operation of BCDC and the conditions of confinement at the facility.

Of relevance here, the parties entered into a Settlement Agreement on November 16, 2015.  *See* ECF 541-2; ECF 552.  Thereafter, they sought judicial approval of the settlement agreement.  ECF 571.  Then, on June 23, 2016, the parties entered a "First Amendment to Settlement Agreement" ("Amendment").  ECF 574.  Unless otherwise noted, I shall refer to the Settlement Agreement and the Amendment collectively as the "Settlement Agreement" or the "Agreement."

The Amendment was necessitated by the closure in September 2015 of the Men's Detention Center, which was previously part of BCDC, and the anticipated closure of the Women's Detention Center, the Annex, and the Wyatt Building. The Amendment extended most of the provisions in the Settlement Agreement to pretrial detainees at BCBIC. *See* ECF 572-1.

The Court held hearings as to the settlement on April 15, 2016 (ECF 555) and June 28, 2016.  ECF 573.  By Memorandum Opinion (ECF 575) and Order (ECF 577) of June 28, 2016, I approved the Agreement.[3] The case was closed. *See* Docket.

The Agreement, by its terms, was originally set to terminate in June 2020. ECF 577.  But, plaintiffs moved to reopen the case in 2018.   ECF 582.   They also moved to enforce the Agreement.  ECF 583.  Those disputes were ultimately resolved by an agreement of the parties to

---

[2] The "tortured procedural history" of this case is recounted in the Court's Memorandum Opinion of June 28, 2016.  ECF 575.

[3] In addition, I issued a separate Order awarding attorneys' fees to plaintiffs' counsel. ECF 576.

extend the expiration of the Settlement Agreement. ECF 640. The Court approved that modification by Order of May 28, 2019. ECF 642. Therefore, the Settlement Agreement is now set to expire on June 22, 2022. *Id.*

During the past year, plaintiffs have filed several motions in relation to the COVID-19 pandemic. In particular, on April 9, 2020, plaintiffs filed an "Emergency Motion For Relief From Risk Of Injury And Death From COVID-19." ECF 645. They also filed supplements. ECF 652; ECF 669. In the motion, plaintiffs asserted that defendants had failed to implement adequate measures at BCBIC to mitigate the risk posed by the coronavirus. *See* ECF 645-1 at 9-11.

The court held a hearing on the motion on June 16, 2020. ECF 668.[4] Thereafter, by Memorandum Opinion (ECF 670) and Order (ECF 671) of June 19, 2020, I denied the request for relief, concluding that plaintiffs did not establish that defendants' response to the pandemic violated either the Settlement Agreement or the Constitution. ECF 670; ECF 671. Rather, I found that the evidence demonstrated a concerted, deliberate effort on the part of defendants to safeguard the health and welfare of the detainees. However, I have since issued various orders relating to defendants' response to the pandemic. *See* ECF 674 (Order requiring defendants to develop a policy governing the monitoring and treatment of detainees at heightened risk); ECF 684 (Order requiring weekly COVID-19 testing and mask distribution); ECF 722 (Order requiring disclosure of information regarding COVID-19 vaccines).

Plaintiffs filed their "Motion to Enforce the Settlement Agreement" (ECF 675) on July 31, 2020. The parties subsequently agreed to hold the motion in abeyance, pending mediation with Magistrate Judge Timothy Sullivan. ECF 686. Ultimately, the parties were unable to resolve their disputes. *See* ECF 699. As a result, plaintiffs renewed their motion on November

---

[4] Due to the pandemic, the hearing was held by video.

20, 2020. ECF 702. I shall refer to ECF 675 and ECF 702 collectively as the "Motion."

In the Motion, plaintiffs assert that over the past four years defendants have failed to achieve substantial compliance with the Settlement Agreement because of "their lack of any incentive to do so." ECF 702-1 at 1. Thus, plaintiffs seek various forms of relief including, *inter alia*, a court order requiring defendants to develop a detailed plan with timelines and a deadline for achieving compliance. They also seek an extension of the terms of the Settlement Agreement for an additional two years.

Defendants oppose the Motion (ECF 709) and submitted three exhibits. ECF 709-1 to ECF 709-3. Plaintiffs replied (ECF 721) and submitted additional exhibits. ECF 721-1; ECF 721-2.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion, in part.

## I.    Background[5]

### A.  The Settlement Agreement

The Settlement Agreement pertains to a broad class of detainees at BCBIC and concerns various issues. *See* ECF 541-2.  In particular, the Agreement addresses the following areas: medical and mental health care; "physical plant" issues; the provision of accessible living and personal hygiene areas for persons with disabilities; and requirements for building maintenance, housekeeping, and sanitation. ECF 541-2.

The Agreement contains ten "substantive provisions."  The category of "Medical and Mental Health Care" includes "Intake and initiation of medication" (¶ 17); "Medical Plan of

---

[5] I incorporate by reference all relevant background information as contained in my opinions of June 28, 2016 (ECF 575) and June 19, 2020 (ECF 670). The facts set forth here are limited to those pertinent to the Motion.

4

Care" (¶ 18); "Medication Management and Testing" (¶ 19); "Interaction Between Medical and Custody" (¶ 20); "Accommodations for plaintiffs with disabilities" (¶ 21); "Specialty Care/Consultation" (¶ 22); "Sick Call" (¶ 23); "Medical Records" (¶ 24); and "Mental Health Care" (¶ 25). In addition, it includes a substantive provision in the category of "Physical Plant." *See id.* ¶ 26.

Of relevance here, the Agreement creates a structure to achieve compliance with the substantive provisions of the Agreement. This structure includes a "compliance coordinator," appointed by the Commissioner, and three "Monitors" who have "professional training and experience in evaluation and supervision of correctional programs in the areas covered by the agreement." *Id.* at 13, 16.

