IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JEROME DUVALL, *et al.*, | * |
| Plaintiffs, | * |
| v. | *     Civil No. MJM-94-2541 |
| WES MOORE, *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### THE STATE'S SECOND QUARTERLY REPORT

Wes Moore, Governor of the State of Maryland, Carolyn J. Scruggs, Secretary ("Secretary") of the Department of Public Safety and Correctional Services (the "DPSCS"), and Cleveland C. Friday, Commissioner ("Commissioner"), Division of Pretrial Detention and Services (the "DPDS,") (the Secretary, DPSCS, the Commissioner, and DPDS are collectively referred to as the "State"), hereby submit this Second Quarterly Report in response to the Order directing the State to report specific categories of information (the "Quarterly Report Order") entered by the Court on June 23, 2023 (Doc. No. 792). As mandated by the Quarterly Report Order, the State submits the following:

#### INTRODUCTION

The State continues to routinely evaluate its continuing efforts to ensure compliance with the Settlement Agreement (Doc. No. 541-2) currently under monitoring by this Court. As part of the State's evaluation, it continues to confirm compliance efforts surrounding the provision of health care to the incarcerated population within its Baltimore Central Booking & Intake Center ("BCBIC") and the Metropolitan Transition Center ("MTC") Infirmary. Progress in the provision of mental health care continues due, in large part, to the collaborative efforts of the State's mental

1

health leadership, the efforts of the contracted mental health provider and Dr. Jeffrey Metzner. The State and its contracted medical provider faced various challenges with the medical monitoring process prior to the resignation of Dr. Michael Puisis in December 2023. (ECF 834). The State described these challenges in prior filings, specifically ECF documents 818 and 828. The State maintains that its concerted efforts to improve medical care for the incarcerated population at BCBIC and the MTC Infirmary demonstrate greater levels of compliance than reported and, in fact, that the provision of healthcare by the State at BCBIC and MTC Infirmary meet, and often exceed, all thresholds for the provision of constitutional medical and mental health services, thereby demonstrating its substantial compliance, as defined in Paragraph 39, with all provisions of the Settlement Agreement.

As directed by the Court, the information set forth below covers the period beginning on September 30, 2023 and ending March 31, 2024.[1]

## CHANGES IN THE ANTICIPATED MONTH AND YEAR OF COMPLIANCE

As set forth above, the State firmly believes that the current circumstances at BCBIC and MTC Infirmary reflect a constitutional level of care. However, predicting when all of the parties and the monitors will agree on the level of care provided by the State at these facilities remains nearly impossible, particularly due to the uncertainties surrounding the appointment and confirmation of the new medical monitor, the methodologies and monitoring practices to be implemented by the new medical monitor, and the effect of the new medical monitor upon projected compliance dates in light of historical monitoring concerns. Despite these uncertainties, the State believes in good faith that the medical and mental health care at BCBIC and MTC Infirmary are currently compliant with, if not exceeding, the terms of the Settlement Agreement

---

[1] Dr. Puisis's resignation as the medical monitor resulted in a temporary stay of the Quarterly Reporting requirements. This Quarterly Report thus encompasses two quarters as set forth in the Court's Order of April 18, 2024 (ECF 868).

and do not place the individuals incarcerated at BCBIC and MTC Infirmary at any significant threat of serious injury.

On April 22, 2024, the mental health monitor provided to the Parties his final compliance report for the period of July 2023 to December 2023. Notwithstanding and without waiver of Defendants' right to object to the mental health monitor's findings as provided in ¶ 41 of the Settlement Agreement, the mental health monitor found the State in substantial compliance with all portions of the Settlement Agreement relating to mental health care, except the following:

- 17(c) – Partial Compliance. The Commissioner implemented a Corrective Action Plan in November 2023, which generated data demonstrating improved compliance.

- 25(a) – Partial Compliance, per Dr. Metzner who found "Compliance was present during the month of December 2023."

