IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

JEROME DUVALL, et al.,          )
          Plaintiffs,           )    CIVIL CASE NO.
                                )    1:94-cv-02541-ELH
          vs.                   )
                                )
WES MOORE, et al.,              )    Courtroom 5C
          Defendant.            )    Baltimore, Maryland
_____        )    2:05 p.m.

FRIDAY, DECEMBER 20, 2024
TRANSCRIPT OF PROCEEDINGS - MOTIONS HEARING
BEFORE THE HONORABLE MATTHEW J. MADDOX

For the Plaintiffs:

David Fathi, Esquire
Jennifer Wedekind, Esquire
ACLU National Prison Project
917 15th Street NW, 7th Fl
Washington, DC 20005

Debra L. Gardner, Esquire
Public Justice Center
201 N. Charles Street, Suite 1200
Baltimore, MD 21201

Toyja Kelley, Esquire
Locke Lord, LLP
701 8th Street NW, Suite 500
Washington, DC 20001

For the Defendants:

William Lunsford, Esquire
Connell L. Archey, Esquire
Margarita Arellano, Esquire
Butler Snow, LLP
200 West Side Square, Suite 100
Huntsville, AL 35801

Laura Mullally, Esquire
Merrilyn Ratliff, Esquire
Maryland Office of the Attorney General
300 East Joppa Road, Suite 1000
Towson, MD 21286
_____
(Computer-aided Transcription of Stenotype Notes)

P R O C E E D I N G S

(2:05 p.m.)

THE CLERK:  The matter now pending before this court is Civil Docket Number MJM-94-2541, Duvall, et al., versus Hogan, et al.  This matter now comes before the Court for the purpose of a motions hearing.  Plaintiff counsel, please identify yourselves for the record.

MR. FATHI:  Good afternoon, Your Honor.  David Fathi of the ACLU National Prison Project for the plaintiff class.

THE COURT:  All right.  Good afternoon.

MS. WEDEKIND:  Good afternoon, Your Honor.  Jennifer Wedekind with the ACLU for the plaintiff class.

THE COURT:  Hello.

MR. KELLEY:  Good afternoon, Your Honor.  Toyja Kelley on behalf of plaintiffs.

THE COURT:  Good afternoon.

MS. GARDNER:  Good afternoon.  Debra Gardner, Public Justice Center, also for the plaintiff class.

THE COURT:  Thank you.  Good afternoon.

THE CLERK:  For the defendant, please.

MR. LUNSFORD:  Good afternoon, Your Honor.  Bill Lunsford for the State and Governor Moore.

THE COURT:  Good afternoon.

MR. ARCHEY:  Good afternoon.  Connell Archey for the State and Governor Moore as well.

MS. ARELLANO:  Good afternoon, Judge.  This is Margarita Arellano for the State and Governor Moore as well.

THE COURT:  All right.  And good afternoon to you.

All right.  So we have several motions that are pending in this case, some that have been pending for a little while now. I think some of them address overlapping issues, I'm thinking specifically of the motion to compel overlapping in some respects with the motion to alter judgment, which is in itself somewhat of an opposition to a motion to preserve evidence that had been filed by the plaintiffs which the Court granted short in time after that motion was filed.

My inclination would be to address the motion to alter the Court's previous order granting the motion to preserve evidence, and that was a motion filed by the defendant.  I think it makes sense to start there and then lead into the other issues that were raised in connection with the motion to compel filed by the plaintiff.

Unless either party has an objection to that or a reason that we should go in a different order.  Mr. Fathi?

MR. FATHI:  That's fine with us, Your Honor.

MR. LUNSFORD:  That's acceptable to us, Your Honor.

THE COURT:  Okay.  So Mr. Lunsford, I'll hear you on your motion to alter the Court's prior order.

MR. LUNSFORD:  Thank you, Your Honor.

Your Honor, it is, as the Court pointed out, a little bit

of an unusual procedural posture with the issues in the motion to compel and our motion to alter, amend, or vacate merging in some ways.

I'd like to start with a little bit of background and orientation because, Your Honor, the most important thing for the State and this entire process is that a fair process exists of monitoring whereby the State knows what documents it must preserve, how those documents should be created on a routine basis to document the activities and the care and services that are being provided to the incarcerated individuals inside of our system that are the subject of this agreement and what documents are necessary to demonstrate the incredible efforts that we're making in order to show and demonstrate and document compliance.

And Your Honor, I think there's some really important themes that underlie our entire motion, and two of those are really important and I want to start with those, which is, number one, there's an agreement that decades ago, long before we were admitted in this case, long before I believe this plaintiffs' counsel was here, we reached an agreement and the agreement reflected the terms and conditions upon which the parties agreed to settle this case.

And the State has worked tirelessly, particularly in the recent history has made incredible strides, and those strides have been acknowledged through the process outlined in the

Settlement Agreement which is monitoring.  We have in this case one of the most recognized experts in the provision of mental health care in a correctional context in Dr. Jeff Metzner.

Your Honor, I don't know if you've had a chance to interact with Dr. Metzner.  I don't know, different courts in our experience in court monitoring have different relationships, but I can't think of a context where we in the context of court monitoring have ever discouraged a court from being active and involved in communications with a monitor.

But I don't know what communications have happened here but the fact is is that based on the November visit that occurred with Dr. Metzner, the State is incredibly close to reaching full and complete compliance with all of the mental health terms and conditions of the agreement.  And here's how this plays in.

Again, Your Honor, I don't know if you've read even or studied Dr. Metzner's reports, but our motion really ties into one key portion of Dr. Metzner's reports, which is the portion that relates to the IMHU, that stands -- Your Honor knows.  I don't want to belabor the point, but it's the Inpatient Mental Health Unit, which is a 32-bed community in which our patients receive the highest level of mental health care at BCBIC.  It's staffed incredibly well.  It's run like -- more like a mental health care hospital than a prison.

And here's -- there's some really interesting historical

points that lead up to this issue because really if you look at the entire motions that are pending on this document issue, they all relate to our creation and retention of documents pertained to that unit.  So let me kind of run through just some really important facts that we think are important for the Court to understand.

Number one, the IMHU is never mentioned in the Settlement Agreement.  This case was settled.  It was then released.  It was then resettled again.  Nothing in the Settlement Agreement imposes any requirement upon the staff behind me that are leadership of BCBIC and the other facilities to establish the IMHU.  It was something done at the recommendation of our Monitor to provide an increased level of care, which we did.

THE COURT:  And the patients there or the detainees there are covered by this Settlement Agreement, correct?

MR. LUNSFORD:  They are patients under the settlement, yes, sir, but the level of care that they receive, nothing in this Settlement Agreement dictates -- for example, one of the key issues here, nothing in this Settlement Agreement dictates the amount of out-of-cell time that those individuals must receive.  There's nothing in the Settlement Agreement that says we have to record out-of-cell time in any unit.

THE COURT:  Are you contending that the time of out-of-cell time, the amount of out-of-cell time they get or

when they get it is completely irrelevant to the provision of medical care?

MR. LUNSFORD:  In this particular context, in this particular context of this Settlement Agreement, yes.

THE COURT:  Why would you listen to anything that Dr. Metzner had to say about it, then?

MR. LUNSFORD:  Because we thought it was a good idea. Why wouldn't you listen to someone who understands correctional medicine and has ideas about how to improve your system?

I mean, that's how -- it is genuinely how interested our practitioners are in ensuring that we're -- and also, we have faced some challenges, as you're going to hear.  We've faced challenges in moving individuals out of BCBIC who have been committed to the mental health department and the State mental health hospital.  I believe there's 30-something of those individuals currently.  Not all -- the IMHU is not composed of only those individuals but there is a need, we would agree that there's a need that's being met through this.

The larger point is, again, the Court's jurisdiction is limited to the agreement and nothing in the agreement requires us, A, to create these documents; B, to track out-of-cell time; or C, to even have an IMHU.

And here's what's the most telling part of it.  Again, Dr. Metzner has been an expert since the late '70s in corrections.  And there are experts testifying in § 1983 cases

all over the country who have been monitored by Dr. Metzner when they were originally on post. And Dr. Metzner issues his report every six months and, Your Honor, I'd just encourage you to look at his report and talk to Dr. Metzner about this issue because if you read through his report, you will get to the end and see a section that says "IMHU." And there's one really important thing missing in that section, unlike every other section of his report where assessing the provisions of the Settlement Agreement. Unlike those other sections, he never reaches a point where he says compliance or noncompliance.

And why is that? Why? Why does Dr. Metzner spend all this time and energy drafting these extensive report documenting his findings and go through all this and make certain comments about the IMHU, but he never makes a finding of compliance or noncompliance. Why does he do that? Because it's not in the Settlement Agreement. But I think there's -- so that's just merely the first point.

The question arises, I'm sure Your Honor is sitting there going, well, you have these documents that document out-of-cell time, maybe the Court believes that's a critical issue and wants to ensure that we're doing that. Fine, understood. I want the Court to understand how this discussion arose over what I'm going to call the out-of-cell tracker. That's what we call it.

The out-of-cell tracker is an electronic document that

indicates for each of the incarcerated individuals in the IMHU when they're out-of-cell, okay?  So the plaintiffs have received copies of it, we've been producing it.  We began producing it I believe about a year and a half to two years ago to Dr. Metzner because he wanted a simple way to see if these individuals were receiving out-of-cell time.

So we created it.  We had discussions about it. Dr. Metzner one time had some concerns about the amount of out-of-cell time, and we wanted to alleviate those concerns to make sure there was no allegation that we were not observing people's mental health needs so, again, we created this log.

THE COURT:  Can I stop you there for a second?

MR. LUNSFORD:  Yes, sir.

THE COURT:  Just for additional context, I believe you stated in your papers that the nursing notes or medical charts for the individuals in this unit also record information as to out-of-cell time and there's other -- there may be other places that you say this information is recorded.

MR. LUNSFORD:  That's correct.

THE COURT:  At that time that Dr. Metzner made this request, was that information being consistently recorded in these other records?

MR. LUNSFORD:  Well, I -- I don't love the word "consistently," because it's like in what industry does anyone consistently document anything, and I would argue no one does

it consistently.

What I would say is that there was not a centralized location where Dr. Metzner could go to confirm, to look quickly at every patient and see all of their out-of-cell time over a period of time. There were locations where the activities out-of-cell were being recorded. Because much of the activity that's occurring out-of-cell is therapeutic activity that's happening at the behest of the mental health staff.

So we were documenting that and in addition to that there's also logs. At every single station, supervisor desk, whatever, there's logs on each unit that document the activity of the housing unit, and so there are logs that also documented what was going on in the unit. So there were multiple different locations where out-of-cell time could be "confirmed." Okay?

So we have this log but there was a concern on the part of our staff that the IMHU is so dedicated to being a therapeutic mental health unit that we were spending a lot of time creating these electronic logs. And Dr. Bonieskie was very outspoken with Dr. Metzner about, we're wasting time that could be providing care by documenting additional duplicating documentation, essentially.

So there was a discussion and, Your Honor, in full candor, I think we from the State's end could have handled the communications better in this piece and we thought we had an

understanding, we thought it was very clear, it's now clear that either, A, it was clear and just because we didn't document it appropriately it was taken advantage of; or B, there was some confusion.

It was discussed during the March visit of this past year in March -- not April, I know there was a dispute about that -- in March, there was a discussion about eliminating this log. We're just going to eliminate it. And so the discussion was had and the plan was June 30 we're going to stop doing this log because it's so much work. And, in fact, that was the plan that Dr. Bonieskie put in. We thought it was clear that -- that conversation happened in front of plaintiffs' counsel, in front of Dr. Metzner, and Dr. Metzner said, here's what I want you to do, I want you to -- I want you to do these audits and make sure you continue to look at this issue.

So the March visit ends. June 30 comes around, Dr. Bonieskie does exactly what she says she was going to do and they stop the log.

Counsel then notifies plaintiffs' counsel after that occurs just as a reminder, hey, remember, we're not doing this anymore. The issue blows up, motions are filed, the Court enters its order to preserve documents. Our motion to amend, Your Honor, isn't necessarily dedicated only to the out-of-cell tracker. It's really based on concerns about the breadth of the order, because as we read the order, Your Honor, it seemed

clear to us that it was a placeholder, that Your Honor was saying, maybe I want to hear more about this, but unless the Court orders otherwise, that last clause that the Court put in that order, I read Your Honor's order and maybe I read too much into it, but I read it as this is going to be a placeholder, you guys keep on holding onto these documents until we have further time to discuss this.

But nevertheless, we reinstituted -- we never destroyed a single out-of-cell tracker, so if anybody is here saying we destroyed any documents of any kind, I would say, please, I hope -- I beg the Court to ask for evidence of that because we didn't destroy any documents.  There's no evidence that anyone associated with the Department of Public Safety ever destroyed any documents.  I don't know where that even suggestion came from.

THE COURT:  It's just that you weren't creating the documents.

MR. LUNSFORD:  We were not creating a duplicative document that was capturing the same information.

So here's what happens.  So July, late July, the 27th, 28th, we restart this laborious process.  And Your Honor, let me be clear, we're going to continue to create this log.  I spoke with Dr. Metzner yesterday and will tell the Court that Dr. Metzner said to me, "Bill, I think it's in your client's best interest to satisfy the plaintiffs, you don't have to do

it but" -- and I said, well, we actually do, I think.  We're going to do it because we don't want to send any message to the Court that we're not abiding by Your Honor's directives.  I said but I understand and I appreciate your advice and we'll continue.

So we're committed to continue to create this duplicative document that's going to take away from us providing patient care simply so plaintiffs' counsel can see that we are providing out-of-cell time.  But here's --

THE COURT:  Can I ask, you're using the word "duplicative" a lot here so I just want to make sure I'm clear on whether that fairly applies.

Is it the same people who were creating the document that you declined to continue to create are the same people that are recording the out-of-cell time in other documents or are these --

MR. LUNSFORD:  Yes.

THE COURT:  -- different people?

MR. LUNSFORD:  Yes.

THE COURT:  Okay.

MR. LUNSFORD:  In multiple different ways.

THE COURT:  So is this nursing staff?

MR. LUNSFORD:  It's nursing staff, custody staff kind of working in conjunction with that, yes.  But they work together.

THE COURT:  Do they record that information in the same place?

MR. LUNSFORD:  They all record it on a log and I believe -- I'll confirm, I believe it's the mental health staff that actually keep the log.

DR. BONIESKIE:  It's our census.

MR. LUNSFORD:  Yeah.

THE COURT:  This log, they're part of the nursing -- they become part of the medical chart; is that correct?

MR. LUNSFORD:  That's the duplicative document. That's the progress notes do contain nurse's notes about out-of-cell time.

THE COURT:  I guess that's what I'm asking is who's creating that -- who's putting the information into the medical chart?

MR. LUNSFORD:  Into the medical records, that's a progress note.  So that would be the -- you've heard the SOAP note idea.  That's here's where the patients is and here's the care we're providing and there's a notation there about -- and the notation is very in length and detailed.  So they're different.  The out-of-cell tracker is an actual spreadsheet. It looks like an Excel spreadsheet and it says, here's the individual, here's when they're out, here's their State Identification Number, all that kind of stuff.

THE COURT:  But there's multiple staff members who

are contributing to that document?

MR. LUNSFORD:  The staff is overall working together in that unit to make sure that document's maintained, so --

THE COURT:  That's the document you stopped creating?

MR. LUNSFORD:  For a period of time.

THE COURT:  Right.

MR. LUNSFORD:  That we are -- ever since late November --

THE COURT:  Right.

MR. LUNSFORD:  -- July, it's still in place.

And Your Honor, if you don't -- in considering this issue, if you don't read any other document, I would plead with the Court to go read Dr. Metzner's report from November.  Because remember, he's an adjunct to the Court.  He doesn't represent our client.  He doesn't represent plaintiffs.  He's here -- the parties agreed -- going back to the agreement -- that the monitor would be the arbitrator of compliance in terms of telling the Court who's in compliance.  And there's a process where the Monitor issues a report and the plaintiffs can come back and say the Monitor's wrong, and the Monitor can consider the plaintiffs' evidence and change it.

But here's -- you know, I'll -- I don't want to read it to you because I think that's not appropriate, but I know Your Honor can but here's the salient points.

THE COURT:  Are you talking about from Dr. Metzner?

MR. LUNSFORD:  From Dr. Metzner.

THE COURT:  So his last report is docketed at -- I'm sorry, 929-2.

MR. LUNSFORD:  Yes, sir.  That's exactly right.

THE COURT:  And you're referring to, I think you described the relevant portion as near the end of that report?

MR. LUNSFORD:  Yes, sir.  I can tell you the exact page.

So Your Honor, on the Word version we received, not the filed version, the November report begins -- it's October 2024 findings, begins on Page 35 of 44.

THE COURT:  Okay.  I'm there.

MR. LUNSFORD:  Okay.  So second paragraph of that. Dr. Metzner says, "I interviewed all of the other patients currently housed in the IMHU."

So again, there's this -- there are repeated allegations in the motion to compel, and this is what I would say sensationalism in the case, that these out-of-cell trackers are critical evidence and that losing that evidence loses evidence forever and there's no other evidence to replace it.

Well, then why in the world did Dr. Metzner meet with the plaintiffs and the class members in this case?  He said five patients in Pod 2 -- that's where he begins and then look at the second sentence -- offered out-of-cell time included four hours in the morning and four hours during the late afternoon.

That's eight hours of out-of-cell time.

To keep in mind, Your Honor, we talk about some people want to use the pejorative "solitary confinement," a common expert that the plaintiffs use, Craig Haney who is of the infamous Stanford Prison Project testified in a case we had that if you have people out-of-cell an hour and a half a day, it's solitary confinement.

So for these people in Pod 2, we have them out of cell eight hours a day, okay?  And this is Dr. Metzner talking without interference from any counsel to the class members. Patients in Pod 2 reported being offered out-of-cell time twice per day ranging from three to four hours during two different shifts.  Again, that's plaintiffs.

So who has the evidence of who -- who has the evidence about who's getting out of cell?  Seems like the plaintiffs have that evidence.  And so it seems like when we read the motion to compel, we're like, this is unusual, this is really odd.  The plaintiffs, the plaintiffs don't -- counsel either, A, don't believe their own clients about out-of-cell time, believe their clients are somehow providing false information or inaccurate information to the Monitor; or B, they want us to maintain information so they can prove their clients are wrong?

Again, there are repeated reports in here where Dr. Metzner is going into this unit and confirming with the patients themselves that they're receiving out-of-cell time.

So if we go on, he says Pod 1, again, was the same. There are some people who are critically ill on this particular unit that we can't let out of cell who are on crisis watch and might involve in either self-injurious behavior or injure others.

But then remember, Your Honor, this report came out in November. So this report came out after the whole debate and dispute in July about whether we should create these or not. Dr. Metzner never once in here criticizes the agency for not having those reports for July, never says he can't assess it, assess the issue because we have four weeks, maybe, at best of not having this out-of-cell tracker.

There's nothing in here that says the out-of-cell tracker is essential. In fact, he simply says I reviewed it and the out-of-cell tracker was consistent what I heard from the inmates or detained individuals and consistent with what I heard from the staff.

And again, it's one of those of it's simply sensational that we are maintaining this document but yet the plaintiffs themselves are in some ways a source of the information and what they're saying is consistent with what we're saying and there's no issue here. There's no need for the -- and this is the concern.

So if the Court goes to its order that was I believe Docket Number 888 entered July 10th, it doesn't just relate to the out-of-cell logs, and that's our -- one of our major

concerns, Your Honor.  If the Court modified this order to only relate to this out-of-cell tracker, fine, we're going to do it anyways.  But essentially what this provision does is requires us to maintain everything even if the Monitor is not using it. Defendants to continue to maintain all records previously maintained in connection with the Settlement Agreement.

Your Honor, there's no way for anyone here in the courtroom because none of us were here when this case began to know what documents were maintained during the Settlement Agreement.  I don't know this and I'm -- as an officer of the Court I feel a burden to tell you that there is no way that we could legally advise our client in a manner to comply with this directive because it's so broad.

Moreover, my concern is what this means for the future of monitoring.  Does the Monitor now have no authority to modify documents that we're maintaining at his request or as part of the monitoring process, because it says we have to maintain the ones that have been historically used, so does that mean all the form -- so if he says our intake form needs to be changed, does that mean it can't be changed?  It says we have to maintain them.  I don't know.  It's not clear.

But at the end of the day, our general concern is that, again, the breadth of the order is so broad it goes further than even the plaintiffs requested which was simply, in our view, the out-of-cell tracker, which we didn't -- again, we

didn't destroy.  We simply ceased filling out for a period of four weeks.

But putting that aside, Your Honor, we're very close.  And Dr. Metzner's report documents exactly how close we are.  And as we go forward, we're going to have to change and modify and improve certain areas where we're going to focus on.  We're going to have to do new audits that capture different information.  We're going to have to scrap information that's now obsolete.  And so this is an evolving thing.

And Your Honor, I would say this is the role of the Monitor.  And if Your Honor hasn't spoken with the Monitor, again, I would say that that would be an appropriate step at this stage to say, are you getting the documents you need?  Has the State deprived you of any documents?  Because in his report, Dr. Metzner never says I didn't get this document, I didn't have access to this information, I didn't have access to these people.

THE COURT:  But isn't the responsibility for monitoring shared between Dr. Metzner and the plaintiffs?

MR. LUNSFORD:  No.  I disagree with that.  Here's why.  It's a different role.  I disagree.

First of all, a monitor, it's really interesting, if you go back and read the last transcript before Your Honor received the case, Mr. Fathi and I agreed on a fact which is, you know, I'm sure noteworthy to the Court that we agreed on the fact

that a monitor is an adjunct of this court.  It's a neutral. There is no set of circumstances in which the plaintiffs can be ethically neutral.  They have a duty of loyalty to their client.  So if they take a role of neutrality, they violated their ethical duty to their clients.

THE COURT:  I guess what I was getting at, I understand that they have different roles, but they both have a monitoring function --

MR. LUNSFORD:  I disagree.

THE COURT:  -- as prescribed by the Settlement Agreement.

MR. LUNSFORD:  Disagree.

THE COURT:  So if we go to the relevant portion of the Settlement Agreement that speaks on the duty on defendants to retain documents, what does it say?

MR. LUNSFORD:  It says we must maintain documents sufficient to demonstrate that we're following, not at the choosing of plaintiffs, not duplicative.  It doesn't say who should determine it's sufficient.  In our view that would be the Monitor since the Monitor, not the plaintiffs, is the one solely charged with the idea of determining when substantial compliance occurs, at least per the terms of the agreement.

THE COURT:  So Paragraph 35, second sentence says, "Upon reasonable request, the Commissioner shall provide such records to the Monitors and plaintiffs' counsel or make such

records available to the Monitors and plaintiffs' counsel at reasonable times" --

MR. LUNSFORD:  That's correct.

THE COURT:  -- "for inspection on site."

MR. LUNSFORD:  That's correct.  We provide them copies of the documents, that's correct.

By the way, that's -- I don't know of a current case -- we have I think six cases currently in monitoring.  I don't know of a case that we currently monitor where plaintiffs' counsel doesn't have access to the records given to the Monitor.  I can't think of a case where that happens.  I mean, this is as common -- in fact, my first Consent Decree involved a 240-person unit in Northern Alabama in 2002 and it contained a very similar provision.

THE COURT:  The point I was getting at is doesn't the Settlement Agreement prescribe a role for the plaintiffs to ensure that the Settlement Agreement is being complied with?

MR. LUNSFORD:  I don't think -- I don't think there's any way that ACLU can guarantee that anything's happening at BCBIC, so no, I don't believe that plaintiffs' counsel --

THE COURT:  They're not entitled to information that bears on compliance with the Settlement Agreement?

MR. LUNSFORD:  I think that's different than guaranteeing compliance.  You said ensure compliance and, no, I don't -- and "ensure" is a very tricky word in the world of

Consent Decrees, Your Honor.  The DOJ uses it like I drink water.  And "ensure" means literally to guarantee.

THE COURT:  Information that's relevant to the question of whether or not the defendants are complying with the Settlement Agreement.

MR.  LUNSFORD:  I think --

THE COURT:  Plaintiffs are entitled to that, correct?

MR.  LUNSFORD:  The Settlement Agreement here acknowledges that plaintiffs' counsel has a role and agreed to a very specific schedule in which the plaintiffs would be paid. It even says they're paid for, I want to be clear, monitoring or Monitor fees or compliance monitoring.

So what does that mean?  The role that's outlined in the agreement is they're a third party to the monitoring itself and if they disagree with the Monitor, they can interject their opinion, but nothing in this agreement says that their say of whether compliance exists or not goes.

THE COURT:  No, I wasn't suggesting that.

MR.  LUNSFORD:  Right.

THE COURT:  And that's not what I was asking you.  I was asking whether or not they're entitled to information and documents that are relevant or bear on the question of whether or not the defendants are in compliance.

MR.  LUNSFORD:  I would say -- I would go to the language of which says they're entitled to records sufficient

to document that the requirements of the Settlement Agreement are being properly implemented and that we've taken actions as described in our compliance reports.  That's what they're entitled to.

THE COURT:  So a couple questions.  You indicated that the information that you're recording or creating in this document that you want to have the authority to not create anymore is duplicative of information contained in other places and there's other ways at getting at the information.  Have those other places where this information is being recorded been produced to the plaintiffs?

MR. LUNSFORD:  They're -- they have been shown. They're in the records so if the plaintiffs want any of the records, the plaintiffs counsel knows every person and can access the roster of every person housed in the IMHU if they just give us dates.  We can tell them who it is and we produce those records if they wanted them, yes.

THE COURT:  And what records are we talking about? We're talking about the patient charts?

MR. LUNSFORD:  Yes.

THE COURT:  Anything else that you say that records out-of-cell time?

MR. LUNSFORD:  I mean, we could check to see what else is out there, but that would be the one location our mental health staff would first point to that documents this

out-of-cell time.

THE COURT:  But you threw out it's less burdensome, the audit proposal that you say that Dr. Metzner proposed.

MR. LUNSFORD:  Correct.

THE COURT:  Has any such auditing occurred?

MR. LUNSFORD:  I believe it did, yes.

THE COURT:  Has the information I guess that was produced through that audit been produced to the plaintiff?

MR. LUNSFORD:  Well, we're still discussing that audit process with Dr. Metzner, so the answer is no.

And let me be clear, though.  I want to correct one thing that I heard.  We're going to -- Dr. Metzner recommended that we continue to create the out-of-cell tracker.  We're going to continue do that.  I'll represent that to the Court.  And we're okay, if the Court wants to alter its order to say you shall maintain these out-of-cell trackers, okay.  We'll do it.

We think -- we think that the modifier at the end of there should be "as long as the Monitor so requires" would be perfect.  Because the Monitor in our view is the one gauging compliance.  He should be able to evaluate what documents are necessary and what -- and this is where I feel like we as lawyers are interjecting into the provision of mental health care.  He's a licensed psychiatrist.  I'm not a licensed psychiatrist.  Plaintiffs' counsel is not a licensed psychiatrist, and I know Your Honor's not.  Why are we telling

a licensed psychiatrist with decades of experience in monitoring what documents he should be reviewing?  That's why we had monitoring.  That's why we did this decades ago in entering into this agreement because we said none of us know how to do it.

And so the role of the Monitor is really what's being trampled here is the Monitor -- in every other case we have, the Monitor dictates what documents are provided and produced, and we will do that and we would encourage the Court have a conversation.  The Court can have ex parte conversations with its adjuncts.

THE COURT:  All right.

MR. LUNSFORD:  And that's not a concern of ours at all because we're confident if you have that conversation, Dr. Metzner is going to say the same thing, which is I talked to defense counsel, told them I thought it was a good idea, I think they should maintain it for now to keep plaintiffs off their back.  That's what we're going to do.

THE COURT:  All right.  So going back to the question of whether this information is duplicative of information kept elsewhere, plaintiffs had pointed out in their briefing inconsistencies that they found between the out-of-cell tracker and other information that they obtained.

Do you have a response to that, and whether or not that bears on -- bears on whether it's appropriate for the

department to continue to track out-of-cell time in the way that you're currently doing it, whether the Medical or Mental Health Monitor requires it or not?

MR. LUNSFORD: Your Honor, this is part of the -- this is part of the game, okay? We got it. Plaintiffs want us to create multiple different documents recording the same activity. And guess what? Between different shifts and different people coming in and out of a unit, there's going to be different recollections and different perspectives of what happened and what time it was.

Maybe I just flew in from my parents' house and I haven't slept very much and I didn't change the time on my watch, and so I write down an hour difference and I'm the officer. And the nurse over here is writing -- and so it's a game of gotcha. It's not about whether we're actually getting out-of-cell time, which, by the way, reminder, Dr. Metzner confirmed that by talking to plaintiffs.

It's a game of trying to make an issue where none exists of, oh, well, BCBIC's trying to hide something. Their officers say it was this time and -- if you have -- my experience, this doesn't relate to the State of Maryland, any operation in the State of Maryland. My experience in life is if you create two sets of documents to record the same activity by two different sets of people, you're going to get different documents and you're going to create an inconsequential issue in particularly

this area because you're going to give them a, well, now they got to match exactly, right?  If they're not exactly, then we've created this conspiracy theory and this false narrative that someone's trying to hide information.

THE COURT:  Is it your contention that the inconsistencies that were identified in plaintiffs' briefing are insignificant?

MR. LUNSFORD:  Again, I would say going into each one of those particular instances there would be explanations as to why different documentation occurred and why one person -- because I would say this, based on our understanding and based on our experience with our staff, all of the statements made in there were true.

We're having this exact same issue on a lockdown unit in Georgia and a judge recently asked us the same question, and the answer is the same, which is just because one person says that Offender X left his cell at 10 a.m. and someone else says he sat down at the table at 11 a.m. doesn't mean those two aren't true.  Something could have happened in the intervening time.  But our point is --

THE COURT:  But that means they're not really inconsistent.

MR. LUNSFORD:  But my question is, well, again, we have to go into each of those situations and here we are, we're in a court hearing, everybody's come here, we're spending all

this time talking about an issue that, guess what, is nowhere in the Settlement Agreement.  We are literally spending hours in court briefing an issue that's not in the Settlement Agreement.

THE COURT:  I know you started with that point.

MR. LUNSFORD:  Is it a mystery why we're not out of this?  I mean, because, again, we would ask the Court to honor the parties' agreement which was this was not part of the agreement.

THE COURT:  All right.  Anything else?

MR. LUNSFORD:  You know, again, Your Honor, let me just wrap up with these two points.  We're maintaining the out-of-cell tracker.  We've listed Dr. Metzner's advice.  We again strongly request, urge, plead with the Court to interact with Dr. Metzner and allow him to use his expertise to guide monitoring because he has done this more than anyone else that we know.

And three is, the Court's order extends, in our view, so far that -- Your Honor, we want to comply with your orders, we want to, in the depths of our soul we want to comply with your orders, but we want orders that we know we can tell you we can comply with.

THE COURT:  Could you give me a flavor of the burden that comes along with having to maintain out-of-cell tracker?

MR. LUNSFORD:  Your Honor, imagine that -- I'm trying

to think.  I don't want to use an inappropriate example.  But on a housing unit on a given day, you can imagine, particularly with people that are suffering from a serious mental illness, all kinds of things can happen.  There can be emergencies, people can have medical needs, they're getting their laundry changed out, they live there 24/7.  And so we now have to track when this person walks out of their cell and when they walk back in.

And we're already tracking which nurses come on the unit and when they come off the unit, when a janitor comes on the unit to clean something up, when a maintenance person comes on.  We're already tracking when a sink doesn't work like it should.  We're already tracking when a mattress needs to be replaced or when a lightbulb goes out, grind out all this stuff.  And then we have nurses writing down what's happening while they're out-of-cell.  And now, to put this really into context of your question of what's the -- I mean, the commonsense question I hear Your Honor asking me about is what's the harm in us just writing all this down and is it not going to be consistent.

THE COURT:  Well, I don't -- in light of the fact that you're saying it's written down somewhere else.

MR. LUNSFORD:  Now we're going to have to be perfect because if we don't have all -- if we don't have the nurse's notes match the out-of-cell tracker log and they're not perfect, guess what, we're going to be right here, back here

talking about a provision of Metzner's report that doesn't relate to the Settlement Agreement.

THE COURT:  All right.  Anything else, Mr. Lunsford?

MR. LUNSFORD:  No, sir.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Fathi, or will it be --

MR. FATHI:  Ms. Wedekind, Your Honor.

THE COURT:  -- Ms. Wedekind?

MS. WEDEKIND:  Good afternoon, Your Honor.

THE COURT:  Hello.

MS. WEDEKIND:  And I'll apologize, I'm losing my voice, so I ask if you'll bear with me here.

At base, the order requires defendants to maintain the status quo.  As we've been discussing so far this morning, Settlement Agreement Paragraph 35 requires the defendants to maintain sufficient records to document the requirements of the settlement are being implemented and that the defendants are taking the steps required or that they describe in their compliance reports.

And Paragraph 35, the latter half of that paragraph also says that if the monitors or plaintiffs' counsel reasonably determine that such records are insufficient to carry out their respective responsibilities under the Settlement Agreement -- as you noted, the plaintiffs have an independent responsibility to monitor -- they may make reasonable requests the Commissioner provide or make available additional records.

Now, on July 5th of this year, defendants counsel informed plaintiffs without explanation that the week prior they had ceased maintaining the logs documenting this out-of-cell time. And in response, we twice requested that the defendants confirm that they would continue to create and maintain all records previously created and maintained in connection with the Settlement Agreement. Our concerns were broader than just the out-of-cell trackers. But twice the defendants did not provide this assurance.

And so out of concern that any number of critical compliance documents were being lost, we filed the motion to preserve evidence seeking the order requiring defendants to continue maintaining all documents previously maintained in connection with the Settlement Agreement, including, but not limited to, those out-of-cell time logs. Again, we were asking to maintain the status quo, and the Court granted that motion.

Now, defendants are asking this court to withdraw or modify that order under Rule 59(e), but neither in their briefing nor today have the defendants demonstrated that they meet that rule's high bar.

THE COURT: Well, I'll just say now I'm not inclined to assess their request or this issue under that standard because I issued that order before they responded. I think that it wouldn't be appropriate for me to look at it. I mean, I think it's more appropriate for me to look at this issue anew

given that they've now responded.  The timing of that order had to do with me considering it an emergency, which was the way that it was more or less presented to me, so I'm not inclined to go under Rule 59(e) on this issue.

MS. WEDEKIND:  Okay.  Well, then, turning to the trackers themselves since that's been the focus of the discussion so far this morning [sic], the Court-appointed Mental Health Monitor has repeatedly identified the conditions in the IMHU as a critical compliance issue, and he relies on these out-of-cell trackers as a crucial data point in his assessment.

As with his prior reports in his most recent report which was assessing January through June of 2024, so a period before the trackers were stopped, he reviewed and relied on the out-of-cell trackers again, specifically listing the tracker in his report on Page 3 as one of the sources of information that he relied on.

THE COURT:  I apologize for interrupting again, but this may cause you to jump ahead as well.  It sounds like from Mr. Lunsford that his client doesn't have a problem with maintaining the out-of-cell tracker as long as the Monitor needs it.

MS. WEDEKIND:  Um-hmm.

THE COURT:  And it sounds like you're making an argument now that the Monitor needs it.  But I guess we can

hear from the Monitor about whether the Monitor needs it or not.  It just sounds like they want to be absolved of their responsibility to keep this document or maintain this document if the Monitor expresses that the Monitor doesn't need it anymore.

So we can jump to -- I mean, you can skip over your contention that the Monitor needs it and I understand your point there, but if it turns out the Monitor expresses either to me or to them that the Monitor doesn't need it anymore, then the question is whether or not they are now no longer obligated to create the document.

Is that correct, Mr. Lunsford?

MR. LUNSFORD:  Your Honor, that's correct.

THE COURT:  Okay.

MS. WEDEKIND:  Sure.  Well, and I will note even in that case, as you pointed out, Your Honor, the plaintiffs' counsel has our own independent duty to monitor compliance with the Settlement Agreement under Paragraph 31, and we have our own right to request and review documents to ensure compliance with the settlement.

And I'll also note that while there's been a lot of discussion about duplicity, about other documents, the defendants have suggested post hoc alternatives that are simply insufficient and do not capture the same level of information contained in these trackers.

For example, they've suggested the out-of-cell time would be tracked through nursing notes and audits of those notes, but they've provided no documentation demonstrating that the nursing notes actually capture this necessary scope of information.  The nursing notes may capture a nurse's observations during rounds.