The responsibilities of the Monitors include, in pertinent part, *id*. ¶ 38:

   a. Conduct on-side inspections of BCDC as necessary in their professional judgment to monitor the implementation of this Settlement Agreement, but no less frequently than once every six months for the first two years from the Effective Date.

   b. Review evidence relating to compliance and assess the Commissioner's progress in meeting the requirements of this Settlement Agreement, including assessing any allegations of Plaintiffs regarding lack of compliance…

In addition, the Settlement Agreement includes various reporting requirements. First, the "Commissioner shall submit semi-annual compliance reports to the Monitors, with a copy to Plaintiffs' counsel." *Id.* ¶ 34. The Commissioner's compliance report "shall describe the status of compliance, including changes in that status, during the reporting period, and further steps anticipated during the next reporting period, to implement the terms of this Settlement Agreement." *Id.*

Substantial compliance is defined in the Agreement as follows, *id.* ¶ 39:

For purposes of this Settlement Agreement, "substantial compliance" means that the Commissioner has achieved: (a) full compliance with the components of the relevant substantive provision of this Settlement Agreement; or (b) sufficient compliance with the components of the relevant substantive provision of this Settlement Agreement such as to remove significant threat of constitutional injury to the plaintiff class posed by any lack of compliance with the components of that substantive provision. For purposes of this Settlement Agreement, a "substantive provision" means the requirements set forth in a single numbered paragraph in Section III of this Settlement Agreement.

And, when the Commissioner claims to have attained substantial compliance with any provision of the Settlement Agreement, the Monitor is to issue a report assessing the claim of substantial compliance. In particular, the Agreement provides, *id.* ¶ 38(d)(i):

Within two months of the submission of a semi-annual compliance report by the Commissioner in which the Commissioner claims to have achieved substantial compliance with one or more substantive provisions of this Settlement Agreement, the appropriate Monitor shall issue a report stating whether the Commissioner has achieved substantial compliance with each applicable substantive provision of this Settlement Agreement at issue.

Notably, "[i]f and when the Commissioner achieves substantial compliance with a substantive provision of this Settlement Agreement, and maintains substantial compliance with such substantive provision for at least six months, such substantive provision of this Settlement Agreement shall be deemed satisfied." *Id.* ¶ 40.

Further, the Settlement Agreement provides that it "shall terminate" either when the Commissioner has achieved substantial compliance or four years from the effective date, whichever is earlier. *Id.* ¶ 42.  The "Effective Date" is defined as "the date the Court enters th[e] Settlement Agreement as an order of the Court." *Id.* ¶ 6.

Of relevance here, the Agreement allows for an extension beyond four years if "Plaintiffs have previously obtained an order from the Court that is fully compliant with 18 U.S.C. § 3626(a)(1) and that finds that the extension of one or more substantive provisions of this Settlement Agreement is necessary to correct an identified, ongoing constitutional violation,

6

extends no further than necessary to correct that ongoing violation, and is the least intrusive means necessary to correct that ongoing violation." *Id.*

With regard to the role and responsibility of the Court, the Agreement states, in relevant part, *id.* ¶ 49:

> 49. The parties consent to the reservation and exercise of jurisdiction by the Court over all disputes between and among the parties arising out of this Settlement Agreement, subject to satisfaction of the following protocol:
>
> a. If, prior to any finding of substantial compliance by a Monitor, Plaintiffs assert that Defendant are not in compliance with one or more of the obligations under this Settlement Agreement, Plaintiffs shall provide Defendants with a written notice to that effect….
>
> b. The notice required in subsection (a) shall be provided in writing to Defendants at least 30 days before the filing of any motion for enforcement by Plaintiffs…

The last four paragraphs of the Agreement are also pertinent to the Motion. The Agreement provides:

> 50. The issue of liability has not been litigated. Defendants deny all the allegations in the complaint filed in this case. This Settlement Agreement does not constitute and shall not be construed or interpreted as an admission of wrongdoing or liability by any party.
>
> 51. The parties stipulate and jointly request that the Court find that, as of the Effective Date, this Settlement Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of the federal right of Plaintiffs.
>
> 52. The parties jointly request that the Court grant preliminary approval to this Settlement Agreement, provide notice to the class, and schedule a hearing regarding the appropriateness of final approval pursuant to Fed. R. Civ. P. 23e. The parties further request that, following a fairness hearing, the Court give final approval to this Settlement Agreement; expressly adopt it as an order of the Court; and retain jurisdiction for the purpose of enforcing this Settlement Agreement.
>
> 53. This Settlement Agreement may be modified at any time upon written agreement of the parties and approval by the Court.

7

### B. Compliance

Pursuant to the terms of the Agreement, the Commissioner issued his semi-annual compliance report in August 2020. ECF 702-3. It states that DPSCS "declares Substantial Compliance with provisions 17 a, b, d, and e; 20 a and d; 21 c; and 23 a – c. Pursuant to provision 40, the Commissioner asserts maintaining substantial compliance with substantive provisions 20 c, e, f, and g; and 21 b and d. Additionally, there continues to be improvement on provisions 18, 20, and 22." *Id.* at 2.

Thereafter, Michael Puisis, D.O., the independent medical monitor, and Raymond Patterson, M.D., the independent mental health monitor, issued reports assessing the Commissioner's claims of compliance and reviewing conditions at BCBIC. *See* ECF 702-7 (Puisis Report); ECF 704 (Patterson Report).

Dr. Puisis evaluates defendants' performance using three measures: noncompliance, substantial compliance, and "partial compliance." Partial compliance is not a defined term in the Settlement Agreement, however.  But, according to Dr. Puisis, "partial compliance" is "defined as between non-compliance and substantial compliance with reasonable efforts ongoing to achieve compliance." ECF 702-7 at 5.  Although it seems to be a useful term to track progress, the provisions that have been assessed as having "partial compliance" would fall under the category of noncompliance.