- 25(b) – Partial Compliance, per Dr. Metzner. BCBIC staff are currently conducting a Quality Improvement ("QI") study, which was approved by Dr. Metzner in January 2024. The audit process began in February 2024 the Partial Compliance rating by Dr. Metzner was based upon his chart reviews conducted during the March 2024 site visit relating to the July – December 2023 monitoring period.

- 25(f)(i) – Partial Compliance, but "Compliance was present for the month of December 2023."

- 25(f)(iv) – Partial Compliance, but "Compliance [was present] during the month of December 2023."

Additionally, the mental health monitor deferred assessment of the following provisions pending the appointment and confirmation of the new medical monitor: 17(a), 17(d), 17(e), and 24(a).

As demonstrated by the mental health monitor's report, compliance with all mental health provisions of the Settlement Agreement currently exists and persists. The State anticipates the mental health monitor will find full compliance in the next monitoring period with nearly all sub-paragraphs of the Agreement pertaining to mental health.

3

The State remains unable to predict with any degree of confidence the prospective dates when the monitor and all parties will agree that the State achieved compliance with medical provisions until the new medical monitor submits his first monitoring report, though the State submits that it firmly believes that substantial compliance currently exists with respect to medical care at BCBIC.

## MOST SIGNIFICANT OBSTACLES TO COMPLIANCE

The State continues to actively evaluate the obstacles to addressing the issues or concerns raised by Plaintiffs and/or the monitors and actively take steps to address those concerns. As of the date of this filing, the various personnel employed or contracted with the State involved in compliance with the Settlement Agreement maintain that the prior timeline submitted to the Court identifies most of the "barriers" to satisfaction of the monitors' requirements and/or recommendations. The State also believes that the medical monitoring process utilized by the prior medical monitor created unnecessary confusion and delays in reaching compliance. The State hopes that the new medical monitor will fairly assess the delivery of medical care at BCBIC and the MTC Infirmary, and, utilizing his/her independent clinical judgment, find that the State has complied with the terms of the Settlement Agreement.

## PROGRESS IN ASSIGNING ON-SITE PERSONNEL AT BCBIC TO COMPLIANCE EFFORTS

DPSCS undertook a review of the Court's prior transcript, the Settlement Agreement and the current state of its management of medical operations at BCBIC in evaluating the medical monitor's request that DPSCS appoint a dedicated site medical director for BCBIC. First, it is now clear that the medical monitor's recommendation arises from an erroneous understanding on the part of the medical monitor. Contrary to the medical monitor's statements to the Court, both Dr. Lynda Bonieskie and Dr. Oscar Jerkins serve as DPSCS's statewide Director of Mental Health

and Chief Medical Director, respectively. Both of these individuals actively participate and oversee all versions of auditing and monitoring of services at BCBIC, though not assigned on a full-time basis to this facility. Moreover, the medical monitor failed to account for and credit the robust monitoring and auditing system installed by the current medical provider that produces the myriad of audit results that the medical monitor *always* relies upon in his bi-annual reviews. To substantiate the medical provider's audit results, DPSCS' Deputy Director of Clinical Services, Dr. Contah Nimely, MD, supervises compliance efforts at BCBIC, guiding the Department's Agency Contract Operations Managers (ACOMs) – RNs assigned to oversee clinical operations and compliance with DPSCS policy – in providing on-site management of clinical processes, and vendor-conducted audits and monitoring.