For example, the nurse may document that they observed the patient sleeping in the cell, they may document they observed the patient sitting at a table in the dayroom, but these nursing notes are not documenting the actual amount of time, you know, two hours, ten minutes, whatever it may be that that patient is spending out of cell.

And in fact, on July 29th, we requested the documents they say demonstrates this information is being kept elsewhere.  We requested the described audits, but to date we have not received any of those nursing notes or audits.

THE COURT:  If they produce them to you, would that suffice or does it depend?  I suspect it depends.

MS. WEDEKIND:  Well, we would have to see what was in the documents, of course, to see if they did, in fact, contain the information they suggest.

THE COURT:  But I guess the question -- I'm sort of imagining sort of best case scenario, if they were to produce information to you that suggested to you that even though the nursing notes may not be completely comprehensive about all of

the out-of-cell time that is spent by each of the patients, if it demonstrates that each patient is spending some, I guess, appreciable period of time out-of-cell, would that be satisfactory such that you wouldn't need the out-of-cell tracker anymore?

MS. WEDEKIND:  Well, Your Honor, based on the nursing notes that we've seen and how they are kept, I don't think the nursing notes would ever capture the full scope of the out-of-cell time.  They're capturing a moment in time when the nurse happens to be in the unit and going to check on somebody but they don't -- you know, if the nurse observes someone sitting at the table at that time, we don't know if that patient has been out-of-cell for ten minutes and is soon going to be moved back to their cell, we don't know if that patient has been out for three hours and is going to remain out for another hour.  It simply does not capture the same type of information that is captured in these out-of-cell trackers. And it's --

THE COURT:  Something I asked you -- I'm sorry, finish your thought.

MS. WEDEKIND:  I was going to say, it's the defendants themselves who developed the current process for tracking this out-of-cell time and they're, of course, free to develop an alternate process provided it continues to accurately capture the same information.

THE COURT:  Okay.  I'll ask you the question that Mr. Lunsford may ask you, which is what provision of the Settlement Agreement does any of this go to in terms of the amount of out-of-cell time spent by each of these patients in this unit?

MS. WEDEKIND:  Yes.  Well, the Settlement Agreement pertains to the provision of mental health care broadly.  And, for example, Paragraph 25(f)(i) refers to the mental health plan of care, and Dr. Metzner has consistently maintained that not only must the mental health treatment plan exist, it must be successfully implemented.

And so if the conditions in the IMHU are not therapeutic, if they restrict what might be an appropriate plan of care, if the conditions are actually counterproductive to a patient's mental health, which we know that solitary confinement is, that's been widely demonstrated in the literature, the Fourth Circuit has taken note of that in Porter, then of course they cannot be in compliance with some of the more basic provisions of the mental health care required under the Settlement Agreement.

And, you know, this is something that Dr. Metzner has focused on himself for many, many years now.  The defendants have conceded themselves that it's an important issue and have highlighted their own efforts to increase their out-of-cell time in their own compliance reports, but that of course means

that they must document and provide the documentation demonstrating what they have done to increase out-of-cell time under the requirements of Settlement Agreement Paragraph 35.

THE COURT:  Is it your contention that there's a problem with out-of-cell time at this point in time?

MS. WEDEKIND:  Your Honor, there have been improvements, definitely, that we have seen.  Dr. Metzner has documented those improvements.  However, we do still have concerns that there are some populations within the IMHU who are not getting that increased out-of-cell time.

There are certain pods that seem to be getting out the four hours in the morning, the four hours in the afternoon, but there are still certain patients in certain pods within the IMHU who are not yet receiving that and so we do think it's an important issue to keep tabs on.

And these reforms are relatively new.  They have not been sustained over a long period of time yet and so it's important that we are able to continue to monitor to ensure that they stay in place, that they are consistent, and that there's no backsliding.

THE COURT:  Is there any particular evidence in the record that you would point to to establish the notion that a certain amount of out-of-cell time is necessary to monitor for purposes of the provisions of the Settlement Agreement?

MS. WEDEKIND:  Well, Your Honor, Dr. Metzner has

cataloged over the years his concerns with the conditions in the IMHU. You know, back in 2022, in his report which is at ECF 765-2, he noted that the IMHU appears to function at a segregation level of confinement from the perspective of the very limited out-of-cell time being offered.

THE COURT: And what part of the -- you said -- I'm sorry, could you give me the ECF number again?

MS. WEDEKIND: That was 765-2.

There are other reports where he's noted this as well. For example, his report from October of 2022, which is at ECF 773-2, he noted that the limited treatment and minimal out-of-cell time within the IMHU detainees are at a significant risk of clinically deteriorating not improving within a reasonable amount of time.

THE COURT: Is this the one at 765-2? I'm sorry.

MS. WEDEKIND: I'm sorry, that last one I was just reading was from 773-2.

THE COURT: Give me one moment, please.

MS. WEDEKIND: Sure.

THE COURT: And what portion of -- what page are you reading from?

MS. WEDEKIND: 29, Your Honor.

THE COURT: 29 of 33?

MS. WEDEKIND: Yes, I believe that's what I have written down, 29, yes.

THE COURT:  There's not much on this page but what -- could you repeat where you were reading from?

MS. WEDEKIND:  That he said related to the current limited treatment and minimal out-of-cell time within the IMHU, detainees in Categories 1-3 are at significant risk of clinically deteriorating or not improving within a reasonable period of time.

THE COURT:  Okay.  That's on Page 28.

MS. WEDEKIND:  My apologies.

THE COURT:  All right.  And is there a similar statement, I assume, in the earlier report which was at 765-2?

MS. WEDEKIND:  Yes, Your Honor.  There's a similar statement, again, where he notes that the IMHU at the time was functioning at a segregation level of confinement based on the very limited out-of-cell time being offered to detainees.  And now in his most recent reports he has noted the improving conditions of confinement, including the increased out-of-cell time, but has described it as being a work in progress.  That was in his November 2023 report at ECF 884-2.

THE COURT:  So that was about a year ago?

MS. WEDEKIND:  That's correct.

THE COURT:  And in the most recent report it doesn't mention this issue at all.

MS. WEDEKIND:  Well, he did review the out-of-cell time logs carefully in his most recent report, yes.

THE COURT:  Okay.  What is your understanding of his position on the need for the out-of-cell tracker?  Do you have any understanding of what he currently believes as to the necessity of maintaining that document?

MS. WEDEKIND:  Well, Your Honor, we did not speak with him yesterday like counsel for the State on the issue.  However, I think he would agree that the nursing notes do not capture the actual amount of out-of-cell time because there was quite a bit of time spent on that issue at this most recent tour where he was comparing nursing notes to the out-of-cell tracker and noting that the information contained in one was not contained in the other.

THE COURT:  Okay.  If you're ready for it, I don't want to short-circuit your argument here, but there's an argument made from the defense which I took to be their primary argument is that the order I entered is overbroad, and it sounds like we're all just talking about the out-of-cell tracker.  Is there anything else that you think that order is necessary for?

MS. WEDEKIND:  Well, Your Honor, we do think the order is still necessary to remain in place as it is.  You know, as we noted, it essentially maintains the status quo and ensures compliance with Paragraph 35 of the Settlement Agreement and, as we noted at the outset, we have some -- multiple document disputes at issue right now regarding what

documents are being maintained and produced.  And so we do think the order is necessary as written to ensure that critical compliance documents are not being lost.

THE COURT:  Well, that order was entered at a time where I guess the -- whether or not the Settlement Agreement was going to continue or not or not was in question.  The defendants had taken the position that it had expired.  We're in a different situation now, clearly.

I guess I would ask for more specificity on your part to identify specific documents that you're concerned would not be maintained if the order was made more narrow, more narrowly focused on the out-of-cell tracker.

MS. WEDEKIND:  Sure.  Well, I'll note even with these alternative documents that we asked them to produce, as I noted before, they have yet to produce them.  They have yet to produce the nursing notes they say captures this information.  They have yet to produce the audits that they say they're conducting on out-of-cell time.  Certainly there could be other ways to try to capture some of this information.  For example, plaintiffs' counsel could be given read-only remote access to the medical record in the same way that the Monitors have.

THE COURT:  Well, the order doesn't speak to production.  It speaks to maintenance.

MS. WEDEKIND:  Right.

THE COURT:  So the question is whether or not you

believe there's certain documents that the defendants are not maintaining or they would not maintain in the absence of my order.

MS. WEDEKIND:  Well, Your Honor, again, I think we do -- we never learned the full scope of what other documents they may have ceased maintaining in June.  This is the one document that -- one of the few documents that they were producing on a regular basis, and so it was made clear to us that they were no longer maintaining this document.

THE COURT:  This document.  You're talking about the out-of-cell tracker?

MS. WEDEKIND:  The out-of-cell tracker, yes.

THE COURT:  I'm putting the out-of-cell tracker to the side.  Is there anything else, in other words, do we really need an order this broad now that it's clear that the Settlement Agreement is still in place and will be in place for some period of time, do we still need an order that's this broad at this point now that we're at -- now that the issue of whether or not the Settlement Agreement is going to continue has been resolved?

MS. WEDEKIND:  Your Honor, given our ongoing concerns about the consistency of the documentation, what is being produced and not being produced to us when we request, given some of the inconsistencies between the different types of documentations that are going to be discussed later today, we

do think the order is necessary as written.

THE COURT:  All right.  I think maybe it makes sense to pivot to those other issues at this point.

MS. WEDEKIND:  Yes.

THE COURT:  So if there's anything else, and I think that there will be other matters that are covered by your motion to compel that we haven't discussed, let's move on to those matters.

MS. WEDEKIND:  Yes, Your Honor, and I'll turn it over to Mr. Fathi for that.

THE COURT:  Okay.

MR. FATHI:  Good afternoon, Your Honor.  I'll be addressing the plaintiffs' motion to compel.

Before I get to the substance I just want to make two prefatory comments.

First, none of the Mr. Lunsford's many factual assertions are evidence.  His assertions about all the other cases he works on, his assertions about conversations he's had with the Monitor, with staff at the jail, none of that is evidence.  A party that wants to present evidence on disputed factual matters has a duty to present admissible evidence, authenticated documents, affidavits.  The statements and unsworn argument of counsel are not evidence.

Secondly, because the defendants place such decisive importance on Dr. Metzner's latest report, I did want to let

the Court know that they have provided notice they will be challenging the accuracy of that report pursuant to the provisions set forth in the Settlement Agreement.

Now, to move on to our motion to compel, there are three sets of documents, three kinds of documents that are at issue here.  The first are what are called count sheets from the Inpatient Mental Health Unit or the IMHU.  This is the unit where the most seriously mentally ill people in the jail are kept, where patients are locked alone in their cell sometimes for 23 or more hours a day, and some of them receive no out-of-cell time at all on a given day.

Now, the issue of out-of-cell time for these desperately ill people has long been a critical compliance issue identified in report after report by Dr. Metzner, and Ms. Wedekind gave the Court some of those citations.  And defendants have repeatedly asserted in their compliance reports actions they have allegedly taken to increase out-of-cell time.

So it is far too late in the day for the defendants to be alleging that this is somehow outside the Settlement Agreement and not a legitimate source of inquiry for the plaintiffs, particularly given our independent duty to monitor compliance that is explicitly set forth in Paragraph 31 of the Settlement Agreement.

So first category of documents are what are called count sheets.  Now, when we visited the IMHU on December 15th of last

year --

THE COURT:  Before you go there, Mr. Fathi --

MR. FATHI:  Yes.

THE COURT:  -- I want to make sure that we're clear about the distinction, if there is any, between count sheets and the out-of-cell trackers as it's termed by Mr. Lunsford.

MR. FATHI:  Yes, Your Honor.  The out-of-cell trackers are developed by Centurion, which is the State's for-profit private mental health care provider.  The out-of-cell count sheets are -- it's a daily log that lists all of the patients in the IMHU with handwritten notes by custody staff indicating when each patient was offered out-of-cell time or, in some cases, indicating that a patient was not offered out-of-cell time that day.  And when we visited the jail on December 15th of last year, we were shown these daily logs by Sergeant Miller who was, at that time, the supervising custody officer in the IMHU.

Now, on December 20th, I wrote to Ms. Mullally requesting that pursuant to the duty to preserve relevant evidence.  She confirm that the count sheets would be preserved effective immediately.  And later that same day, Ms. Mullally responded and she wrote and I quote, "I have requested preservation of the count sheets, including any notes made by any correctional officer working a shift in the IMHU."

And that e-mail exchange, Your Honor, is at 894-10 and

894-11.

On January 17th, Ms. Mullally produced 33 pages of daily count sheets spanning from October 10th through December 18th. And if the Court wants to get a sense of what they look like, they are filed at 895-1, redacted to remove identifying information.

Now, fast forward to April 12th of this year, we sent a letter asking the defendants update their production and produce the count sheets for January through March and then going forward every 30 days.  After five weeks the defendants responded that these documents whose preservation we had specifically requested and which Ms. Mullally had agreed to preserve "are not preserved for production."

We sent a letter reminding them of their obligation to preserve documents and we received no response.

Now, the timing here is critical.  They were preserving the count sheets.  They produced them through December 18th. Then on December 20th, we requested their preservation and Ms. Mullally agreed to preserve them, and then when we asked for the sheets for January through March we're told they weren't preserved after all.  In other words, the count sheets were being preserved until we requested their preservation and then they were destroyed.  This sequence of events shows intentional willfulness and bad faith conduct.

This is an undeniable case of spoliation of evidence for

which the defendants should be sanctioned.

THE COURT:  I'm sorry, I'm just going to literally ask you to repeat yourself on that point.

MR. FATHI:  Yes.

THE COURT:  What was the destruction?  You concisely stated it.  I just think I may have missed part of it.

MR. FATHI:  Yes.  We know that they were preserving these documents at least through December 18th because they produced them through December 18th.  On December 20th, we requested that they be preserved going forward.  Ms. Mullally agreed they would be preserved.  Then when we asked for them for January through March we were told "they are not preserved for production."

So this is a straightforward case of spoliation of evidence.

THE COURT:  It sounds like they're just not creating them.

MR. FATHI:  No, Your Honor, that's not what they said in their letter which is at 894.6.  They didn't say they stopped creating them.  They said these are unofficial documents that are not preserved for production.

THE COURT:  What if it's -- what if it's more accurate to say that they just stopped creating them?

MR. FATHI:  Well, Your Honor, we have note --

THE COURT:  Do you still have a spoliation argument?

MR. FATHI: Yes, Your Honor. We happen to know that's not true because on Dr. Metzner's most recent -- and again, this is not in the record, I'm happy to create a declaration if needed, Dr. Metzner's most recent visit we were told again that these documents are being kept. We asked for them again and we were told again they are not being preserved.

So it's not that they're not being created, Your Honor. They are being created and then destroyed. And the amazing thing, Your Honor, is that in their response brief to our motion which is at ECF 907, they don't address the spoliation evidence at all. They don't dispute any of our factual assertions, they don't address our legal argument about spoliation and, therefore, they have waived any argument that they have not engaged in the spoliation of evidence.

I'm happy to go through the elements of spoliation but it's in our briefs and defendants don't dispute our showing of spoliation, and so unless the Court has questions we will rest on our briefs on the spoliation issue, subject to a right to reply. But this, Your Honor, this is why the Court's order, preservation order should not be narrowed just to the out-of-cell trackers that are created by Centurion.

THE COURT: I'm sorry. I'm a little confused about this --

MR. FATHI: Yes, Your Honor.

THE COURT: -- because the document you pointed me to

says "out-of-cell tracker" at the top of it.

MR. FATHI:  I'm sorry, does it?

THE COURT:  So I think that's what Mr. Lunsford was referring to is out-of-cell tracker.  Can you just briefly clarify that, Mr. Lunsford?  I'm not sure if you heard me, Mr. Lunsford.

MR. LUNSFORD:  Your Honor, I did not.  I'm sorry.

THE COURT:  Okay.  So it seems like Mr. Fathi is using the term "out-of-cell tracker" differently than in the way that you were.  Do you have the same sense?

MR. LUNSFORD:  The word "confused" is the best word. I'm totally confused by what Mr. Fathi's talking about.

THE COURT:  When you were using the word out-of-cell tracker, they're referring to the count sheet, the same thing that he's --

MR. LUNSFORD:  No.

THE COURT:  Okay.

MR. LUNSFORD:  There's an out-of-cell tracking log that is digital.  It is a digital document inputted on a computer or a digital device and it's printed as a spreadsheet.

THE COURT:  And this is Centurion doing this?

MR. LUNSFORD:  I'm not exactly sure who.  I just know we have it and it's created on the IMHU.

THE COURT:  Okay.

MR. LUNSFORD:  There is a separate sheet referred to

as a "count sheet."

THE COURT:  Um-hmm.  So --

MR. LUNSFORD:  I'm -- I could not be -- having read the briefing, having read the communications with Ms. Mullally, I can tell you there could not be a worse case of communication failure that I've ever seen where we don't -- we don't know what they're referring to as count sheets because what we understood all along they were talking about was handwritten notes and the count sheets, contrary to plaintiffs' counsel's representations, no idea where he got it, do not have a section where our officers are instructed to track out-of-cell time. That's not what the discussion said, that's not even what plaintiffs' counsel's evidence says.  Their own declaration --

MR. FATHI:  Your Honor --

MR. LUNSFORD:  -- says something very, very different about what transpired on a site visit where the confusion first arose and, Your Honor, I can -- I know plaintiffs' counsel put a count sheet in the record.  We've produced them to plaintiffs' counsel.

MR. FATHI:  Your Honor --

THE COURT:  Go ahead, Mr. Fathi.

MR. FATHI:  Thank you.  Mr. Lunsford may be confused. Nobody else is, Your Honor.  There are two different documents. There is the document that's created by Centurion.  This is the document that the defendants' unilaterally decided to stop

producing after June 30th.  This is the document that was the subject of our preservation motion and the Court's preservation order.

THE COURT:  Okay.

MR. FATHI:  What I'm talking about now are the documents at 895-1.  I'm sorry if the heading is confusing or the term I used is confusing.  This is a different document.

THE COURT:  Okay.  I see it now.  Because 895 without the 1 is the Centurion tracker.

MR. FATHI:  895-1.

THE COURT:  Right.  Got it.

MR. FATHI:  So what you have before you, Your Honor, is it's a list of all the patients in the IMHU that day. Obviously that's blocked out.  And then you have handwritten notes by the officers showing how much time they got out or if they didn't get out.  So that's what we're talking about now, Your Honor.

THE COURT:  Understood.

MR. FATHI:  That's what we asked to be preserved. That's what Ms. Mullally agreed to preserve, and then that's what we were later told is not preserved, which is a textbook case of spoliation of evidence.  And it would have been helpful if defendants had actually responded in their opposition brief instead of simply ignoring the spoliation claim, but since they chose not to respond, then they have waived any argument.

But what I was beginning to say, Your Honor, is the Court's preservation order should reach these -- let's call them custody documents, the ones at 895.1.

THE COURT: Count sheet?

MR. FATHI: Pardon me?

THE COURT: Count sheet?

MR. FATHI: Count sheet.

THE COURT: I apologize, earlier I was looking at the wrong document. The document you're talking about does say count sheet report at the top.

MR. FATHI: Okay. And here's why they're important, Your Honor, because when we compared the count sheets to the Centurion trackers, we found systematic discrepancies, with the Centurion trackers consistency showing more out-of-cell time provided than the count sheet. So it will frequently happen that the Centurion tracker shows the patient is receiving out-of-cell time while the count sheet for the same patient on the same day shows no out-of-cell time.

And far from being sort of random errors of that as Mr. Lunsford speculated that would expect to -- you would expect them to be in both directions and not systematically, these were not random at all. These discrepancies are all in the same direction. They are always showing -- the count sheet always shows less out-of-cell time than this Centurion tracker does and we have laid out that side-by-side comparison at ECF

894-14, Pages 4 to 6.

So that's why the Court's preservation order should not be limited just to the Centurion tracker. It should be also extended to the count sheets which the defendants agreed to preserve but then failed to preserve.

If the Court has no further questions on spoliation, I'll move on to the other categories of documents.

THE COURT: Yes.

MR. FATHI: The next category is death records. We requested records regarding our clients who died in the jail. In March of this year, three class members died in the jail in a 20-day period, and we requested all of their health records, all of the incident reports around their deaths, and all autopsies and mortality views for these patients.

And this is particularly important, Your Honor, because we haven't had a court-appointed medical Monitor in this case for over a year. So these deaths have not been reviewed by anyone outside of DPSCS. We, as class counsel, have a duty to review these deaths, but to do that we need the documents that the defendants are refusing to produce.

THE COURT: And it sounds like they've given you some of the documents but not all.

MR. FATHI: Correct, Your Honor.

THE COURT: So what specifically have they not turned over?

MR. FATHI:  They have not provided the autopsy reports.  Their initial response was that they had not yet received the autopsy reports but today, nine months after the deaths, they still haven't produced the autopsy reports or provided any explanation of their continuing refusal to provide them.  Do they have them now?  Have they even asked for them?  They have told us nothing.

The next category of documents they're refusing to produce are death summaries and mortality reviews for any of these three deceased persons.

Now, mortality reviews are particularly important because they examine how the death occurred and whether any systematic defects in the jail's healthcare or other jail operations contributed to the death.

Now, the defendants agreed -- initially agreed to produce these documents once a protective order was entered.  We pointed out there is already a protective order in place that clearly applies to these documents, but defendant still refused to produce the mortality reviews and death summaries.

Now, having initially agreed to produce these documents once a protective order was entered, now in response to our motion, they refuse to produce these documents based on additional arguments that were not initially asserted in response to our argument -- in response to our request.

So first they say that these documents are protected and

confidential, but they identify no specific privilege and they cite no authority for that proposition.  So any assertion of privilege is waived.

And in any event, the all-but-unanimous authority is that State law privileges do not apply in federal question litigation in federal court, and we've collected those cases at ECF 913 at Page 7, Note 4.

Second, they argue that they're only required to produce the medical records of deceased class members and autopsy -- I'm sorry, mortality reviews and death summaries don't count as medical records.  That is false.  Under Paragraph 36(c), medical records of deceased class members are in a special categories and the defendants are required to produce those sua sponte.  Whenever a patient dies in the jail they are required to produce the medical records without waiting for a request.

Even if the death summaries and the mortality reviews don't qualify as medical records, which I think is highly doubtful, they remain discoverable under the more general provisions of Paragraphs 35 and 36.

Next, the defendants claim that responding to these requests with regard to three deceased class members would be unduly burdensome for a multibillion-dollar state agency.  But of course counsel's conclusory assertions of burden are not sufficient.  A party claiming burden has to support that claim with specific facts and affidavits, and defendants have not

done so here.

And finally, and I think most revealing, while defendants are continuing to produce -- refuse to produce these documents with respect to these three people who died in March, another person died at the jail in June and the defendants did produce the death summary and the mortality review for this patient without any objection, without any assertion of privilege, without any assertion of burden, and without any suggestion that a new protective order was necessary.  And this is set forth in my declaration at ECF 914, Paragraphs 2 and 3.

So defendants haven't explained why they could produce these documents for the person who died in June but they continue to refuse to produce the documents for the people who died in March.

Now, the final category, Your Honor, is documents pertaining -- documents that have been provided to the Mental Health Doctor -- Monitor, Dr. Metzner in conjunction with his monitoring visits.

During Dr. Metzner's March of 2024 monitoring visit, it became apparent that the defendants had provided Dr. Metzner some documents that they did not provide to us, and so we requested that all documents provided to the monitors be contemporaneously provided to plaintiffs' counsel.

THE COURT:  And that's what you want the order to say is that going forward prospectively any time that they produce

documents to the Monitor, they should simultaneously produce them to you?

MR. FATHI:  Correct, Your Honor.  And inexplicably the defendants responded that nothing in the Settlement Agreement requires disclosure of those documents to opposing counsel, but that is incorrect.  If you look at Paragraph 36(a), it unambiguously says "records or other documents provided to the Monitors shall also be provided to plaintiffs." We pointed that provision out to the defendants, but we received no further response.

And I want to make clear, Your Honor, that this is still a live dispute because in August of this year in preparation for Dr. Metzner's October of 2024 visit -- and by the way it was October, not November as Mr. Lunsford said -- we wrote to the defendants and once again requested that all documents provided to Dr. Metzner be contemporaneously provided to the plaintiffs and we received no response.

And in the State's brief, its opposition to our motion, they continue to assert what they call their right, their "right to provide the monitors with documents on an ex parte basis."

So there is apparently still a live dispute as to whether the defendants need to comply with that plain language of Paragraph 36(a) that I read.  So the Court should remove any misunderstanding on defendants' part and order that henceforth

all documents provided to the Medical or Mental Health Monitor be contemporaneously provided to plaintiffs' counsel.

If the Court has no questions, I will conclude there, again reserving the right to respond.

THE COURT:  All right.  Thank you, Mr. Fathi.

Mr. Lunsford?

MR. LUNSFORD:  Your Honor, let me assure the Court, first of all, contrary to some things that opposing counsel said, no documents have been destroyed.  There is no claim for spoliation.  Certainly it would be beneficial if we could engage in a less adversarial exchange of information with plaintiffs' counsel, but it does seem as though behind every conversation creeps an opportunity to cry wolf and that's exactly what is happening here.

Let me go through a number of different just plain-old facts.

To clarify, Your Honor, I want to be clear on the five -- going back for a minute to the out-of-cell tracker, I use that term intentionally, some people will refer to it as the -- I did double-check -- the Centurion tracker, because I do believe Centurion maintains that document.  Dr. Metzner did suggest an audit of five individuals and I've conferred with the client just -- Dr. Metzner did conduct an audit of those five patients looking at the progress notes that we mentioned earlier of the nurses in front of plaintiffs' counsel.

I wasn't present for that audit, Your Honor, so I wasn't in the room when it happened but my co-counsel confirmed that that did.  And that's -- you know, again, would encourage you to certainly talk to Dr. Metzner about that process.  I think it's interesting, though, it's an unusual experience somewhat for us to have plaintiff counsel up here arguing pounding on the desk saying the State's not maintaining adequate documents to show compliance and yet where is the letter from Dr. Metzner?  Where is the comment in Dr. Metzner's report where he says I need this information.  You can't -- you can't ever have me find you in compliance without this information.  You're being obstructive.  Where is that?  It doesn't exist because this is a crisis of creation by plaintiffs' counsel.

Let me explain.  I'll start with the count sheets.  I'll talk a little bit about the mortality review documents, Your Honor, and then we'll talk about the communication with Dr. Metzner.  Because I do believe that the Settlement Agreement has some issues in terms of how we read -- how we read it and whether the plaintiffs are entitled to utilize the provision in one hand and then ignore it when it comes to the defendants.  So let me run through first the count sheet.

So Your Honor, the most important thing about the count sheet is the title.  Not sheet, obviously.  That's not important.  We know it's a sheet.  Count.  It's a count sheet.  Well, what are we counting?  Here's what happens, Your Honor,

four times a day at BCBIC and at the other -- for that matter most Maryland facilities, the staff go around and they count.

What are they counting?  They're counting the detainees. Why would we want to count detainees?  To make sure they're all there.  In fact, if we don't do it, we've had clients get sued by Mr. Fathi's group if we don't count and if we don't match up their name with where they're housed.

So there's a sheet, and guess what that sheet is -- the count sheet does?  It records the count.  It's really not that difficult.  It doesn't record out-of-cell time.  Let me say that again.  The count sheet is not designed to record out-of-cell time.  It is designed to record the count.

And so in one of those six occasions during the day, those sheets are distributed throughout the facility, the officers have them and they write the count on the sheet.  And that's the way they track and that -- all those forms are collected. All those forms are collected and they're sent to a single office at BCBIC, and then they're maintained by custody staff. They're not destroyed.  They're not sent to an incinerator and shredded.

We're still maintaining count sheets today.  We will maintain them tomorrow and for the foreseeable future as long as we have detained individuals that we need to count, as far as I could tell, it's been a policy, I think it's been around since the '80s, we're going to count and we're going to use

count sheets.

THE COURT:  If you're keeping them, then why -- and maybe you didn't say this, I'm hearing from Mr. Fathi that you said you're not preserving them anymore.

MR. LUNSFORD:  Well, that's -- it's really curious. Go back and read the evidence that Mr. Fathi summarized.

Ms. Mullally never said we're not keeping the count sheets, okay?  And really the dispute has nothing to do with the count sheets.  Zero.  Here's what happened, okay?

There is an ongoing site visit happening and for some reason the discussion ensues between plaintiffs' counsel and our client, wholly inappropriate for them to do what they did, but they did it and we're stuck with what our particular officer said on this particular occasion because guess what he had in his hand?  His count sheet.  He had made notations on this one -- Sergeant Miller had made notations -- we don't dispute this.  Sergeant Miller had made notations on the count sheet saying here's when these guys had gotten out of cell, okay?

THE COURT:  I'm looking at a version of this right now and I want to be clear about where it says that.

MR. LUNSFORD:  It doesn't say that.

THE COURT:  Well, this is why I interpreted there's a column that says "out."

MR. LUNSFORD:  Yes.

THE COURT:  And there's some notation in some -- on some lines of that column, and then there's what appears to be a range of time next to that.

MR. LUNSFORD:  Okay.  Again, the notations, "out" refers to a number of different scenarios not necessarily out-of-cell time.  For example, think about this, Your Honor, this applies to every single unit at BCBIC.  Why would we be -- why would we be monitoring out-of-cell time in any other unit?  We wouldn't.  The "in" and "out" is -- if you're if you want testimony about this, if you want to ask the Commissioner about this, you can ask him about it and he'll explain it.  That has to do with the movement of individuals.  They're out of the unit.  They're out -- they're not on the unit at the time and here's where they are.

THE COURT:  So it's not out-of-cell; it's out of unit?

MR. LUNSFORD:  It's out of unit, yes.  It's not out-of-cell.  It's not intended to track out-of-cell time because then it has a reason at the end.

THE COURT:  I apologize for interrupting you.

MR. LUNSFORD:  No, it's fine, Your Honor.

THE COURT:  You were talking about how this issue came about.

MR. LUNSFORD:  Honestly, when I looked at it the first time, Your Honor, I asked the same question.  Well, this

says "in" and "out." Okay? So we're talking he had his own personal notes that were then being utilized elsewhere, okay? He had written on one of these count sheets and turned it in and it's gone through the whole process.

The fact is is that this is not a record of anything related to out-of-cell time. Just like if he wrote down on here a disciplinary related to detainee who had violated our policies and procedures, that wouldn't be a disciplinary. There would be no action taken on that. It would be no official record. We have never trained an employee to do that, nor will we. And, in fact, we've told them not to do that. And that's the point of Ms. Mullally's statement in her letter when she said we -- here's what she said. She said we don't retain people's personal notes; we do retain count sheets.

But we don't -- and this is the problem. This is the -- this is inherently our frustration with this because, again, it's not about our people getting out of cell. It's a gotcha. Gotcha now. This is what -- you know, it reminds me, I thought about this, Your Honor. It reminds me of the Allen Iverson rant. We're not talking about a game, we're talking about practice. We're not talking about whether people are getting out of cell. We're talking about notes. We're not talking about out-of-cell tracker. We're talking about notes that go into the out-of-cell tracker.

THE COURT: So if we take the particular case of

Mr. Miller, the handwritten note, is it your understanding that that was on a count sheet?

MR. LUNSFORD:  He had written it in the margin on the count sheet, yes.

THE COURT:  So you would preserve that.

MR. LUNSFORD:  Well, it's preserved, yes.  It's preserved as part of the count sheets and I believe they're kept for three years.

THE COURT:  So what was Ms. Mullally referring to again?

MR. LUNSFORD:  She was referring to we don't go around and collect people's notes.

THE COURT:  Okay.  All right.

MR. LUNSFORD:  Yeah, the count sheets.  But I think it's a miscommunication.  I think there were ships passing in the night where it's unclear -- it was unclear to me as this whole exchange is going on whether they're talking about the count sheets or the notes because at some point in time there was even a conversation where it was like we want every note that everybody keeps in the system, and we're like, we can't do that.  I mean, we would have a treasure trove of sticky notes that we'd have to maintain.

THE COURT:  Is it your contention that the plaintiff isn't entitled to this information upon request --

MR. LUNSFORD:  No.

THE COURT:   -- the count sheets?

MR. LUNSFORD:  We can't -- listen, if they want to go through count sheets, you know, we can produce them but, again, why are we listening to a bunch of lawyers about what we need to confirm in order to confirm out-of-cell time for seriously mentally ill people when we are paying $500 an hour for a psychiatrist?

THE COURT:  I'm sensitive to that, too.  That's why I'm trying to skip to where the dispute lies.  So you don't dispute that the plaintiffs can have the count sheets if they ask for it.

MR. LUNSFORD:  It will be burdensome.  It will be challenging for us to go through and pull.  We'll have to go day by day.  There are six sets of these created every day. They are all bundled together hard copy sheets, they're all bundled together in stacks for a single count.  So imagine, there's basically two to three pages for every housing unit, and I don't know, there's eight housing units I think?  12?  I don't know.  There's dozens of housing units and so we're going to have to go through all of those and pull out just the IMHU so we can go on a fishing expedition for notes that may or may not exist.

THE COURT:  Is this part of what you produced to the Monitor?

MR. LUNSFORD:  No.

THE COURT:  Okay.

MR. LUNSFORD:  The Monitor has never asked for count sheets.  The Monitor has never said I don't want the official record, I want to know if somebody walks around with a steno pad and keeps personal notes.  In fact, in 25 years I've never had a Monitor say I want the warden's personal notebook, I want their personal calendar.  I've never had that happen.

THE COURT:  All right.  I have a lot of questions on this issue mainly because your brief was silent on a lot of these issues that I'm hearing from you now for the first time.

Is there any explanation for that?

MR. LUNSFORD:  Your Honor, again, we believe it relates to the personal note issue alone, which is -- and again the facts are the facts about Sergeant Miller.  And they did produce our responses which we felt like were adequate in terms of addressing that we keep the count seat sheets, we don't keep people's personal notes at BCBIC because it's an impossible unending task.

THE COURT:  If you have any more points on the count sheets, I'll hear them, but otherwise we can move on to the other.

MR. LUNSFORD:  Yes, Your Honor.  Thank you so much.

Your Honor, on the mortality review issue, I'll say this.  We've produced the medical records and we'll continue to produce medical records for any decedent.

Motions Hearing 12/20/2024

Now, Mr. Fathi mentioned Paragraph 33 as being the authority.  Maybe he misspoke.  The authority for their right to request death records.  I'm not seeing that.  Again, the fact that we --

THE COURT:  I think it's 36, 36(c).

MR. LUNSFORD:  Yes.  Yeah, I agree.  We have agreed that as a general matter we're going to provide plaintiffs' counsel with the medical records that they request.

THE COURT:  Specifically the autopsy reports, death summaries, and mortality reviews.

MR. LUNSFORD:  So in this particular set -- respect, the autopsies take a very long time.  We're still trying to confirm where exactly those are in process.  I don't know that we have received those.  Sometimes they don't come directly back to us.  But Ms. Mullally confirmed with me again we're still checking on the status of autopsies.  We don't have those.  When we receive them, we have -- I know we have provided those in the past to the plaintiff.  I don't see any privilege that necessarily attaches to autopsy.  Our statement was merely we don't have them yet.

THE COURT:  So you don't object to producing them.

MR. LUNSFORD:  I haven't received them.  We've asked for them and we will continue to ask for them.  And we will produce them.  As soon as I get them from the client we will produce them to plaintiffs' counsel, so I see that as a

nonissue.

THE COURT:  All right.  Death summaries?

MR. LUNSFORD:  The death summaries and mortality reviews are part of our internal review process.  And, Your Honor, when we saw this request we immediately went to the Settlement Agreement and says these are not medical records.  These are separate records that are kept under -- that are created pursuant to a policy where there's a medical review committee, and certainly Maryland does a peer review statute that does in our view provide a State privilege around this document.

Now, I don't dispute that there are federal courts out there that have held that those are not binding necessarily upon the State.  This is a little bit different because, in my view, this case is now under 18 U.S.C. 3626.  And if you look at 18 U.S.C. 3626, it says this court cannot direct the State of Maryland or any State of Maryland official to violate State of Maryland law.  And it is the law in the State of Maryland that these documents are subject to that privilege.

Let me -- and Your Honor can read it's section -- of the Maryland Medical Occupation Code, it's § 1-401, I believe it's Subsection (d) that addresses this.  But Your Honor --

THE COURT:  Which article again?  I apologize.

MR. LUNSFORD:  1-401.

THE COURT:  The Article that it's in, that section.

MR. LUNSFORD:  Oh, it's Medical Occupation.

THE COURT:  Okay.