The following chart reflects the assessments from the three reports submitted as of August 2020.

| Provision | Commissioner's Report (ECF 702-3) | Monitors' Reports (ECF 702-7; ECF 704) |
|---|---|---|
| 17.a. | Substantial compliance | Partial compliance |
| 17.b. | Substantial compliance | Partial compliance |
| 17.c. | Noncompliance | Noncompliance |

| | | |
|---|---|---|
| 17.d. | Substantial compliance | Partial compliance |
| 17.e. | Substantial compliance | Partial compliance |
| 18a-f | Noncompliance in all components | Partial compliance |
| 19a-g | Noncompliance in all components | Noncompliance |
| 20.a. | Substantial compliance | Partial compliance |
| 20.b. | Noncompliance | Noncompliance |
| 20.c. | Continued substantial compliance | Substantial compliance (previously verified) |
| 20.d. | Substantial compliance | Partial compliance |
| 20.e. | Continued substantial compliance | Substantial compliance (previously verified) |
| 20.f. | Continued substantial compliance | Substantial compliance (previously verified) |
| 20.g. | Continued substantial compliance | Substantial compliance (previously verified) |
| 21.a. | Noncompliance | Noncompliance |
| 21.b. | Continued substantial compliance | Substantial compliance |
| 21.c. | Substantial compliance | Partial compliance |
| 21.d. | Continued substantial compliance | Substantial compliance |
| 22a-e | Noncompliance in all components | Noncompliance |
| 23.a. | Substantial compliance | Partial compliance |
| 23.b. | Substantial compliance | Partial compliance |
| 23.c. | Substantial compliance | Partial compliance |
| 23.d. | Noncompliance | Partial compliance |
| 24.a. | Noncompliance | Noncompliance |
| 25a-g | Noncompliance in all components | Noncompliance |
| 26 | Substantial compliance | Substantial compliance (previously verified, *see* ECF 720-3) |

In sum, as Dr. Puisis explains, ECF 702-7 at 6: "There are 37 medical provisions to be judged. The current status is that six provisions are substantially compliant and all six have remained substantially compliant for two visits. Eighteen provisions are partially compliant, three provisions having moved from partial compliance to noncompliance but five other

provisions moving from noncompliance to partial compliance. Thirteen provisions are non-compliant. DPSCS claims compliance for 10 items but all ten remain partially compliant." Additionally, there are eight mental health provisions. *See* ECF 541-2, ¶¶ 17(c), 25(a)-(g). All remain noncompliant.

Dr. Puisis provides a number of useful details about prison conditions and defendants' progress in the executive summary of his report. As to the physical plant, he states, ECF 702-7 at 6: "There have been few changes to the medical physical plant at BCBIC. While I believe the physical plant issues continue to affect ability to perform, particularly in intake, the medical programs continues [sic] to plod on, attempting to improve despite the physical plant limitations. There are no plans to make any major physical plant changes. I was told that there have been no changes to the woman's [sic] clinic."

With respect to training, Dr. Puisis states: "Training resources are currently nonexistent." *Id.* at 6. In fact, he notes: "Current training is ad hoc and left up to supervisory staff…to figure out which is a recipe for failure." *Id.*

Dr. Puisis reviewed meeting minutes from four DPSCS meetings from the first half of 2020 regarding "[q]uality improvement efforts." *Id.* at 7. According to Dr. Puisis, three out of the four meetings were "focused almost entirely on obtaining a good score on Duvall audits. The focus is very intense." *Id.* Further, he posits, *id.*: "This compliance approach focuses on minute details of the operations that may or may not reflect or affect overall quality. More importantly, the compliance approach focuses entirely on compliance scores even when the compliance approach may be auditing a defective process that will not actually improve quality of care. This is driven by a strategy that continues to utilize broken processes and audit against them. The result is continual dysfunction and chasing one bad development after another."

To illustrate the problem of "broken processes," Dr. Puisis provided a few examples. *Id.* at 7-8. For instance, he points to the requirement in provision 19c "that policy and procedure are implemented to ensure that when a clinician orders vital signs or blood sugar tests that they are documented and reviewed." *Id.* at 7. According to Dr. Puisis, the "scores are abysmal. Only 5% of ordered vital signs are completed. The organization is assiduously and painfully analyzing why nurses are not receiving orders, how nurses are completing orders, and the documentation by providers of review." *Id.* But, he continues, there "is no policy requirement with respect to ordering vital signs. Moreover, no one has asked a simple question, why do we order vital signs and how do vital signs advance and promote improved quality?" *Id.*

According to Dr. Puisis, the "processes" he has "described represent fragmentation, working in silos, collection of information that is apparently not used by clinicians, lack of communication between nurses and physicians and ineffective management that results in wasted work complicated by possible lack of documentation in the medical record."  *Id.* at 9. In his view, these are "processes of care that need to be evaluated, repaired, and memorialized in standard procedures that are clear for all staff." *Id.*  He adds, *id.*: "If efforts are intensely focused on obtaining a good score without attempting to ensure that a good process is audited, the system will obtain a good score at incredible effort that will be auditing a defective process that may or may not reflect compliance with the Settlement Agreement."

Based on those examples, Dr. Puisis "recommend[s] hiring a process expert to be part of the quality effort, at least for a couple years until DPSCS is capable of leading this effort on their own. That expert should work with key clinical and administrative leaders who are authorized to change procedures as needed…. Key areas of focus for process analysis, as a start, should be

11

medication management, intake, detoxification, sick call, and scheduling. The implementation of the new electronic record should be included as an overriding process." *Id.*

Notably, despite his sharp criticism, Dr. Puisis states, *id.* at 10: "I had multiple calls with DPSCS staff. They submitted numerous data. DPSCS was cooperative in submitting any data requests I had. They need to be acknowledge [sic] also for the work they have completed in their attempts to obtain compliance with less than adequate support with respect to facilities and the lack of a functional record system."