Secondly, the recommendation from the prior medical monitor that DPSCS appoint a dedicated on-site medical director for BCBIC reflects another instance of the medical monitor attempting to impose additional performance obligations on the State outside of the Settlement Agreement. DPSCS has never employed a dedicated site medical director for BCBIC at any time. When the parties settled this matter, the State never agreed and Plaintiffs never demanded the creation of such a position. Moreover, the employment of an on-site medical director specific to BCBIC contradicts the healthcare delivery model employed by the State in delivering healthcare to its incarcerated population, which constitutes a contracted function under the medical supervision of the contractor. Employing site-specific medical staff, as suggested by the medical monitor, defies this long-standing structure for the delivery of healthcare to the incarcerated population across the State of Maryland, which is consistent with the model used in jurisdictions across the country. Notwithstanding these objections to the prior medical monitor's recommendations, the DPDS Deputy Commissioner consistently served as the compliance

coordinator, overseeing efforts and processes for compliance with the Settlement Agreement.[2]

### NAMES AND TITLES OF DPSCS EMPLOYEES RESPONSIBLE FOR PROMOTING *DUVALL* COMPLIANCE[3]

Myriad employees of DPSCS, along with various employees of contracted service providers as described above, actively participate in and promote compliance with the Settlement Agreement. Considering the breadth of issues and resources necessary to achieve compliance, nearly every employee of DPSCS who is stationed at or oversees operations of BCBIC must incorporate aspects of *Duvall* compliance efforts into their job responsibilities. Specifically, though not their "primary responsibilities," the following employees actively and consistently engage in monitoring and compliance efforts: Deputy Secretary of Operations; Chief Medical Director; Deputy Director of Clinical Services; Director of Mental Health; Deputy Director of Mental Health; Assistant Secretary for Programs, Treatment and Reentry Services; and Commissioner of DPDS.

The following employees' primary job responsibilities involve promoting compliance with the Settlement Agreement:

(1) Kelvin L. Harris, Deputy Commissioner of DPDS (Promoted to current role October 4, 2023);

(2) Akisha Price, Director of Health Services and *Duvall* Compliance (Hired October 19, 2022);

(3) Holly Turner, Deputy Director of Health Services and *Duvall* Compliance (Hired 2012; Assigned to current role April 11, 2022);

(4) Tyrell A. Wilson, Sr., Warden of BCBIC (Assigned to BCBIC April 3, 2023);

(5) Nate' Denton, Assistant Warden of BCIBC (Responsible for Programs and Services, including Medical and Mental Health

---

[2] Kelvin L. Harris is the current Deputy Commissioner of DPDS.
[3] This is the first Quarterly Report for which the State provides this information. *See* ECF 792, ¶ 4 *and* ECF 868.

>    Services) (Promoted to current role May 31, 2023); and
>
> (6) Kathleen J. Landerkin, Warden of MTC (Transferred from another facility to MTC December 13, 2023).  Warden Landerkin replaced Warden Debora Darden, who resigned on November 1, 2023.

DPSCS will continue to retain and appoint individuals to ensure adequate staffing and supervision for *Duvall* compliance activities.

## APPROPRIATIONS AND EXPENDITURES FOR COMPLIANCE[4]

DPSCS does not track specific expenditures related to *Duvall* compliance separate from other departmental costs and expenses.  Moreover, given the breadth of the issues addressed in the Settlement Agreement, DPSCS historically incurred various expenses (such as personnel expenses for compliance staff and contract costs related to medical and mental health care) that existed prior to the Settlement Agreement, but could certainly be lumped into the category of *Duvall* compliance.  Thus, dissecting Departmental expenses, which are general operating costs, from those directly related to *Duvall* compliance efforts is an arduous and nearly impossible task.  In addition, the scope of the Settlement Agreement and the requirements and recommendations of the monitors are such that *Duvall* compliance affects nearly every aspect of operations at BCBIC.

The Settlement Agreement touches on nearly every aspect of medical and mental health care provided to incarcerated individuals at BCBIC – intake screening; medication initiation, monitoring, and management; plan of care creation and monitoring; laboratory testing; management, policy-making, and oversight; physical accommodations for mobility and housing; air conditioning; chronic and specialty care; sick call; medical records; assessments and referrals; and sanitation, pest control, and maintenance.  (ECF 541-2 at ¶¶ 16–26).  Identification of expenditures and appropriations which directly relate to the requirements of the Settlement

---

[4] *Id*.