MR. LUNSFORD:  Sorry.  Health Occupation.

THE COURT:  Health Occupation.

MR. LUNSFORD:  Sorry.  Thank you.

THE COURT:  This is the source of the State privilege?

MR. LUNSFORD:  Yes.  Yes, it is.  And basically the statute in summary says if you have a committee that's reviewing from a self-critical analysis standpoint the review of care and patient records in order to improve care, which is the purpose of our death summary and our mortality review process, then that is privileged and confidential and not subject to disclosure.

The point is and, you know, I know my friends at plaintiffs' counsel table want to agree with me on this, but here's the larger policy point, Your Honor, is this is a bad practice.

THE COURT:  What is a bad practice?

MR. LUNSFORD:  For plaintiffs to request an internal review in a confidential setting of a death, and here's why.

Imagine that you're a supervising physician, and there's one or two scenarios that can exist.  You can go in and review the medical care that was provided to a now-deceased individual and you can do so under the shroud of confidentiality without

knowing that your words and the things you say and the conclusions you make are going to be used against you, you or your colleague or your employer.  That's why this peer review privilege exists.  The policy makes sense.

The policy is essentially that there should be a place where clinicians can get together and in a safe place have a genuine conversation about how our care could be improved.  And Maryland has enacted that policy itself where it intended to create this space.

Your Honor, if you order us to produce this stuff, we will, but I want you to understand the incredible impact that will have on the process.

THE COURT:  But it sounds like you did produce it --

MR. LUNSFORD:  I'm -- I haven't had a chance to check that.  I just heard that for the first time and if we did, it was inadvertent.

THE COURT:  It's in their brief.

MR. LUNSFORD:  Well, again, I'm not sure I was aware. I'm still -- we're still trying to figure out what that was. It was inadvertent disclosure but we certainly, again, there's an impact on this being produced, which is if you order us to produce it, we will produce it, but there's an impact and we certainly don't believe that can happen.

But again, here's our problem.  This is not any medical doctor.  If Your Honor is of the opinion that someone needs to

look at these deaths, which would -- I would understand that perspective if that's the Court's opinion, then let's appoint a Medical Monitor and let's provide them with the mortality review and not let anyone else see it.

The protective order here that was entered decades ago was a discovery order that doesn't provide nearly the level of protection that we need.  In fact, plaintiffs' counsel could go show it to their entire class arguably under the prior protective order.

THE COURT:  Could you devise a protective order that you would feel comfortable with?

MR. LUNSFORD:  Absolutely, yes, we could.

THE COURT:  Why haven't you done that?

MR. LUNSFORD:  Because, well, we said we would like to discuss a protective order and they said the 2004 is adequate and we said will you discuss any modifications, and they said no.  That was absolutely what was discussed.

THE COURT:  All right.  I hesitate to multiply the briefing that's already in front of me, but a motion to modify or to request a new protective order could have been filed.

MR. LUNSFORD:  Certainly we could have done that, yes.

THE COURT:  Okay.  But I -- I understand --

MR. LUNSFORD:  But a motion to compel was filed and I think that's always the struggle of us is, well, a motion's

pending, we don't want to clog your docket with multiple motions. You know, it's before Your Honor, we could brief it this way.

THE COURT: All right. This is the first time I'm hearing about the statute that you contend gives you contend gives you the privilege to these documents.

MR. LUNSFORD: Yes.

THE COURT: Let me take a moment to review it.

(Pause in Proceedings.)

THE COURT: Okay. What would you protective order look like?

MR. LUNSFORD: Well, it -- our first preference would be that we provide it to the Monitor and that the Monitor not be allowed to share it.

If it was produced to plaintiffs' counsel, what we would propose is that we would make a copy available for them to inspect but not take a copy of that we could set up a location at Ms. Mullally's office where plaintiffs' counsel come in, they could have a whole day to review the mortality reviews and they could take notes. There would be a provision in there that said they couldn't copy it verbatim because that would be disingenuous and contrary to the order but they could take whatever time they wanted to review the documents essentially almost in an in-camera way for counsel and couldn't share the contents of that with any third party.

THE COURT:  Attorneys' Eyes Only essentially?

MR. LUNSFORD:  Yes, sir, essentially without a copy.

THE COURT:  Understood.  All right.  Let's move to the other category, the documents produced to monitors and whether or not plaintiffs are entitled to contemporaneous production.

MR. LUNSFORD:  So first of all let me say if there are -- this is where we're starting to cross each other and we've told plaintiffs' counsel, you know, if there's a particular category of documents you're not sure about in terms of whether we've given them to you, you know, kind of let us know what those are, but we have, as Mr. Fathi pointed out, we have repeatedly said we believe as of -- we sit here today we've provided every single document that we provide to Dr. Metzner to the plaintiffs.  We believe that.

If there are other categories of documents they don't believe they have, I would like to know what those were and we'll investigate whether those exist.

THE COURT:  So you don't dispute they're entitled to it?

MR. LUNSFORD:  We have concerns about this blanket prohibition they've raised now.  Their statement is if we provide any single document to the Monitor, they're entitled to it.

THE COURT:  Right.  I mean, there's support for that

proposition in the text of the Settlement Agreement.

MR. LUNSFORD:  But -- okay.  So if that's the case, then it's helpful for us to understand because that renders another provision completely inconsequential.

THE COURT:  Well, the other provision I believe you're referring to refers to -- I think it uses the term "information"?

MR. LUNSFORD:  So what's -- so what you're saying is we can redact.  Can we redact all the documents?  Because it's just information on the documents and if the information is what's confidential about what the documents are, then we could redact and we could send them what looks like a missive from Cambodia in 1965.

THE COURT:  Let me take a look anew at the provision we're referring to.  Do you have that paragraph offhand?

MR. LUNSFORD:  Yes, sir.  It's right here.  I believe it's 31 or 32, but I'll let you know.  30.

THE COURT:  Okay.  So I'll present this as a potential interpretation of the two provisions.  On one hand you are required to turn over to the plaintiffs any documents that you turn over to the Monitor.  That's what the other paragraph seems to say.  But here Paragraph 30 says you can provide information on an ex parte basis, which I assume means that documents are not encompassed in information.

MR. LUNSFORD:  Okay.  If that's the case, then,

here's the conviction.

THE COURT:  All right.

MR. LUNSFORD:  The plaintiffs provided red-line comments to Dr. Metzner's draft report and they e-mailed him their comments about his draft report.

THE COURT:  Okay.

MR. LUNSFORD:  We requested it.  The plaintiffs responded and said the documents that we provided to Dr. Metzner are confidential under Paragraph 30.

THE COURT:  Well, no, no, the other paragraph -- what is the other paragraph?  We have Paragraph 30 on one hand.  Can you give me the paragraph number of the other?  I believe it's 35.

MR. LUNSFORD:  It is.  It's the first sentence of 35.

MR. FATHI:  36(a), Your Honor.

THE COURT:  36(a)?  Yes, 36(a), records or other documents provided to the monitor shall be provided to the plaintiff.  That's a one-way production obligation.

MR. LUNSFORD:  But hold on.  But you said -- but you said 30 doesn't include documents.

THE COURT:  Right, but you -- what you've --

MR. LUNSFORD:  You can't --

THE COURT:  The scenario that you presented was plaintiffs on an ex parte basis providing a document to the Monitor.

MR. LUNSFORD:  Correct.

THE COURT:  And them invoking Paragraph 30 as the basis upon which they don't have to produce that same document to you.

MR. LUNSFORD:  Correct.

THE COURT:  But they don't have to contend with Paragraph 36(a) because Paragraph 36(a) contemplates a one-way production obligation from you to the plaintiffs.

MR. LUNSFORD:  But Your Honor, doesn't that say that the interpretation, that information means one thing when it's you and a different thing when it's plaintiffs?  How can that be?  If information -- the question is, the Court should read the word "information" so it has the same definition for the State and for the plaintiffs.

I've never heard of a contract interpretation where we're going to say, well, this word "information" doesn't mean the same thing for both contracting parties.  So what Your Honor's interpretation would be, information for the State means it's only information, not documents.

THE COURT:  I understand.

MR. LUNSFORD:  But for the plaintiffs it doesn't mean documents.

THE COURT:  I understand your argument.  So how do you contend with Paragraph 36(a) then?

MR. LUNSFORD:  Again, it's -- we'll do either one but

they can't use it -- they cannot use Paragraph 30 as a shield and a sword, which is what they're doing. They're saying for us it's a sword. Give us the documents. It's only information. And we said, oh, really, it's documents, too, so give us the documents you sent to the Monitor. And they say whoa, whoa, whoa, it says confidential information.

It's the same interpretation Your Honor just was kind of hypothetically throwing out. It's wrong. The word "information" either does or does not include documents. And so the question would be how do we --

THE COURT: I would put it slightly differently. It does or does not include documents to be produced to the plaintiffs because I have to -- both of these provisions have to be read in a way that doesn't nullify the other one and --

MR. LUNSFORD: I'll say this. If -- again, I'm just -- I want to set this up and make sure the Court's clear the problem this is going to create because I generally, as a philosophical matter in full disclosure to the Court, disagree with Paragraph 30. I think it creates a very huge problem for the Court.

And you didn't create it, Your Honor. Whoever signed this agreement created it for every court that exists because how is an adjunct of this court who's subject to the rules of judicial ethics supposed to receive ex parte information which they can, by the way, provide to you because they're your adjunct, how

are they going to do that when you can't send an agent out to do something in violation of any judicial canon of ethics that Your Honor's held to, and so now stuck with this ex parte communications.  I just continue to believe that we've provided -- let me say on the documents, we've provided them, but on a larger basis is this going to be what is good for the goose not good for the gander.

THE COURT:  It doesn't sound like there's a real dispute over your willingness or obligation to produce any documents that you produced to the monitors to the plaintiffs; is that correct?

MR. LUNSFORD:  I mean, if that's the Court's interpretation, that's what we will abide by.

THE COURT:  No, I'm asking.

MR. LUNSFORD:  I don't like the idea that we can't -- that we can't provide any documents under Paragraph 30, but if that's the Court's interpretation, we will act accordingly.

THE COURT:  All right.  I think that covers all three categories.

MR. LUNSFORD:  Yes, sir, I believe it does.

THE COURT:  All right.  Thank you.  Let me just -- before you leave, Mr. Lunsford, let me just check my notes here.

MR. LUNSFORD:  Yes, sir.

THE COURT:  I think we covered everything.  Thank

you.

MR. LUNSFORD:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Fathi?  So I guess you don't really have a spoliation case if it's indeed true that the count sheets are being preserved.

MR. FATHI:  Well, no, Your Honor, what we have here is more unsupported assertions by counsel that contradict the documentary record.  And this I think is why it's very significant that they didn't respond to the spoliation issue at all in their response.

It would have been the easiest thing in the world for them to present an affidavit under penalty of perjury from someone with personal knowledge saying those documents were not destroyed.

THE COURT:  I said "if."  I said "if" for a reason because I understand that you are -- you were duly focused on whether or not competent evidence has been presented here.  But I said if it's indeed true that the count sheets are being preserved, then there would be no spoliation.

MR. FATHI:  If the count sheets are being preserved there would be no spoliation, but we would be -- there would be a significant problem that counsel had misled us and said that they were not preserved for production.

THE COURT:  Well, I think he was referring to -- I think he was saying that Ms. Mullally was referring to

handwritten notes.

MR. FATHI:  No, Your Honor.  Let's look at 894-6.

THE COURT:  All right.

MR. FATHI:  This is a letter signed by Mr. Lunsford and under -- on Page 3, using the ECF numbers, records of out-of-cell time at IMHU.  The State previously explained that the records of out-of-cell time created by custody staff are not official documents and are therefore not preserved for production.  That's a letter signed by Mr. Lunsford.

Today Mr. Lunsford said nothing's been destroyed and, in fact, those records are maintained.  So the question is, which is it, and why was -- why did they not respond to this at all and why did they not submit an affidavit under penalty of perjury saying, no, these documents were not destroyed, these documents exist and we're willing to produce them or we're not willing to produce them.

But we took Mr. Lunsford's representation at face value, the documents were not preserved for production, and that's why we filed a spoliation motion to which they did not deign to respond.

Now, I want to respond to Mr. Lunsford's creative argument that the out-of-cell -- the count sheet reports don't show out-of-cell time, and I'd ask --

THE COURT:  Just for clarification, this is Paragraph Number 3 or Item Number 3 on the letter that you just read from

Mr. Lunsford is referring to the count sheets?

MR. FATHI:  Correct, Your Honor.

THE COURT:  All right.  I'm sorry.  You can continue.

MR. FATHI:  And if you look at our letter, which our request which is at --

THE COURT:  Is that 94-5?

MR. FATHI:  Exactly.  Then that is where it becomes very clear.

So Mr. Lunsford, again, for the first time, didn't say this in response to our motion, for the first time today says, oh, no, count sheets, those don't show out-of-cell time at all, they show when the person's out of the unit.

Does the Court have 895-1 in front of it?  I would ask --

THE COURT:  One moment.

MR. FATHI:  Yes.  Thank you, Your Honor.

THE COURT:  Yes.

MR. FATHI:  All right.  Well, let's take a look at some of these.  So what Mr. Lunsford said is these notations don't show out-of-cell time, they show when the person's off the unit.

Okay.  So let's look at Page 2, again, using the ECF numbers.

THE COURT:  Well, if we use the numbers at the bottom of the page, is it 40 or 41?

MR. FATHI:  This is 40, Your Honor.

THE COURT:  40 of 47?

MR. FATHI:  Well, actually, Your Honor, they're all --

THE COURT:  They're all 47.

MR. FATHI:  I think that's the form.  So can we use the ECF numbers?

THE COURT:  Sure.

MR. FATHI:  All right.  ECF Number 2.

THE COURT:  All right.

MR. FATHI:  All right.  So you see some notations that say "refused."

So according to Mr. Lunsford, that means the person refused to be off the unit.  You see "not suitable."  According to Mr. Lunsford, that means the person wasn't -- or wasn't suitable to be off the unit.

THE COURT:  I don't -- that's not how I'm reading Mr. Lunsford's interpretation.  If we skip down to where it says "O" in the column where it says --

MR. FATHI:  Yes.

MR. LUNSFORD:  Your Honor, I'm sorry, we're trying to catch up.  Can we get a page number?

THE COURT:  We are on ECF Number 895-1 in the second page.

MR. FATHI:  Let me cut to the chase, Your Honor.

THE COURT:  Yes.

MR. FATHI:  Looking at that middle column under where it says "name" --

THE COURT:  Yes.

MR. FATHI:  -- and then it says these notations "refused," "not suitable," "not offered," those make sense only if they are referring to whether or not the person was offered out-of-cell time.  They don't make any sense under Mr. Lunsford's novel explanation that these refer to whether or not the person was off the unit.

What does it mean to say the person refused to be off the unit?  What does it mean to say the person wasn't suitable to be off the unit?  What does it mean to say that -- I'll leave it there, Your Honor.  Again, this is a novel explanation, again, set forth by counsel, not in an affidavit from anyone that we are hearing for the first time today.

It is absolutely clear that these notations refer to out-of-cell time and, again, they match up when you compare them side by side with the Centurion out-of-cell trackers, they match up; although, again, it is consistently the case that the Centurion trackers show more out-of-cell time than the count sheets, which is why the count sheets are so important.

If it is the case, as we are hearing for the first time today, contrary to Mr. Lunsford's statement in his letter, that these documents were not destroyed, then I agree, we don't have a spoliation case, but we need an order that they be produced.

THE COURT:  Could you give me an example of marrying up the out-of-cell tracker from Centurion to the count sheet? I understand that you also provided a copy of the out-of-cell tracker document or one version of it.

MR. FATHI:  Yes, Your Honor.  If you look at --

THE COURT:  That's 895, I believe.

MR. FATHI:  If you look at 894-14, at 4 to 6, that's the declaration of Corene Kendrick where she lays out, you know, for this patient for this day this is what the Centurion tracker shows, this is what the count sheet shows.

THE COURT:  All right.

MR. FATHI:  And given that the defendants have chosen not to provide any admissible evidence on this, no affidavits, one way to clear this up is to allow us to take the deposition of Sergeant Miller who created these documents of the person who currently occupies Sergeant Miller's position in the IMHU and Dr. Bonieskie, who is the mental health director who supervises the IMHU.  That way with will have to not the unsworn assertions of counsel, we will have testimony, sworn under penalty of perjury, and we can get to the bottom of this once and for all.  But again, if defendants are now saying these count sheets were not destroyed, then we need an order that they be produced.

THE COURT:  All right.  There was an assertion of privilege as to the death summaries and morality reviews based

upon a Maryland statute, which does speak to their confidentiality.

MR. FATHI:  Yes, Your Honor.  This, again, is an argument that we're hearing for the first time today.  Although the defendants did respond on our request for the mortality reviews, they did not make this argument, they did not cite the statute and they certainly did not argue as they are arguing today that the Prison Litigation Reform Act overrules the supremacy clause, again, an argument for which they cite no authority whatsoever.

We have cited a number of cases in our brief, cases postdating the enactment of the Prison Litigation Reform Act holding that State law privileges simply do not control in federal question litigation in federal court.

THE COURT:  Okay.  If we could skip past the question of whether there's actually a privilege here that's enforceable in this context, do you have any objection to the proposal of having access to these documents upon inspection on an Attorneys' Eyes Only basis?

MR. FATHI:  Yes, Your Honor.  Mr. Lunsford talks a lot about the other cases that he works on, and I have some little bit of experience in prison litigation as well, and I can tell you that such an order would be utterly unprecedented. It is routine in these cases, which I have been doing since 1990, that as class counsel we have access to these documents,

subject to a protective order that limits their distribution, of course. But it's not, you can only inspect it and take notes, it's not Attorneys' Eyes Only. We need to be able to show it to our expert to get his or her impression, his or her opinion on whether adequate medical care is being provided so yes, we would strenuously object.

We don't object to protective order. Again, there is already a protective order in place. Defendants already produced mortality reviews and death summaries for another person who died. So we don't object to a protective order, Your Honor, but we object strenuously to the unprecedented protective order that Mr. Lunsford suggested.

And if we are going to go that route, Your Honor, of a new protective order, the burden is on the defendants. The existing protective order in this case at ECF 215, specifically says that if a party contends that more protection is necessary than is granted by this order, it is their burden to seek a different protective order under Rule 26(c). And as the Court correctly pointed out, defendants have not done that since we first requested these documents back in April of this year.

And again, the idea that this is somehow bad practice, again, a new argument, was not in their brief, again, I can tell you, Your Honor, based on nearly 35 years of doing this work that these documents are produced in this kind of litigation as a matter of course, again, subject to a

protective order that limits its distribution but not subject to the kind of protective order that Mr. Lunsford proposed.

THE COURT:  All right.

MR. FATHI:  Finally, Your Honor, on Rule -- on the documents provided to the monitors, I don't think I need to say much more on this, except let me read again 36(a):  "Records or other documents provided to the Monitors shall also be provided to plaintiffs."

As the Court observed, that is not a symmetrical obligation.  That is a one-way obligation that is imposed on the defendants as the custodians of all these records to produce all of those documents to the plaintiffs.  And because the defendants are still, at least in their brief, contesting that obligation, we need a clear order that all documents provided to the monitors are contemporaneously provided to plaintiffs' counsel.

And again, as you pointed out, Your Honor, there's no contradiction between Paragraph 30 which says that both parties shall have the right to provide information to the monitors on a confidential ex parte basis and the obligation to produce documents.

What Paragraph 30 means is the parties, either party can talk to the monitors by phone, by text, by e-mail, they can write them a letter in person, that's all fine, both sides do that in this case as a matter of course, but when they are

providing documents, preexisting documents to the monitors, those have to be provided to us.

THE COURT:  So in that context a letter doesn't count as a document?

MR. FATHI:  No, Your Honor.  We acknowledged they can write letters and we can write letters ex parte, too.  But again, if it's a preexisting document that's being given to the Monitor in connection with his monitoring duties that has to be provided to us.

THE COURT:  And also would not be included in documents as we're using that term and as Paragraph 36 uses that term, we're not including in that sort of notations on a draft report, you know, that sort of thing.

MR. FATHI:  Correct, Your Honor.  Correct.  Again, I --

THE COURT:  I guess we're reading into -- from your perspective we're reading into Paragraph 36, I think you're using the word "preexisting."

MR. FATHI:  Yes.

THE COURT:  In other words, records that are kept in the normal course of business, that sort of thing.

MR. FATHI:  Exactly.

THE COURT:  All right.

MR. FATHI:  So we need an order making that pellucidly clear because there still seems to be some confusion

on defendants' part as to whether they need to comply with that provision of Paragraph 36.

THE COURT:  So you wouldn't have a problem if defendants, in response to a draft report from a Monitor, made notations on it and give it to the Monitor on an ex parte basis for discussion purposes?

MR. FATHI:  No objection whatsoever, Your Honor.

THE COURT:  All right.  Understood.

MR. FATHI:  If the Court has no further questions, I will leave it there.

THE COURT:  Okay.  I do not.  Thank you.

MR. FATHI:  Thank you, Your Honor.

THE COURT:  So as to the defendants' motion to alter the order, I will grant that motion insofar as it will focus on the out-of-cell tracker document.

Mr. Lunsford, what is the language that you propose?

MR. LUNSFORD:  Your Honor, we would just eliminate the "including, but not limited to," and your order, I can -- let me find it.  I have it right here.

THE COURT:  I've lost track of my copy.  Let me find it again.

So it says defendants shall continue to maintain all records previously maintained in connection with the Settlement Agreement, including, but not limited to --

MR. LUNSFORD:  Your Honor, I would just say defendant

shall continue to maintain the out-of-cell -- I would use "tracker" instead of "time logs," and then I would say until and unless, you know, the Court or the Monitor determined otherwise.

MR. FATHI:  Your Honor, we would object to a couple of provisions of that.  Again, we under -- as plaintiffs' counsel under the agreement, we have an independent duty to Monitor and we have an independent duty or an independent right to information.  So even if the Monitor were to decide that he doesn't need these anymore, that is not dispositive of whether plaintiffs need them.

Obviously, if the Court decides they're no longer necessary, that is the end of the matter, but it should not be the case that the Monitor says he doesn't need them, that necessarily means that they are no longer preserved because plaintiffs may decide that we need them.

We would also ask that you include the count sheet -- now that we have been told the count sheet reports have not been destroyed, they are being created, we would also ask that the order extend to preserving them as well.  So the order would be about documents recording out-of-cell time, both the Centurion trackers and the count sheet reports.

THE COURT:  It sounds like you're maintaining count sheets anyway, so you don't have any objection to preservation.

MR. LUNSFORD:  Well, Your Honor, I have a problem

Motions Hearing 12/20/2024

with a court order for us to do something that we've never, ever not done.  We've always preserved them.  But I know that seems probably inconsequential, Your Honor, but given what -- the vitriol we see particularly coming from the other side and the opportunity to look for any basis to say -- because I can tell you, I wouldn't be surprised if the next thing you say is they go through a set of count sheets for this week and they go, well, there's no personal notes on these, you're altering them, you're changing them, you're destroying them.  So here we go again with controversy number two based on your order for us to preserve documents we never ever said we were going to destroy.

My letter is very clear and in my mind what I was communicating is very clear.  That's the only evidence they have.  The only evidence they have related to this whole spoliation thing is a letter from me.  So what did I mean?  I don't know.  I mean, it seems like Mr. Fathi started his argument today saying that's not evidence, but yet they submit it as evidence.  So let me explain.

What I was saying is we don't preserve people's personal notes.  That's what we understood they were asking for.  We preserve the count sheets that are turned in that reflect count.

MR. FATHI:  Your Honor, to the extent that there is confusion or uncertainty --

THE COURT:  Hold on.  Before you start, Mr. Fathi, give me one moment.

MR. FATHI:  Yes.

THE COURT:  So Mr. Lunsford, your letter refers to records of out-of-cell time created by custody staff.

MR. LUNSFORD:  That's right.

THE COURT:  Or nonofficial documents.

MR. LUNSFORD:  That's correct.

THE COURT:  You were referring to handwritten notes.

MR. LUNSFORD:  That's correct.

THE COURT:  That are separate from the count sheets.

MR. LUNSFORD:  I'm saying even if they make it on a count sheet, we don't --

THE COURT:  But you're preserving the count sheet, so if they make notes on the count sheet, then that would be preserved.

MR. LUNSFORD:  Well, understand those notes were made on a count sheet that was never turned in as a count sheet. Okay?  Are you following me?

So I'm trying to think of an example.  Let's assume that Your Honor's going to go to the grocery store and writes down a grocery list on an expense reimbursement form for the United States District Court system, right?  Does that mean it has to be preserved as an expense reimbursement that you're submitting?  No.

That's what this was.  He was making -- those notes that you were shown were notes on a sheet that are personal notes written on a sheet.  We don't -- we don't know what they do with those.  The count sheet is not intended for that purpose.  No one was ever told to use it for that purpose.  The "in" and "out" was literally for people in and out of the unit.  And if you look on down through, you'll see there's other count sheets that don't include that.

I'm happy -- again, maybe the best way to resolve this is we produce a set of them unredacted and show them what we retained.  But the general precept that we were all responding to was this idea that there was this blowup and plaintiffs' counsel went apoplectic on site of you've got to maintain every single -- I think the words "every single" came out of somebody's mouth what was reported to, me every single note that these officers are keeping about out-of-cell time because it's just so important you got to keep every note.  And that's unreasonable.  We can't do that.  And these were part of the notes and so because the officer made the notes on this one particular form, this form became critical.  We keep the form itself and when they fill it out for the purpose for which it was intended, which is count.

THE COURT:  So you don't have an objection to being ordered to -- well, you have an objection to being ordered to preserve count sheets and out-of-cell trackers, but you are

preserving them anyway.

MR. LUNSFORD:  An order simply because we're worried it's going to create an manipulation opportunity for plaintiffs' counsel just so say -- bring another complaint against our client, right?  And again, it's not just, I mean --

THE COURT:  Well, I'll just cut it short.  I think that that's sort of a speculative scenario that I can't even imagine, so I'm going to order that the count sheets and out-of-cell trackers be preserved.  You're doing it anyway.

MR. LUNSFORD:  Your Honor, could you put a duration on those, because we have count sheets, like currently I think we keep them three years, but like there's no reason for us that I can think of to keep count sheets from 2021.  The IMHU didn't even exist I don't think in 2021.

What year did it start?

I mean, and again, the order to preserve all count sheets goes beyond even their request because they're not asking count sheets for any other unit other than IMHU.

THE COURT:  Um-hmm.

MR. LUNSFORD:  So if we're going to narrowly tailor this thing, it ought to at least be limited to the IMHU.

THE COURT:  Any objection to that?

MR. FATHI:  Your Honor, we have no objection to limiting it to IMHU.  We would also have no objection to a reasonable durational -- a reasonable limit on how far back the

preservation obligation goes.  They do need to be preserved going forward, obviously.

THE COURT:  It sounds like you're preserving them for three years anyway.

MR. LUNSFORD:  That's what I was told earlier today, Your Honor.

THE COURT:  I assume that's reasonable?

MR. FATHI:  Yes, Your Honor.

THE COURT:  Okay.  All right.  So that handles the defendants' motion.

As to the plaintiffs' motion to compel, that motion will be granted as to the items of documents, the categories of documents that plaintiffs are seeking to compel, specifically the count sheets, the death records to include death summaries and mortality reviews, and the documents provided to any monitor.

That last category is based upon the plain language of the Settlement Agreement, which in Paragraph 36, clearly obligates the defendants to produce any documents produced to the Monitor to the plaintiffs.  I can't read that out of the agreement by reading Paragraph 30 broadly, more broad than what Paragraph 30 requires.

As to the death records, I do see them as records that are relevant to compliance, but I take defendants' point as to the sensitivity of these documents.  So the production obligation

will not apply until I'm presented with and enter -- am presented with at least a proposal from the defendants as to what the protective order should look like.  So the defendants will have leave to file a motion to enter a protective order that has language that they're comfortable with, but I will require the parties to meet and confer about the terms of that protective order before any such motion is filed.

As to the count sheets, the information provided in the plaintiffs' briefing is sufficient to raise a question as to whether or not either record is an accurate recordation of out-of-cell time for the patients at the IMHU.  I do see that information as relevant to compliance.  It has to do with the sufficiency of mental health care being provided in that unit, as noted in past reports submitted by the Mental Health Monitor, which raises questions about the sufficiency of out-of-cell time.

Although both parties seem to be in agreement this issue has improved since the earlier reports, I think that plaintiffs in their -- plaintiffs' counsel in their monitoring function is entitled to this information.  So that's the reason why the count sheets will be preserved as well, preserved and produced, as well as the out-of-cell tracker information so that plaintiffs have investigate any discrepancies that they think is worth investigating.

MR. LUNSFORD:  Your Honor, can I raise an issue with

that?

THE COURT:  Yes.  All right.

MR. LUNSFORD:  Your Honor, we're talking about you want us to produce the count sheets for every shift for every day of the IMHU for a six-month period?

THE COURT:  We'll start with -- I'm glad you raised that because it doesn't sound like I have a good assessment of what the volume is of what we're talking about here.  So what I will ask for is for the plaintiffs to identify a time period of I'll say three months, a three-month time period that defendants will be obligated to produce count sheets for, and then they can ask for a larger -- I guess a larger time span if they think it's worth it based upon their analysis of those count sheets.  But I'm not going to order a larger time span to be ordered to be produced at this time because I would need to -- what would need to happen is this:

It sounds like the plaintiffs are lacking information in order to make a fair comparison between the defendants' various documentation of out-of-cell time, so what will need to be produced is the out-of-cell tracker information and some sampling of the count sheets so that they can assess whether or not those inconsistencies are there and are worthy of a broader set of count sheets to be produced, or call for a broader set of count sheets to be produced.

MR. FATHI:  Thank you, Your Honor.  We would ask only

two things:  One, that we be allowed to specify the three-month period so that that is up to us.

THE COURT:  Yes.  That's what I intended to say just now.

MR. FATHI:  Thank you.  And also the Court's order be clear this is not a one-time thing, that we can request another three months at some point in the future so that we don't all have to come back here again.

THE COURT:  Well, I don't think -- part of the reason why we had to be here today is because I just think that the briefing on the defense side was deficient.  It didn't answer all of the arguments and the evidence that was presented by the plaintiffs, and then we're hearing a lot of these things for the first time, the plaintiffs don't have all the information to satisfy them.

But I will say, Mr. Fathi, is my hope is that the three-month period will satisfy you such that you won't even have interest in the count sheets because perhaps, what I'm hearing from Mr. Lunsford about the relevance of the count sheets to out-of-cell time really doesn't exist, but at least if you had a sampling of the count sheets you could learn that and be satisfied about that one way or the other.

I have to take Mr. Lunsford at his word.  He represents the client that knows what those count sheets are really for and what information they record, and it sounds like they're

Motions Hearing 12/20/2024

not really a recordation of out-of-cell time.  But you need to be -- I think that you're entitled to be satisfied about that so you'll get a three-month sampling for any time period that you choose and you'll be able to conduct the analysis that you need to conduct.  If you want more count sheets, then you'll have to come back to the Court if the defendants don't voluntarily produce it.  Does that make sense?

MR. FATHI:  Thank you.  That's fine, Your Honor.

THE COURT:  All right.  Mr. Lunsford?

MR. LUNSFORD:  Your Honor, just if we could limit it as much as possible.  Three months is -- I know it's going to be over -- I think by my estimate it's going to be over 2,000 pages, and so and we are going to have to pull those.  We're going to to go back through --

THE COURT:  They're not like kept in one place?

MR. LUNSFORD:  Well, they're kept in one place in a large stack for the whole facility, so we're going to have to go through six shifts a day, you know, we're talking about a hundred pages stacked together in a handwritten document, and we're going to have to go through six of those stacks for every day and now you're talking about 90 days and find the -- and so you're talking about six stacks a day for 90 days, so you're talking 540 incidents of these stacks.  We're going to have to go through 500 of these stacks and we're going to have to go look for two pages or three pages.

THE COURT:  For sampling purposes, would a smaller I guess tranche of information or tranche of documents suffice?

MR. FATHI:  Your Honor, again, this is why a response would have been helpful.  Looking at 895.1, we see essentially -- if we're talking just about the IMHU, we see one sheet per day.  So if the Court -- we would like the three months.  If defendants want to produce an affidavit setting forth what Mr. Lunsford just said, I think the Court should fairly consider that, but barring such an affidavit I think the three months should stay.

MR. LUNSFORD:  We'd be happy to submit a declaration to the Court that explains what is retained and what exists and the process that we would have to go through to comply with the Court's directive to produce count sheets.

THE COURT:  Okay.  So after that affidavit is filed, I'll get with counsel on the phone about how plaintiffs respond to it.

MR. FATHI:  Thank you.  We would ask, Your Honor, that it be three months until and unless the Court -- I'm just concerned about time, Your Honor.  It seems to be very difficult to get on defense counsel's schedule, so I would ask that the order be -- that we are entitled to three months.  The Court may revisit that based on the declaration but that the provisional order would be for the three months.

THE COURT:  How long will it take you to produce the

affidavit?

MR. LUNSFORD:  Your Honor, we have a holiday next week, so that's going to delay some things and I'm not sure who's out but, you know, given the holiday, could we submit it, say, January 6th?

THE COURT:  I think that that's fine.  January 6th.

And then plaintiff in writing will have an opportunity to -- well, put it in writing.  It'll give you an opportunity to respond in writing to the defendants' submission within two weeks and then I'll decide whether or not the three-month period is -- whether the plaintiff is -- I'm sorry, the defendant is obligated to produce that three-month period of count sheets based upon your response to their affidavit.

MR. FATHI:  Thank you, Your Honor.

THE COURT:  All right.  Okay.  So let me modify the resolution of the motion to compel.

As to the categories of the death records and the documents provided to the monitors, my ruling stands.

As to the count sheets, the order will reflect that the defendants will have until January 6th to produce an affidavit that goes to the creation of the count sheets and its relevance for purposes of determining out-of-cell time.

The plaintiffs will have two weeks to respond to the defendants' submission, and the Court will reserve its ruling as to the motion to compel the count sheets until after I have

an opportunity to review the plaintiffs' submission.

MR. FATHI:  I'm sorry, Your Honor, I may have misunderstood.

THE COURT:  Yeah.

MR. FATHI:  I thought the only issue on which you were requesting an affidavit is the burden of producing it.  I understood your ruling that we were entitled to the count sheets to compare them with the Centurion trackers, and I thought you just said that the affidavit could also address relevance.  I think that -- my understanding was that that horse had left the barn, you had decided that we were entitled to see them to compare them to the Centurion trackers and so that the only issue to be addressed by this affidavit was the burden of production, of producing three months.

THE COURT:  So when you were describing the affidavit that you proffered some of the information that will be contained in that affidavit.  Did that go solely to burden or does it also go to relevance?

MR. LUNSFORD:  It primarily goes to burden, Your Honor.

THE COURT:  Okay.

MR. LUNSFORD:  I mean, I just -- I want to be able to produce this, and to Mr. Fathi's point, I want to convince him that we're going to be responsive to their demands about his allegations today, and so I just didn't want this to take

forever and also we are going to have to pull staff away from providing for patients and providing for the detainees to find this information and, unfortunately, I don't believe it's segregated in a way where we can just go pull these two sheets. I think we're going to have to go through and literally search through shift by shift day by day.

THE COURT: Okay. The defendants' affidavit will speak to the burden of production. Mr. Fathi will have an opportunity to respond. I'm contemplating ordering production of some quantity of the count sheets. I just don't know what that quantity is yet until I have the opportunity to review the parties' submission.

MR. LUNSFORD: Let me offer up, too, Your Honor, if Mr. Fathi could go ahead and e-mail me early next week with the time frame that they are thinking about looking at, I can go ahead and start looking at that particular time frame. That would be helpful and speed things up.

THE COURT: The three months was sort of made up off the top of my head, so Mr. Fathi, if there's a smaller time frame that would satisfy you, I encourage you to speak to the defendants about that.

MR. FATHI: We will certainly speak to them about that, Your Honor. Yes. That's fine.

THE COURT: Okay. I believe that that handles all the pending motions, although there's the issue of the

appointment of the Medical Monitor, but I just want to be -- I want to confirm with each counsel that the pending motions have been resolved.  Is that correct?

MR. FATHI:  That's correct, Your Honor.  I do have two brief additional matters I'd like to raise, with the Court's permission.

THE COURT:  Okay.  Before or after we discuss the Medical Monitor?

MR. FATHI:  It can be after, Your Honor.