As to mental health services, Dr. Patterson reports that DPSCS "has not declared Substantial Compliance for any provisions of the Settlement Agreement regarding mental health services." ECF 704 at 3. Nonetheless, in his findings, Dr. Patterson makes note of improvements as well as continuing challenges towards progress. He asserts, *id.* at 10: "The addition of a State Chief Psychologist is very positive and it is anticipated that another State Psychologist will join the staff in the near future. However, multidisciplinary treatment team planning by State Psychology and Centurion [defendants' for-profit mental health contractor] continues to be inadequate." Further he notes, the electronic health record "remains problematic for the staff to enter, document, track, and extract necessary information. Efforts to move forward on a new contract are continuing, but it has not yet materialized." *Id.*

Significantly, Dr. Patterson also indicates that COVID-19 has and will continue to have an impact on the facility. *Id.* at 11. He adds, *id.*: "It is anticipated that the impact of COVID-19 will continue for an extended period of time and therefore the provision of services will require adjustments in a number of areas to appropriately serve the needs of mentally ill detainees housed in the BCBIC."

Additional facts are included, *infra*.

12

## II.    Discussion

Plaintiffs assert that the Court has "plenary power to enforce the settlement agreement and to set deadlines for compliance." ECF 702-1 at 16. Alternatively, plaintiffs urge the Court to modify the Settlement Agreement, under Fed. R. Civ. P. 60(b), to impose deadlines for compliance and extend the terms of the Agreement by an additional two years. *Id.* at 19-22.

Defendants do not contend that they are in compliance with the Settlement Agreement. But, they insist that plaintiffs' requested relief is foreclosed by State and federal law. First, defendants urge the Court to decline to consider the Motion because plaintiffs failed to provide defendants with notice "as required by the Settlement Agreement before seeking intervention from the Court." ECF 709 at 10-12. Second, defendants assert that the Motion is barred by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq. Id.* at 13. According to defendants, plaintiffs seek judicial enforcement of a settlement agreement, not a consent decree, so plaintiffs may only seek prospective relief by demonstrating that the conditions within the facility violate their constitutional rights. *Id.* at 14, 21. And, defendants posit, plaintiffs have failed to establish that the defendants acted with deliberate indifference to serious medical or mental health care needs of the inmates. *Id.* at 21-26. Last, defendants maintain that plaintiffs have filed to establish that they are entitled to a modification of the Agreement under Rule 60(b). *Id.* at 26-31.

Plaintiffs vigorously dispute all of defendants' contentions. In particular, they maintain that the PLRA does not bar the Motion because courts "need *not* find a new constitutional violation in order to enforce a settlement agreement," such as the Agreement; the Settlement Agreement is a consent decree, not a private settlement agreement under the PLRA; and the Court has "inherent power" to enforce the Agreement. ECF 720 at 9-13. Plaintiffs also contend

that they have met the standard to modify the Agreement and to extend the termination date. ECF 720 at 14-17.

## A.  Notice

As a threshold matter, defendants urge the Court to dismiss the Motion on the ground that plaintiffs failed to provide defendants with the notice required under the Settlement Agreement. ECF 709 at 10.

As noted, under the Agreement the parties consented to the Court retaining jurisdiction over disputes arising out of the Agreement, but only under certain conditions.  In this regard, the Settlement Agreement provides:

> a.  If, prior to any finding of substantial compliance by a Monitor, Plaintiffs assert that Defendants are not in compliance with any one or more of the obligations under this Settlement Agreement, Plaintiffs shall provide Defendants with a written notice to that effect. The written notice of non-compliance shall set forth the specific substantive provisions of this Settlement Agreement with which Plaintiffs contend the Commissioner is not in compliance, and shall provide a summary of the factual basis for the alleged non-compliance with sufficient specificity to allow Defendants to understand the precise nature of the alleged non-compliance.

In addition, paragraph 49(b) of the Agreement requires the notice to be "provided in writing to Defendants at least 30 days prior to the filing of any motion for enforcement by Plaintiffs."

Plaintiffs do not dispute that they did not file a 30-day notice in writing prior to filing the Motion. *See* ECF 709-2 (Email from plaintiffs' counsel to defendants' counsel confirming that they did not send notice). Nonetheless, plaintiffs contend that the notice requirement does not bar the Court's consideration of the Motion. ECF 720 at 18. According to plaintiffs, the provision in paragraph 49(a) is no longer in effect because a Monitor has "made a finding of substantial compliance" as to Paragraph 26 of the Agreement. *Id.* But, even if it was still in effect, plaintiffs

claim that this would not bar the Court's consideration of the Motion because the provision only requires notice prior to a "motion for enforcement," not for modification. *Id.* And, "[m]ore fundamentally," plaintiffs argue, defendants "claim no prejudice" from plaintiffs' failure to provide notice. *Id.* at 19. Further, they argue that defendants were put on notice in July 2020, when plaintiffs filed the first motion to enforce. *Id.* at 19-20.

I am satisfied that the notice requirement does not preclude the Court from considering this Motion.

To be sure, plaintiffs have not complied perfectly with the notice requirement under paragraph 49.  But, it is clear that defendants were put on notice of plaintiffs' claims and demands well before plaintiffs filed the second, renewed Motion in November 2020. In particular, in July 2020, plaintiffs first filed a motion alleging defendants' noncompliance with the Agreement. *See* ECF 675. Thereafter, the parties agreed to hold the motion in abeyance while they participated in settlement discussions with Judge Sullivan in September and October of 2020.  The renewed motion was filed in November 2020, only after the parties were at an impasse. ECF 699.