Agreement could rationally encompass most of the appropriations for BCBIC ($83 million) and MTC ($68 million) for the 2024 fiscal year.

Despite the administrative considerations discussed above, DPDS staff, with the assistance of counsel, reviewed the departments' financial records in attempts to identify major expenditures related to *Duvall* compliance for the relevant period of July through December 2023. As demonstrated in prior pleadings (*see, e.g.*, ECF 827, 833), the medical monitor took particular interest in the functionality of the electronic patient health records during the relevant period. The State paid $1,615,544.21 to NextGen, the software provider of the EPHR, to modify and revise the electronic record software in accordance with the medical monitor's recommendations. The State incurred costs of $96,264.65 for medical and mental health monitoring services during the relevant period.

While these expenditures indicate a portion of the costs directly related to *Duvall* compliance efforts, other costs cannot be precisely measured. For example, because physical plant improvements, sanitation, and pest control are ongoing operating costs, the State cannot accurately determine what portion of these expenditures are fairly attributable to *Duvall* compliance. Likewise, medical and mental health care expenses are ongoing and required operating costs distinct from efforts to comply with the Settlement Agreement and/or monitor recommendations.

WHEREFORE, PREMISES CONSIDERED, the State submits the above information as evidence of its continuing good faith efforts to comply with the terms and conditions of the Settlement Agreement (Doc. No. 541-2) executed among the parties in this action.

Dated: May 15, 2024.

*Joh Sedtal* for
Carolyn J. Scruggs
*Secretary of Public Safety & Correctional Services*
Office of Secretary
Department of Public Safety & Correctional Services
6852 4th St., Sykesville, MD 21784
Telephone: (410) 585-3300
dpscs.secretaryscruggs@maryland.gov


/s/ William R. Lunsford

*One of the Attorneys for the Defendants*

William R. Lunsford*
Matthew B. Reeves*
**BUTLER SNOW LLP,**
200 West Side Square
Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651
bill.lunsford@butlersnow.com
matt.reeves@butlersnow.com

Connell L. Archey *
Allena McCain *
**BUTLER SNOW LLP**
445 North Boulevard, Ste. 300
Baton Rouge, LA 70802
Telephone: (225) 325-8700
Facsimile: (225) 325-8800
connell.archey@butlersnow.com
allena.mccain@butlersnow.com

        Laura Mullally
        **MARYLAND OFFICE OF**
        **THE ATTORNEY GENERAL**
        Federal Bar No. 28145
        200 St. Paul Place, 19th Floor
        Baltimore, MD 21202
        Telephone: (443) 204-0675
        laura.mullally@maryland.gov

*Attorneys for the Defendants*

*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter, including without limitation the following, by the Court's CM/ECF system and/or U.S. Mail on this 15th day of May, 2024:

Corene T. Kendrick *(pro hac vice)*
**ACLU NATIONAL PRISON PROJECT**
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
ckendrick@aclu.org

David C. Fathi *(pro hac vice)*
Jennifer Wedekind *(pro hac vice)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Facsimile: (202) 393-4931
dfathi@aclu.org
jwedekind@aclu.org

Debra L. Gardner
**PUBLIC JUSTICE CENTER**
201 N Charles St Ste 1200
Baltimore, MD 21201
Telephone: (410) 625-9409
Facsimile: (410) 625-9423
gardnerd@publicjustice.org

Noah J. Mason *(pro hac vice)*
**LOCKE LORD LLP**
Terminus 200, Ste. 2000,
3333 Piedmont Rd. NE
Atlanta, GA 30305
Telephone: (404) 870-4648
noah.mason@lockelord.com

Aditi Deal *(pro hac vice)*
**LOCKE LORD LLP**
600 Travis St., Ste. 2800
Houston, TX 77002
Telephone: (713) 226-1435
aditi.deal@lockelord.com

*Attorneys for Plaintiffs*

*/s/ William R. Lunsford*
Of Counsel