THE COURT:  All right.  As to the Medical Monitor, I have reviewed the parties' submissions.  Let me just pull up my copy of them.  There's one question I have for the State.  ECF Number 934, Page 3, which is your response to the plaintiffs' nominations --

MR. LUNSFORD:  Correct.

THE COURT:  -- you're speaking about Dr. Anandkumar?

MR. LUNSFORD:  Yes, sir.

THE COURT:  At the top of Page 3, and it says -- you're questioning what his experience level with respect to management?

MR. LUNSFORD:  Yes.

THE COURT:  I just want to make sure I understood what you're saying there because, I mean, I think if you clearly look at his resumé he's had managerial and administrative positions with correctional or jail institution.

MR. LUNSFORD:  I'm sorry, you said 933 --

THE COURT:  934.

MR. LUNSFORD:  Okay.

THE COURT:  Page 3.

MR. LUNSFORD:  Okay.

THE COURT:  It says -- well, it starts on Page 2 the sentence that says based on the curriculum vitae that the plaintiffs submitted, it is apparent that Dr. Anandkumar possesses no actual management experience in a prison or correctional setting.

And if we go to his resumé or CV which is at 931-3, it notes his experience as an associate medical director for performance improvement and a medical director for performance improvement which is a medical provider to Dallas County Jail, so I'm just trying to understand what you're saying is his deficiency with respect to management.

MR. LUNSFORD:  So Your Honor, here's the concern as it relates to Dr. Anandkumar.  And plaintiffs pointed out he is currently a monitor for our client in the Virgin Islands and, Your Honor, this is another area where as you selecting an extension of this court, I'd again strongly encourage you call each of these individuals they know they've been nominated, have a Zoom with them, meet with them and evaluate their communications style, evaluate all the intangibles of a person who's going to come in and work with our staff, you know, and

provide technical assistance as required by the Settlement Agreement to our staff and who's going to be most effective in bringing all of these people together, especially in the contentious environment that it is.

And Dr. Anandkumar in particular is someone who has -- he has two almost distinct roles.  He has this -- and when we say managerial experience of there's no real indication in that role as medical director, you can ask him about it and I think I know what you'll find, is that where he is leading and guiding a medical operation the size of this operation from stem to stern, most of his experience is in this continuous quality improvement, we call it CQI area.

So most of his experience is in quality assurance and he takes that skill set and he applies it in a constitutional systemic reform litigation case where those two in our view don't mix.  He wants to -- he wants to be a coach and he wants to talk about best practices and a lot of themes and you can look at instances even in the report they attached where he -- he goes beyond the terms of the settlement and gets into kind of this best practice realm.

And so what our thing is with Dr. Anandkumar is -- Dr. Anandkumar, we have identified no experience where Dr. Anandkumar came into a system that if you believe plaintiffs' allegations is struggling or not complying with the basic necessities of providing medical care.  We disagree with

that.  He's never come into that system and modified and it changed in a way and reformed it in a way that plaintiffs believes this system needs to be reformed.

So if we're going to hire somebody to perform this role, shouldn't that be a necessary qualifications?  The people we have established have done that in a number of different settings.  Dr. Keldie is one great example of someone who's done that from a real management perspective of having to deal with multiple different facilities in a statewide facility.

For example, here's another managerial issue.  It's really easy to oversee Dallas County, right?  That's where he was, Dallas County.  You know why?  Because it's a county.  You don't have to worry about a staff member in Dallas County getting pulled to Houston County.  Why is that?  Because it's a county system.  Our system, this is not simply a jail.  We have staff that work all over.  We have a statewide medical director and a statewide medical director and a statewide mental health director who don't have to just worry about this particular jail.  We've got to worry how this facility interacts with a whole statewide system.

THE COURT:  What is the size and scope of the system that are at issue in the cases where he is already serving as Medical Monitor?

MR. LUNSFORD:  I believe there -- well, first of all, Albuquerque is I believe a jail, and maybe Mr. Fathi knows,

I'll tell you, the case in which he's our monitor in the Virgin Islands, you know, we've had challenges with Dr. Anandkumar. And -- I mean, if I felt comfortable with him we would have conceded, yes, we'll agree to him, but in our prison case in St. Croix, which again is a single facility kind of makeup, it's 140 individuals.

THE COURT:  I'm confused.  The Virgin Island case is your case?

MR. LUNSFORD:  Yes.

THE COURT:  And in his most recent report, isn't that the one where he found that there was sustained compliance in about 15 provisions out of 20 and he rated another four or so substantial compliance and another one partial compliance?

MR. LUNSFORD:  Yes.

THE COURT:  Okay.

MR. LUNSFORD:  And here's what crazy --

THE COURT:  what problems are you having with him? He sounds pretty great.

MR. LUNSFORD:  Exactly.  No, I mean -- well, first of all, that case I believe is from 1986.  It took us that long to get into a settlement or get into compliance even though we have an incredible medical staff at that facility.

The people in the facility at St. Croix receive better care than the people in the community.  But let me give you an example of the problems we have at St. Croix.  We contract for

nursing staff, because you can imagine, in the territories it's difficult to hire RNs, right?  Very difficult to find a registered nurse.  So we contracted out with a staffing firm to provide us with nurses and he kept on saying that wasn't acceptable.  There's -- I mean, he said that for years, he made this finding.  And but for the assistance of the DOJ, I'm not sure that he would have changed his position on that.

And so we had a lot of -- and again, we saw our experience with him is just what you saw in the report and Albuquerque which plaintiffs submitted which is this continuing creep of continuous quality improvement.

I want to be clear, though.  As a person, I really like Dr. Anandkumar.  He's a very is nice gentleman.  Personally, I enjoyed interacting with him.  Professionally, I felt like his style doesn't bode -- he doesn't operate like Dr. Metzner does, who is a great kind of shining beacon of how, in my view, generally how a monitoring visit and how monitoring should go.

I'll give you another example.  Here's what happened last visit, we were in we were in St. Croix, and he interviews all the staff and when he interviews the staff, he always finishes with this thing of just tell me whatever it is that you need that would make your job easier.

And we can't object and we can't interfere but, of course, we as lawyers are sitting there going, who cares?  Why would you ask that question?  Because, A, it sets up an unreasonable

expectation from the employees' perspective that you, the court monitor, are somehow going to make life easier, you're going to bring all these resources to bear and the demand that the territory provide X, Y, and Z.

And so he -- it just was very -- I've never -- I don't know that I've seen a monitor do that recently, but he has this kind of style where he just kind of gets people to complain for no reason and then for a long time it appeared in his reports.

THE COURT:  All right.  That's all I had questions about.  Do you want to respond, Mr. Fathi?

MR. FATHI:  I do, Your Honor.

All right.  Being a court-appointed Medical Monitor, as Mr. Lunsford put it, an adjunct to the Court in complex institutional reform litigation is a distinct skill and expertise.  It's different than being a healthcare provider in a prison or jail.  It's different than being a testifying expert witness for one side in litigation.

It involves interpreting the requirements of the Settlement Agreement, it involves finding the facts in a neutral, transparent, and reliable way.  It involves analyzing and synthesizing sometimes conflicting information received from the parties, and it involves providing accurate and reliable reports to the Court.

Dr. Anandkumar and Dr. Wilcox have ample experience in this role.  Defendants' nominees have none.  For this reason

alone, the Court should appoint either Dr. Anandkumar and/or Dr. Wilcox.

THE COURT:  All right.  Thank you, Mr. Fathi.

MR. FATHI:  May I just respond to the comments about Dr. Anandkumar?

THE COURT:  You may.

MR. FATHI:  Again, where's the declaration?  Where are the documents?  Defendants had an opportunity to submit a declaration setting forth all these complaints about Dr. Anandkumar.  They didn't.  Their statement that Dr. Anandkumar's experience is limited to advocating for plaintiffs instituting litigation and that he possesses no actual management experience, no actual management experience in a prison or correctional setting, those statements are categorically false.

Dr. Anandkumar already collaborates with Dr. Metzner where they are the Medical and Mental Health Monitors respectively in the McClendon case in the Albuquerque -- out in the jail in Albuquerque, New Mexico.  In fact, Dr. Metzner recommended Dr. Anandkumar as a candidate for the new Medical Monitor.

And the defendants also say that Dr. Anandkumar makes monitoring perpetually necessary.  Well, as the Court pointed out, I think the Court was maybe reading a previous report because in his latest report from November of this year from the Virgin Islands case where Mr. Lunsford is counsel,

Dr. Anandkumar found the defendants in compliance with 18 out of 19 medical measures, with the 19th measure in partial compliance, and that's at ECF 931-5 at Page 91.  So defendants' claims about perpetual monitoring are entirely fencible.

THE COURT:  All right.  Thank you.  I was looking at the same document, but I may have miscounted.  I was literally going through the document and using my finger to count them so I may have miscounted.  But it is clear that he found compliance with the vast majority of the provisions of that particular order and partial compliance with the small remainder.

I do find Dr. Anandkumar to be the most qualified and suitable among the nominees presented by the parties.  He served as a medical director of an entity that provided medical services to the Dallas County Jail which shows that he does have managerial and administrative experience.

Although, it's not a statewide system, as Mr. Lunsford points out, I find that managerial experience to be adequate for our purposes, especially when you compare it to his extensive experience -- relatively extensive experience serving as a Medical Monitor in other cases, including the cases that were discussed just now.

And also there's an added benefit that he has previously worked alongside or maybe he's still currently working alongside Dr. Metzner in the McClendon case.  He also has --

well, I'll just say that he has greater experience in that role than the State's nominees, which don't appear to have, I don't believe, any experience serving as independent Medical Monitors based on my review of the submissions.

In addition, they have histories of adverse judicial findings as to their helpfulness or credibility as experts or other deficiencies in their experience level that have been pointed out by other courts.  Those instances have been cited by the plaintiffs in their briefing at ECF Number 933.

I don't find that those issues are necessarily disqualifying.  I just find Dr. Anandkumar to be more qualified in general as the role of the Medical Monitor.  I don't believe that I need to speak to him personally in order to make that determination because I've reviewed his written work product in other cases and I find that at least establishes that he's the most qualified among the group that's been presented to me.  So for that reason, he will be appointed as Medical Monitor.

I'm just not absolutely clear as to the language that the order must state in order to make this appointment.  It may be as simple as saying Dr. Anandkumar is the new Medical Monitor or is more required under the terms of the Settlement Agreement?  I'll let you start, Mr. Fathi.

MR. FATHI:  Your Honor, we believe a simple order from the Court is sufficient to appoint him.  Of course I believe he will then need to sign a contract with the State,

but in terms of to allow for payment and such things, but in terms of his appointment, we believe that an order from the Court is sufficient under Paragraph 33 of the Settlement Agreement.

THE COURT:  Okay.  Do you take a different position Mr. Lunsford on that?

MR. LUNSFORD:  Your Honor, no.  And just for the record, so it's clear, as soon as Your Honor enters that order we'll promptly begin that contract.  I think we already have one with Dr. Metzner.  We'll use essentially the same form. He'll be required to follow the contracting process.  And as soon as we get through that, we'll begin working with plaintiffs' counsel to get a date scheduled for Dr. Anandkumar, for us to have a call with him in order to begin the process that he would like to go through to orient himself and hopefully set dates for him to be on site in the near future.

THE COURT:  Any estimation about how long this process will take before he can begin his work?

MS. MULLALLY:  I'm sorry, Your Honor.  Laura Mullally for the State.

THE COURT:  Yes, please.

MS. MULLALLY:  It depends on whether or not contract needs to go through the Board of Public Works.  The principal counsel for the Department of Public Safety is the person that would be drafting the contract.  I would have to communicate

with him about this.

And in terms of estimating a time, if it needs to go before the Board of Public Works, it could be up to six weeks. If we can just draft a contract, get him to sign it, it would be a shorter period of time.

THE COURT:  Okay.  Thank you.

MR. LUNSFORD:  But if you could --

THE COURT:  Ma'am, if you could just state your name for the record so it's accurately recorded on the transcript.

MS. MULLALLY:  Laura, L-a-u-r-a, Mullally, M-u-l-l-a-l-l-y.

THE COURT:  Thank you, Ms. Mullally.

I'm sorry, you were starting to say something, Mr. Lunsford?

MR. LUNSFORD:  No, sir, I was just going to say we'll begin that process as soon as the Court enters its order.

THE COURT:  Very good.

I think maybe a good time for a status report would be mid February as to where everything stands with regards to Dr. Anandkumar's appointment.  Is that agreeable?

MR. LUNSFORD:  Yes, sir.

THE COURT:  So since we last met I did enter an order extending the Settlement Agreement.  Well, first, let me ask Mr. Fathi, I think there was some other issues you wanted to raise before we get to this?

MR. FATHI:  Thank you, Your Honor.

Four months ago the Court ordered defendants to pay plaintiffs' counsel about $125,000 in attorney's fees.  The Court -- or the defendants have not complied with the Court's order and when we ask when they plan to comply, we haven't received a response.  We think it's time for the defendants to comply with the Court's order, and so we'd ask the Court to set a firm deadline for them to do so.

THE COURT:  All right.  Anything else that you wanted to raise?

MR. FATHI:  Yes, Your Honor.  In its order extending the terms of the Settlement Agreement, the Court said it would set interim deadlines for defendants to come into compliance with the terms of the Settlement Agreement.  We'd simply ask that the Court do so as soon as possible so that we don't once again find ourselves in a position where the Settlement Agreement is about to expire and the defendants remain far from compliance.

THE COURT:  Okay.  Has each party had an opportunity to submit their proposals as to benchmarks?

MR. FATHI:  We have not, Your Honor.  Speaking for plaintiffs, we were waiting for the Court to call for those submissions.

THE COURT:  Right.  So this is exactly the issue I was going to lead into before you spoke, Mr. Fathi, so thank

you for raising it.

I'll entertain any proposals to present these dates to the Court.  I think it's better for me to respond to your proposals than for me to invent arbitrary deadlines.  So what's the best mechanism to put your proposed dates in front of me, from your perspective, Mr. Fathi?

MR. FATHI:  I would suggest simultaneous filings perhaps the week of -- I don't have a calendar in front of me, the week of January 13th, if that's a --

THE COURT:  The middle of January?

MR. FATHI:  Middle of January.  Let's leave it at that.

MR. LUNSFORD:  Your Honor, I want to make sure this exercise is useful.  First of all, there's no way the State could currently predict benchmarks with regard to mental health care in totality, number one, and for a variety of reasons, and we certainly couldn't even begin to formulate any benchmarks as it relates to medical because we have no Medical Monitor.

And we certainly objected to the manner in which Dr. Puisis monitored us which led to his departure.  And so now we have a new Medical Monitor coming in.  We have no idea what methodologies, what records he's going to review, what systems he's going to employ, what standards he's going to employ, and so -- or what guidance and advice he's going to give us in terms of if he finds us in noncompliance in any area, which

candidly we don't believe there's a lot of areas he would do that, there's no way for me to know that.

And moreover, let me say that this whole idea of benchmarks, I know plaintiffs suggested it early on, is a little bit of destined to fail from the State sense.  There are multiple areas across Dr. Metzner's report where the State maintains currently its in substantial compliance.

So for you to ask us to say tell me a date you're going to be in substantial compliance, a lot of those are going to be, A, Dr. Metzner already found we're in substantial compliance, so now, so that's not useful because you already have in writing the places where he's found us in substantial compliance.

There are areas in Dr. Metzner's report where he says I can't reach a conclusion about compliance because I'm going to defer to the Medical Monitor.  I don't know what the medical Monitor is going to say.  We maintain in a lot of those areas we're currently in substantial compliance, but I don't know how he's going to measure it.

And so I just feel like for us, this is going to be a very -- you're going to be very frustrated, I'm sure, if the expectation is to get firm dates and I'm just going to set them, but then the question is what does that mean because I just -- we've had discussion before in other instances about benchmarks but I don't know what a benchmark means.  The

deadline is out there. The State wants to be in compliance tomorrow. The State believes it's in compliance with most of the agreement today.

So it's just to me, Your Honor, it's an impossible exercise at best, at best. What I would say is if we could get a site visit and a first report from Dr. Anandkumar and we have an upcoming site visit, I think you're going to hear we have an upcoming site visit scheduled with Dr. Metzner in April. If we have the April visit and then before or after that we have Dr. Anandkumar's visit, then after those two visits and after those two reports come out, we can assess where we are and provide you with some guidance about where we are and how long it will take us to do the things they want us to do.

THE COURT: I understand your position on the medical side, but how can you take that position on the mental health side when monitoring hasn't been interrupted? He literally just filed a report.

MR. LUNSFORD: No, I know, but he says in multiple sections I defer to medical. So I can't tell -- I can't tell you we're going to be in compliance as it pertains to mental health on this section by this time because Dr. Metzner hasn't reviewed it. He's deferring to medical.

THE COURT: Okay.

MR. LUNSFORD: So that's the problem. There are some areas, we're filed a notice of disagreement. I know Mr. Fathi

said earlier we said it was inaccurate.  First of all I've never said Jeff Metzner is inaccurate and I don't appreciate the suggestion because it's false.

What we said was we disagreed because the plaintiffs have absolutely hammered him.  As soon as -- the closer we get to compliance, they are just wearing him out on things he previously historically and for months and years found us in compliance with.  They're now hammering him and saying no, they're not, and he's backing off his prior findings.  And we filed a notice of disagreement saying, listen, respectfully Dr. Metzner's going to testify because he's getting a lot of pressure from plaintiffs to not find us in compliance but we are.

And so in many ways I think there are two -- one or two areas where we want to improve documentation, but when it come to mental health, frankly, Your Honor, we believe there would be an adequate basis to move to terminate the entire mental health portion today because, look at it, we're getting people out-of-cell, we're getting them their medication, we're identifying serious mental health needs, we're providing people with groups and counseling.  Dr. Metzner's report is replete with that stuff.  So that's why mental health, is it easier?  Sure, because we have some report.  Can it be complete?  No, it's not going to be complete and I just don't want to mislead you, Your Honor.

THE COURT:  All right.  Thank you.

Any response, Mr. Fathi?

MR. FATHI:  Yes, Your Honor.  I've known Dr. Metzner for 35 years.  I had no idea he was such a shrinking violet.

But the agreement is now set to expire in about 18 months and unless there are interim deadlines for compliance with subprovisions of the agreement, unless defendants are held accountable to those interim deadlines, we will find ourselves once again in the same position as we did earlier this year when the agreement is about to expire and the defendants are nowhere close to compliance and they're not -- once again claim to be unable to tell the Court when they're going to come into compliance.  We think interim deadlines are essential, Your Honor.

THE COURT:  If our projected timeline for Dr. Anandkumar's appointment holds, what would be the date of his first report?  Would that be I guess around -- would it be May or June or this year?

MR. FATHI:  Your Honor, you know, the reports typically come in --

THE COURT:  April, perhaps.

MR. FATHI:  -- March, April, October, November.  I think if the parties agreed to one out of, you know, out of that exact sequence, plaintiffs would have no objection to him doing his first report as soon as possible even if it didn't

adhere specifically to that timetable.

I don't know defendants' position but we certainly agree that he should get to work as soon as possible and we certainly hope that defendants will expedite the contracting process as much as they can.

THE COURT:  Okay.  But in the normal course his site visit would be around March and then the report would be in April?

MR. FATHI:  Yes, Your Honor.  In fact, as Mr. Lunsford said, Dr. Metzner's next site visit is currently scheduled for April, so in the past, sometimes the two monitors have toured together.  That's not essential, but in either event I think March or April would be realistic.

THE COURT:  Okay.  You proposed simultaneous submissions.  I'm just trying to understand what would be the reason why they would be simultaneous rather than have you submit your proposal first and then have the defendants respond to it.

MR. FATHI:  I have no strong views, Your Honor.

THE COURT:  All right.  I'll set a schedule for that as to the mental health monitoring or the mental health provisions.  I won't require any submissions with respect to the medical side until after I see -- until after Dr. Anandkumar files his first report.

MR. LUNSFORD:  Your Honor, I don't want to pull any

punches.  I want you to be clear, if Your Honor is going to enter benchmarks, then we believe you have to make findings under the Prison Litigation Reform Act because -- and we would need clear definitions of what the benchmark means or what would not meeting a benchmark mean for the State or what would meeting a benchmark mean.  So if we meet the benchmark, does monitoring end?

I think we need some clarity on that and we certainly would say if this is intended as relief, if the Court intends to hold -- you know, consider a contempt motion if we don't meet a benchmark then we certainly believe that's relief that would require a PLRA finding.

THE COURT:  Okay.  I'll let you brief that issue in response to the plaintiffs' submission and then the plaintiff will have an opportunity to reply.

MR. FATHI:  Thank you, Your Honor.

THE COURT:  Anything else to address here?

MR. FATHI:  Just the -- the payment of fees which is now four months overdue.

THE COURT:  Oh.

MR. LUNSFORD:  Your Honor, let me say, counsel for the State is bothered by this, too.  I was bothered by it before we exchanged some communications about it.  We've apologized.  We have called, we have badgered, and we believe that we now know where the payment is and we're hopeful that

payment will be processed in the near future.  It's with the Department of Treasury, I believe, or the Treasury Department of the State, and --

THE COURT:  Can I get more specificity "in the near future"?

MR. LUNSFORD:  Ms. Mullally?

MS. MULLALLY:  Again, Laura Mullally for the State.

The payment, in spite of the Court's ruling, the payment had to be approved by the Board of Public Works.  It was approved on December 4th, after which time it was promptly submitted to accounts payable, along with the information that the plaintiff had given us about where the payment should be sent electronically.

As it turns out, the payment cannot be sent electronically.  The treasurer's office is cutting two paper checks, one for former counsel in this case Elizabeth Alexander, and the majority for the ACLU.  The head of accounts payable told me on Thursday that she would call me the minute she received the information from the treasurer -- or the checks from the treasurer and at that point I will pick them up and contact plaintiffs' counsel to find out where I should send them.

THE COURT:  Okay.  I'll set a deadline for the end of July.

MR. FATHI:  Excuse me?

THE COURT:  A deadline for the end of July.

MR. FATHI:  End of July, Your Honor?

THE COURT:  January.  I'm sorry.  January.  J-N-Y, not the end of July.  I apologize.  It's late in the afternoon.  But yes, end of January.

MR. FATHI:  Thank you, Your Honor.

MS. GARDNER:  For the record, I thought you were joking, Your Honor.

THE COURT:  All right.  Anything else, Mr. Fathi?

MR. FATHI:  Nothing further, Your Honor.  Thank you.

THE COURT:  Anything else from you, Mr. Lunsford?

MR. LUNSFORD:  Not this afternoon, Your Honor.

THE COURT:  All right.  Well, I thank you all for your patience.  I know it's been a lengthy hearing and we're here on a Friday.  I hope everyone has a great holiday season.  I'll enter a written order as soon as I'm able.

MR. FATHI:  Thank you, Your Honor.

MR. LUNSFORD:  Thank you, Your Honor.

MR. FATHI:  Happy holidays.

(The proceedings concluded at 4:52 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Amanda L. Longmore, Registered Professional Reporter and Federal Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of January 2025
-S-
_____
AMANDA L. LONGMORE, RPR, FCRR
FEDERAL OFFICIAL COURT REPORTER

Motions Hearing 12/20/2024

**$125,000** [1] - 117:3
**$500** [1] - 66:6
**'70s** [1] - 7:24
**'80s** [1] - 61:25
**1** [2] - 18:1; 52:9
**1-3** [1] - 40:5
**1-401** [2] - 69:21, 24
**10** [1] - 28:17
**10th** [2] - 18:24; 47:3
**11** [1] - 28:18
**12** [1] - 66:18
**12th** [1] - 47:7
**13th** [1] - 118:9
**140** [1] - 109:6
**15** [1] - 109:12
**15th** [2] - 45:25; 46:15
**17th** [1] - 47:2
**18** [4] - 69:15; 113:1; 122:5
**18th** [4] - 47:3, 17; 48:8
**19** [1] - 113:2
**1965** [1] - 75:13
**1983** [1] - 7:25
**1986** [1] - 109:20
**1990** [1] - 86:25
**19th** [1] - 113:2
**2** [7] - 16:23; 17:8, 11; 57:10; 82:21; 83:8; 106:6
**2,000** [1] - 100:12
**20** [1] - 109:12
**20-day** [1] - 54:12
**2002** [1] - 22:13
**2004** [1] - 72:15
**2021** [2] - 95:13
**2022** [2] - 39:2, 10
**2023** [1] - 40:19
**2024** [4] - 16:10; 33:13; 57:19; 58:13
**20th** [3] - 46:18; 47:18; 48:9
**215** [1] - 87:15
**23** [1] - 45:10
**24/7** [1] - 30:6
**240-person** [1] - 22:13
**25** [1] - 67:5
**25(f)(i** [1] - 37:8
**26(c)** [1] - 87:18
**27th** [1] - 12:20
**28** [1] - 40:8
**28th** [1] - 12:21

**29** [3] - 39:22, 25
**29th** [1] - 35:13
**2:05** [1] - 2:2
**3** [8] - 33:16; 57:10; 81:5, 25; 105:13, 18; 106:4
**30** [16] - 11:9, 16; 47:10; 75:17, 22; 76:9, 11, 20; 77:2; 78:1, 19; 79:16; 88:18, 22; 96:21
**30-something** [1] - 7:15
**30th** [1] - 52:1
**31** [3] - 34:18; 45:22; 75:17
**32** [1] - 75:17
**32-bed** [1] - 5:21
**33** [4] - 39:23; 47:2; 68:1; 115:3
**35** [11] - 16:11; 21:23; 31:14, 19; 38:3; 41:23; 56:19; 76:13; 87:23; 122:4
**36** [6] - 56:19; 68:5; 89:11, 17; 90:2; 96:18
**36(a** [9] - 58:7, 24; 76:15; 77:7, 24; 88:6
**36(c** [1] - 56:11
**36(c)** [1] - 68:5
**3626** [2] - 69:15
**4** [3] - 54:1; 56:7; 85:7
**40** [3] - 82:24; 83:1
**41** [1] - 82:24
**44** [1] - 16:11
**47** [2] - 83:1, 4
**4:52** [1] - 126:20
**4th** [1] - 125:10
**500** [1] - 100:24
**540** [1] - 100:23
**59(e** [2] - 32:18; 33:4
**5th** [1] - 32:1
**6** [2] - 54:1; 85:7
**6th** [3] - 102:5, 20
**7** [1] - 56:7
**765-2** [4] - 39:3, 8, 15; 40:11
**773-2** [2] - 39:11, 17
**884-2** [1] - 40:19
**888** [1] - 18:24

**894-10** [1] - 46:25
**894-11** [1] - 47:1
**894-14** [2] - 54:1; 85:7
**894-6** [1] - 81:2
**894.6** [1] - 48:19
**895** [2] - 52:8; 85:6
**895-1** [5] - 47:5; 52:6, 10; 82:13; 83:22
**895.1** [2] - 53:3; 101:4
**90** [2] - 100:21
**907** [1] - 49:10
**91** [1] - 113:3
**913** [1] - 56:7
**914** [1] - 57:10
**929-2** [1] - 16:3
**931-3** [1] - 106:11
**931-5** [1] - 113:3
**933** [2] - 106:1; 114:9
**934** [2] - 105:13; 106:2
**94-5** [1] - 82:6
**a.m** [2] - 28:17
**abide** [1] - 79:13
**abiding** [1] - 13:3
**able** [6] - 25:20; 38:18; 87:3; 100:4; 103:22; 126:16
**absence** [1] - 43:2
**absolutely** [5] - 72:12, 17; 84:16; 114:18; 121:5
**absolved** [1] - 34:2
**acceptable** [2] - 3:21; 110:5
**access** [7] - 20:16; 22:10; 24:15; 42:20; 86:18, 25
**according** [2] - 83:12
**accordingly** [1] - 79:17
**accountable** [1] - 122:8
**accounts** [2] - 125:11, 17
**accuracy** [1] - 45:2
**accurate** [3] - 48:23; 97:10; 111:22
**accurately** [2] -

36:25; 116:9
**acknowledged** [2] - 4:25; 89:5
**acknowledges** [1] - 23:9
**ACLU** [4] - 2:9, 12; 22:19; 125:17
**Act** [3] - 86:8, 12; 124:3
**act** [1] - 79:17
**action** [1] - 64:9
**actions** [2] - 24:2; 45:16
**active** [1] - 5:9
**activities** [2] - 4:9; 10:5
**activity** [5] - 10:6, 11; 27:7, 23
**actual** [6] - 14:21; 35:10; 41:8; 106:9; 112:13
**added** [1] - 113:23
**addition** [2] - 10:9; 114:5
**additional** [5] - 9:14; 10:21; 31:25; 55:23; 105:5
**address** [6] - 3:6, 12; 49:10, 12; 103:9; 124:17
**addressed** [1] - 103:13
**addresses** [1] - 69:22
**addressing** [2] - 44:13; 67:16
**adequate** [6] - 60:7; 67:15; 72:16; 87:5; 113:18; 121:17
**adhere** [1] - 123:1
**adjunct** [5] - 15:14; 21:1; 78:23, 25; 111:13
**adjuncts** [1] - 26:11
**administrative** [2] - 105:25; 113:16
**admissible** [2] - 44:21; 85:13
**admitted** [1] - 4:19
**advantage** [1] - 11:3
**adversarial** [1] - 59:11

**adverse** [1] - 114:5
**advice** [3] - 13:4; 29:13; 118:24
**advise** [1] - 19:12
**advocating** [1] - 112:11
**affidavit** [15] - 80:12; 81:13; 84:14; 101:7, 9, 15; 102:1, 13, 20; 103:6, 9, 13, 15, 17; 104:7
**affidavits** [3] - 44:22; 56:25; 85:13
**afternoon** [18] - 2:8, 10-11, 14, 16-17, 19, 21, 23-24; 3:1, 3; 16:25; 31:8; 38:12; 44:12; 126:4, 12
**agency** [2] - 18:8; 56:22
**agent** [1] - 79:1
**ago** [6] - 4:18; 9:4; 26:3; 40:20; 72:5; 117:2
**agree** [7] - 7:17; 41:7; 68:6; 70:16; 84:24; 109:4; 123:2
**agreeable** [1] - 116:20
**agreed** [15] - 4:22; 15:16; 20:24; 23:9; 47:12, 19; 48:11; 52:20; 54:4; 55:15, 20; 68:6; 122:23
**agreement** [24] - 4:11, 18, 20-21; 5:14; 7:20; 15:16; 21:22; 23:14, 16; 26:4; 29:8; 78:22; 91:7; 96:18, 20; 97:17; 117:14; 120:3; 122:5, 7, 10
**Agreement** [52] - 5:1; 6:8, 15, 18, 20, 22; 7:4; 8:9, 16; 19:6, 10; 21:11, 14; 22:16, 22; 23:5, 8; 24:1; 29:2, 4; 31:2, 14, 22; 32:7, 14; 34:18;

37:3, 6, 20; 38:3, 24; 41:24; 42:5; 43:16, 19; 45:3, 19, 23; 58:5; 60:18; 69:6; 75:1; 90:24; 107:2; 111:19; 114:22; 115:4; 116:23; 117:12, 17
**ahead** [4] - 33:19; 51:21; 104:14, 16
**al** [2] - 2:4
**Alabama** [1] - 22:13
**Albuquerque** [4] - 108:25; 110:9; 112:18
**Alexander** [1] - 125:17
**all-but-unanimous** [1] - 56:4
**allegation** [1] - 9:10
**allegations** [3] - 16:16; 103:25; 107:24
**allegedly** [1] - 45:17
**alleging** [1] - 45:19
**Allen** [1] - 64:19
**alleviate** [1] - 9:9
**allow** [3] - 29:15; 85:14; 115:1
**allowed** [2] - 73:14; 99:1
**almost** [2] - 73:24; 107:6
**alone** [3] - 45:9; 67:13; 112:1
**alongside** [2] - 113:24
**alter** [6] - 3:8, 12, 23; 4:2; 25:15; 90:13
**altering** [1] - 92:8
**alternate** [1] - 36:24
**alternative** [1] - 42:14
**alternatives** [1] - 34:23
**amazing** [1] - 49:8
**amend** [2] - 4:2; 11:22
**amount** [8] - 6:20, 25; 9:8; 35:10;

37:4; 38:23; 39:14; 41:8
**ample** [1] - 111:24
**analysis** [3] - 70:10; 98:13; 100:4
**analyzing** [1] - 111:20
**anandkumar** [1] - 105:16
**Anandkumar** [22] - 106:8, 18; 107:5, 21-23; 109:2; 110:13; 111:24; 112:1, 5, 10, 16, 20-21; 113:1, 12; 114:11, 20; 115:13; 120:6; 123:24
**Anandkumar's** [4] - 112:11; 116:20; 120:10; 122:16
**anew** [2] - 32:25; 75:14
**answer** [3] - 25:10; 28:16; 99:11
**anyway** [4] - 91:24; 95:1, 9; 96:4
**anyways** [1] - 19:3
**apologies** [1] - 40:9
**apologize** [6] - 31:10; 33:18; 53:8; 63:20; 69:23; 126:4
**apologized** [1] - 124:24
**apoplectic** [1] - 94:13
**apparent** [2] - 57:20; 106:8
**appear** [1] - 114:2
**appeared** [1] - 111:8
**applies** [4] - 13:12; 55:18; 63:7; 107:14
**apply** [2] - 56:5; 97:1
**appoint** [3] - 72:2; 112:1; 114:24
**appointed** [4] - 33:7; 54:16; 111:12; 114:17
**appointment** [5] -

105:1; 114:19; 115:2; 116:20; 122:16
**appreciable** [1] - 36:3
**appreciate** [2] - 13:4; 121:2
**appropriate** [6] - 15:23; 20:12; 26:25; 32:24; 37:13
**appropriately** [1] - 11:3
**approved** [2] - 125:9
**April** [10] - 11:6; 47:7; 87:20; 120:8; 122:21; 123:8, 11, 13
**arbitrary** [1] - 118:4
**arbitrator** [1] - 15:17
**ARCHEY** [1] - 2:24
**Archey** [1] - 2:24
**area** [4] - 28:1; 106:20; 107:12; 118:25
**areas** [7] - 20:6; 119:1, 6, 14, 17; 120:25; 121:15
**Arellano** [1] - 3:2
**ARELLANO** [1] - 3:1
**arguably** [1] - 72:8
**argue** [3] - 9:25; 56:8; 86:7
**arguing** [2] - 60:6; 86:7
**argument** [17] - 33:25; 41:14-16; 44:23; 48:25; 49:12; 52:25; 55:24; 77:23; 81:21; 86:4, 6, 9; 87:22; 92:18
**arguments** [2] - 55:23; 99:12
**arises** [1] - 8:18
**arose** [2] - 8:22; 51:17
**article** [1] - 69:23
**Article** [1] - 69:25
**aside** [1] - 20:3
**assert** [1] - 58:19
**asserted** [2] - 45:16; 55:23
**assertion** [4] -

56:2; 57:7; 85:24
**assertions** [7] - 44:16-18; 49:12; 56:23; 80:7; 85:19
**assess** [5] - 18:9; 32:22; 98:21; 120:11
**assessing** [2] - 8:8; 33:13
**assessment** [2] - 33:11; 98:7
**assistance** [2] - 107:1; 110:6
**associate** [1] - 106:12
**associated** [1] - 12:13
**assume** [4] - 40:11; 75:23; 93:20; 96:7
**assurance** [2] - 32:9; 107:13
**assure** [1] - 59:7
**attached** [1] - 107:18
**attaches** [1] - 68:19
**attorney's** [1] - 117:3
**Attorneys'** [3] - 74:1; 86:19; 87:3
**audit** [6] - 25:3, 8, 10; 59:22; 60:1
**auditing** [1] - 25:5
**audits** [6] - 11:14; 20:7; 35:2, 15-16; 42:17
**August** [1] - 58:12
**authenticated** [1] - 44:22
**authority** [7] - 19:15; 24:7; 56:2, 4; 68:2; 86:10
**autopsies** [3] - 54:14; 68:12, 16
**autopsy** [6] - 55:1, 3-4; 56:9; 68:9, 19
**available** [3] - 22:1; 31:25; 73:16
**aware** [1] - 71:18
**background** [1] - 4:4
**backing** [1] - 121:9