Thus, under the particular circumstances attendant here, it is clear that long before the renewed Motion was filed in November 2020, defendants had actual knowledge of plaintiffs' complaints under the Settlement Agreement.  They have not been prejudiced in any way as a result of plaintiffs' failure to send a formal notice. *See B & P Enters v. Overland Equip. Co.,* 133 Md. App. 583, 613, 758 A.2d 1026, 1041 (2000) (Hollander, J.) (finding plaintiff's failure to provide notice of breach of contract did not bar suit when opposing party had actual notice of its breach and suffered no prejudice from lack of notice).

15

To reject the Motion on the ground of failure to comply with the notice requirement would exalt form over substance.  Accordingly, I will consider the Motion.

### B.  Motion to Enforce

Plaintiffs contend that the Court has plenary power to enforce the Settlement Agreement and to set deadlines for compliance. ECF 702-1.  They ask the Court to grant the following relief, ECF 702 at 1:

1.  That Defendants shall submit within 30 days a detailed plan, including timelines, for achieving compliance with each Provision of the Settlement Agreement for which they concede non-compliance in the Commissioner's Semi-Annual Compliance Report, dated February 28, 2020.

2.  Following the submission of Defendants' plan, that the Court schedule an evidentiary hearing to receive evidence, including but not limited to testimony from the independent medical and mental health monitors, regarding the causes of Defendants' failure to make progress in achieving compliance with numerous provisions of the Settlement Agreement.

3.  That the Court establish deadlines for Defendants to comply with the provisions of the Settlement Agreement, with a final deadline for full compliance of June 22, 2024.

Plaintiffs also ask the Court to extend the Settlement Agreement for an additional two years.  Such a change entails a modification of the terms. *See Thompson v. U.S. Dep't Of Hous. & Urb. Dev.*, 404 F.3d 821, 824 (4th Cir. 2005) (holding that extension of a consent decree's termination date required modification of the decree). I shall discuss this request, *infra*.

Defendants' primary argument in opposition to plaintiffs' requests is that the PLRA bars the Court from enforcing the Agreement and granting the requested relief. ECF 709 at 13. The PLRA limits the power of federal courts to grant or approve certain remedies in actions challenging prison conditions.  It states, in part, 18 U.S.C. § 3626(a)(1)(A):

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any

prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

The "term 'prospective relief' means all relief other than compensatory monetary damages." *Id.* § 3626(g)(7). And, "the term 'relief' means all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements…" *Id.* § 3626(g)(9).

As a threshold matter, the parties disagree as to whether the Settlement Agreement constitutes a consent decree or merely a settlement agreement.  The dispute implicates the Court's role in oversight of the Agreement, including the ability to extend it.

A consent decree allows for judicial approval and oversight, including enforcement actions. *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002) ("A consent decree, because it is entered as an order of the court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of settlement agreements.").  With respect to the PLRA, a "consent decree" is defined as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." 18 U.S.C. § 3626(g)(1).

Notably, "'[a] consent decree, although founded on the agreement of the parties, is a judgment. It has the force of res judicata, protecting the parties from future litigation. As a judgment, it may be enforced by judicial sanctions, including citation for contempt if it is violated.'" *Smyth ex rel. Smyth*, 282 F.3d at 280 (quoting *United States v. Miami*, 664 F.2d 435, 439–40 (5th Cir. 1981) (en banc) (concurring opinion of Rubin, J., joined by Brown, Anderson, Randall, and Thomas A. Clark, JJ.)).

In contrast, a settlement agreement generally does not involve oversight by a court. *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health and Human Res*., 532 U.S. 598, 604 n. 7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal."); *see Smith ex rel. Smyth*, 282 F.3d at 280.   A "private settlement agreement" is defined in the PLRA as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(g)(6).

Defendants contend that the Settlement Agreement is not a consent decree because the Court did not "direct the defendants to comply with the agreement or order or enjoin them to provide any prospective relief." ECF 709 at 17. Plaintiffs, in contrast, maintain that the Agreement constitutes a consent decree because it "'evinces the parties' intention to make the settlement agreement enforceable in federal court.'" ECF 720 at 12 (quoting *Kelly v. Wengler*, 822 F.3d 1085, 1095 (9th Cir. 2016)).

The Agreement is titled "Settlement Agreement."   But, the title is not dispositive; "it is the reality, not the nomenclature which is at issue." *Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009) ("We agree with other circuits that the formal label of 'consent decree' need not be attached…"); *Smyth ex rel. Smyth*, 282 F.3d at 281 ("We will assume, then, that an order containing an agreement reached by the parties may be functionally a consent decree…even if not entitled as such."). The question of whether a court order is the functional equivalent of a consent decree may be determined by asking "whether the order contains the sort of judicial involvement and actions inherent in a 'court-ordered consent decree.'" *Aronov*, 562 F.3d at 90.

18

In my view, defendants' position overlooks the long history of this case and the extent of judicial involvement.  Given the age of the case, all filings are not electronically available.  But, it is apparent that from at least 1993, there was a "Revised consolidated decree," because then Governor William Donald Schaefer sought to modify it.  *See* ECF 2.  Governor Parris Glendening filed a memorandum in 1995 in support of a modified population plan.  ECF 23. And, Judge Motz held hearings on May 9, 1995 (*see* Docket) and on August 22, 1995, regarding compliance with the court decree.  *See* Docket.  By Order of September 29, 1995 (ECF 39), Judge Motz stayed the 1993 Revised Consolidated Decree.  Then, by Order of October 31, 1997, enforcement of the decree was suspended until further order of the court.  ECF 60; ECF 74.  The litigation continued, however.  Plaintiffs sought to reopen the case in 2002.  ECF 76.  The parties subsequently entered into a "Consent Order" in August 2002, approved by the Court, to reopen the case. ECF 84.