**backsliding** [1] - 38:20
**bad** [4] - 47:24; 70:17, 19; 87:21
**badgered** [1] - 124:24
**bar** [1] - 32:20
**barn** [1] - 103:11
**barring** [1] - 101:9
**base** [1] - 31:12
**based** [16] - 5:11; 11:24; 28:11; 36:6; 40:14; 55:22; 85:25; 87:23; 92:10; 96:17; 98:13; 101:23; 102:13; 106:7; 114:4
**basic** [2] - 37:18; 107:25
**basis** [12] - 4:9; 43:8; 58:21; 75:23; 76:24; 77:3; 79:6; 86:19; 88:20; 90:5; 92:5; 121:17
**BCBIC** [8] - 5:22; 6:11; 7:13; 22:20; 61:1, 18; 63:7; 67:17
**BCBIC's** [1] - 27:19
**beacon** [1] - 110:16
**bear** [3] - 23:22; 31:11; 111:3
**bears** [3] - 22:22; 26:25
**became** [2] - 57:20; 94:20
**become** [1] - 14:9
**becomes** [1] - 82:7
**beg** [1] - 12:11
**began** [2] - 9:3; 19:8
**begin** [6] - 115:9, 12, 14, 18; 116:16; 118:17
**beginning** [1] - 53:1
**begins** [3] - 16:10, 23
**behalf** [1] - 2:15
**behavior** [1] - 18:4
**behest** [1] - 10:8
**behind** [2] - 6:10; 59:12

**belabor** [1] - 5:20
**believes** [4] - 8:20; 41:3; 108:3; 120:2
**benchmark** [6] - 119:25; 124:4-6, 11
**benchmarks** [6] - 117:20; 118:15, 17; 119:4, 25; 124:2
**beneficial** [1] - 59:10
**benefit** [1] - 113:23
**best** [10] - 12:25; 18:10; 35:23; 50:11; 94:9; 107:17, 20; 118:4; 120:5
**better** [3] - 10:25; 109:23; 118:3
**between** [8] - 20:19; 26:22; 27:7; 43:24; 46:5; 62:11; 88:18; 98:18
**beyond** [2] - 95:17; 107:19
**Bill** [2] - 2:21; 12:24
**binding** [1] - 69:13
**bit** [7] - 3:25; 4:4; 41:9; 60:15; 69:14; 86:22; 119:5
**blanket** [1] - 74:21
**blocked** [1] - 52:14
**blows** [1] - 11:21
**blowup** [1] - 94:12
**Board** [3] - 115:23; 116:3; 125:9
**bode** [1] - 110:15
**BONIESKIE** [1] - 14:6
**Bonieskie** [4] - 10:19; 11:11, 17; 85:17
**bothered** [2] - 124:22
**bottom** [2] - 82:23; 85:20
**breadth** [2] - 11:24; 19:23
**brief** [11] - 49:9;

52:23; 58:18; 67:9; 71:17; 73:2; 86:11; 87:22; 88:13; 105:5; 124:13
**briefing** [9] - 26:21; 28:6; 29:3; 32:19; 51:4; 72:19; 97:9; 99:11; 114:9
**briefly** [1] - 50:4
**briefs** [2] - 49:16, 18
**bring** [2] - 95:4; 111:3
**bringing** [1] - 107:3
**broad** [5] - 19:13, 23; 43:15, 18; 96:21
**broader** [3] - 32:7; 98:22
**broadly** [2] - 37:7; 96:21
**bunch** [1] - 66:4
**bundled** [2] - 66:15
**burden** [12] - 19:11; 29:23; 56:23; 57:8; 87:14, 17; 103:6, 14, 17, 19; 104:8
**burdensome** [3] - 25:2; 56:22; 66:12
**business** [1] - 89:21
**calendar** [2] - 67:7; 118:8
**Cambodia** [1] - 75:13
**camera** [1] - 73:24
**candidate** [1] - 112:20
**candidly** [1] - 119:1
**candor** [1] - 10:23
**cannot** [4] - 37:18; 69:16; 78:1; 125:14
**canon** [1] - 79:2
**capture** [9] - 20:7; 34:24; 35:4; 36:8, 16, 25; 41:8; 42:19
**captured** [1] - 36:17
**captures** [1] -

Motions Hearing 12/20/2024

42:16
**capturing** [2] - 12:19; 36:9
**care** [25] - 4:9; 5:3, 22, 24; 6:13, 17; 7:2; 10:21; 13:8; 14:19; 25:23; 37:7, 9, 13, 19; 46:9; 70:11, 24; 71:7; 87:5; 97:13; 107:25; 109:24; 118:16
**carefully** [1] - 40:25
**cares** [1] - 110:24
**carry** [1] - 31:21
**case** [42] - 3:5; 4:19, 22; 5:1; 6:8; 16:18, 22; 17:5; 19:8; 20:24; 22:7, 9, 11; 26:7; 34:16; 35:23; 47:25; 48:14; 51:5; 52:22; 54:16; 64:25; 69:15; 75:2, 25; 80:4; 84:19, 22, 25; 87:15; 88:25; 91:14; 107:15; 109:1, 4, 7-8, 20; 112:18, 25; 113:25; 125:16
**cases** [13] - 7:25; 22:8; 44:17; 46:13; 56:6; 86:11, 21, 24; 108:22; 113:21; 114:15
**cataloged** [1] - 39:1
**catch** [1] - 83:21
**categorically** [1] - 112:15
**categories** [7] - 40:5; 54:7; 56:13; 74:16; 79:19; 96:12; 102:17
**category** [7] - 45:24; 54:9; 55:8; 57:15; 74:4, 10; 96:17
**ceased** [3] - 20:1; 32:3; 43:6
**cell** [152] - 6:20, 22, 25; 7:21; 8:19, 23, 25; 9:2, 6, 9, 17;

10:4, 6-7, 14; 11:23; 12:9; 13:9, 15; 14:12, 21; 16:18, 24; 17:1, 6, 8, 11, 15, 19, 25; 18:3, 11-12, 14, 25; 19:2, 25; 24:22; 25:1, 13, 16; 26:22; 27:1, 15; 28:17; 29:13, 24; 30:7, 16, 24; 32:3, 8, 15; 33:10, 15, 21; 35:1, 8, 12; 36:1, 3-4, 9, 13-14, 17, 23; 37:4, 24; 38:2, 5, 10, 23; 39:5, 12; 40:4, 15, 17, 24; 41:2, 8, 10, 17; 42:12, 18; 43:11-13; 45:9, 11-12, 17; 46:6, 10, 12, 14; 49:21; 50:1, 4, 9, 13, 18; 51:11; 53:14, 17-18, 24; 59:18; 61:10, 12; 62:18; 63:6, 8, 15, 18; 64:6, 17, 22-24; 66:5; 81:6, 22-23; 82:11, 19; 84:7, 17-18, 20; 85:2; 90:15; 91:1, 21; 93:5; 94:16, 25; 95:9; 97:11, 16, 22; 98:19; 99:20; 100:1; 102:22; 121:19
**census** [1] - 14:6
**Center** [1] - 2:18
**centralized** [1] - 10:2
**Centurion** [19] - 46:8; 49:21; 50:21; 51:24; 52:9; 53:13, 16, 24; 54:3; 59:20; 84:18, 20; 85:2, 9; 91:21; 103:8, 12
**certain** [7] - 8:14; 20:6; 38:11, 13, 23; 43:1
**certainly** [15] - 42:18; 59:10; 60:4; 69:9;

71:20, 23; 72:21; 86:7; 104:22; 118:17, 19; 123:2; 124:8, 11
**challenges** [3] - 7:12; 109:2
**challenging** [2] - 45:2; 66:13
**chance** [2] - 5:4; 71:14
**change** [3] - 15:21; 20:5; 27:12
**changed** [5] - 19:19; 30:6; 108:2; 110:7
**changing** [1] - 92:9
**charged** [1] - 21:21
**chart** [2] - 14:9, 15
**charts** [2] - 9:16; 24:19
**chase** [1] - 83:24
**check** [5] - 24:23; 36:10; 59:20; 71:14; 79:22
**checking** [1] - 68:16
**checks** [2] - 125:16, 20
**choose** [1] - 100:4
**choosing** [1] - 21:18
**chose** [1] - 52:25
**chosen** [1] - 85:12
**Circuit** [1] - 37:17
**circuit** [1] - 41:14
**circumstances** [1] - 21:2
**citations** [1] - 45:15
**cite** [3] - 56:2; 86:6, 9
**cited** [2] - 86:11; 114:8
**Civil** [1] - 2:4
**claim** [5] - 52:24; 56:20, 24; 59:9; 122:11
**claiming** [1] - 56:24
**claims** [1] - 113:4
**clarification** [1] - 81:24
**clarify** [2] - 50:5;

59:17
**clarity** [1] - 124:8
**class** [12] - 2:9, 12, 18; 16:22; 17:10; 54:11, 18; 56:9, 12, 21; 72:8; 86:25
**clause** [2] - 12:3; 86:9
**clean** [1] - 30:11
**clear** [31] - 11:1, 11; 12:1, 22; 13:11; 19:21; 23:11; 25:11; 43:8, 15; 46:4; 58:11; 59:17; 62:21; 78:16; 82:8; 84:16; 85:14; 88:14; 89:25; 92:13; 99:6; 110:12; 113:8; 114:18; 115:8; 124:1, 4
**clearly** [4] - 42:8; 55:18; 96:18; 105:24
**CLERK** [2] - 2:3, 20
**client** [10] - 15:15; 19:12; 21:4; 33:20; 59:22; 62:12; 68:24; 95:5; 99:24; 106:19
**client's** [1] - 12:24
**clients** [6] - 17:19, 22; 21:5; 54:10; 61:5
**clinically** [2] - 39:13; 40:6
**clinicians** [1] - 71:6
**clog** [1] - 73:1
**close** [4] - 5:12; 20:3; 122:11
**closer** [1] - 121:5
**co** [1] - 60:2
**co-counsel** [1] - 60:2
**coach** [1] - 107:16
**Code** [1] - 69:21
**collaborates** [1] - 112:16
**colleague** [1] - 71:3
**collect** [1] - 65:12
**collected** [3] - 56:6; 61:16
**column** [4] - 62:24; 63:2;

83:18; 84:1
**comfortable** [3] - 72:11; 97:5; 109:3
**coming** [3] - 27:8; 92:4; 118:21
**comment** [1] - 60:9
**comments** [5] - 8:14; 44:15; 76:4; 112:4
**Commissioner** [3] - 21:24; 31:25; 63:10
**committed** [2] - 7:14; 13:6
**committee** [2] - 69:9; 70:9
**common** [2] - 17:3; 22:12
**commonsense** [1] - 30:17
**communicate** [1] - 115:25
**communicating** [1] - 92:14
**communication** [2] - 51:5; 60:16
**communications** [7] - 5:9; 10:25; 51:4; 79:4; 106:24; 124:23
**community** [2] - 5:21; 109:24
**compare** [4] - 84:17; 103:8, 12; 113:19
**compared** [1] - 53:12
**comparing** [1] - 41:10
**comparison** [2] - 53:25; 98:18
**compel** [13] - 3:7, 17; 4:2; 16:17; 17:17; 44:7, 13; 45:4; 72:24; 96:11, 13; 102:16, 25
**competent** [1] - 80:17
**complain** [1] - 111:7
**complaint** [1] - 95:4
**complaints** [1] - 112:9
**complete** [3] - 5:13; 121:23
**completely** [3] -

7:1; 35:25; 75:4
**complex** [1] - 111:13
**compliance** [56] - 4:14; 5:13; 8:10, 15; 15:17; 21:22; 22:22, 24; 23:12, 17, 23; 24:3; 25:20; 31:18; 32:11; 33:9; 34:17, 19; 37:18, 25; 41:23; 42:3; 45:13, 16, 21; 60:8, 11; 96:24; 97:12; 109:11, 13, 21; 113:1, 3, 9-10; 117:13, 18; 119:7, 9-10, 13, 15, 18; 120:1, 20; 121:6, 8, 12; 122:6, 11, 13
**complied** [2] - 22:17; 117:4
**comply** [9] - 19:12; 29:19, 22; 58:23; 90:1; 101:13; 117:5, 7
**complying** [2] - 23:4; 107:24
**composed** [1] - 7:16
**comprehensive** [1] - 35:25
**computer** [1] - 50:20
**conceded** [2] - 37:23; 109:4
**concern** [7] - 10:16; 18:22; 19:14, 22; 26:13; 32:10; 106:17
**concerned** [2] - 42:10; 101:20
**concerns** [9] - 9:8; 11:24; 19:1; 32:7; 38:9; 39:1; 43:21; 74:21
**concisely** [1] - 48:5
**conclude** [1] - 59:3
**concluded** [1] - 126:20
**conclusion** [1] - 119:15
**conclusions** [1] - 71:2

**conclusory** [1] - 56:23
**conditions** [7] - 4:21; 5:14; 33:8; 37:12, 14; 39:1; 40:17
**conduct** [4] - 47:24; 59:23; 100:4
**conducting** [1] - 42:18
**confer** [1] - 97:6
**conferred** [1] - 59:22
**confident** [1] - 26:14
**confidential** [7] - 56:1; 70:13, 21; 75:11; 76:9; 78:6; 88:20
**confidentiality** [2] - 70:25; 86:2
**confinement** [6] - 17:3, 7; 37:15; 39:4; 40:14, 17
**confirm** [8] - 10:3; 14:4; 32:4; 46:20; 66:5; 68:13; 105:2
**confirmed** [4] - 10:15; 27:16; 60:2; 68:15
**confirming** [1] - 17:24
**conflicting** [1] - 111:21
**confused** [5] - 49:22; 50:11; 51:22; 109:7
**confusing** [2] - 52:6
**confusion** [4] - 11:4; 51:16; 89:25; 92:25
**conjunction** [2] - 13:24; 57:17
**connection** [6] - 3:16; 19:6; 32:6, 14; 89:8; 90:23
**Connell** [1] - 2:24
**Consent** [2] - 22:12; 23:1
**consider** [3] - 15:20; 101:9; 124:10
**considering** [2] - 15:11; 33:2
**consistency** [2] - 43:22; 53:14
**consistent** [5] -

18:14, 20; 30:19; 38:19
**consistently** [6] - 9:21, 24-25; 10:1; 37:9; 84:19
**conspiracy** [1] - 28:3
**constitutional** [1] - 107:14
**contact** [1] - 125:21
**contain** [2] - 14:11; 35:20
**contained** [6] - 22:13; 24:8; 34:25; 41:11; 103:17
**contemplates** [1] - 77:7
**contemplating** [1] - 104:9
**contemporaneous** [1] - 74:5
**contemporaneously** [4] - 57:23; 58:16; 59:2; 88:15
**contempt** [1] - 124:10
**contend** [4] - 73:5; 77:6, 24
**contending** [1] - 6:24
**contends** [1] - 87:16
**contention** [4] - 28:5; 34:7; 38:4; 65:23
**contentious** [1] - 107:4
**contents** [1] - 73:25
**contesting** [1] - 88:13
**context** [9] - 5:3, 7-8; 7:3; 9:14; 30:16; 86:17; 89:3
**continue** [22] - 11:15; 12:22; 13:5, 14; 19:5; 25:13; 27:1; 32:5, 13; 38:18; 42:6; 43:19; 57:13; 58:19; 67:24; 68:23; 79:4; 82:3; 90:22; 91:1
**continues** [1] -

36:24
**continuing** [3] - 55:5; 57:3; 110:10
**continuous** [2] - 107:11; 110:11
**contract** [7] - 77:15; 109:25; 114:25; 115:9, 22, 25; 116:4
**contracted** [1] - 110:3
**contracting** [3] - 77:17; 115:11; 123:4
**contradict** [1] - 80:7
**contradiction** [1] - 88:18
**contrary** [4] - 51:9; 59:8; 73:22; 84:23
**contributed** [1] - 55:14
**contributing** [1] - 15:1
**control** [1] - 86:13
**controversy** [1] - 92:10
**conversation** [6] - 11:12; 26:10, 14; 59:13; 65:19; 71:7
**conversations** [2] - 26:10; 44:18
**conviction** [1] - 76:1
**convince** [1] - 103:23
**copies** [2] - 9:3; 22:6
**copy** [8] - 66:15; 73:16, 21; 74:2; 85:3; 90:20; 105:12
**Corene** [1] - 85:8
**correct** [25] - 6:15; 9:19; 14:9; 22:3, 5-6; 23:7; 25:4, 11; 34:12; 40:21; 54:23; 58:3; 77:1, 5; 79:11; 82:2; 89:14; 93:8, 10; 105:3, 15
**correctional** [6] - 5:3; 7:8; 46:23; 105:25; 106:10; 112:14
**corrections** [1] -

7:25
**correctly** [1] - 87:19
**counsel** [62] - 2:6; 4:20; 11:12, 19; 13:8; 17:10, 18; 21:25; 22:1, 9, 20; 23:9; 24:14; 25:24; 26:16; 31:20; 32:1; 34:17; 41:6; 42:20; 44:23; 51:17, 19; 54:18; 57:23; 58:6; 59:2, 8, 12, 25; 60:2, 6, 13; 62:11; 68:8, 25; 70:16; 72:7; 73:15, 18, 24; 74:9; 80:7, 22; 84:14; 85:19; 86:25; 88:16; 91:7; 94:13; 95:4; 97:19; 101:16; 105:2; 112:25; 115:13, 24; 117:3; 124:21; 125:16, 21
**counsel's** [4] - 51:9, 13; 56:23; 101:21
**counseling** [1] - 121:21
**count** [116] - 45:6, 24; 46:5, 10, 20, 23; 47:3, 9, 17, 21; 50:14; 51:1, 7, 9, 18; 53:4, 6-7, 10, 12, 15, 17, 23; 54:4; 56:10; 60:14, 21-22, 24; 61:2, 4, 6, 9, 11-12, 15, 21, 23, 25; 62:1, 7, 9, 15, 17; 64:3, 14; 65:2, 4, 7, 14, 18; 66:1, 3, 10, 16; 67:2, 16, 19; 80:5, 18, 20; 81:22; 82:1, 11; 84:20; 85:2, 10, 22; 89:3; 91:17, 22-23; 92:7, 22-23; 93:11, 13-15, 18; 94:4, 7, 22, 25; 95:8, 11, 13, 16-17; 96:14; 97:8, 21;

98:4, 11, 14, 21, 23-24; 99:18, 21, 24; 100:5; 101:14; 102:13, 19, 21, 25; 103:7; 104:10; 113:7
**counterproductive** [1] - 37:14
**counting** [3] - 60:25; 61:3
**country** [1] - 8:1
**County** [6] - 106:14; 108:11-14; 113:15
**county** [2] - 108:12, 15
**couple** [2] - 24:5; 91:5
**course** [12] - 35:20; 36:23; 37:17, 25; 56:23; 87:2, 25; 88:25; 89:21; 110:23; 114:24; 123:6
**court** [19] - 2:3; 5:6, 8; 21:1; 28:25; 29:3; 32:17; 54:16; 56:6; 69:16; 78:20, 22-23; 86:14; 92:1; 106:21; 111:1, 12
**Court** [68] - 2:5; 3:10, 25; 6:6; 8:20, 22; 11:21; 12:3, 11, 23; 13:3; 15:13, 18; 18:23; 19:1, 11; 20:25; 25:14; 26:9; 29:7, 14; 32:16; 33:7; 45:1, 15; 47:4; 49:17; 54:6; 58:24; 59:3, 7; 77:12; 78:18; 82:13; 87:18; 88:9; 90:9; 91:3, 12; 93:23; 100:6; 101:6, 8, 12, 19, 23; 102:24; 111:13, 23; 112:1, 22-23; 114:24; 115:3; 116:16; 117:2, 4, 7, 12, 15, 22; 118:3;

122:12; 124:9
**COURT** [290] - 2:10, 13, 16, 19, 23; 3:3, 22; 6:14, 24; 7:5; 9:12, 14, 20; 12:16; 13:10, 18, 20, 22; 14:1, 8, 13, 25; 15:4, 6, 9, 25; 16:2, 5, 12; 20:18; 21:6, 10, 13, 23; 22:4, 15, 21; 23:3, 7, 18, 20; 24:5, 18, 21; 25:2, 5, 7; 26:12, 19; 28:5, 21; 29:5, 10, 23; 30:20; 31:3, 5, 7, 9; 32:21; 33:18, 24; 34:14; 35:17, 22; 36:19; 37:1; 38:4, 21; 39:6, 15, 18, 20, 23; 40:1, 8, 10, 20, 22; 41:1, 13; 42:4, 22, 25; 43:10, 13; 44:2, 5, 11; 46:2, 4; 48:2, 5, 16, 22, 25; 49:22, 25; 50:3, 8, 13, 17, 21, 24; 51:2, 21; 52:4, 8, 11, 18; 53:4, 6, 8; 54:8, 21, 24; 57:24; 59:5; 62:2, 20, 23; 63:1, 15, 20, 22; 64:25; 65:5, 9, 13, 23; 66:1, 8, 23; 67:1, 8, 19; 68:5, 9, 21; 69:2, 23, 25; 70:2, 4, 6, 19; 71:13, 17; 72:10, 13, 18, 23; 73:4, 8, 10; 74:1, 3, 19, 25; 75:5, 14, 18; 76:2, 6, 10, 16, 21, 23; 77:2, 6, 20, 23; 78:11; 79:8, 14, 18, 21, 25; 80:3, 15, 24; 81:3, 24; 82:3, 6, 14, 16, 23; 83:1, 4, 7, 9, 16, 22, 25; 84:3; 85:1, 6, 11, 24; 86:15; 88:3; 89:3, 10, 16, 20,

23; 90:3, 8, 11, 13, 20; 91:23; 93:1, 4, 7, 9, 11, 14; 94:23; 95:6, 19, 22; 96:3, 7, 9; 98:2, 6; 99:3, 9; 100:9, 15; 101:1, 15, 25; 102:6, 15; 103:4, 15, 21; 104:7, 18, 24; 105:7, 10, 16, 18, 22; 106:2, 4, 6; 108:21; 109:7, 10, 15, 17; 111:9; 112:3, 6; 113:5; 115:5, 17, 21; 116:6, 8, 12, 17, 22; 117:9, 19, 24; 118:10; 120:14, 23; 122:1, 15, 21; 123:6, 14, 20; 124:13, 17, 20; 125:4, 23; 126:1, 3, 9, 11, 13

**Court's** [18] - 3:13, 23; 7:19; 29:18; 49:19; 52:2; 53:2; 54:2; 72:2; 78:16; 79:12, 17; 99:5; 101:14; 105:6; 117:4, 7; 125:8

**Court-appointed** [1] - 33:7

**court-appointed** [2] - 54:16; 111:12

**courtroom** [1] - 19:8

**courts** [3] - 5:5; 69:12; 114:8

**covered** [3] - 6:15; 44:6; 79:25

**covers** [1] - 79:18

**CQI** [1] - 107:12

**Craig** [1] - 17:4

**crazy** [1] - 109:16

**create** [17] - 7:21; 12:22; 13:6, 14; 18:7; 24:7; 25:13; 27:6, 22, 25; 32:5; 34:11; 49:3; 71:9; 78:17, 21; 95:3

**created** [17] - 4:8;

9:7, 11; 28:3; 32:6; 49:7, 21; 50:23; 51:24; 66:14; 69:8; 78:22; 81:7; 85:15; 91:19; 93:5

**creates** [1] - 78:19

**creating** [10] - 10:18; 12:16, 18; 13:13; 14:14; 15:4; 24:6; 48:16, 20, 23

**creation** [3] - 6:3; 60:13; 102:21

**creative** [1] - 81:21

**credibility** [1] - 114:6

**creep** [1] - 110:10

**creeps** [1] - 59:13

**crisis** [2] - 18:3; 60:13

**critical** [9] - 8:20; 16:19; 32:10; 33:9; 42:2; 45:13; 47:16; 70:10; 94:20

**critically** [1] - 18:2

**criticizes** [1] - 18:8

**Croix** [4] - 109:5, 23, 25; 110:19

**cross** [1] - 74:8

**crucial** [1] - 33:10

**cry** [1] - 59:13

**curious** [1] - 62:5

**current** [3] - 22:7; 36:22; 40:3

**curriculum** [1] - 106:7

**custodians** [1] - 88:11

**custody** [7] - 13:23; 46:11, 16; 53:3; 61:18; 81:7; 93:5

**cut** [2] - 83:24; 95:6

**cutting** [1] - 125:15

**CV** [1] - 106:11

**daily** [3] - 46:10, 15; 47:2

**Dallas** [5] - 106:14; 108:11-13; 113:15

**data** [1] - 33:10

**date** [4] - 35:15; 115:13; 119:8; 122:16

**dates** [5] - 24:16; 115:16; 118:2, 5; 119:22

**David** [1] - 2:8

**dayroom** [1] - 35:9

**days** [3] - 47:10; 100:21

**deadline** [4] - 117:8; 120:1; 125:23; 126:1

**deadlines** [5] - 117:13; 118:4; 122:6, 8, 13

**deal** [1] - 108:8

**death** [20] - 54:9; 55:9, 12, 14, 19; 56:10, 16; 57:6; 68:3, 9; 69:2; 70:12, 21; 85:25; 87:9; 96:14, 23; 102:17

**deaths** [5] - 54:13, 17, 19; 55:4; 72:1

**debate** [1] - 18:6

**Debra** [1] - 2:17

**decades** [4] - 4:18; 26:1, 3; 72:5

**deceased** [5] - 55:10; 56:9, 12, 21; 70:24

**decedent** [1] - 67:25

**December** [10] - 45:25; 46:15, 18; 47:3, 17-18; 48:8; 125:10

**decide** [3] - 91:9, 16; 102:10

**decided** [2] - 51:25; 103:11

**decides** [1] - 91:12

**decisive** [1] - 44:24

**declaration** [8] - 49:4; 51:13; 57:10; 85:8; 101:11, 23; 112:7, 9

**declined** [1] - 13:14

**Decree** [1] - 22:12

**Decrees** [1] - 23:1

**dedicated** [2] - 10:17; 11:23

**defects** [1] - 55:13

**defendant** [5] - 2:20; 3:14; 55:18; 90:25; 102:12

**defendants** [71] - 19:5; 21:14; 23:4, 23; 31:12, 14, 16; 32:1, 4, 8, 12, 17, 19; 34:23; 36:22; 37:22; 42:7; 43:1; 44:24; 45:15, 18; 47:8, 10; 48:1; 49:16; 52:23; 54:4, 20; 55:15; 56:13, 20, 25; 57:2, 5, 11, 20; 58:4, 9, 15, 23; 60:21; 85:12, 21; 86:5; 87:8, 14, 19; 88:11, 13; 90:4, 22; 96:19; 97:2; 98:11; 100:6; 101:7; 102:20; 104:21; 112:8, 21; 113:1; 117:2, 4, 6, 13, 17; 122:7, 10; 123:4, 17

**defendants'** [13] - 51:25; 58:25; 90:1, 13; 96:10, 24; 98:18; 102:9, 24; 104:7; 111:25; 113:3; 123:2

**defense** [4] - 26:16; 41:15; 99:11; 101:21

**defer** [2] - 119:16; 120:19

**deferring** [1] - 120:22

**deficiencies** [1] - 114:7

**deficiency** [1] - 106:16

**deficient** [1] - 99:11

**definitely** [1] - 38:7

**definition** [1] - 77:13

**definitions** [1] -

124:4

**deign** [1] - 81:19

**delay** [1] - 102:3

**demand** [1] - 111:3

**demands** [1] - 103:24

**demonstrate** [3] - 4:12; 21:17

**demonstrated** [2] - 32:19; 37:16

**demonstrates** [2] - 35:14; 36:2

**demonstrating** [2] - 35:3; 38:2

**department** [3] - 7:14; 27:1; 125:2

**Department** [3] - 12:13; 115:24; 125:2

**departure** [1] - 118:20

**deposition** [1] - 85:14

**deprived** [1] - 20:14

**depths** [1] - 29:20

**describe** [1] - 31:17

**described** [4] - 16:6; 24:3; 35:15; 40:18

**describing** [1] - 103:15

**designed** [2] - 61:11

**desk** [2] - 10:10; 60:7

**desperately** [1] - 45:12

**destined** [1] - 119:5

**destroy** [3] - 12:12; 20:1; 92:12

**destroyed** [13] - 12:8, 10, 13; 47:23; 49:8; 59:9; 61:19; 80:14; 81:10, 14; 84:24; 85:22; 91:19

**destroying** [1] - 92:9

**destruction** [1] - 48:5

**detailed** [1] - 14:20

**detained** [2] -

18:15; 61:23

**detainee** [1] - 64:7

**detainees** [7] - 6:14; 39:12; 40:5, 15; 61:3; 104:2

**deteriorating** [2] - 39:13; 40:6

**determination** [1] - 114:14

**determine** [2] - 21:19; 31:21

**determined** [1] - 91:3

**determining** [2] - 21:21; 102:22

**develop** [1] - 36:24

**developed** [2] - 36:22; 46:8

**device** [1] - 50:20

**devise** [1] - 72:10

**dictates** [3] - 6:18, 20; 26:8

**died** [7] - 54:10; 57:4, 12, 14; 87:10

**dies** [1] - 56:14

**difference** [1] - 27:13

**different** [35] - 3:19; 5:5; 10:14; 13:18, 21; 14:21; 17:12; 20:7, 21; 21:7; 22:23; 27:6-9, 23-24; 28:10; 42:8; 43:24; 51:15, 23; 52:7; 59:15; 63:5; 69:14; 77:11; 87:18; 108:6, 9; 111:15; 115:5

**differently** [2] - 50:9; 78:11

**difficult** [4] - 61:10; 101:21; 110:2

**digital** [3] - 50:19

**direct** [1] - 69:16

**direction** [1] - 53:23

**directions** [1] - 53:21

**directive** [2] - 19:13; 101:14

**directives** [1] - 13:3

**directly** [1] -

Motions Hearing 12/20/2024

68:14
**director** [8] -
85:17; 106:12;
107:8;
108:16-18;
113:14
**disagree** [7] -
20:20; 21:9, 12;
23:15; 78:18;
107:25
**disagreed** [1] -
121:4
**disagreement** [2]
- 120:25; 121:10
**disciplinary** [2] -
64:7
**disclosure** [4] -
58:5; 70:14;
71:20; 78:18
**discouraged** [1] -
5:8
**discoverable** [1] -
56:18
**discovery** [1] -
72:6
**discrepancies** [3]
- 53:13, 22;
97:23
**discuss** [4] - 12:7;
72:15; 105:7
**discussed** [5] -
11:5; 43:25;
44:7; 72:17;
113:22
**discussing** [2] -
25:9; 31:13
**discussion** [10] -
8:22; 10:23;
11:7; 33:7;
34:22; 51:12;
62:11; 90:6;
119:24
**discussions** [1] -
9:7
**disingenuous** [1]
- 73:22
**dispositive** [1] -
91:10
**dispute** [13] -
11:6; 18:7;
49:11, 16;
58:12, 22; 62:8,
17; 66:9; 69:12;
74:19; 79:9
**disputed** [1] -
44:20
**disputes** [1] -
41:25
**disqualifying** [1] -
114:11

**distinct** [2] -
107:6; 111:14
**distinction** [1] -
46:5
**distributed** [1] -
61:14
**distribution** [2] -
87:1; 88:1
**District** [1] - 93:23
**docket** [1] - 73:1
**Docket** [2] - 2:4;
18:24
**docketed** [1] -
16:2
**doctor** [2] - 57:17;
71:25
**document** [52] -
4:9, 13; 6:2;
8:19, 25; 9:25;
10:11; 11:3;
12:19; 13:7, 13;
14:10; 15:1, 4,
12; 18:18;
20:15; 24:1, 7;
31:15; 34:3, 11;
35:7; 38:1; 41:4,
25; 43:7, 9-10;
49:25; 50:19;
51:24; 52:1, 7;
53:9; 59:21;
69:11; 74:14,
23; 76:24; 77:3;
85:4; 89:4, 7;
90:15; 100:19;
113:6
**document's** [1] -
15:3
**documentary** [1] -
80:8
**documentation**
[7] - 10:22;
28:10; 35:3;
38:1; 43:22;
98:19; 121:15
**documentations**
[1] - 43:25
**documented** [2] -
10:12; 38:8
**documenting** [5]
- 8:13; 10:9, 21;
32:3; 35:10
**documents** [133] -
4:7, 12; 6:3;
7:21; 8:19;
11:22; 12:6, 10,
12, 14, 17;
13:15; 19:9, 16;
20:4, 13-14;
21:15; 22:6;
23:22; 24:25;

25:20; 26:2, 8;
27:6, 23-24;
32:11, 13;
34:19, 22;
35:13, 20; 42:1,
3, 10, 14; 43:1,
5, 7; 44:22;
45:5, 24; 47:11,
15; 48:8, 21;
49:5; 51:23;
52:6; 53:3; 54:7,
19, 22; 55:8, 16,
18, 20, 22, 25;
57:3, 12-13,
15-16, 21-22;
58:1, 5, 7, 15,
20; 59:1, 9;
60:7, 15; 69:19;
73:6, 23; 74:4,
10, 16; 75:9-11,
20, 24; 76:8, 17,
20; 77:19, 22;
78:3-5, 9, 12;
79:5, 10, 16;
80:13; 81:8,
14-15, 18;
84:24; 85:15;
86:18, 25;
87:20, 24; 88:5,
7, 12, 14, 21;
89:1, 11; 91:21;
92:11; 93:7;
96:12, 15, 19,
25; 101:2;
102:18; 112:8
**DOJ** [2] - 23:1;
110:6
**dollar** [1] - 56:22
**done** [10] - 6:12;
29:16; 38:2;
57:1; 72:13, 21;
87:19; 92:2;
108:6, 8
**double** [1] - 59:20
**double-check** [1]
- 59:20
**doubtful** [1] -
56:18
**down** [10] - 27:13;
28:18; 30:15,
19, 21; 39:25;
64:6; 83:17;
93:21; 94:7
**dozens** [1] - 66:19
**DPSCS** [1] - 54:18
**Dr** [109] - 5:3, 5,
12, 17-18; 7:6,
24; 8:1, 4, 11;
9:5, 8, 20; 10:3,
19-20; 11:11,

13, 17; 12:23;
15:13, 25; 16:1,
14, 21; 17:9, 24;
18:8; 20:4, 15,
19; 25:3, 10, 12;
26:15; 27:16;
29:13, 15; 37:9,
21; 38:7, 25;
44:25; 45:14;
49:2, 4; 57:17,
19-20; 58:13,
16; 59:21, 23;
60:4, 9, 17;
74:15; 76:4, 9;
85:17; 105:16;
106:8, 18;
107:5, 21-23;
108:7; 109:2;
110:13, 15;
111:24; 112:1,
5, 10-11, 16,
19-21; 113:1,
12, 25; 114:11,
20; 115:10, 13;
116:20; 118:20;
119:6, 10, 14;
120:6, 8, 10, 21;
121:11, 21;
122:3, 16;
123:10, 24
**DR** [1] - 14:6
**draft** [5] - 76:4;
89:13; 90:4;
116:4
**drafting** [2] - 8:12;
115:25
**drink** [1] - 23:1
**duly** [1] - 80:16
**duplicating** [1] -
10:21
**duplicative** [7] -
12:18; 13:6, 11;
14:10; 21:18;
24:8; 26:20
**duplicity** [1] -
34:22
**duration** [1] -
95:10
**durational** [1] -
95:25
**during** [7] - 11:5;
16:25; 17:12;
19:9; 35:6;
57:19; 61:13
**duties** [1] - 89:8
**duty** [10] - 21:3, 5,
14; 34:17;
44:21; 45:21;
46:19; 54:18;
91:7

**Duvall** [1] - 2:4
**e-mail** [3] - 46:25;
88:23; 104:14
**e-mailed** [1] -
76:4
**early** [2] - 104:14;
119:4
**easier** [3] -
110:22; 111:2;
121:22
**easiest** [1] - 80:11
**easy** [1] - 108:11
**ECF** [17] - 39:3, 7,
10; 40:19;
49:10; 53:25;
56:7; 57:10;
81:5; 82:21;
83:6, 8, 22;
87:15; 105:12;
113:3; 114:9
**effective** [2] -
46:20; 107:2
**efforts** [2] - 4:12;
37:24
**eight** [3] - 17:1, 9;
66:18
**either** [11] - 3:18;
11:2; 17:18;
18:4; 34:8;
77:25; 78:9;
88:22; 97:10;
112:1; 123:12
**electronic** [2] -
8:25; 10:19
**electronically** [2]
- 125:13, 15
**elements** [1] -
49:15
**eliminate** [2] -
11:8; 90:17
**eliminating** [1] -
11:7
**Elizabeth** [1] -
125:16
**elsewhere** [3] -
26:21; 35:14;
64:2
**emergencies** [1] -
30:4
**emergency** [1] -
33:2
**employ** [2] -
118:23
**employee** [1] -
64:10
**employees'** [1] -
111:1
**employer** [1] -
71:3
**enacted** [1] - 71:8