In December 2003, plaintiffs filed a "Motion to Restore the Medical and Physical Plant Provisions of the [1993] Consent Decree to the Active Docket and to Schedule Appropriate Further Proceedings." ECF 128. After the motion was fully briefed, Judge Motz advised the parties that "the issue would best be framed by the defendants filing [a] renewed motion to terminate" the 1993 Consent Decree. *See* ECF 148. Soon thereafter, in April 2004, defendants filed a "Renewed Motion to Terminate [the 1993] Consent Decree." ECF 148. On August 30, 2004, Judge Motz issued an Order (ECF 196) granting plaintiffs' motion to restore the case to the active docket and denying defendants' motion to terminate the consent decree.

A lengthy period of discovery and settlement negotiations ensued.  On September 15, 2009, plaintiffs filed a motion for preliminary approval of a partial settlement agreement.  ECF 377.  Judge Motz issued an Order on November 10, 2009, granting approval.  ECF 382.

Plaintiffs moved for final approval of the partial settlement on March 1, 2010.  ECF 387. Following a hearing on March 12, 2010 (ECF 390), Judge Motz approved the Partial Settlement Agreement by Order of March 17, 2010.  ECF 394.

The Partial Settlement Agreement of 2009 (ECF 374-1, ¶¶ 6-7) and the Amendment to the Partial Settlement Agreement in May 2012 (ECF 447-1) expressly state that they were not consent decrees.  *Id.* ¶¶ 1, 3.  Nevertheless, in the long life of this case, there are numerous filings that reflect the parties' intent to involve the Court in monitoring and to make various agreements enforceable by the Court.

In contrast to the agreements in 2009 and 2012, the 2015 Settlement Agreement does not state that it is not a consent decree.  Moreover, the 2015 Agreement created a mechanism by which the Court "retain[ed] jurisdiction for the purpose of enforcing" the terms. ECF 541-2, ¶ 52; *see Smyth ex rel. Smyth*, 282 F.3d at 280 (noting that "[e]ither incorporation of the terms of the agreement or a separate provision retaining jurisdiction over the agreement will suffice for" the purpose of making the terms of an agreement enforceable). Moreover, there are numerous provisions in the Agreement that indicate the parties' intent to render it enforceable in federal court. *See, e.g.*, ECF 541-2, ¶¶ 42, 49, 51, 52. And, the Agreement received the approval of the Court. *See Smyth ex rel. Smyth*, 282 F.3d at 280.  Moreover, since the Agreement was reached, the parties have repeatedly come to the Court for one reason or another.  Yet, the defense has never suggested that judicial involvement was inappropriate.

Even if the Court considers the Settlement Agreement to be a consent decree, defendant argues, the Court's authority to enforce the Agreement is still limited under the PLRA. ECF 709 at 17-18. Defendants maintain that the Court cannot enforce the Settlement Agreement unless

plaintiffs establish a constitutional violation. ECF 709 at 18-22. According to defendants, plaintiffs cannot prove such a violation. *Id.* at 21-26.

Defendants do not cite any relevant rules or authority to support their argument.  And, it is well established that courts have the authority to enforce consent orders, even when issued pursuant to the PLRA. *See Frew v. Hawkins,* 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379 (1994) (ancillary enforcement jurisdiction permits the Court to "manage its proceedings, vindicate its authority, and effectuate its decrees"); *System Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961) (explaining that injunctions "often require [ ] continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief"); *Thompson*, 404 F.3d at 833 (noting that "even if the district court had declined to modify the retention-of-jurisdiction clause, the court's inherent authority over its own judgment would have provided it with the continuing authority to enforce the Consent Decree against HUD"); *Smyth ex rel. Smyth*, 282 F.3d at 282 ("A court's responsibility to ensure that its orders are fair and lawful stamps an agreement that is made part of an order with judicial imprimatur, and the continuing jurisdiction involved in the court's inherent power to protect and effectuate its decrees entails judicial oversight of the agreement"); *see also Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018) (finding that district court was not required to make new findings of a constitutional violation before enforcing the consent decree); *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) ("Consent decrees are subject to continuing supervision and enforcement by the court."); *Essex Cty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445,

462 (D.N.J. 1998) ("As long as the underlying consent order remains valid—neither party has made a 3626(b) motion to terminate—the court must be able to enforce it.").

Therefore, "enforcement of a valid consent decree is not the kind of 'prospective relief' considered by § 3626(a)." *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004) (noting that the (citing *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002)). Accordingly, I am satisfied that the Court has the authority to enforce the terms of the Agreement.

Nevertheless, consent decrees are generally construed as contracts for purposes of enforcement. Therefore, the Court cannot expand the defendants' obligations beyond the terms of the Agreement. *Kokkonen*, 511 U.S. at 377 (noting that federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree"); *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) ("A federal district court may not use its power of enforcing consent decrees to enlarge or diminish the duties on which the parties have agreed and which the court has approved." (citations omitted)).

Notably, the Court must determine whether plaintiffs' request falls within the scope of the Agreement that was approved by the Court. *See Int'l Longshoremen's Ass'n, Loc. 333 v. Int'l Longshoremen's Ass'n, AFL-CIO*, 687 F. App'x 315, 326 (4th Cir. 2017) ("[T]he 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'") (quoting *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (internal citation omitted)); *Johnson*, 987 F.3d at 1049; *Willie M. v. Hunt*, 657 F.2d 55, 60 (4th Cir. 1981) ("[T]he scope of a consent decree must be discerned within the four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

As with a contract, "[w]hen interpreting a consent decree, words must be read in context, each of its provisions being interpreted together with its other provisions. Absent ambiguity in terms of the consent judgment, the intent of the parties must be ascertained solely from the instrument itself and extrinsic evidence will not be admitted." *Gibson v. Allen*, No. 2:78-2375, 2011 WL 2214919, at *6 (S.D. W. Va. June 3, 2011) (internal quotation and citation omitted). But, "[t]he circumstances surrounding the formation of the consent order or any technical or specialized meaning understood by the parties for words in the order may properly inform a court while it yet adheres to the 'four corners rule.'" *Willie M.*, 657 F.2d at 60 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, (1975)).