**enactment** [1] -
86:12
**encompassed** [1]
- 75:24
**encourage** [5] -
8:3; 26:9; 60:3;
104:20; 106:21
**end** [13] - 8:5;
10:24; 16:6;
19:22; 25:17;
63:19; 91:13;
124:7; 125:23;
126:1, 4
**ends** [1] - 11:16
**energy** [1] - 8:12
**enforceable** [1] -
86:16
**engage** [1] -
59:11
**engaged** [1] -
49:14
**enjoyed** [1] -
110:14
**ensues** [1] - 62:11
**ensure** [8] - 8:21;
22:17; 24-25;
23:2; 34:19;
38:18; 42:2
**ensures** [1] -
41:23
**ensuring** [1] -
7:11
**enter** [5] - 97:1, 4;
116:22; 124:2;
126:16
**entered** [6] -
18:24; 41:16;
42:4; 55:16, 21;
72:5
**entering** [1] - 26:4
**enters** [3] - 11:22;
115:8; 116:16
**entertain** [1] -
118:2
**entire** [5] - 4:6,
16; 6:2; 72:8;
121:17
**entirely** [1] -
113:4
**entitled** [15] -
22:21; 23:7, 21,
25; 24:4; 60:19;
65:24; 74:5, 19,
23; 97:20;
100:2; 101:22;
103:7, 11
**entity** [1] - 113:14
**environment** [1] -
107:4
**errors** [1] - 53:19

especially [2] - 107:3; 113:19
essential [3] - 18:13; 122:13; 123:12
essentially [9] - 10:22; 19:3; 41:22; 71:5; 73:23; 74:1; 101:5; 115:10
establish [2] - 6:11; 38:22
established [1] - 108:6
establishes [1] - 114:15
estimate [1] - 100:12
estimating [1] - 116:2
estimation [1] - 115:17
et [2] - 2:4
ethical [1] - 21:5
ethically [1] - 21:3
ethics [2] - 78:24; 79:2
evaluate [3] - 25:20; 106:23
event [2] - 56:4; 123:13
events [1] - 47:23
evidence [34] - 3:9, 14; 12:11; 15:21; 16:19; 17:14, 16; 32:12; 38:21; 44:17, 19-21, 23; 46:19; 47:25; 48:15; 49:11, 14; 51:13; 52:22; 62:6; 80:17; 85:13; 92:14, 18-19; 99:12
evolving [1] - 20:9
ex [9] - 26:10; 58:20; 75:23; 76:24; 78:24; 79:3; 88:20; 89:6; 90:5
exact [3] - 16:7; 28:14; 122:24
exactly [12] - 11:17; 16:4; 20:4; 28:2; 50:22; 59:14; 68:13; 82:7; 89:22; 109:19;

117:24
examine [1] - 55:12
example [14] - 6:18; 30:1; 35:1, 7; 37:8; 39:10; 42:19; 63:6; 85:1; 93:20; 108:7, 10; 109:25; 110:18
Excel [1] - 14:22
except [1] - 88:6
exchange [3] - 46:25; 59:11; 65:17
exchanged [1] - 124:23
excuse [1] - 125:25
exercise [2] - 118:14; 120:5
exist [8] - 37:10; 60:12; 66:22; 70:23; 74:18; 81:15; 95:14; 99:20
existing [1] - 87:15
exists [6] - 4:6; 23:17; 27:18; 71:4; 78:22; 101:12
expect [2] - 53:20
expectation [2] - 111:1; 119:22
expedite [1] - 123:4
expedition [1] - 66:21
expense [2] - 93:22, 24
experience [26] - 5:6; 26:1; 27:20, 22; 28:12; 60:5; 86:22; 105:19; 106:9, 12; 107:7, 11, 13, 22; 110:8; 111:24; 112:11, 13; 113:16, 18, 20; 114:1, 3, 7
expert [4] - 7:24; 17:4; 87:4; 111:17
expertise [2] - 29:15; 111:15
experts [3] - 5:2; 7:25; 114:6
expire [3] - 117:17; 122:5,

10
expired [1] - 42:7
explain [3] - 60:14; 63:11; 92:19
explained [2] - 57:11; 81:6
explains [1] - 101:12
explanation [5] - 32:2; 55:5; 67:11; 84:8, 13
explanations [1] - 28:9
explicitly [1] - 45:22
expresses [2] - 34:4, 8
extend [1] - 91:20
extended [1] - 54:4
extending [2] - 116:23; 117:11
extends [1] - 29:18
extension [1] - 106:21
extensive [3] - 8:12; 113:20
extent [1] - 92:24
Eyes [3] - 74:1; 86:19; 87:3
face [1] - 81:17
faced [2] - 7:12
facilities [3] - 6:11; 61:2; 108:9
facility [7] - 61:14; 100:17; 108:9, 19; 109:5, 22
fact [18] - 5:11; 11:10; 18:13; 20:24; 22:12; 30:20; 35:13, 20; 61:5; 64:5, 11; 67:5; 68:4; 72:7; 81:11; 112:19; 123:9
facts [6] - 6:5; 56:25; 59:16; 67:14; 111:19
factual [3] - 44:16, 20; 49:11
fail [1] - 119:5
failed [1] - 54:5
failure [1] - 51:6
fair [2] - 4:6; 98:18
fairly [2] - 13:12; 101:9

faith [1] - 47:24
false [5] - 17:20; 28:3; 56:11; 112:15; 121:3
far [8] - 29:19; 31:13; 33:7; 45:18; 53:19; 61:23; 95:25; 117:17
fast [1] - 47:7
FATHI [98] - 2:8; 3:20; 31:6; 44:12; 46:3, 7; 48:4, 7, 18, 24; 49:1, 24; 50:2; 51:14, 20, 22; 52:5, 10, 12, 19; 53:5, 7, 11; 54:9, 23; 55:1; 58:3; 76:15; 80:6, 20; 81:2, 4; 82:2, 4, 7, 15, 17, 25; 83:2, 5, 8, 10, 19, 24; 84:1, 4; 85:5, 7, 12; 86:3, 20; 88:4; 89:5, 14, 19, 22, 24; 90:7, 9, 12; 91:5; 92:24; 93:3; 95:23; 96:8; 98:25; 99:5; 100:8; 101:3, 18; 102:14; 103:2, 5; 104:22; 105:4, 9; 111:11; 112:4, 7; 114:23; 117:1, 11, 21; 118:7, 11; 122:3, 19, 22; 123:9, 19; 124:16, 18; 125:25; 126:2, 6, 10, 17, 19
Fathi [30] - 2:8; 3:19; 20:24; 31:5; 44:10; 46:2; 50:8; 51:21; 59:5; 62:3, 6; 68:1; 74:12; 80:3; 92:17; 93:1; 99:16; 104:8, 14, 19; 108:25; 111:10; 112:3; 114:22; 116:24; 117:25; 118:6; 120:25; 122:2; 126:9

Fathi's [3] - 50:12; 61:6; 103:23
February [1] - 116:19
federal [5] - 56:5; 69:12; 86:14
fees [3] - 23:12; 117:3; 124:18
felt [3] - 67:15; 109:3; 110:14
fencible [1] - 113:4
few [1] - 43:7
figure [1] - 71:19
file [1] - 97:4
filed [16] - 3:10, 14, 17; 11:21; 16:10; 32:11; 47:5; 72:20, 24; 81:19; 97:7; 101:15; 120:17, 25; 121:10
files [1] - 123:24
filings [1] - 118:7
fill [1] - 94:21
filling [1] - 20:1
final [1] - 57:15
finally [2] - 57:2; 88:4
findings [5] - 8:13; 16:11; 114:6; 121:9; 124:2
fine [8] - 3:20; 8:21; 19:2; 63:21; 88:24; 100:8; 102:6; 104:23
finger [1] - 113:7
finish [1] - 36:20
finishes [1] - 110:20
firm [3] - 110:3; 117:8; 119:22
first [35] - 8:17; 20:22; 22:12; 24:25; 44:16; 45:6, 24; 51:16; 55:25; 59:8; 60:21; 63:25; 67:10; 71:15; 73:4, 12; 74:7; 76:14; 82:9; 84:15, 22; 86:4; 87:20; 99:14; 108:24; 109:19; 116:23; 118:14; 120:6; 121:1; 122:17, 25; 123:17, 24

fishing [1] - 66:21
five [5] - 16:22; 47:10; 59:17, 22
flavor [1] - 29:23
flew [1] - 27:11
focus [3] - 20:6; 33:6; 90:14
focused [3] - 37:22; 42:12; 80:16
follow [1] - 115:11
following [2] - 21:17; 93:19
for-profit [1] - 46:9
foreseeable [1] - 61:22
forever [2] - 16:20; 104:1
form [8] - 19:19; 83:5; 93:22; 94:20; 115:10
former [1] - 125:16
forms [2] - 61:16
formulate [1] - 118:17
forth [6] - 45:3, 22; 57:10; 84:14; 101:8; 112:9
forward [6] - 20:5; 47:7, 10; 48:10; 57:25; 96:2
four [11] - 16:24; 17:12; 18:10; 20:2; 38:12; 61:1; 109:12; 117:2; 124:19
Fourth [1] - 37:16
frame [3] - 104:15, 20
frankly [1] - 121:16
free [1] - 36:23
frequently [1] - 53:15
Friday [1] - 126:15
friends [1] - 70:15
front [7] - 11:12; 59:25; 72:19; 82:13; 118:5, 8
frustrated [1] - 119:21
frustration [1] - 64:16
full [5] - 5:13; 10:23; 36:8; 43:5; 78:18

Motions Hearing 12/20/2024

**function** [3] - 21:8; 39:3; 97:19
**functioning** [1] - 40:14
**future** [6] - 19:14; 61:22; 99:7; 115:16; 125:1, 5
**game** [4] - 27:5, 14, 18; 64:20
**gander** [1] - 79:7
**GARDNER** [2] - 2:17; 126:7
**Gardner** [1] - 2:17
**gauging** [1] - 25:19
**general** [5] - 19:22; 56:18; 68:7; 94:11; 114:12
**generally** [2] - 78:17; 110:17
**gentleman** [1] - 110:13
**genuine** [1] - 71:7
**genuinely** [1] - 7:10
**Georgia** [1] - 28:15
**given** [15] - 22:10; 30:2; 33:1; 42:20; 43:21, 23; 45:11, 21; 54:21; 74:11; 85:12; 89:7; 92:3; 102:4; 125:12
**glad** [1] - 98:6
**goose** [1] - 79:7
**gotcha** [3] - 27:14; 64:17
**Governor** [3] - 2:22, 25; 3:2
**grant** [1] - 90:14
**granted** [4] - 3:10; 32:16; 87:17; 96:12
**granting** [1] - 3:13
**great** [4] - 108:7; 109:18; 110:16; 126:15
**greater** [1] - 114:1
**grind** [1] - 30:14
**grocery** [2] - 93:21
**group** [2] - 61:6; 114:16
**groups** [1] - 121:21
**guarantee** [2] -

22:19; 23:2
**guaranteeing** [1] - 22:24
**guess** [18] - 14:13; 21:6; 25:7; 27:7; 29:1; 30:25; 33:25; 35:22; 36:2; 42:5, 9; 61:8; 62:14; 80:3; 89:16; 98:12; 101:2; 122:17
**guidance** [2] - 118:24; 120:12
**guide** [1] - 29:15
**guiding** [1] - 107:10
**guys** [2] - 12:6; 62:18
**half** [3] - 9:4; 17:6; 31:19
**hammered** [1] - 121:5
**hammering** [1] - 121:8
**hand** [4] - 60:20; 62:15; 75:19; 76:11
**handled** [1] - 10:24
**handles** [2] - 96:9; 104:24
**handwritten** [7] - 46:11; 51:8; 52:14; 65:1; 81:1; 93:9; 100:19
**Haney** [1] - 17:4
**happy** [5] - 49:3, 15; 94:9; 101:11; 126:19
**hard** [1] - 66:15
**harm** [1] - 30:18
**head** [2] - 104:19; 125:17
**heading** [1] - 52:6
**health** [36] - 5:3, 14, 21-22, 24; 7:14; 9:11; 10:8, 18; 14:4; 24:25; 25:22; 27:3; 37:7, 10, 15, 19; 46:9; 54:12; 57:17; 59:1; 70:4; 85:17; 97:13; 108:17; 118:15; 120:15, 21; 121:16, 18, 20, 22; 123:21
**Health** [5] - 33:8;

45:7; 70:3; 97:14; 112:17
**healthcare** [2] - 55:13; 111:15
**hear** [7] - 3:22; 7:12; 12:2; 30:18; 34:1; 67:20; 120:7
**heard** [7] - 14:17; 18:14, 16; 25:12; 50:5; 71:15; 77:15
**hearing** [11] - 2:6; 28:25; 62:3; 67:10; 73:5; 84:15, 22; 86:4; 99:13, 19; 126:14
**held** [3] - 69:13; 79:3; 122:7
**hello** [2] - 2:13; 31:9
**helpful** [4] - 52:22; 75:3; 101:4; 104:17
**helpfulness** [1] - 114:6
**henceforth** [1] - 58:25
**hesitate** [1] - 72:18
**hide** [2] - 27:19; 28:4
**high** [1] - 32:20
**highest** [1] - 5:22
**highlighted** [1] - 37:24
**highly** [1] - 56:17
**himself** [2] - 37:22; 115:15
**hire** [2] - 108:4; 110:2
**historical** [1] - 5:25
**historically** [2] - 19:18; 121:7
**histories** [1] - 114:5
**history** [1] - 4:24
**hmm** [3] - 33:23; 51:2; 95:19
**hoc** [1] - 34:23
**Hogan** [1] - 2:5
**hold** [3] - 76:19; 93:1; 124:10
**holding** [2] - 12:6; 86:13
**holds** [1] - 122:16
**holiday** [3] - 102:2, 4; 126:15

**holidays** [1] - 126:19
**honestly** [1] - 63:24
**Honor** [178] - 2:8, 11, 14, 21; 3:20, 24-25; 4:5, 15; 5:4, 16, 19; 8:3, 18; 10:23; 11:23, 25; 12:1, 21; 15:11, 24; 16:9; 17:2; 18:5; 19:1, 7; 20:3, 10-11, 23; 23:1; 27:4; 29:11, 19, 25; 30:18; 31:4, 6, 8; 34:13, 16; 36:6; 38:6, 25; 39:22; 40:12; 41:5, 20; 43:4, 21; 44:9, 12; 46:7, 25; 48:18, 24; 49:1, 7, 9, 19, 24; 50:7; 51:14, 17, 20, 23; 52:12, 17; 53:1, 12; 54:15, 23; 57:15; 58:3, 11; 59:7, 17; 60:1, 16, 22, 25; 63:6, 21, 25; 64:19; 67:12, 22-23; 69:5, 20, 22; 70:17; 71:10, 25; 73:2; 76:15; 77:9; 78:7, 21; 80:2, 6; 81:2; 82:2, 15, 25; 83:2, 20, 24; 84:13; 85:5; 86:3, 20; 87:11, 13, 23; 88:4, 17; 89:5, 14; 90:7, 12, 17, 25; 91:5, 25; 92:3, 24; 95:10, 23; 96:6, 8; 97:25; 98:3, 25; 100:8, 10; 101:3, 18, 20; 102:2, 14; 103:2, 20; 104:13, 23; 105:4, 9; 106:17, 20; 111:11; 114:23; 115:7, 19; 117:1, 11, 21; 118:13; 120:4; 121:16, 25; 122:3, 14, 19; 123:9, 19, 25;

124:1, 16, 21; 126:2, 6, 8, 10, 12, 17
**honor** [1] - 29:7
**Honor's** [6] - 12:4; 13:3; 25:25; 77:17; 79:3; 93:21
**hope** [4] - 12:11; 99:16; 123:4; 126:15
**hopeful** [1] - 124:25
**hopefully** [1] - 115:16
**horse** [1] - 103:11
**hospital** [2] - 5:24; 7:15
**hour** [4] - 17:6; 27:13; 36:16; 66:6
**hours** [11] - 16:25; 17:1, 9, 12; 29:2; 35:11; 36:15; 38:12; 45:10
**house** [1] - 27:11
**housed** [3] - 16:15; 24:15; 61:7
**housing** [5] - 10:12; 30:2; 66:17
**Houston** [1] - 108:14
**huge** [1] - 78:19
**hundred** [1] - 100:19
**hypothetically** [1] - 78:8
**idea** [11] - 7:7; 14:18; 21:21; 26:16; 51:10; 79:15; 87:21; 94:12; 118:21; 119:3; 122:4
**ideas** [1] - 7:9
**Identification** [1] - 14:24
**identified** [4] - 28:6; 33:8; 45:13; 107:22
**identify** [4] - 2:7; 42:10; 56:1; 98:9
**identifying** [2] - 47:5; 121:20
**ignore** [1] - 60:20
**ignoring** [1] - 52:24

**ill** [4] - 18:2; 45:8, 13; 66:6
**illness** [1] - 30:3
**imagine** [6] - 29:25; 30:2; 66:16; 70:22; 95:8; 110:1
**imagining** [1] - 35:23
**IMHU** [38] - 5:19; 6:7, 12; 7:16, 22; 8:6, 14; 9:1; 10:17; 16:15; 24:15; 33:9; 37:12; 38:9, 14; 39:2, 12; 40:4, 13; 45:7, 25; 46:11, 17, 24; 50:23; 52:13; 66:20; 81:6; 85:16, 18; 95:13, 18, 21, 24; 97:11; 98:5; 101:5
**immediately** [2] - 46:21; 69:5
**impact** [3] - 71:11, 21
**implemented** [3] - 24:2; 31:16; 37:11
**importance** [1] - 44:25
**important** [16] - 4:5, 15, 17; 6:5; 8:7; 37:23; 38:15, 17; 53:11; 54:15; 55:11; 60:22, 24; 84:21; 94:17
**imposed** [1] - 88:10
**imposes** [1] - 6:10
**impossible** [2] - 67:17; 120:4
**impression** [1] - 87:4
**improve** [4] - 7:9; 20:6; 70:11; 121:15
**improved** [2] - 71:7; 97:18
**improvement** [4] - 106:13; 107:12; 110:11
**improvements** [2] - 38:7
**improving** [3] - 39:13; 40:6, 16

Motions Hearing 12/20/2024

**in-camera** [1] - 73:24
**inaccurate** [3] - 17:21; 121:1
**inadvertent** [2] - 71:16, 20
**inappropriate** [2] - 30:1; 62:12
**incarcerated** [2] - 4:10; 9:1
**incident** [1] - 54:13
**incidents** [1] - 100:23
**incinerator** [1] - 61:19
**inclination** [1] - 3:12
**inclined** [2] - 32:21; 33:3
**include** [6] - 76:20; 78:9, 12; 91:17; 94:8; 96:14
**included** [2] - 16:24; 89:10
**including** [7] - 32:14; 40:17; 46:23; 89:12; 90:18, 24; 113:21
**inconsequential** [3] - 27:25; 75:4; 92:3
**inconsistencies** [4] - 26:22; 28:6; 43:24; 98:22
**inconsistent** [1] - 28:22
**incorrect** [1] - 58:6
**increase** [3] - 37:24; 38:2; 45:17
**increased** [3] - 6:13; 38:10; 40:17
**incredible** [4] - 4:12, 24; 71:11; 109:22
**incredibly** [2] - 5:12, 23
**indeed** [2] - 80:4, 18
**independent** [7] - 31:23; 34:17; 45:21; 91:7; 114:3
**indicated** [1] - 24:5

**indicates** [1] - 9:1
**indicating** [2] - 46:12
**indication** [1] - 107:7
**individual** [2] - 14:23; 70:24
**individuals** [14] - 4:10; 6:21; 7:13, 16-17; 9:1, 6, 16; 18:15; 59:22; 61:23; 63:12; 106:22; 109:6
**industry** [1] - 9:24
**inexplicably** [1] - 58:3
**infamous** [1] - 17:5
**information** [72] - 9:16, 18, 21; 12:19; 14:1, 14; 17:20-22; 18:19; 20:8, 16; 22:21; 23:3, 21; 24:6, 8-10; 25:7; 26:20, 23; 28:4; 33:16; 34:24; 35:5, 14, 21, 24; 36:17, 25; 41:11; 42:16, 19; 47:6; 59:11; 60:10; 65:24; 75:7, 10, 23-24; 77:10, 12-13, 16, 18-19; 78:4, 6, 9, 24; 88:19; 91:9; 97:8, 12, 20, 22; 98:17, 20; 99:14, 25; 101:2; 103:16; 104:3; 111:21; 125:11, 19
**informed** [1] - 32:1
**inherently** [1] - 64:16
**initial** [1] - 55:2
**injure** [1] - 18:4
**injurious** [1] - 18:4
**inmates** [1] - 18:15
**Inpatient** [1] - 45:7
**inpatient** [1] - 5:20
**inputted** [1] - 50:19
**inquiry** [1] - 45:20

**inside** [1] - 4:10
**insignificant** [1] - 28:7
**insofar** [1] - 90:14
**inspect** [2] - 73:17; 87:2
**inspection** [2] - 22:4; 86:18
**instances** [4] - 28:9; 107:18; 114:8; 119:24
**instead** [2] - 52:24; 91:2
**instituting** [1] - 112:12
**institution** [1] - 105:25
**institutional** [1] - 111:14
**instructed** [1] - 51:11
**insufficient** [2] - 31:21; 34:24
**intake** [1] - 19:19
**intangibles** [1] - 106:24
**intended** [6] - 63:18; 71:8; 94:4, 22; 99:3; 124:9
**intends** [1] - 124:9
**intentional** [1] - 47:24
**intentionally** [1] - 59:19
**interact** [2] - 5:5; 29:14
**interacting** [1] - 110:14
**interacts** [1] - 108:19
**interest** [2] - 12:25; 99:18
**interested** [1] - 7:10
**interesting** [3] - 5:25; 20:22; 60:5
**interfere** [1] - 110:23
**interference** [1] - 17:10
**interim** [4] - 117:13; 122:6, 8, 13
**interject** [1] - 23:15
**interjecting** [1] - 25:22

**internal** [2] - 69:4; 70:20
**interpretation** [8] - 75:19; 77:10, 15, 18; 78:7; 79:13, 17; 83:17
**interpreted** [1] - 62:23
**interpreting** [1] - 111:18
**interrupted** [1] - 120:16
**interrupting** [2] - 33:18; 63:20
**intervening** [1] - 28:19
**interviewed** [1] - 16:14
**interviews** [2] - 110:19
**invent** [1] - 118:4
**investigate** [2] - 74:18; 97:23
**investigating** [1] - 97:24
**invoking** [1] - 77:2
**involve** [1] - 18:4
**involved** [2] - 5:9; 22:12
**involves** [4] - 111:18-20, 22
**irrelevant** [1] - 7:1
**Island** [1] - 109:7
**Islands** [3] - 106:19; 109:2; 112:25
**issue** [43] - 6:1; 8:4, 20; 11:15, 21; 15:11; 18:10, 21; 27:18, 25; 28:14; 29:1, 3; 32:22, 25; 33:4, 9; 37:23; 38:15; 40:23; 41:6, 9, 25; 43:18; 45:5, 12-13; 49:18; 63:22; 67:9, 13, 23; 80:9; 97:17, 25; 103:5, 13; 104:25; 108:10, 22; 117:24; 124:13
**issued** [1] - 32:23
**issues** [11] - 3:6, 16; 4:1; 6:19; 8:2; 15:19; 44:3; 60:18; 67:10; 114:10; 116:24

**It'll** [1] - 102:8
**Item** [1] - 81:25
**items** [1] - 96:12
**itself** [4] - 3:8; 23:14; 71:8; 94:21
**Iverson** [1] - 64:19
**Jail** [2] - 106:14; 113:15
**jail** [14] - 44:19; 45:8; 46:14; 54:10; 55:13; 56:14; 57:5; 105:25; 108:15, 19, 25; 111:16; 112:18
**jail's** [1] - 55:13
**janitor** [1] - 30:10
**January** [14] - 33:13; 47:2, 9, 20; 48:12; 102:5, 20; 118:9-11; 126:3, 5
**Jeff** [2] - 5:3; 121:2
**Jennifer** [1] - 2:11
**JNY** [1] - 126:3
**job** [1] - 110:22
**joking** [1] - 126:8
**Judge** [1] - 3:1
**judge** [1] - 28:15
**judgment** [1] - 3:8
**judicial** [3] - 78:23; 79:2; 114:5
**July** [12] - 12:20; 15:10; 18:7, 9, 24; 32:1; 35:13; 125:24; 126:1, 4
**jump** [2] - 33:19; 34:6
**June** [8] - 11:9, 16; 33:13; 43:6; 52:1; 57:5, 12; 122:18
**jurisdiction** [1] - 7:19
**Justice** [1] - 2:18
**keep** [12] - 12:6; 14:5; 17:2; 26:17; 34:3; 38:15; 67:16; 94:17, 20; 95:12
**keeping** [3] - 62:2, 7; 94:16
**keeps** [2] - 65:20; 67:5
**Keldie** [1] - 108:7

**KELLEY** [1] - 2:14
**Kelley** [1] - 2:15
**Kendrick** [1] - 85:8
**kept** [11] - 26:20; 35:14; 36:7; 45:9; 49:5; 65:8; 69:7; 89:20; 100:15; 110:4
**key** [2] - 5:18; 6:19
**kind** [13] - 6:4; 12:10; 13:23; 14:24; 74:11; 78:7; 87:24; 88:2; 107:19; 109:5; 110:16; 111:7
**kinds** [2] - 30:4; 45:5
**knowing** [1] - 71:1
**knowledge** [1] - 80:13
**known** [1] - 122:3
**knows** [5] - 4:7; 5:19; 24:14; 99:24; 108:25
**laborious** [1] - 12:21
**lacking** [1] - 98:17
**laid** [1] - 53:25
**language** [6] - 23:25; 58:23; 90:16; 96:17; 97:5; 114:18
**large** [1] - 100:17
**larger** [6] - 7:19; 70:17; 79:6; 98:12, 14
**last** [9] - 12:3; 16:2; 20:23; 39:16; 45:25; 46:15; 96:17; 110:18; 116:22
**late** [6] - 7:24; 12:20; 15:7; 16:25; 45:18; 126:4
**latest** [2] - 44:25; 112:24
**latter** [1] - 31:19
**laundry** [1] - 30:5
**Laura** [3] - 115:19; 116:10; 125:7
**LAURA** [1] - 116:10
**law** [4] - 56:5; 69:18; 86:13

Motions Hearing 12/20/2024

**lawyers** [3] - 25:22; 66:4; 110:24
**lays** [1] - 85:8
**lead** [3] - 3:15; 6:1; 117:25
**leadership** [1] - 6:11
**leading** [1] - 107:9
**learn** [1] - 99:21
**learned** [1] - 43:5
**least** [7] - 21:22; 48:8; 88:13; 95:21; 97:2; 99:20; 114:15
**leave** [5] - 79:22; 84:12; 90:10; 97:4; 118:11
**led** [1] - 118:20
**left** [2] - 28:17; 103:11
**legal** [1] - 49:12
**legally** [1] - 19:12
**legitimate** [1] - 45:20
**length** [1] - 14:20
**lengthy** [1] - 126:14
**less** [4] - 25:2; 33:3; 53:24; 59:11
**letter** [15] - 47:8, 14; 48:19; 60:8; 64:12; 81:4, 9, 25; 82:4; 84:23; 88:24; 89:3; 92:13, 16; 93:4
**letters** [2] - 89:6
**level** [9] - 5:22; 6:13, 17; 34:24; 39:4; 40:14; 72:6; 105:19; 114:7
**licensed** [4] - 25:23; 26:1
**lies** [1] - 66:9
**life** [2] - 27:22; 111:2
**light** [1] - 30:20
**lightbulb** [1] - 30:14
**limit** [2] - 95:25; 100:10
**limited** [11] - 7:20; 32:15; 39:5, 11; 40:4, 15; 54:3; 90:18, 24; 95:21; 112:11
**limiting** [1] -

95:24
**limits** [2] - 87:1; 88:1
**line** [1] - 76:3
**lines** [1] - 63:2
**list** [2] - 52:13; 93:22
**listed** [1] - 29:13
**listen** [4] - 7:5, 8; 66:2; 121:10
**listening** [1] - 66:4
**listing** [1] - 33:15
**lists** [1] - 46:10
**literally** [7] - 23:2; 29:2; 48:2; 94:6; 104:5; 113:6; 120:16
**literature** [1] - 37:16
**Litigation** [3] - 86:8, 12; 124:3
**litigation** [8] - 56:6; 86:14, 22; 87:25; 107:15; 111:14, 17; 112:12
**live** [3] - 30:6; 58:12, 22
**location** [3] - 10:3; 24:24; 73:17
**locations** [2] - 10:5, 14
**lockdown** [1] - 28:14
**locked** [1] - 45:9
**log** [12] - 9:11; 10:16; 11:7, 9, 18; 12:22; 14:3, 5, 8; 30:24; 46:10; 50:18
**logs** [10] - 10:10-12, 19; 18:25; 32:3, 15; 40:25; 46:15; 91:2
**look** [26] - 6:1; 8:4; 10:3; 11:15; 16:23; 32:24; 47:4; 58:6; 69:15; 72:1; 73:11; 75:14; 81:2; 82:4, 17, 21; 85:5, 7; 92:5; 94:7; 97:3; 100:25; 105:24; 107:18; 121:18
**looked** [1] - 63:24
**looking** [8] - 53:8;

59:24; 62:20; 84:1; 101:4; 104:15; 113:5
**looks** [2] - 14:22; 75:12
**loses** [1] - 16:19
**losing** [2] - 16:19; 31:10
**lost** [3] - 32:11; 42:3; 90:20
**love** [1] - 9:23
**loyalty** [1] - 21:3
**LUNSFORD** [168] - 2:21; 3:21, 24; 6:16; 7:3, 7; 9:13, 19, 23; 12:18; 13:17, 19, 21, 23; 14:3, 7, 10, 16; 15:2, 5, 7, 10; 16:1, 4, 7, 13; 20:20; 21:9, 12, 16; 22:3, 5, 18, 23; 23:6, 8, 19, 24; 24:12, 20, 23; 25:4, 6, 9; 26:13; 27:4; 28:8, 23; 29:6, 11, 25; 30:22; 31:4; 34:13; 50:7, 11, 16, 18, 22, 25; 51:3, 15; 59:7; 62:5, 22, 25; 63:4, 17, 21, 24; 65:3, 6, 11, 14, 25; 66:2, 12, 25; 67:2, 12, 22; 68:6, 11, 22; 69:3, 24; 70:1, 3, 5, 8, 20; 71:14, 18; 72:12, 14, 21, 24; 73:7, 12; 74:2, 7, 21; 75:2, 8, 16, 25; 76:3, 7, 14, 19, 22; 77:1, 5, 9, 21, 25; 78:15; 79:12, 15, 20, 24; 80:2; 83:20; 90:17, 25; 91:25; 93:6, 8, 10, 12, 17; 95:2, 10, 20; 96:5; 97:25; 98:3; 100:10, 16; 101:11; 102:2; 103:19, 22; 104:13; 105:15, 17, 21; 106:1, 3,

5, 17; 108:24; 109:9, 14, 16, 19; 115:7; 116:7, 15, 21; 118:13; 120:18, 24; 123:25; 124:21; 125:6; 126:12, 18
**Lunsford** [39] - 2:22; 3:22; 31:3; 33:20; 34:12; 37:2; 46:6; 50:3, 5-6; 51:22; 53:20; 58:14; 59:6; 79:22; 81:4, 9-10; 82:1, 9, 18; 83:12, 14; 86:20; 87:12; 88:2; 90:16; 93:4; 99:19, 23; 100:9; 101:8; 111:13; 112:25; 113:17; 115:6; 116:14; 123:10; 126:11
**Lunsford's** [6] - 44:16; 81:17, 21; 83:17; 84:8, 23
**M-u-l-l-a-l-l-y** [1] - 116:11
**ma'am** [1] - 116:8
**mail** [3] - 46:25; 88:23; 104:14
**mailed** [1] - 76:4
**maintain** [21] - 17:22; 19:4, 17, 21; 21:16; 25:16; 26:17; 29:24; 31:12, 15; 32:5, 16; 34:3; 43:2; 61:22; 65:22; 90:22; 91:1; 94:13; 119:17
**maintained** [11] - 15:3; 19:6, 9; 32:6, 13; 37:9; 42:1, 11; 61:18; 81:11; 90:23
**maintaining** [13] - 18:18; 19:16; 29:12; 32:3, 13; 33:21; 41:4; 43:2, 6, 9; 60:7; 61:21; 91:23
**maintains** [3] - 41:22; 59:21; 119:7

**maintenance** [2] - 30:11; 42:23
**major** [1] - 18:25
**majority** [2] - 113:9; 125:17
**makeup** [1] - 109:5
**management** [6] - 105:20; 106:9, 16; 108:8; 112:13
**managerial** [5] - 105:24; 107:7; 108:10; 113:16, 18
**manipulation** [1] - 95:3
**manner** [2] - 19:12; 118:19
**March** [14] - 11:5-7, 16; 47:9, 20; 48:12; 54:11; 57:4, 14, 19; 122:22; 123:7, 13
**Margarita** [1] - 3:2
**margin** [1] - 65:3
**marrying** [1] - 85:1
**Maryland** [11] - 27:21; 61:2; 69:9, 17-18, 21; 71:8; 86:1
**match** [5] - 28:2; 30:24; 61:6; 84:17, 19
**matter** [8] - 2:3, 5; 61:1; 68:7; 78:18; 87:25; 88:25; 91:13
**matters** [4] - 44:6, 8, 21; 105:5
**mattress** [1] - 30:13
**McClendon** [2] - 112:18; 113:25
**mean** [32] - 7:10; 19:18, 20; 22:11; 23:13; 24:23; 28:18; 29:7; 30:17; 32:24; 34:6; 65:21; 74:25; 77:16, 21; 79:12; 84:10-12; 92:16; 93:23; 95:5, 16; 103:22; 105:23; 109:3, 19; 110:5; 119:23;

124:5
**means** [13] - 19:14; 23:2; 28:21; 37:25; 75:23; 77:10, 18; 83:12, 14; 88:22; 91:15; 119:25; 124:4
**measure** [2] - 113:2; 119:19
**measures** [1] - 113:2
**mechanism** [1] - 118:5
**Medical** [13] - 69:21; 72:3; 105:1, 8, 10; 108:23; 111:12; 112:20; 113:21; 114:3, 12, 17, 20
**medical** [46] - 7:2; 9:15; 14:9, 14, 16; 27:2; 30:5; 42:21; 54:16; 56:9, 11-12, 15, 17; 59:1; 67:24; 68:8; 69:6, 8; 70:1, 24; 71:24; 87:5; 106:12-14; 107:8, 10, 25; 108:16; 109:22; 112:17; 113:2, 14; 118:18, 21; 119:16; 120:14, 19, 22; 123:23
**medication** [1] - 121:19
**medicine** [1] - 7:9
**meet** [6] - 16:21; 32:20; 97:6; 106:23; 124:6, 11
**meeting** [2] - 124:5
**member** [1] - 108:13
**members** [7] - 14:25; 16:22; 17:10; 54:11; 56:9, 12, 21
**Mental** [4] - 33:8; 45:7; 97:14; 112:17
**mental** [35] - 5:2, 13, 20, 22-23; 7:14; 9:11; 10:8, 18; 14:4; 24:25; 25:22; 27:2; 30:3; 37:7, 10,

Motions Hearing 12/20/2024

15, 19; 46:9; 57:16; 59:1; 85:17; 97:13; 108:17; 118:15; 120:15, 20; 121:16, 20, 22; 123:21

**mentally** [2] - 45:8; 66:6

**mention** [1] - 40:23

**mentioned** [3] - 6:7; 59:24; 68:1

**merely** [2] - 8:17; 68:20

**merging** [1] - 4:2

**message** [1] - 13:2

**met** [2] - 7:18; 116:22

**methodologies** [1] - 118:22

**Metzner** [58] - 5:3, 5, 12; 7:6, 24; 8:1, 4, 11; 9:5, 8, 20; 10:3, 20; 11:13; 12:23; 15:25; 16:1, 14, 21; 17:9, 24; 18:8; 20:15, 19; 25:3, 10, 12; 26:15; 27:16; 29:15; 37:9, 21; 38:7, 25; 45:14; 57:17, 20; 58:16; 59:21, 23; 60:4, 9, 17; 74:15; 76:9; 110:15; 112:16, 19; 113:25; 115:10; 119:10; 120:8, 21; 121:2; 122:3