Accordingly, the question for the Court is whether setting internal deadlines for the defendants' compliance, as well as ordering defendants to draw up a detailed plan and timeline for compliance, would go beyond the four corners of the Settlement Agreement. A few provisions of the Agreement are relevant to this analysis.

The Agreement provides that the "Commissioner shall implement any reforms necessary to effectuate this Settlement Agreement. The implementation of this Settlement Agreement will begin on the Effective Date; however, the parties recognize that some of the substantive provisions of this Settlement Agreement will reasonably require time to implement, and the parties agree that this Settlement Agreement shall be construed accordingly." ECF 541-2, ¶ 28. Additionally, the Agreement provides for termination of the Agreement upon the Commissioner's achievement of substantial compliance or four years from the effective date. *Id.* ¶ 42. However, other than these two provisions, the Agreement does not include any other directions as to a timeline for progress or deadlines for compliance.

23

Also of relevance, and as discussed, the Agreement expressly provides for continued enforcement by the Court. It says, *id.* ¶ 52: "The parties further request that…the Court…retain jurisdiction for the purpose of enforcing this Settlement Agreement." Given the fact that the Court retains jurisdiction as to the case, in order to ensure compliance with the Agreement, devising a method to obtain compliance does not necessarily extend beyond the four corners of the Agreement. *See Juan F. By & Through Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) ("Rather than modifying the decree by increasing defendants' obligations, as defendants claim, the court order in this case simply ensured compliance with the time frame originally established by the manuals.").

Given the pace of defendants' progress, and the obligation of the Court to ensure compliance with the Agreement, the parties are directed to submit a plan, jointly if possible, that includes a timeline for defendants to achieve compliance with each provision of the Settlement Agreement that was non-compliant as of the most recent Monitors' reports. Thereafter, the Court will establish deadlines for defendants to comply with the provisions.

### C.  Motion to Modify

Plaintiffs have asked the Court to modify the Settlement Agreement by extending the termination deadline by two years, pursuant to Fed. R. Civ. P. 60(b)(5). ECF 702-1 at 22. Rule 60(b)(5) provides for relief from a final judgment or order when "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been released or vacated; or applying it prospectively is no longer equitable[.]" Fed. R. Civ. Pro. 60(b)(5); *Thompson*, 404 F.3d at 828-29 ("The court's inherent authority to modify a consent decree or other injunction is now encompassed in Rule 60(b)(5).") (citing *Plyler v. Evatt*, 924 F.2d 1321, 1324 (4th Cir. 1991)).

A motion to modify a consent decree is governed by the standard set out by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). *See Thompson*, 404 F.3d 821, 827-29 (relying on the standard set by *Rufo*). Under that standard, modification may be appropriate if the party seeking modification demonstrates that "a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383; *see also Horne v. Flores*, 557 U.S. 433 (2009) ("Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'") (quoting *Rufo*, 502 U.S. at 384). "A 'significant change either in factual conditions or in law' can support a requested modification." *Thompson*, 404 F.3d at 827 (quoting *Rufo*, 502 U.S. at 383). Notably, the question "is whether the parties *actually* anticipated the events giving rise to the modification request; that the events were theoretically foreseeable does not foreclose a modification." *Thompson*, 404 F.3d at 828 (emphasis in original).

"If the moving party meets this standard, the court should [then] consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. Further, "once a party carries [the *Rufo*] burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

Also of relevance here, in *Rufo* the Supreme Court endorsed a flexible approach to consent decrees that result from institutional reform litigation. The Court said, *id.* at 380-81 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)):

> The experience of the District Courts and Courts of Appeals in implementing and modifying such decrees has demonstrated that a flexible approach is often

essential to achieving the goals of reform litigation. The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."

The Court emphasized, however, that while "a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances." *Id.* at 383.

Courts have consistently held that the failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances justifying modification. *See Thompson*, 404 F.3d at 829 (affirming district court's conclusions that defendants' "nearly complete failure to comply with their obligations was a sufficient change of circumstances to warrant modification of the Consent Decree"); *Labor/Cmty. Strategy Center v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120–21 (9th Cir. 2009) (noting that "failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances that would justify the decree's temporal extension"); *Holland v. N.J. Dept. of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) ("Courts have extended a decree or parts of a decree when ... one party was in substantial non-compliance with the decree."); *David C. v. Leavitt*, 242 F.3d 1206, 1213 (10th Cir. 2001) (affirming district court's decision to modify consent decree by extending its enforcement period because of defendant's significant non-compliance with the terms of the decree: "[I]t would defy logic for Appellees to agree to include the four-year Termination Provision in the Agreement if they actually foresaw that Utah would not be in substantial compliance with the terms of the Agreement at the end of the four-year period."); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (upholding extension of decree where district court found that "the goals of the decree 'will be fulfilled in a

short period of time and this action will then come to an end.'"). And, it is undisputed here that there has been a failure of substantial compliance with respect to some of the terms of the Settlement Agreement.

But, as with the enforcement capability, the fact that the Court has the power to modify the Agreement is only part of the inquiry; whether the Court should use its discretionary power to modify is a separate question. The Court must determine if the plaintiffs' proposed extension "is tailored to resolve the problems created by the change in circumstances." *Rufo*, 502 U.S. at 391. And, in doing so, "there is no doubt that the court must determine whether the proposed modification furthers the purpose of the consent decree." *David C.*, 13 F. Supp. 2d at 1211 (citing *Kozlowski v. Coughlin*, 871 F.2d 241, 247–8 (2nd Cir. 1989) ("The analysis must identify the essential purpose or purposes of the decree in question and weigh the impact of the proposed modification on that ultimate objective."); *Lorain NAACP v. Lorain Board of Education*, 979 F.2d 1141, 1148 (6th Cir. 1992) ("The modification of an institutional consent decree will be upheld 'if it furthers the original purpose of the decree in a more efficient way.'")).