**Metzner's** [18] - 5:17; 15:13; 20:4; 29:13; 31:1; 44:25; 49:2, 4; 57:19; 58:13; 60:9; 76:4; 119:6, 14; 121:11, 21; 123:10

**Mexico** [1] - 112:19

**mid** [1] - 116:18

**middle** [3] - 84:1; 118:10

**might** [2] - 18:3; 37:13

**Miller** [6] - 46:16;

62:16; 65:1; 67:14; 85:15

**Miller's** [1] - 85:16

**mind** [2] - 17:2; 92:13

**minimal** [2] - 39:11; 40:4

**minute** [2] - 59:18; 125:18

**minutes** [2] - 35:11; 36:13

**miscommunicati on** [1] - 65:15

**miscounted** [2] - 113:6, 8

**mislead** [1] - 121:24

**misled** [1] - 80:22

**missed** [1] - 48:6

**missing** [1] - 8:7

**missive** [1] - 75:12

**misspoke** [1] - 68:2

**misunderstandi ng** [1] - 58:25

**misunderstood** [1] - 103:3

**mix** [1] - 107:16

**MJM-94-2541** [1] - 2:4

**modifications** [1] - 72:16

**modified** [2] - 19:1; 108:1

**modifier** [1] - 25:17

**modify** [5] - 19:15; 20:5; 32:18; 72:19; 102:15

**moment** [5] - 36:9; 39:18; 73:8; 82:14; 93:2

**monitor** [23] - 5:9; 15:17; 20:22; 21:1, 20; 22:9; 23:12; 25:18; 26:8; 31:24; 34:7, 17; 38:18, 23; 45:21; 76:17; 96:16; 106:19; 109:1; 111:2, 6

**Monitor** [61] - 6:13; 15:19; 17:21; 19:4, 15; 20:11; 21:20; 22:10; 23:15;

26:6; 27:3; 33:8, 21, 25; 34:1, 4, 9; 44:19; 54:16; 57:17; 58:1; 59:1; 66:24; 67:2, 6; 72:3; 73:13; 74:23; 75:21; 76:25; 78:5; 89:8; 90:4; 91:3, 8-9, 14; 96:19; 97:15; 105:1, 8, 10; 108:23; 111:12; 112:20; 113:21; 114:12, 17, 20; 118:18, 21; 119:16

**Monitor's** [1] - 15:20

**monitored** [2] - 8:1; 118:20

**monitoring** [27] - 4:7; 5:1, 6, 8; 19:15, 17; 20:19; 21:8; 22:8; 23:11, 14; 26:2; 29:16; 57:18; 63:8; 89:8; 97:19; 110:17; 112:22; 113:4; 120:16; 123:21; 124:7

**monitors** [16] - 21:25; 31:20; 42:21; 57:22; 58:8, 20; 74:4; 79:10; 88:5, 7, 15, 19, 23; 89:1; 102:18; 123:11

**Monitors** [3] - 22:1; 112:17; 114:3

**month** [7] - 98:5, 10; 99:1, 17; 100:3; 102:10, 12

**months** [16] - 8:3; 55:3; 98:10; 99:7; 100:11; 101:7, 10, 19, 22, 24; 103:14; 104:18; 117:2; 121:7; 122:5; 124:19

**Moore** [3] - 2:22, 25; 3:2

**morality** [1] - 85:25

**moreover** [2] - 19:14; 119:3

**morning** [4] - 16:25; 31:13; 33:7; 38:12

**mortality** [17] - 54:14; 55:9, 11, 19; 56:10, 16; 57:6; 60:15; 67:23; 68:10; 69:3; 70:12; 72:3; 73:19; 86:5; 87:9; 96:15

**most** [21] - 4:5; 5:2; 7:23; 33:12; 40:16, 22, 25; 41:9; 45:8; 49:2, 4; 57:2; 60:22; 61:2; 107:2, 11, 13; 109:10; 113:12; 114:16; 120:2

**motion** [39] - 3:7-9, 11-14, 16, 23; 4:1, 16; 5:17; 11:22; 16:17; 17:17; 32:11, 16; 44:7, 13; 45:4; 49:10; 52:2; 55:22; 58:18; 72:19, 24; 81:19; 82:10; 90:13; 96:10; 97:4, 7; 102:16, 25; 124:10

**motion's** [1] - 72:25

**motions** [7] - 2:6; 3:4; 6:2; 11:21; 73:2; 104:25; 105:2

**mouth** [1] - 94:15

**move** [6] - 44:7; 45:4; 54:7; 67:20; 74:3; 121:17

**moved** [1] - 36:14

**movement** [1] - 63:12

**moving** [1] - 7:13

**MR** [268] - 2:8, 14, 21, 24; 3:20, 24; 6:16; 7:3, 7; 9:13, 19, 23; 12:18; 13:17, 19, 21, 23; 14:3, 7, 10, 16; 15:2, 5, 7, 10; 16:1, 4, 7, 13; 20:20; 21:9, 12, 16;

22:3, 5, 18, 23; 23:6, 8, 19, 24; 24:12, 20, 23; 25:4, 6, 9; 26:13; 27:4; 28:8, 23; 29:6, 11, 25; 30:22; 31:4, 6; 34:13; 44:12; 46:3, 7; 48:4, 7, 18, 24; 49:1, 24; 50:2, 7, 11, 16, 18, 22, 25; 51:3, 14-15, 20, 22; 52:5, 10, 12, 19; 53:5, 7, 11; 54:9, 23; 55:1; 58:3; 59:7; 62:5, 22, 25; 63:4, 17, 21, 24; 65:3, 6, 11, 14, 25; 66:2, 12, 25; 67:2, 12, 22; 68:6, 11, 22; 69:3, 24; 70:1, 3, 5, 8, 20; 71:14, 18; 72:12, 14, 21, 24; 73:7, 12; 74:2, 7, 21; 75:2, 8, 16, 25; 76:3, 7, 14-15, 19, 22; 77:1, 5, 9, 21, 25; 78:15; 79:12, 15, 20, 24; 80:2, 6, 20; 81:2, 4; 82:2, 4, 7, 15, 17, 25; 83:2, 5, 8, 10, 19-20, 24; 84:1, 4; 85:5, 7, 12; 86:3, 20; 88:4; 89:5, 14, 19, 22, 24; 90:7, 9, 12, 17, 25; 91:5, 25; 92:24; 93:3, 6, 8, 10, 12, 17; 95:2, 10, 20, 23; 96:5, 8; 97:25; 98:3, 25; 99:5; 100:8, 10, 16; 101:3, 11, 18; 102:2, 14; 103:2, 5, 19, 22; 104:13, 22; 105:4, 9, 15, 17, 21; 106:1, 3, 5, 17; 108:24; 109:9, 14, 16, 19; 111:11; 112:4, 7; 114:23; 115:7;

116:7, 15, 21; 117:1, 11, 21; 118:7, 11, 13; 120:18, 24; 122:3, 19, 22; 123:9, 19, 25; 124:16, 18, 21; 125:6, 25; 126:2, 6, 10, 12, 17

**MS** [38] - 2:11, 17; 3:1; 31:8, 10; 33:5, 23; 34:15; 35:19; 36:6, 21; 37:6; 38:6, 25; 39:8, 16, 19, 22, 24; 40:3, 9, 12, 21, 24; 41:5, 20; 42:13, 24; 43:4, 12, 21; 44:4, 9; 115:19, 22; 116:10; 125:7; 126:7

**MULLALLY** [4] - 115:19, 22; 116:10; 125:7

**Mullally** [17] - 46:18, 21; 47:2, 12, 19; 48:10; 51:4; 52:20; 62:7; 65:9; 68:15; 80:25; 115:19; 116:10, 12; 125:6

**Mullally's** [2] - 64:12; 73:18

**multibillion** [1] - 56:22

**multibillion- dollar** [1] - 56:22

**multiple** [9] - 10:13; 13:21; 14:25; 27:6; 41:25; 73:1; 108:9; 119:6; 120:18

**multiply** [1] - 72:18

**must** [7] - 4:7; 6:21; 21:16; 37:10; 38:1; 114:19

**mystery** [1] - 29:6

**name** [3] - 61:7; 84:2; 116:8

**narrative** [1] - 28:3

**narrow** [1] - 42:11

**narrowed** [1] - 49:20

Motions Hearing 12/20/2024

**narrowly** [2] - 42:11; 95:20
**National** [1] - 2:9
**near** [4] - 16:6; 115:16; 125:1, 4
**nearly** [2] - 72:6; 87:23
**necessarily** [6] - 11:23; 63:5; 68:19; 69:13; 91:15; 114:10
**necessary** [13] - 4:12; 25:21; 35:4; 38:23; 41:19, 21; 42:2; 44:1; 57:9; 87:16; 91:13; 108:5; 112:22
**necessities** [1] - 107:25
**necessity** [1] - 41:4
**need** [38] - 7:17; 18:21; 20:13; 34:4, 9; 36:4; 41:2; 43:15, 17; 54:19; 58:23; 60:10; 61:23; 66:4; 72:7; 84:25; 85:22; 87:3; 88:5, 14; 89:24; 90:1; 91:10, 14, 16; 96:1; 98:15, 19; 100:1, 5; 110:21; 114:13, 25; 124:4, 8
**needed** [1] - 49:4
**needs** [13] - 9:11; 19:19; 30:5, 13; 33:22, 25; 34:1, 7; 71:25; 108:3; 115:23; 116:2; 121:20
**neutral** [3] - 21:1, 3; 111:20
**neutrality** [1] - 21:4
**never** [21] - 6:7; 8:9, 14; 12:8; 18:8; 20:15; 43:5; 62:7; 64:10; 67:2, 5, 7; 77:15; 92:1, 11; 93:18; 108:1; 111:5; 121:2
**nevertheless** [1] - 12:8
**new** [9] - 20:7;

38:16; 57:9; 72:20; 87:13, 22; 112:20; 114:20; 118:21
**New** [1] - 112:19
**next** [8] - 54:9; 55:8; 56:20; 63:3; 92:6; 102:2; 104:14; 123:10
**nice** [1] - 110:13
**night** [1] - 65:16
**nine** [1] - 55:3
**nobody** [1] - 51:23
**nominated** [1] - 106:22
**nominations** [1] - 105:14
**nominees** [3] - 111:25; 113:13; 114:2
**noncompliance** [3] - 8:10, 15; 118:25
**none** [6] - 19:8; 26:4; 27:18; 44:16, 19; 111:25
**nonissue** [1] - 69:1
**nonofficial** [1] - 93:7
**normal** [2] - 89:21; 123:6
**Northern** [1] - 22:13
**notation** [3] - 14:19; 63:1
**notations** [10] - 62:15-17; 63:4; 82:18; 83:10; 84:4, 16; 89:12; 90:5
**note** [13] - 14:17; 34:15, 21; 37:17; 42:13; 48:24; 56:7; 65:1, 19; 67:13; 94:15, 17
**notebook** [1] - 67:6
**noted** [9] - 31:23; 39:3, 9, 11; 40:16; 41:22, 24; 42:14; 97:14
**notes** [47] - 9:15; 14:11; 30:24; 35:2, 4-5, 10, 16, 25; 36:7;

40:13; 41:7, 10; 42:16; 46:11, 23; 51:9; 52:15; 59:24; 64:2, 14, 22-23; 65:12, 18, 21; 66:21; 67:5, 17; 73:20; 79:22; 81:1; 87:3; 92:8, 21; 93:9, 15, 17; 94:1, 19; 106:12
**noteworthy** [1] - 20:25
**nothing** [11] - 6:9, 18-19, 21; 7:20; 18:12; 23:16; 55:7; 58:4; 62:8; 126:10
**nothing's** [1] - 81:10
**notice** [3] - 45:1; 120:25; 121:10
**notifies** [1] - 11:19
**noting** [1] - 41:11
**notion** [1] - 38:22
**novel** [2] - 84:8, 13
**November** [9] - 5:11; 15:8, 13; 16:10; 18:6; 40:19; 58:14; 112:24; 122:22
**now-deceased** [1] - 70:24
**nowhere** [2] - 29:1; 122:11
**nullify** [1] - 78:14
**Number** [9] - 2:4; 14:24; 18:24; 81:25; 83:8, 22; 105:13; 114:9
**number** [12] - 4:18; 6:7; 32:10; 39:7; 59:15; 63:5; 76:12; 83:21; 86:11; 92:10; 108:6; 118:16
**numbers** [4] - 81:5; 82:22; 83:6
**nurse** [5] - 27:14; 35:7; 36:10; 110:3
**nurse's** [3] - 14:11; 30:23; 35:5
**nurses** [4] - 30:9, 15; 59:25; 110:4

**nursing** [16] - 9:15; 13:22; 14:8; 35:2, 4-5, 10, 16, 25; 36:6, 8; 41:7, 10; 42:16; 110:1
**object** [7] - 68:21; 87:6, 10-11; 91:5; 110:23
**objected** [1] - 118:19
**objection** [11] - 3:18; 57:7; 86:17; 90:7; 91:24; 94:23; 95:22-24; 122:24
**obligated** [3] - 34:10; 98:11; 102:12
**obligates** [1] - 96:18
**obligation** [10] - 47:14; 76:18; 77:8; 79:9; 88:10, 14, 20; 96:1, 25
**observations** [1] - 35:6
**observed** [3] - 35:7; 88:9
**observes** [1] - 36:11
**observing** [1] - 9:10
**obsolete** [1] - 20:9
**obstructive** [1] - 60:12
**obtained** [1] - 26:23
**obviously** [4] - 52:14; 60:23; 91:12; 96:2
**occasion** [1] - 62:14
**occasions** [1] - 61:13
**Occupation** [1] - 69:21
**occupation** [3] - 70:1, 3
**occupies** [1] - 85:16
**occurred** [4] - 5:12; 25:5; 28:10; 55:12
**occurring** [1] - 10:7
**occurs** [2] -

11:20; 21:22
**October** [6] - 16:10; 39:10; 47:3; 58:13; 122:22
**odd** [1] - 17:18
**Offender** [1] - 28:17
**offer** [1] - 104:13
**offered** [8] - 16:24; 17:11; 39:5; 40:15; 46:12; 84:5
**offhand** [1] - 75:15
**office** [3] - 61:18; 73:18; 125:15
**officer** [6] - 19:10; 27:13; 46:17, 24; 62:14; 94:19
**officers** [5] - 27:19; 51:11; 52:15; 61:14; 94:16
**official** [4] - 64:10; 67:3; 69:17; 81:8
**old** [1] - 59:15
**once** [8] - 18:8; 55:16, 21; 58:15; 85:21; 117:15; 122:9, 11
**one** [59] - 4:18; 5:2, 18; 6:7, 19; 8:6; 9:8, 25; 18:17, 25; 21:20; 24:24; 25:11, 19; 28:8, 10, 16; 33:16; 39:15, 18; 41:11; 43:6; 60:20; 61:13; 62:16; 64:3; 70:23; 75:19; 76:11, 18; 77:7, 10, 25; 78:14; 82:14; 85:4, 14; 88:10; 93:2; 94:5, 19; 99:1, 6, 22; 100:15; 101:5; 105:12; 108:7; 109:11, 13; 111:17; 115:10; 118:16; 121:14; 122:23; 125:16
**one-time** [1] - 99:6
**one-way** [3] -

76:18; 77:7; 88:10
**ones** [2] - 19:18; 53:3
**ongoing** [2] - 43:21; 62:10
**operate** [1] - 110:15
**operation** [3] - 27:21; 107:10
**operations** [1] - 55:13
**opinion** [4] - 23:16; 71:25; 72:2; 87:5
**opportunity** [11] - 59:13; 92:5; 95:3; 102:7; 103:1; 104:9, 11; 112:8; 117:19; 124:15
**opposing** [2] - 58:5; 59:8
**opposition** [3] - 3:9; 52:23; 58:18
**order** [101] - 3:13, 19, 23; 4:13; 11:22, 25; 12:4; 18:23; 19:1, 23; 25:15; 29:18; 31:12; 32:12, 18, 23; 33:1; 41:16, 18, 21; 42:2, 4, 11, 22; 43:3, 15, 17; 44:1; 49:19; 52:3; 53:2; 54:2; 55:16, 21; 57:9, 24; 58:25; 66:5; 70:11; 71:10, 21; 72:5, 9-10, 15, 20; 73:10, 22; 84:25; 85:22; 86:23; 87:1, 7-8, 10, 12, 14-15, 17-18; 88:1, 14; 89:24; 90:14, 18; 91:20; 92:1, 10; 95:2, 8, 16; 97:3, 7; 98:14, 18; 99:5; 101:22, 24; 102:19; 113:10; 114:13, 19, 23; 115:2, 8, 14; 116:16, 22; 117:5, 7, 11; 126:16

Motions Hearing 12/20/2024

**ordered** [4] - 94:24; 98:15; 117:2
**ordering** [1] - 104:9
**orders** [4] - 12:3; 29:19, 21
**orient** [1] - 115:15
**orientation** [1] - 4:5
**originally** [1] - 8:2
**otherwise** [3] - 12:3; 67:20; 91:4
**ought** [1] - 95:21
**ourselves** [2] - 117:16; 122:8
**out-of-cell** [140] - 6:20, 22, 25; 7:21; 8:19, 23, 25; 9:2, 6, 9, 17; 10:4, 6-7, 14; 11:23; 12:9; 13:9, 15; 14:12, 21; 16:18, 24; 17:1, 6, 11, 19, 25; 18:11, 14, 25; 19:2, 25; 24:22; 25:1, 13, 16; 26:22; 27:1, 15; 29:13, 24; 30:16, 24; 32:3, 8, 15; 33:10, 15, 21; 35:1; 36:1, 3-4, 9, 13, 17, 23; 37:4, 24; 38:2, 5, 10, 23; 39:5, 12; 40:4, 15, 17, 24; 41:2, 8, 10, 17; 42:12, 18; 43:11-13; 45:11, 17; 46:6, 10, 12, 14; 49:21; 50:1, 4, 9, 13, 18; 51:11; 53:14, 17-18, 24; 59:18; 61:10, 12; 63:6, 8, 15, 18; 64:6, 23-24; 66:5; 81:6, 22-23; 82:11, 19; 84:7, 17-18, 20; 85:2; 90:15; 91:1, 21; 93:5; 94:16, 25; 95:9; 97:11, 16, 22; 98:19; 99:20; 100:1; 102:22; 121:19
**outlined** [2] -

4:25; 23:13
**outset** [1] - 41:24
**outside** [2] - 45:19; 54:18
**outspoken** [1] - 10:19
**overall** [1] - 15:2
**overbroad** [1] - 41:16
**overdue** [1] - 124:19
**overlapping** [2] - 3:6
**overrules** [1] - 86:8
**oversee** [1] - 108:11
**own** [7] - 17:19; 34:17, 19; 37:24; 51:13; 64:1
**p.m** [2] - 2:2; 126:20
**pad** [1] - 67:5
**page** [6] - 16:8; 39:20; 40:1; 82:24; 83:21, 23
**Page** [11] - 16:11; 33:16; 40:8; 56:7; 81:5; 82:21; 105:13, 18; 106:4, 6; 113:3
**Pages** [1] - 54:1
**pages** [6] - 47:2; 66:17; 100:13, 19, 25
**paid** [2] - 23:10
**paper** [1] - 125:15
**papers** [1] - 9:15
**paragraph** [7] - 16:13; 31:19; 75:15, 22; 76:10
**Paragraph** [32] - 21:23; 31:14, 19; 34:18; 37:8; 38:3; 41:23; 45:22; 56:11; 58:6, 24; 68:1; 75:22; 76:9, 11; 77:2, 7, 24; 78:1, 19; 79:16; 81:24; 88:18, 22; 89:11, 17; 90:2; 96:18, 21; 115:3
**Paragraphs** [2] - 56:19; 57:10
**pardon** [1] - 53:5
**parents'** [1] -

27:11
**part** [18] - 7:23; 10:16; 14:8; 19:16; 27:4; 29:8; 39:6; 42:9; 48:6; 58:25; 65:7; 66:23; 69:4; 90:1; 94:18; 99:9
**parte** [9] - 26:10; 58:20; 75:23; 76:24; 78:24; 79:3; 88:20; 89:6; 90:5
**partial** [3] - 109:13; 113:2, 10
**particular** [15] - 7:3; 18:2; 28:9; 38:21; 62:13; 64:25; 68:11; 74:10; 94:20; 104:16; 107:5; 108:18; 113:10
**particularly** [7] - 4:23; 27:25; 30:2; 45:21; 54:15; 55:11; 92:4
**parties** [10] - 4:22; 15:16; 77:17; 88:18, 22; 97:6, 17; 111:22; 113:13; 122:23
**parties'** [3] - 29:8; 104:12; 105:11
**party** [8] - 3:18; 23:14; 44:20; 56:24; 73:25; 87:16; 88:22; 117:19
**passing** [1] - 65:15
**past** [5] - 11:5; 68:18; 86:15; 97:14; 123:11
**patience** [1] - 126:14
**patient** [17] - 10:4; 13:7; 24:19; 35:8, 12; 36:2, 13-14; 46:12; 53:16; 56:14; 57:6; 70:11; 85:9
**patient's** [1] - 37:14
**patients** [18] - 5:21; 6:14, 16; 14:18; 16:14,

23; 17:11, 25; 36:1; 37:4; 38:13; 45:9; 46:11; 52:13; 54:14; 59:23; 97:11; 104:2
**Pause** [1] - 73:9
**pay** [1] - 117:2
**payable** [2] - 125:11, 18
**paying** [1] - 66:6
**payment** [8] - 115:1; 124:18, 25; 125:1, 8, 12, 14
**peer** [2] - 69:9; 71:3
**pejorative** [1] - 17:3
**pellucidly** [1] - 89:25
**penalty** [3] - 80:12; 81:13; 85:20
**pending** [7] - 2:3; 3:4; 6:2; 73:1; 104:25; 105:2
**people** [28] - 13:13, 18; 17:2, 6, 8; 18:2; 20:17; 27:8, 24; 30:3, 5; 45:8, 13; 57:4, 13; 59:19; 64:17, 21; 66:6; 94:6; 107:3; 108:5; 109:23; 111:7; 121:18, 20
**people's** [5] - 9:11; 64:14; 65:12; 67:17; 92:20
**per** [3] - 17:12; 21:22; 101:6
**perfect** [3] - 25:19; 30:22, 25
**perform** [1] - 108:4
**performance** [2] - 106:13
**perhaps** [3] - 99:18; 118:8; 122:21
**period** [18] - 10:5; 15:5; 20:1; 33:13; 36:3; 38:17; 40:7; 43:17; 54:12; 98:5, 9-10; 99:2, 17; 100:3;

102:11; 116:5
**perjury** [3] - 80:12; 81:14; 85:20
**permission** [1] - 105:6
**perpetual** [1] - 113:4
**perpetually** [1] - 112:22
**person** [20] - 24:14; 28:10, 16; 30:7, 11; 57:5, 12; 83:12, 14; 84:6, 9-11; 85:15; 87:10; 88:24; 106:24; 110:12; 115:24
**person's** [2] - 82:12, 19
**personal** [11] - 64:2, 14; 67:5-7, 13, 17; 80:13; 92:8, 20; 94:2
**personally** [2] - 110:13; 114:13
**persons** [1] - 55:10
**perspective** [6] - 39:4; 72:2; 89:17; 108:8; 111:1; 118:6
**perspectives** [1] - 27:9
**pertained** [1] - 6:4
**pertaining** [1] - 57:16
**pertains** [2] - 37:7; 120:20
**philosophical** [1] - 78:18
**phone** [2] - 88:23; 101:16
**physician** [1] - 70:22
**pick** [1] - 125:20
**piece** [1] - 10:25
**pivot** [1] - 44:3
**place** [13] - 14:2; 15:10; 38:19; 41:21; 43:16; 44:24; 55:17; 71:5; 87:8; 100:15
**placeholder** [2] - 12:1, 5
**places** [4] - 9:18; 24:8, 10; 119:12
**plain** [3] - 58:23;

59:15; 96:17
**plain-old** [1] - 59:15
**plaintiff** [14] - 2:6, 9, 12, 18; 3:17; 25:8; 60:6; 65:23; 68:18; 76:18; 102:7, 11; 124:14; 125:12
**plaintiffs** [73] - 2:15; 3:10; 9:2; 12:25; 15:15, 19; 16:22; 17:4, 13, 15, 18; 18:18; 19:24; 20:19; 21:2, 18, 20; 22:16; 23:7, 10; 24:11, 13-14; 26:17, 21; 27:5, 17; 31:23; 32:2; 45:20; 58:8, 16; 60:19; 66:10; 70:20; 74:5, 15; 75:20; 76:3, 7, 24; 77:8, 11, 14, 21; 78:13; 79:10; 88:8, 12; 91:11, 16; 96:13, 20; 97:18, 23; 98:9, 17; 99:13; 101:16; 102:23; 106:8, 18; 108:2; 110:10; 112:12; 114:9; 117:22; 119:4; 121:4, 12; 122:24
**plaintiffs'** [47] - 4:20; 11:12, 19; 13:8; 15:21; 21:25; 22:1, 9, 20; 23:9; 25:24; 28:6; 31:20; 34:16; 42:20; 44:13; 51:9, 13, 17, 19; 57:23; 59:2, 12, 25; 60:13; 62:11; 68:7, 25; 70:16; 72:7; 73:15, 18; 74:9; 88:16; 91:6; 94:12; 95:4; 96:11; 97:9, 19; 103:1; 105:13; 107:24; 115:13; 117:3; 124:14; 125:21

Motions Hearing 12/20/2024

**plan** [6] - 11:9; 37:9, 13; 117:5
**plays** [1] - 5:15
**plead** [2] - 15:12; 29:14
**PLRA** [1] - 124:12
**Pod** [4] - 16:23; 17:8, 11; 18:1
**pods** [2] - 38:11, 13
**point** [23] - 5:20; 7:19; 8:10, 17; 22:15; 24:25; 28:20; 29:5; 33:10; 34:8; 38:5, 22; 43:18; 44:3; 48:3; 64:12; 65:18; 70:15, 17; 96:24; 99:7; 103:23; 125:20
**pointed** [12] - 3:25; 26:21; 34:16; 49:25; 55:17; 58:9; 74:12; 87:19; 88:17; 106:18; 112:22; 114:8
**points** [5] - 6:1; 15:24; 29:12; 67:19; 113:18
**policies** [1] - 64:8
**policy** [6] - 61:24; 69:8; 70:17; 71:4, 8
**populations** [1] - 38:9
**Porter** [1] - 37:17
**portion** [6] - 5:18; 16:6; 21:13; 39:20; 121:18
**position** [10] - 41:2; 42:7; 85:16; 110:7; 115:5; 117:16; 120:14; 122:9; 123:2
**positions** [1] - 105:25
**possesses** [2] - 106:9; 112:12
**possible** [4] - 100:11; 117:15; 122:25; 123:3
**post** [2] - 8:2; 34:23
**postdating** [1] - 86:12
**posture** [1] - 4:1
**potential** [1] -

75:19
**pounding** [1] - 60:6
**practice** [5] - 64:21; 70:18; 87:21; 107:20
**practices** [1] - 107:17
**practitioners** [1] - 7:11
**precept** [1] - 94:11
**predict** [1] - 118:15
**preexisting** [3] - 89:1, 7, 18
**prefatory** [1] - 44:15
**preference** [1] - 73:12
**preparation** [1] - 58:12
**prescribe** [1] - 22:16
**prescribed** [1] - 21:10
**present** [6] - 44:20; 60:1; 75:18; 80:12; 118:2
**presented** [8] - 33:3; 76:23; 80:17; 97:1; 99:12; 113:13; 114:16
**preservation** [11] - 46:22; 47:11, 18, 22; 49:20; 52:2; 53:2; 54:2; 91:24; 96:1
**preserve** [18] - 3:9, 13; 4:8; 11:22; 32:12; 46:19; 47:13, 15, 19; 52:20; 54:5; 65:5; 92:11, 20, 22; 94:25; 95:16
**preserved** [27] - 46:20; 47:13, 21-22; 48:10-12, 21; 49:6; 52:19, 21; 65:6; 80:5, 19-20, 23; 81:8, 18; 91:15; 92:2; 93:16, 24; 95:9; 96:1; 97:21
**preserving** [7] - 47:16; 48:7;

62:4; 91:20; 93:14; 95:1; 96:3
**pressure** [1] - 121:12
**pretty** [1] - 109:18
**previous** [2] - 3:13; 112:23
**previously** [7] - 19:5; 32:6, 13; 81:6; 90:23; 113:23; 121:7
**primarily** [1] - 103:19
**primary** [1] - 41:15
**principal** [1] - 115:23
**printed** [1] - 50:20
**Prison** [5] - 2:9; 17:5; 86:8, 12; 124:3
**prison** [6] - 5:24; 86:22; 106:9; 109:4; 111:16; 112:14
**private** [1] - 46:9
**privilege** [11] - 56:1, 3; 57:7; 68:19; 69:10, 19; 70:7; 71:4; 73:6; 85:25; 86:16
**privileged** [1] - 70:13
**privileges** [2] - 56:5; 86:13
**problem** [10] - 33:20; 38:5; 64:15; 71:24; 78:17, 19; 80:22; 90:3; 91:25; 120:24
**problems** [2] - 109:17, 25
**procedural** [1] - 4:1
**procedures** [1] - 64:8
**proceedings** [1] - 126:20
**Proceedings** [1] - 73:9
**process** [21] - 4:6, 25; 12:21; 15:18; 19:17; 25:10; 36:22, 24; 60:4; 64:4; 68:13; 69:4; 70:13; 71:12;

101:13; 115:11, 14, 18; 116:16; 123:4
**processed** [1] - 125:1
**produce** [50] - 24:16; 35:17, 23; 42:14-17; 47:9; 54:20; 55:8, 15, 19-20, 22; 56:8, 13, 15; 57:3, 5, 11, 13, 25; 58:1; 66:3; 67:15, 25; 68:24; 71:10, 13, 22; 77:3; 79:9; 81:15; 88:12, 20; 94:10; 96:19; 98:4, 11; 100:7; 101:7, 14, 25; 102:12, 20; 103:23
**produced** [29] - 24:11; 25:8; 26:8; 42:1; 43:23; 47:2, 17; 48:9; 51:18; 55:4; 66:23; 67:24; 71:21; 73:15; 74:4; 78:12; 79:10; 84:25; 85:23; 87:9, 24; 96:19; 97:21; 98:15, 20, 23
**producing** [7] - 9:3; 43:8; 52:1; 68:21; 103:6, 14
**product** [1] - 114:14
**production** [15] - 42:23; 47:8, 13; 48:13, 21; 74:6; 76:18; 77:8; 80:23; 81:9, 18; 96:25; 103:14; 104:8
**professionally** [1] - 110:14
**proffered** [1] - 103:16
**profit** [1] - 46:9
**progress** [4] - 14:11, 17; 40:18; 59:24
**prohibition** [1] - 74:22
**Project** [2] - 2:9; 17:5

**projected** [1] - 122:15
**promptly** [2] - 115:9; 125:10
**properly** [1] - 24:2
**proposal** [4] - 25:3; 86:17; 97:2; 123:17
**proposals** [3] - 117:20; 118:2
**propose** [2] - 73:16; 90:16
**proposed** [4] - 25:3; 88:2; 118:5; 123:14
**proposition** [2] - 56:2; 75:1
**prospectively** [1] - 57:25
**protected** [1] - 55:25
**protection** [2] - 72:7; 87:16
**protective** [23] - 55:16, 21; 57:9; 72:5, 9-10, 15, 20; 73:10; 87:1, 7-8, 10, 12, 14-15, 18; 88:1; 97:3, 7
**prove** [1] - 17:22
**provide** [25] - 6:13; 21:24; 22:5; 31:25; 32:8; 38:1; 55:5; 57:21; 58:20; 68:7; 69:10; 72:3, 6; 73:13; 74:14, 23; 75:23; 78:25; 79:16; 85:13; 88:19; 107:1; 110:4; 111:4; 120:12
**provided** [41] - 4:10; 26:8; 35:3; 36:24; 45:1; 53:15; 55:1, 5; 57:16, 20, 22-23; 58:8, 15-16; 59:1; 68:18; 70:24; 74:14; 76:3, 8, 17; 79:5; 85:3; 87:5; 88:5, 7, 15; 89:2, 9; 96:15; 97:8, 13; 102:18; 113:14
**provider** [3] - 46:9; 106:14;

111:15
**providing** [12] - 10:21; 13:7, 9; 14:19; 17:20; 76:24; 89:1; 104:2; 107:25; 111:22; 121:20
**provision** [15] - 5:2; 7:1; 19:3; 22:14; 25:22; 31:1; 37:2, 7; 58:9; 60:20; 73:20; 75:4, 14; 90:2
**provisional** [1] - 101:24
**provisions** [11] - 8:8; 37:18; 38:24; 45:3; 56:19; 75:19; 78:13; 91:6; 109:12; 113:9; 123:22
**psychiatrist** [5] - 25:23-25; 26:1; 66:7
**Public** [6] - 2:17; 12:13; 115:23; 116:3; 125:9
**Puisis** [1] - 118:20
**pull** [7] - 66:13, 20; 100:13; 104:1, 4; 105:11; 123:25
**pulled** [1] - 108:14
**punches** [1] - 124:1
**purpose** [5] - 2:6; 70:12; 94:4, 21
**purposes** [5] - 38:24; 90:6; 101:1; 102:22; 113:19
**pursuant** [3] - 45:2; 46:19; 69:8
**put** [9] - 11:11; 12:3; 30:16; 51:17; 78:11; 95:10; 102:8; 111:13; 118:5
**putting** [3] - 14:14; 20:3; 43:13
**qualifications** [1] - 108:5
**qualified** [3] - 113:12; 114:11,

Motions Hearing 12/20/2024

16
**qualify** [1] - 56:17
**quality** [3] -
107:12; 110:11
**quantity** [2] -
104:10
**questioning** [1] -
105:19
**questions** [8] -
24:5; 49:17;
54:6; 59:3; 67:8;
90:9; 97:15;
111:9
**quickly** [1] - 10:3
**quite** [1] - 41:9
**quo** [3] - 31:13;
32:16; 41:22
**quote** [1] - 46:22
**raise** [5] - 97:9,
25; 105:5;
116:25; 117:10
**raised** [3] - 3:16;
74:22; 98:6
**raises** [1] - 97:15
**raising** [1] - 118:1
**random** [2] -
53:19, 22
**range** [1] - 63:3
**ranging** [1] -
17:12
**rant** [1] - 64:20
**rated** [1] - 109:12
**rather** [1] - 123:16
**reach** [2] - 53:2;
119:15
**reached** [1] - 4:20
**reaches** [1] - 8:10
**reaching** [1] -
5:13
**read** [24] - 5:16;
8:5; 11:25; 12:4;
15:12, 22;
17:16; 20:23;
42:20; 51:3;
58:24; 60:18;
62:6; 69:20;
77:12; 78:14;
81:25; 88:6;
96:20
**read-only** [1] -
42:20
**reading** [8] -
39:17, 21; 40:2;
83:16; 89:16;
96:21; 112:23
**ready** [1] - 41:13
**real** [3] - 79:8;
107:7; 108:8
**realistic** [1] -
123:13

**really** [24] - 4:15,
17; 5:17, 25;
6:1, 5; 8:6;
11:24; 17:17;
20:22; 26:6;
28:21; 30:16;
43:14; 61:9;
62:5, 8; 78:4;
80:4; 99:20, 24;
100:1; 108:10;
110:12
**realm** [1] - 107:20
**reason** [11] - 3:18;
62:11; 63:19;
80:15; 95:12;
97:20; 99:9;
111:8, 25;
114:17; 123:16
**reasonable** [8] -
21:24; 22:2;
31:24; 39:14;
40:6; 95:25;
96:7
**reasonably** [1] -
31:20
**reasons** [1] -
118:16
**receive** [7] - 5:22;
6:17, 21; 45:10;
68:17; 78:24;
109:23
**received** [13] -
9:3; 16:9; 20:23;
35:16; 47:15;
55:3; 58:10, 17;
68:14, 22;
111:21; 117:6;
125:19
**receiving** [4] -
9:6; 17:25;
38:14; 53:16
**recent** [9] - 4:24;
33:12; 40:16,
22, 25; 41:9;
49:2, 4; 109:10
**recently** [2] -
28:15; 111:6
**recognized** [1] -
5:2
**recollections** [1] -
27:9
**recommendatio
n** [1] - 6:12
**recommended** [2]
- 25:12; 112:19
**record** [22] - 2:7;
6:22; 9:16; 14:1,
3; 27:23; 38:22;
42:21; 49:3;
51:18; 61:10-12;