Defendants argue that the Court is barred from modifying the Agreement because a "unilateral amendment was not part of the Agreement." ECF 709 at 26-27 (citing ECF 541-2, ¶ 53). But, a consent decree's terms cannot restrict a Court's inherent power and ability to modify its own order. *See Thompson*, 404 F.3d at 832 n.6 ("Issues of *interpretation* and *enforcement* of a consent decree typically are subject to traditional rules of contract interpretation, and the district court's authority is thus constrained by the language of the decree.... A court's inherent power to *modify* a consent decree, however, is not circumscribed by the language of the decree.") (emphasis in original); *David C.*, 242 F.3d at 1210-11 ("Contrary to Utah's assertions, a court's equitable power to modify its own order in the face of changed circumstances is an inherent

judicial power that cannot be limited simply because an agreement by the parties purports to do so.... To hold otherwise would allow the parties, by the terms of their agreement, to divest a court of its equitable power or significantly constrain that power by dictating its parameters."); *South v. Rowe*, 759 F.2d 610, 613 (7th Cir. 1985) ("Of course, the parties could not agree to restrict the court's equitable powers to modify its judgment enforcing the consent decree ... in light of 'changed circumstances.'"), *abrogated on other grounds by Rufo*, 502 U.S. 106.

Further, defendants argue that plaintiffs must meet three or four threshold conditions before the Court can consider modification under Rule 60(b). ECF 709 at 27-28. However, the cases on which defendants rely to support this interpretation of the modification standard are inapplicable here; they do not involve Rule 60(b)(5) or the modification of consent decrees. *See, e.g., National Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993) (vacating judgment against a defendant under Rule 60(b)(6)); *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987) (affirming district court's denial of defendant's motion for relief from default judgment under Rule 60(b)).

Significantly, without objection, defendants previously agreed to a modification of the Agreement, by way of a two-year extension of its terms. In particular, in 2018, in response to the plaintiffs' motion to enforce the Agreement (ECF 583), defendants agreed to a two-year extension to give them an opportunity to achieve compliance with the medical and mental health provisions of the Agreement. ECF 616 (Defendants' response to plaintiffs' motion to enforce, dated 12/13/2018) at 20. The Court approved that extension. ECF 642.

It is not uncommon for a court to modify a consent decree by extending the termination date when a party has failed to substantially comply. In *Thompson*, 404 F.3d 821, for example, the Fourth Circuit, applying the *Rufo* standard, found that the magnitude of a party's failure to

28

comply with the terms of the consent decree was a significant change in circumstances, warranting modification of the decree. The *Thompson* Court noted that the defendants were "woefully behind schedule with regard to many provisions of the Consent Decree" and plaintiffs had not anticipated the "exceptional magnitude" of non-compliance. 404 F.3d at 825, 828-29. Thus, the Fourth Circuit affirmed the district court's decision to extend its jurisdiction over the defendants, concluding that the modification ensured that the decree could be efficiently enforced. *Id.* at 831; *see also, e.g., Labor/Cmty. Strategy Center*, 564 F.3d at 1120–21; *David C.*, 242 F.3d at 1212–13 (district court acted appropriately in granting "relief from the four-year Termination Provision by extending the term of the Agreement" "to allow [the defendant] to fulfill the very obligations it voluntarily undertook when it entered into the Agreement"); *Vanguards of Cleveland*, 23 F.3d at 1019–20 (affirming extension of consent decree where the expectations underlying the decree had failed to materialize).

The Settlement Agreement is aimed at addressing conditions of confinement at BCBIC, including medical and mental health care of the inmates. Plaintiffs contend that because it is clear that defendants will not be in compliance with the Agreement by the current expiration date of June 2022, an extension "will give Plaintiffs at least part of the benefit of their bargain, while giving Defendants an incentive to comply as soon as possible." ECF 702-1 at 22.

It cannot be disputed that the COVID-19 pandemic created an unforeseen and significant change in circumstances.  Indeed, since at least March 2020, life as we have known it virtually came to a halt.  Only recently have we seen a return to some semblance of normalcy. Undoubtedly, issues as to COVID-19 hampered defendants' compliance because many in the work force were unable to provide services. And, defendants also had to focus their efforts on more immediate health concerns pertaining to detainees. *See* ECF 704 (noting that the COVID-

19 pandemic has had a serious impact on mental health services within BCBIC); *id.* at 11 ("It is anticipated that the impact of COVID-19 will continue for an extended period of time…."); ECF 702-7 at 5 (noting that the COVID-19 pandemic "has affected operations" inside BCBIC). Given the pace with which progress is currently being made, as well as the additional challenges that have followed due to the COVID-19 pandemic, extending the Agreement by 18 months is suitably tailored to the change in circumstance.[6]

Because of defendants' failure to achieve compliance, the Court is convinced that it must retain jurisdiction to protect the purpose of the Agreement.  But, as plaintiffs observe, the termination provision in the Settlement Agreement includes a proviso that defendants could achieve termination prior to the expiration date by reaching substantial compliance on all the substantive provisions. ECF 541-2, ¶ 42.

### III.    Conclusion

For the reasons stated, the Court shall grant the Motion, in part. In particular, the Court shall extend the Agreement by 18 months, with a new expiration date of December 22, 2023. Within 30 days of the docketing of this Order, the parties are directed to submit a proposal, joint if possible, to include a timeline for defendants' compliance with the remaining provisions of the Agreement.

An Order follows, consistent with this Memorandum Opinion.

Date:   May 20, 2021                                      _____/s/_____
                                                          Ellen Lipton Hollander
                                                          United States District Judge

---

[6] The extension roughly approximates the length of time that COVID-19 has affected our society.