64:5, 10; 67:4;
80:8; 97:10;
99:25; 115:8;
116:9; 126:7
**recordation** [2] -
97:10; 100:1
**recorded** [5] -
9:18, 21; 10:6;
24:10; 116:9
**recording** [4] -
13:15; 24:6;
27:6; 91:21
**records** [47] -
9:22; 14:16;
19:5; 21:25;
22:1, 10; 23:25;
24:13, 17-18,
21; 31:15, 21,
25; 32:5; 54:9,
12; 56:9, 11-12,
15, 17; 58:7;
61:9; 67:24;
68:3, 8; 69:6;
70:11; 76:16;
81:5, 7, 11;
88:6, 11; 89:20;
90:23; 93:5;
96:14, 23;
102:17; 118:22
**red** [1] - 76:3
**red-line** [1] - 76:3
**redact** [3] - 75:9,
12
**redacted** [1] -
47:5
**refer** [3] - 59:19;
84:8, 16
**referred** [1] -
50:25
**referring** [13] -
16:5; 50:4, 14;
51:7; 65:9, 11;
75:6, 15; 80:24;
82:1; 84:6; 93:9
**refers** [4] - 37:8;
63:5; 75:6; 93:4
**reflect** [2] - 92:22;
102:19
**reflected** [1] -
4:21
**Reform** [3] - 86:8,
12; 124:3
**reform** [2] -
107:15; 111:14
**reformed** [2] -
108:2
**reforms** [1] -
38:16
**refusal** [1] - 55:5
**refuse** [3] - 55:22;

57:3, 13
**refused** [5] -
55:18; 83:11,
13; 84:5, 10
**refusing** [2] -
54:20; 55:8
**regard** [2] - 56:21;
118:15
**regarding** [2] -
41:25; 54:10
**regards** [1] -
116:19
**registered** [1] -
110:3
**regular** [1] - 43:8
**reimbursement**
[2] - 93:22, 24
**reinstituted** [1] -
12:8
**relate** [5] - 6:3;
18:24; 19:2;
27:21; 31:2
**related** [4] - 40:3;
64:6; 92:15
**relates** [4] - 5:19;
67:13; 106:18;
118:18
**relationships** [1] -
5:7
**relatively** [2] -
38:16; 113:20
**released** [1] - 6:8
**relevance** [4] -
99:19; 102:21;
103:10, 18
**relevant** [7] -
16:6; 21:13;
23:3, 22; 46:19;
96:24; 97:12
**reliable** [2] -
111:20, 23
**relied** [2] - 33:14,
17
**relief** [2] - 124:9,
11
**relies** [1] - 33:9
**remain** [4] -
36:15; 41:21;
56:18; 117:17
**remainder** [1] -
113:11
**remember** [3] -
11:20; 15:14;
18:5
**reminder** [2] -
11:20; 27:16
**reminding** [1] -
47:14
**reminds** [2] -
64:18

**remote** [1] - 42:20
**remove** [2] - 47:5;
58:24
**renders** [1] - 75:3
**repeat** [2] - 40:2;
48:3
**repeated** [2] -
16:16; 17:23
**repeatedly** [3] -
33:8; 45:16;
74:13
**replace** [1] -
16:20
**replaced** [1] -
30:13
**replete** [1] -
121:21
**reply** [2] - 49:19;
124:15
**report** [49] - 8:3-5,
8, 12; 15:13, 19;
16:2, 6, 10;
18:5; 20:4, 15;
31:1; 33:12, 16;
39:2, 10; 40:11,
19, 22, 25;
44:25; 45:2, 14;
53:10; 60:9;
76:4; 89:13;
90:4; 107:18;
109:10; 110:9;
112:23; 116:18;
119:6, 14;
120:6, 17;
121:21, 23;
122:17, 25;
123:7, 24
**reported** [2] -
17:11; 94:15
**reports** [25] -
5:17; 17:23;
18:9; 24:3;
31:18; 33:12;
37:25; 39:9;
40:16; 45:16;
54:13; 55:2-4;
68:9; 81:22;
91:18, 22;
97:14, 18;
111:8, 23;
120:11; 122:19
**represent** [3] -
15:14; 25:14
**representation**
[1] - 81:17
**representations**
[1] - 51:10
**represents** [1] -
99:23
**request** [19] -

9:21; 19:16;
21:24; 29:14;
32:22; 34:19;
43:23; 55:24;
56:15; 65:24;
68:3, 8; 69:5;
70:20; 72:20;
82:5; 86:5;
95:17; 99:6
**requested** [15] -
19:24; 32:4;
35:13, 15;
46:22; 47:12,
18, 22; 48:10;
54:10, 12;
57:22; 58:15;
76:7; 87:20
**requesting** [2] -
46:18; 103:6
**requests** [2] -
31:24; 56:21
**require** [3] - 97:6;
123:22; 124:12
**required** [9] -
31:17; 37:19;
56:8, 13-14;
75:20; 107:1;
114:21; 115:11
**requirement** [1] -
6:10
**requirements** [4]
- 24:1; 31:15;
38:3; 111:18
**requires** [8] -
7:20; 19:3;
25:18; 27:3;
31:12, 14; 58:5;
96:22
**requiring** [1] -
32:12
**reserve** [1] -
102:24
**reserving** [1] -
59:4
**resettled** [1] - 6:9
**resolution** [1] -
102:16
**resolve** [1] - 94:9
**resolved** [2] -
43:20; 105:3
**resources** [1] -
111:3
**respect** [5] - 57:4;
68:11; 105:19;
106:16; 123:22
**respectfully** [1] -
121:10
**respective** [1] -
31:22
**respectively** [1] -

112:17
**respects** [1] - 3:8
**respond** [15] - 52:25; 59:4; 80:9; 81:12, 20-21; 86:5; 101:16; 102:9, 23; 104:9; 111:10; 112:4; 118:3; 123:17
**responded** [7] - 32:23; 33:1; 46:21; 47:11; 52:23; 58:4; 76:8
**responding** [2] - 56:20; 94:11
**response** [19] - 26:24; 32:4; 47:15; 49:9; 55:2, 21, 24; 58:10, 17; 80:10; 82:10; 90:4; 101:3; 102:13; 105:13; 117:6; 122:2; 124:14
**responses** [1] - 67:15
**responsibilities** [1] - 31:22
**responsibility** [3] - 20:18; 31:23; 34:3
**responsive** [1] - 103:24
**rest** [1] - 49:17
**restart** [1] - 12:21
**restrict** [1] - 37:13
**resumé** [2] - 105:24; 106:11
**retain** [3] - 21:15; 64:14
**retained** [2] - 94:11; 101:12
**retention** [1] - 6:3
**revealing** [1] - 57:2
**review** [22] - 34:19; 40:24; 54:18; 57:6; 60:15; 67:23; 69:4, 8-9; 70:10, 12, 21, 23; 71:3; 72:4; 73:8, 19, 23; 103:1; 104:11; 114:4; 118:22
**reviewed** [6] - 18:13; 33:14;

54:17; 105:11; 114:14; 120:22
**reviewing** [2] - 26:2; 70:10
**reviews** [12] - 55:9, 11, 19; 56:10, 16; 68:10; 69:4; 73:19; 85:25; 86:6; 87:9; 96:15
**revisit** [1] - 101:23
**risk** [2] - 39:13; 40:5
**RNs** [1] - 110:2
**role** [12] - 20:10, 21; 21:4; 22:16; 23:9, 13; 26:6; 107:8; 108:4; 111:25; 114:1, 12
**roles** [2] - 21:7; 107:6
**room** [1] - 60:2
**roster** [1] - 24:15
**rounds** [1] - 35:6
**route** [1] - 87:13
**routine** [2] - 4:8; 86:24
**Rule** [4] - 32:18; 33:4; 87:18; 88:4
**rule's** [1] - 32:20
**rules** [1] - 78:23
**ruling** [4] - 102:18, 24; 103:7; 125:8
**run** [3] - 5:23; 6:4; 60:21
**safe** [1] - 71:6
**Safety** [2] - 12:13; 115:24
**salient** [1] - 15:24
**sampling** [4] - 98:21; 99:21; 100:3; 101:1
**sanctioned** [1] - 48:1
**sat** [1] - 28:18
**satisfactory** [1] - 36:4
**satisfied** [2] - 99:22; 100:2
**satisfy** [4] - 12:25; 99:15, 17; 104:20
**saw** [3] - 69:5; 110:8
**scenario** [3] - 35:23; 76:23;

95:7
**scenarios** [2] - 63:5; 70:23
**schedule** [3] - 23:10; 101:21; 123:20
**scheduled** [3] - 115:13; 120:8; 123:11
**scope** [4] - 35:4; 36:8; 43:5; 108:21
**scrap** [1] - 20:8
**search** [1] - 104:5
**season** [1] - 126:15
**seat** [1] - 67:16
**second** [6] - 9:12; 16:13, 24; 21:23; 56:8; 83:22
**secondly** [1] - 44:24
**section** [7] - 8:6-8; 51:10; 69:20, 25; 120:21
**sections** [2] - 8:9; 120:19
**see** [21] - 8:6; 9:5; 10:4; 13:8; 24:23; 35:19; 52:8; 68:18, 25; 72:4; 83:10, 13; 92:4; 94:7; 96:23; 97:11; 101:4; 103:12; 123:23
**seeing** [1] - 68:3
**seek** [1] - 87:17
**seeking** [2] - 32:12; 96:13
**seem** [3] - 38:11; 59:12; 97:17
**segregated** [1] - 104:4
**segregation** [2] - 39:4; 40:14
**selecting** [1] - 106:20
**self** [2] - 18:4; 70:10
**self-critical** [1] - 70:10
**self-injurious** [1] - 18:4
**send** [4] - 13:2; 75:12; 79:1; 125:21
**sensational** [1] -

18:17
**sensationalism** [1] - 16:18
**sense** [9] - 3:15; 44:2; 47:4; 50:10; 71:4; 84:5, 7; 100:7; 119:5
**sensitive** [1] - 66:8
**sensitivity** [1] - 96:25
**sent** [7] - 47:7, 14; 61:17, 19; 78:5; 125:13
**sentence** [4] - 16:24; 21:23; 76:14; 106:7
**separate** [3] - 50:25; 69:7; 93:11
**sequence** [2] - 47:23; 122:24
**Sergeant** [6] - 46:16; 62:16; 67:14; 85:15
**serious** [2] - 30:3; 121:20
**seriously** [2] - 45:8; 66:5
**served** [1] - 113:14
**services** [2] - 4:9; 113:15
**serving** [3] - 108:22; 113:20; 114:3
**set** [20] - 21:2; 45:3, 22; 57:9; 68:11; 73:17; 78:16; 84:14; 92:7; 94:10; 98:23; 107:14; 115:16; 117:7, 13; 119:22; 122:5; 123:20; 125:23
**sets** [5] - 27:23; 45:5; 66:14; 110:25
**setting** [5] - 70:21; 101:7; 106:10; 112:9, 14
**settings** [1] - 108:7
**settle** [1] - 4:22
**settled** [1] - 6:8
**settlement** [7] - 6:17; 31:16;

34:20; 96:18; 107:19; 109:21; 117:14
**Settlement** [52] - 5:1; 6:7, 9, 15, 18-19, 21; 7:4; 8:9, 16; 19:6, 9; 21:10, 14; 22:16, 22; 23:5, 8; 24:1; 29:2; 31:2, 14, 22; 32:7, 14; 34:18; 37:3, 6, 19; 38:3, 24; 41:23; 42:5; 43:16, 19; 45:3, 19, 22; 58:4; 60:17; 69:6; 75:1; 90:23; 107:1; 111:19; 114:21; 115:3; 116:23; 117:12, 16
**several** [1] - 3:4
**shall** [8] - 21:24; 25:15; 58:8; 76:17; 88:7, 19; 90:22; 91:1
**share** [2] - 73:14, 24
**shared** [1] - 20:19
**sheet** [40] - 50:14, 25; 51:1, 18; 53:4, 6-7, 10, 15, 17, 23; 60:21, 23-24; 61:8, 11, 15; 62:15, 18; 65:2, 4; 81:22; 85:2, 10; 91:17, 22; 93:13-15, 18; 94:2-4; 101:6
**sheets** [74] - 45:6, 25; 46:5, 10, 20, 23; 47:3, 9, 17, 20-21; 51:7, 9; 53:12; 54:4; 60:14; 61:14, 21; 62:1, 8-9; 64:3, 14; 65:7, 14, 18; 66:1, 3, 10, 15; 67:3, 16, 20; 80:5, 18, 20; 82:1, 11; 84:21; 85:22; 91:24; 92:7, 22; 93:11; 94:7, 25; 95:8, 11, 13, 16, 18; 96:14; 97:8, 21; 98:4, 11, 14, 21, 23-24; 99:18,

20-21, 24; 100:5; 101:14; 102:13, 19, 21, 25; 103:8; 104:4, 10
**shield** [1] - 78:1
**shift** [4] - 46:24; 98:4; 104:6
**shifts** [3] - 17:13; 27:7; 100:18
**shining** [1] - 110:16
**ships** [1] - 65:15
**short** [3] - 3:10; 41:14; 95:6
**short-circuit** [1] - 41:14
**shorter** [1] - 116:5
**show** [11] - 4:13; 60:8; 72:8; 81:22; 82:11, 19; 84:20; 87:4; 94:10
**showing** [4] - 49:16; 52:15; 53:14, 23
**shown** [3] - 24:12; 46:15; 94:2
**shows** [7] - 47:23; 53:16, 18, 24; 85:10; 113:15
**shredded** [1] - 61:20
**shrinking** [1] - 122:4
**shroud** [1] - 70:25
**sic** [1] - 33:7
**side** [11] - 43:14; 53:25; 84:18; 92:4; 99:11; 111:17; 120:15; 123:23
**side-by-side** [1] - 53:25
**sides** [1] - 88:24
**sign** [2] - 114:25; 116:4
**signed** [3] - 78:21; 81:4, 9
**significant** [4] - 39:12; 40:5; 80:9, 22
**silent** [1] - 67:9
**similar** [3] - 22:14; 40:10, 12
**simple** [3] - 9:5; 114:20, 23
**simply** [12] - 13:8; 18:13, 17; 19:24; 20:1;

Motions Hearing 12/20/2024

34:23; 36:16; 52:24; 86:13; 95:2; 108:15; 117:14
**simultaneous** [3] - 118:7; 123:14, 16
**simultaneously** [1] - 58:1
**single** [11] - 10:10; 12:9; 61:17; 63:7; 66:16; 74:14, 23; 94:14; 109:5
**sink** [1] - 30:12
**sit** [1] - 74:13
**site** [10] - 22:4; 51:16; 62:10; 94:13; 115:16; 120:6-8; 123:6, 10
**sitting** [4] - 8:18; 35:9; 36:12; 110:24
**situation** [1] - 42:8
**situations** [1] - 28:24
**six** [9] - 8:3; 22:8; 61:13; 66:14; 98:5; 100:18, 20, 22; 116:3
**six-month** [1] - 98:5
**size** [2] - 107:10; 108:21
**skill** [2] - 107:14; 111:14
**skip** [4] - 34:6; 66:9; 83:17; 86:15
**sleeping** [1] - 35:8
**slept** [1] - 27:12
**slightly** [1] - 78:11
**small** [1] - 113:10
**smaller** [2] - 101:1; 104:19
**SOAP** [1] - 14:17
**solely** [2] - 21:21; 103:17
**solitary** [3] - 17:3, 7; 37:15
**someone** [7] - 7:8; 28:17; 36:11; 71:25; 80:12; 107:5; 108:7
**sometimes** [4] -

45:9; 68:14; 111:21; 123:11
**somewhat** [2] - 3:9; 60:5
**somewhere** [1] - 30:21
**soon** [10] - 36:13; 68:24; 115:8, 12; 116:16; 117:15; 121:5; 122:25; 123:3; 126:16
**sorry** [21] - 16:3; 36:19; 39:7, 15-16; 48:2; 49:22; 50:2, 7; 52:6; 56:10; 70:3, 5; 82:3; 83:20; 102:11; 103:2; 106:1; 115:19; 116:13; 126:3
**sort** [8] - 35:22; 53:19; 89:12, 21; 95:7; 104:18
**soul** [1] - 29:20
**sound** [2] - 79:8; 98:7
**sounds** [12] - 33:19, 24; 34:2; 41:17; 48:16; 54:21; 71:13; 91:23; 96:3; 98:17; 99:25; 109:18
**source** [3] - 18:19; 45:20; 70:6
**sources** [1] - 33:16
**space** [1] - 71:9
**span** [2] - 98:12, 14
**spanning** [1] - 47:3
**speaking** [2] - 105:16; 117:21
**speaks** [2] - 21:14; 42:23
**special** [1] - 56:12
**specific** [4] - 23:10; 42:10; 56:1, 25
**specifically** [8] - 3:7; 33:15; 47:12; 54:24; 68:9; 87:15; 96:13; 123:1
**specificity** [2] - 42:9; 125:4

**specify** [1] - 99:1
**speculated** [1] - 53:20
**speculative** [1] - 95:7
**speed** [1] - 104:17
**spend** [1] - 8:11
**spending** [5] - 10:18; 28:25; 29:2; 35:12; 36:2
**spent** [3] - 36:1; 37:4; 41:9
**spite** [1] - 125:8
**spoken** [1] - 20:11
**spoliation** [20] - 47:25; 48:14, 25; 49:10, 13-15, 17-18; 52:22, 24; 54:6; 59:10; 80:4, 9, 19, 21; 81:19; 84:25; 92:16
**sponte** [1] - 56:14
**spreadsheet** [3] - 14:21; 50:20
**St** [4] - 109:5, 23, 25; 110:19
**stack** [1] - 100:17
**stacked** [1] - 100:19
**stacks** [5] - 66:16; 100:20, 22
**staff** [27] - 6:10; 10:8, 17; 13:22; 14:4, 25; 15:2; 18:16; 24:25; 28:12; 44:19; 46:12; 61:2, 18; 81:7; 93:5; 104:1; 106:25; 107:2; 108:13, 16; 109:22; 110:1, 20
**staffed** [1] - 5:23
**staffing** [1] - 110:3
**stage** [1] - 20:13
**standard** [1] - 32:22
**standards** [1] - 118:23
**standpoint** [1] - 70:10
**stands** [3] - 5:19; 102:18; 116:19
**Stanford** [1] - 17:5
**start** [9] - 3:15;

4:4, 17; 60:14; 93:1; 95:15; 98:6; 104:16; 114:22
**started** [2] - 29:5; 92:17
**starting** [2] - 74:8; 116:13
**starts** [1] - 106:6
**state** [3] - 56:22; 114:19; 116:8
**State** [37] - 2:22, 25; 3:2; 4:6, 23; 5:12; 7:14; 14:23; 20:14; 27:21; 41:6; 56:5; 69:10, 14, 16-18; 70:6; 77:14, 18; 81:6; 86:13; 105:12; 114:25; 115:20; 118:14; 119:5; 120:1; 124:5, 22; 125:3, 7
**State's** [5] - 10:24; 46:8; 58:18; 60:7; 114:2
**statement** [7] - 40:11, 13; 64:12; 68:19; 74:22; 84:23; 112:10
**statements** [3] - 28:12; 44:22; 112:14
**States** [1] - 93:23
**statewide** [6] - 108:9, 16-17, 20; 113:17
**station** [1] - 10:10
**status** [5] - 31:13; 32:16; 41:22; 68:16; 116:18
**statute** [5] - 69:9; 70:9; 73:5; 86:1, 7
**stay** [2] - 38:19; 101:10
**stem** [1] - 107:11
**steno** [1] - 67:4
**step** [1] - 20:12
**steps** [1] - 31:17
**stern** [1] - 107:11
**sticky** [1] - 65:21
**still** [20] - 15:10; 25:9; 38:8, 13; 41:21; 43:16; 48:25; 55:4, 18; 58:11, 22;

61:21; 68:12, 16; 71:19; 88:13; 89:25; 113:24
**stop** [4] - 9:12; 11:9, 18; 51:25
**stopped** [4] - 15:4; 33:14; 48:20, 23
**store** [1] - 93:21
**straightforward** [1] - 48:14
**strenuously** [2] - 87:6, 11
**strides** [2] - 4:24
**strong** [1] - 123:19
**strongly** [2] - 29:14; 106:21
**struggle** [1] - 72:25
**struggling** [1] - 107:24
**stuck** [2] - 62:13; 79:3
**studied** [1] - 5:17
**stuff** [4] - 14:24; 30:14; 71:10; 121:22
**style** [3] - 106:24; 110:15; 111:7
**sua** [1] - 56:13
**subject** [9] - 4:11; 49:18; 52:2; 69:19; 70:14; 78:23; 87:1, 25; 88:1
**submission** [5] - 102:9, 24; 103:1; 104:12; 124:14
**submissions** [5] - 105:11; 114:4; 117:23; 123:15, 22
**submit** [7] - 81:13; 92:18; 101:11; 102:4; 112:8; 117:20; 123:17
**submitted** [4] - 97:14; 106:8; 110:10; 125:11
**submitting** [1] - 93:25
**subprovisions** [1] - 122:7
**Subsection** [1] - 69:22
**substance** [1] -

44:14
**substantial** [7] - 21:21; 109:13; 119:7, 9-10, 12, 18
**successfully** [1] - 37:11
**sued** [1] - 61:5
**suffering** [1] - 30:3
**suffice** [2] - 35:18; 101:2
**sufficiency** [2] - 97:13, 15
**sufficient** [8] - 21:17, 19; 23:25; 31:15; 56:24; 97:9; 114:24; 115:3
**suggest** [3] - 35:21; 59:21; 118:7
**suggested** [5] - 34:23; 35:1, 24; 87:12; 119:4
**suggesting** [1] - 23:18
**suggestion** [3] - 12:14; 57:8; 121:3
**suitable** [5] - 83:13, 15; 84:5, 11; 113:13
**summaries** [10] - 55:9, 19; 56:10, 16; 68:10; 69:2; 85:25; 87:9; 96:14
**summarized** [1] - 62:6
**summary** [3] - 57:6; 70:9, 12
**supervises** [1] - 85:18
**supervising** [2] - 46:16; 70:22
**supervisor** [1] - 10:10
**support** [2] - 56:24; 74:25
**supposed** [1] - 78:24
**supremacy** [1] - 86:9
**surprised** [1] - 92:6
**suspect** [1] - 35:18
**sustained** [2] - 38:17; 109:11

Motions Hearing 12/20/2024

sword [2] - 78:2
sworn [1] - 85:19
symmetrical [1] - 88:9
synthesizing [1] - 111:21
system [12] - 4:11; 7:9; 65:20; 93:23; 107:23; 108:1, 3, 15, 20-21; 113:17
systematic [2] - 53:13; 55:12
systematically [1] - 53:21
systemic [1] - 107:15
systems [1] - 118:22
table [4] - 28:18; 35:9; 36:12; 70:16
tabs [1] - 38:15
tailor [1] - 95:20
talks [1] - 86:20
task [1] - 67:18
technical [1] - 107:1
ten [2] - 35:11; 36:13
term [6] - 50:9; 52:7; 59:19; 75:6; 89:11
termed [1] - 46:6
terminate [1] - 121:17
terms [17] - 4:21; 5:14; 15:17; 21:22; 37:3; 60:18; 67:15; 74:10; 97:6; 107:19; 114:21; 115:1; 116:2; 117:12, 14; 118:25
territories [1] - 110:1
territory [1] - 111:4
testified [1] - 17:5
testify [1] - 121:11
testifying [2] - 7:25; 111:16
testimony [2] - 63:10; 85:19
text [2] - 75:1; 88:23
textbook [1] - 52:21
THE [292] - 2:3,

10, 13, 16, 19-20, 23; 3:3, 22; 6:14, 24; 7:5; 9:12, 14, 20; 12:16; 13:10, 18, 20, 22; 14:1, 8, 13, 25; 15:4, 6, 9, 25; 16:2, 5, 12; 20:18; 21:6, 10, 13, 23; 22:4, 15, 21; 23:3, 7, 18, 20; 24:5, 18, 21; 25:2, 5, 7; 26:12, 19; 28:5, 21; 29:5, 10, 23; 30:20; 31:3, 5, 7, 9; 32:21; 33:18, 24; 34:14; 35:17, 22; 36:19; 37:1; 38:4, 21; 39:6, 15, 18, 20, 23; 40:1, 8, 10, 20, 22; 41:1, 13; 42:4, 22, 25; 43:10, 13; 44:2, 5, 11; 46:2, 4; 48:2, 5, 16, 22, 25; 49:22, 25; 50:3, 8, 13, 17, 21, 24; 51:2, 21; 52:4, 8, 11, 18; 53:4, 6, 8; 54:8, 21, 24; 57:24; 59:5; 62:2, 20, 23; 63:1, 15, 20, 22; 64:25; 65:5, 9, 13, 23; 66:1, 8, 23; 67:1, 8, 19; 68:5, 9, 21; 69:2, 23, 25; 70:2, 4, 6, 19; 71:13, 17; 72:10, 13, 18, 23; 73:4, 8, 10; 74:1, 3, 19, 25; 75:5, 14, 18; 76:2, 6, 10, 16, 21, 23; 77:2, 6, 20, 23; 78:11; 79:8, 14, 18, 21, 25; 80:3, 15, 24; 81:3, 24; 82:3, 6, 14, 16, 23; 83:1, 4, 7, 9, 16, 22, 25; 84:3; 85:1, 6, 11, 24; 86:15; 88:3; 89:3, 10, 16, 20, 23; 90:3, 8, 11,

13, 20; 91:23; 93:1, 4, 7, 9, 11, 14; 94:23; 95:6, 19, 22; 96:3, 7, 9; 98:2, 6; 99:3, 9; 100:9, 15; 101:1, 15, 25; 102:6, 15; 103:4, 15, 21; 104:7, 18, 24; 105:7, 10, 16, 18, 22; 106:2, 4, 6; 108:21; 109:7, 10, 15, 17; 111:9; 112:3, 6; 113:5; 115:5, 17, 21; 116:6, 8, 12, 17, 22; 117:9, 19, 24; 118:10; 120:14, 23; 122:1, 15, 21; 123:6, 14, 20; 124:13, 17, 20; 125:4, 23; 126:1, 3, 9, 11, 13
themes [2] - 4:16; 107:17
themselves [5] - 17:25; 18:19; 33:6; 36:22; 37:23
theory [1] - 28:3
therapeutic [3] - 10:7, 17; 37:12
therefore [2] - 49:13; 81:8
they've [6] - 33:1; 35:1, 3; 54:21; 74:22; 106:22
thinking [2] - 3:6; 104:15
third [2] - 23:14; 73:25
three [31] - 17:12; 29:18; 36:15; 45:4; 54:11; 55:10; 56:21; 57:4; 65:8; 66:17; 79:18; 95:12; 96:4; 98:10; 99:1, 7, 17; 100:3, 11, 25; 101:6, 10, 19, 22, 24; 102:10, 12; 103:14; 104:18
three-month [6] - 98:10; 99:1, 17;

100:3; 102:10, 12
threw [1] - 25:2
throughout [1] - 61:14
throwing [1] - 78:8
Thursday [1] - 125:18
ties [1] - 5:17
timeline [1] - 122:15
timetable [1] - 123:1
timing [2] - 33:1; 47:16
tirelessly [1] - 4:23
title [1] - 60:23
today [17] - 32:19; 43:25; 55:3; 61:21; 74:13; 81:10; 82:10; 84:15, 23; 86:4, 8; 92:18; 96:5; 99:10; 103:25; 120:3; 121:18
together [8] - 13:25; 15:2; 66:15; 71:6; 100:19; 107:3; 123:12
tomorrow [2] - 61:22; 120:2
took [3] - 41:15; 81:17; 109:20
top [4] - 50:1; 53:10; 104:19; 105:18
totality [1] - 118:16
totally [1] - 50:12
tour [1] - 41:10
toured [1] - 123:12
Toyja [1] - 2:14
track [7] - 7:21; 27:1; 30:6; 51:11; 61:16; 63:18; 90:20
tracked [1] - 35:2
tracker [44] - 8:23, 25; 11:24; 12:9; 14:21; 18:11, 14; 19:2, 25; 25:13; 26:22; 29:13, 24; 30:24; 33:15, 21; 36:5; 41:2, 11, 18; 42:12;

43:11-13; 50:1, 4, 9, 14; 52:9; 53:16, 24; 54:3; 59:18, 20; 64:23; 85:2, 4, 10; 90:15; 91:2; 97:22; 98:20
trackers [21] - 16:18; 25:16; 32:8; 33:6, 10, 14-15; 34:25; 36:17; 46:6, 8; 49:21; 53:13; 84:18, 20; 91:22; 94:25; 95:9; 103:8, 12
tracking [5] - 30:9, 12-13; 36:23; 50:18
trained [1] - 64:10
trampled [1] - 26:7
tranche [2] - 101:2
transcript [2] - 20:23; 116:9
transparent [1] - 111:20
transpired [1] - 51:16
treasure [1] - 65:21
treasurer [2] - 125:19
treasurer's [1] - 125:15
Treasury [1] - 125:2
treasury [1] - 125:2
treatment [3] - 37:10; 39:11; 40:4
tricky [1] - 22:25
trove [1] - 65:21
true [5] - 28:13, 19; 49:2; 80:4, 18
try [1] - 42:19
trying [11] - 27:18; 28:4; 29:25; 66:9; 68:12; 71:19; 83:20; 93:20; 106:15; 123:15
turn [3] - 44:9; 75:20
turned [4] - 54:24; 64:3; 92:22; 93:18

turning [1] - 33:5
turns [2] - 34:8; 125:14
twice [3] - 17:11; 32:4, 8
two [28] - 4:16; 9:4; 17:12; 27:22; 28:18; 29:12; 35:11; 44:14; 51:23; 66:17; 70:23; 75:19; 92:10; 99:1; 100:25; 102:9, 23; 104:4; 105:5; 107:6, 15; 120:10; 121:14; 123:11; 125:15
type [1] - 36:16
types [1] - 43:24
typically [1] - 122:20
U.S.C [2] - 69:15
um-hmm [3] - 33:23; 51:2; 95:19
unable [1] - 122:12
unambiguously [1] - 58:7
unanimous [1] - 56:4
uncertainty [1] - 92:25
unclear [2] - 65:16
undeniable [1] - 47:25
under [28] - 6:16; 31:22; 32:18, 22; 33:4; 34:18; 37:19; 38:3; 56:11, 18; 69:7, 15; 70:25; 72:8; 76:9; 79:16; 80:12; 81:5, 13; 84:1, 7; 85:20; 87:18; 91:6; 114:21; 115:3; 124:3
underlie [1] - 4:16
understood [8] - 8:21; 51:8; 52:18; 74:3; 90:8; 92:21; 103:7; 105:22
unduly [1] - 56:22
unending [1] - 67:18
unfortunately [1]

Motions Hearing 12/20/2024

- 104:3

**unilaterally** [1] - 51:25

**unit** [38] - 5:21; 6:4, 23; 9:16; 10:11-13, 18; 15:3; 17:24; 18:2; 22:13; 27:8; 28:14; 30:2, 9-11; 36:10; 37:5; 45:7; 63:7, 13, 16-17; 66:17; 82:12, 20; 83:13, 15; 84:9, 11-12; 94:6; 95:18; 97:13

**Unit** [1] - 45:7

**United** [1] - 93:22

**units** [2] - 66:18

**unless** [7] - 3:18; 12:2; 49:17; 91:3; 101:19; 122:6

**unlike** [2] - 8:7, 9

**unofficial** [1] - 48:20

**unprecedented** [2] - 86:23; 87:11

**unreasonable** [2] - 94:18; 110:25

**unredacted** [1] - 94:10

**unsupported** [1] - 80:7

**unsworn** [2] - 44:23; 85:19

**unusual** [3] - 4:1; 17:17; 60:5

**up** [21] - 6:1; 11:21; 29:12; 30:11; 60:6; 61:6; 73:17; 78:16; 83:21; 84:17, 19; 85:2, 14; 99:2; 104:13, 17-18; 105:11; 110:25; 116:3; 125:20

**upcoming** [2] - 120:7

**update** [1] - 47:8

**urge** [1] - 29:14

**useful** [2] - 118:14; 119:11

**uses** [3] - 23:1; 75:6; 89:11

**utilize** [1] - 60:19

**utilized** [1] - 64:2

**utterly** [1] - 86:23

**vacate** [1] - 4:2

**value** [1] - 81:17

**variety** [1] - 118:16

**various** [1] - 98:18

**vast** [1] - 113:9

**verbatim** [1] - 73:21

**version** [4] - 16:9; 62:20; 85:4

**versus** [1] - 2:4

**view** [8] - 19:25; 21:19; 25:19; 29:18; 69:10, 15; 107:15; 110:16

**views** [2] - 54:14; 123:19

**violate** [1] - 69:17

**violated** [2] - 21:4; 64:7

**violation** [1] - 79:2

**violet** [1] - 122:4

**Virgin** [4] - 106:19; 109:1, 7; 112:25

**visit** [17] - 5:11; 11:5, 16; 49:4; 51:16; 57:19; 58:13; 62:10; 110:17, 19; 120:6-10; 123:7, 10

**visited** [2] - 45:25; 46:14

**visits** [2] - 57:18; 120:10

**vitae** [1] - 106:7

**vitriol** [1] - 92:4

**voice** [1] - 31:11

**volume** [1] - 98:8

**voluntarily** [1] - 100:7

**waiting** [2] - 56:15; 117:22

**waived** [3] - 49:13; 52:25; 56:3

**walk** [1] - 30:7

**walks** [2] - 30:7; 67:4

**wants** [8] - 8:21; 25:15; 44:20; 47:4; 107:16; 120:1

**warden's** [1] - 67:6

**wasting** [1] - 10:20

**watch** [2] - 18:3; 27:12

**water** [1] - 23:2

**ways** [6] - 4:3; 13:21; 18:19; 24:9; 42:19; 121:14

**wearing** [1] - 121:6

**WEDEKIND** [31] - 2:11; 31:8, 10; 33:5, 23; 34:15; 35:19; 36:6, 21; 37:6; 38:6, 25; 39:8, 16, 19, 22, 24; 40:3, 9, 12, 21, 24; 41:5, 20; 42:13, 24; 43:4, 12, 21; 44:4, 9

**Wedekind** [4] - 2:12; 31:6; 45:14

**week** [6] - 32:2; 92:7; 102:3; 104:14; 118:8

**weeks** [6] - 18:10; 20:2; 47:10; 102:10, 23; 116:3

**whatsoever** [2] - 86:10; 90:7

**whereby** [1] - 4:7

**whoa** [3] - 78:6

**whole** [8] - 18:6; 64:4; 65:17; 73:19; 92:15; 100:17; 108:20; 119:3

**wholly** [1] - 62:12

**widely** [1] - 37:16

**Wilcox** [2] - 111:24; 112:2

**willfulness** [1] - 47:24

**willing** [2] - 81:15

**willingness** [1] - 79:9

**withdraw** [1] - 32:17

**witness** [1] - 111:17

**wolf** [1] - 59:13

**Word** [1] - 16:9

**word** [11] - 9:23; 13:10; 22:25; 50:11, 13; 77:13, 16; 78:8; 89:18; 99:23

**words** [5] - 43:14; 47:21; 71:1; 89:20; 94:14

**Works** [3] - 115:23; 116:3; 125:9

**works** [2] - 44:18; 86:21

**world** [3] - 16:21; 22:25; 80:11

**worried** [1] - 95:2

**worry** [3] - 108:13, 18

**worse** [1] - 51:5

**worth** [2] - 97:24; 98:13

**worthy** [1] - 98:22

**wrap** [1] - 29:12

**write** [5] - 27:13; 61:15; 88:24; 89:6

**writes** [1] - 93:21

**writing** [7] - 27:14; 30:15, 19; 102:7-9; 119:12

**written** [9] - 30:21; 39:25; 42:2; 44:1; 64:3; 65:3; 94:3; 114:14; 126:16

**wrote** [4] - 46:18, 22; 58:14; 64:6

**year** [15] - 9:4; 11:5; 32:1; 40:20; 46:1, 15; 47:7; 54:11, 17; 58:12; 87:20; 95:15; 112:24; 122:9, 18

**years** [11] - 9:4; 37:22; 39:1; 65:8; 67:5; 87:23; 95:12; 96:4; 110:5; 121:7; 122:4

**yesterday** [2] - 12:23; 41:6

**yourself** [1] - 48:3

**yourselves** [1] - 2:7

**zero** [1] - 62:9

**Zoom** [1] - 106:23

**§** [2] - 7:25; 69:21