IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEROME DUVALL, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 94-cv-02541-MJM |
| WES MOORE, *et al.*, | * | |
| Defendants. | * | |

**************************************************************************
**PLAINTIFFS' RESPONSE TO DEFENDANTS' CHALLENGE TO FINDINGS OF THE COURT-APPOINTED MENTAL HEALTH MONITOR (ECF 941)**
**************************************************************************

Defendants ask this Court to overrule the professional judgment of the independent Court-appointed Mental Health Monitor, Dr. Jeffrey Metzner. Their challenge to Dr. Metzner's findings once again asks this Court to engage in a purely academic exercise about the ratings given to individual sub-provisions of the Settlement Agreement—but because compliance is determined only by looking at each Settlement paragraph as a whole, any decision by this Court will have no effect on their overall compliance ratings. Moreover, Defendants' objections are untimely, misstate the facts, misapply the controlling law, and fail to follow this Court's prior direction and the plain language of the Settlement Agreement. They should be rejected.

## ARGUMENT

**I.    The Court should continue to decline to engage with Defendants' academic objections.**

Defendants challenge Dr. Metzner's findings of partial compliance for two sub-provisions of the Settlement Agreement: subparagraph 17.c and subparagraph 25.f.iii. But the

remaining sub-provisions in Paragraphs 17 and 25 are not yet in compliance, making any decision by this Court a purely academic exercise.[1]

The Settlement Agreement provides:

> For purposes of this Settlement Agreement, "substantial compliance" means that the Commissioner has achieved: (a) full compliance with the components of the relevant substantive provision of this Settlement Agreement; or (b) sufficient compliance with the components of the relevant substantive provision of this Settlement Agreement such as to remove significant threat of constitutional injury to the plaintiff class posed by any lack of compliance with the components of that substantive provision. **For purposes of this Settlement Agreement, a "substantive provision" means the requirements set forth in a single numbered paragraph in Section III of this Settlement Agreement.**

ECF 541-2 ¶ 39 (emphasis added). The parties have stipulated, and the Court has ordered, that "a finding of substantial compliance with a lettered subparagraph of a numbered paragraph shall be of no legal effect until the entire numbered paragraph has achieved 'substantial compliance' as defined in Paragraph 39." ECF 777 at 1.[2]

The most recent report from the Court-appointed Medical Monitor found Defendants not compliant with Subparagraphs 17.a., 17.b., 17.d., and 17.e. ECF 819-1 at 100. Dr. Metzner's most recent report found Defendants in partial compliance with Subparagraph 17.c., and "deferred" a finding on Subparagraphs 17.a., 17.d., and 17.e. "pending assessment by the medical monitor to be appointed." ECF 929-2 at 10–13. Thus, even if the Court were to overrule Dr. Metzner and find Defendants compliant with Subparagraph 17.c., such a finding would be

---

[1] As a preliminary matter, Defendants' challenge is untimely. Paragraph 41.e requires that any challenge be filed with the Court "within 45 days of issuance of the applicable Monitor's report." ECF 541-2 ¶ 41.e. Dr. Metzner issued his report to the parties on November 2, 2024. Fathi Dec. ¶ 3 & Ex. 1. Defendants' challenges were therefore due December 17, 2024. Defendants did not file their challenge with the Court until December 20, 2024. ECF 941.

[2] Citations to documents previously filed in this case are to the page numbers assigned by the ECF system.

"of no legal effect," ECF 777 at 1, because Paragraph 17 as a whole remains far from substantial compliance.

Paragraph 25 is similarly broken into 10 sub-provisions. In his most recent report, Dr. Metzner found Defendants in compliance with 8 of those sub-provisions but found Defendants only in partial compliance with 25.b. and 25.f.iii. Defendants do not challenge Dr. Metzner's finding on 25.b. Again, therefore, even if the Court were to overrule Dr. Metzner's findings with regard to Subparagraph 25.f.iii., this finding would also have no effect on Defendants' compliance rating for Paragraph 25. *See* ECF 777 at 1.[3]

This Court has previously acknowledged that there is no need to make such an academic ruling. *See* Aug. 20, 2024 Hr'g Tr. 123:11–21. The Court should continue to refrain from issuing such an advisory opinion.

## II.    The Monitors' findings regarding compliance are entitled to deference.

Unlike other settlement agreements in which compliance is monitored by plaintiffs' counsel, the parties here agreed that compliance would be monitored by neutral Court-appointed Monitors with expertise in the provision of correctional medical and mental health care. *See* ECF 541-2 ¶ 32. The Monitor is required to issue a draft report; each party may then submit evidence or other information in response to the draft; and then the Monitor issues a final report. *Id.* ¶¶ 38.d.iii., 38.d.iv. The Settlement Agreement specifically provides that "[i]f the Commissioner or Plaintiffs provide evidence or information in response to such draft before it is finalized, the Monitor may take such evidence or information into account in finalizing the report." *Id.* ¶

---

[3] In addition, as discussed further below, Defendants' challenge to subparagraph 25.f.iii. is not yet ripe for Court resolution.

38.d.iii.[4]

The parties' joint decision to entrust the assessment of compliance to neutral Court-appointed Monitors necessarily implies some deference to the expertise and judgment of those Monitors. As the court recently observed in a similar prison conditions case, "The EMT [External Monitoring Team], in exercise of its unique expertise, possesses the broad authority to create the performance measures and define substantial compliance for each performance measure." *Braggs v. Hamm*, No. 2:14cv601-MHT, 2024 WL 866532, at *7 (M.D. Ala. Feb. 29, 2024) (internal quotation marks, citation omitted); *see also id.* at *8 ("[I]t is the EMT that needs to determine many of the details of how to carry out monitoring, including fashioning performance measures and audit tools.") (internal quotation marks, citation omitted). While the Court is the ultimate arbiter of compliance, the considered expert judgment of the Monitors is "crucial evidence[,]" *id.* at *7, that cannot be overborne by Defendants' mere disagreement, unsupported by any evidence or legal authority.

### III. Defendants' objections to the Mental Health Monitor's findings regarding subparagraph 17.c. have no merit.

Defendants object to Dr. Metzner's conclusion that they are in partial compliance with sub-provision 17.c. Under Settlement Agreement paragraph 41, Defendants "bear the burden of proof to demonstrate that the Monitor's findings are incorrect." ECF 541-2 ¶ 41.e. Defendants fail to meet their burden. Dr. Metzner found Defendants in partial compliance based on Defendants' own internal data demonstrating delays in seeing patients with urgent mental health needs. Defendants' objections rest largely on what appears to be a misreading of Dr. Metzner's

---

[4] Thus, while Defendants portray Plaintiffs' submission of comments on Dr. Metzner's draft reports as illegitimate and nefarious, *see* ECF 941 at 20 (citing "Plaintiffs' wrongful objection"); *id.* at 22 ("the lengths to which the Plaintiffs go to manipulate data"), it is a procedure explicitly contemplated by the Settlement Agreement.

4

most recent report, as well as an erroneous interpretation of the Settlement Agreement and the applicable law.

> Subparagraph 17.c. provides:
>
> The Commissioner shall ensure that any plaintiff who is identified during intake screening as currently prescribed psychotropic medication (unless he or she receives a bridge order as provided in paragraph 25.b.) or as having an urgent mental health need, including a suicide risk, shall receive a mental health evaluation by a Mental Health Practitioner within 24 hours of the intake screening, or sooner if clinically indicated.

ECF 541-2 ¶ 17.c.

The plain language of this provision requires Defendants to timely see two populations of patients: (1) those who are identified on intake as currently prescribed psychotropic medication, but that medication is not continued with a bridge order; and (2) those identified as having an urgent mental health need, including a suicide risk. *Id.* Both populations require a mental health evaluation by a Mental Health Practitioner within 24 hours of intake screening, or sooner if clinically indicated. *Id.*

### A.  The Most Recent Reporting Period: January – June 2024

In his November 2024 report, evaluating Defendants' compliance for January through June 2024, Dr. Metzner concluded that Defendants were in partial compliance with sub-provision 17.c. *See* ECF 929-2 at 11. In his report, he first summarized the update and data provided by Defendants relevant to this provision, including two internal audits conducted by Defendants. *Id.* One audit examined whether patients presenting with an urgent mental health need during the intake process were "referred and seen by a Mental Health Practitioner within 24 hours of the Suicide Risk Evaluation (SRE) and/or the 7-day follow-up evaluations (or sooner if clinically indicated)." *Id.* That audit showed a 94% aggregate compliance rate, with 66 out of 70 patients seen within 24 hours. *Id.* The second audit examined the other population covered by

sub-provision 17.c and asked whether patients found on intake to have currently prescribed psychotropic medications and for whom "the mid-level provider does not continue the medication" were seen timely. *Id.* That audit showed a 24% compliance rate. *Id.* Dr. Metzner concluded Defendants were in partial compliance. *Id.* at 12.

Dr. Metzner's recommendations for this provision referred to his discussion regarding sub-provision 25.b. *Id.*[5] In that section of his report, Dr. Metzner examined the second audit discussed here and the results demonstrating that when a mid-level provider did not continue a patient's currently prescribed psychotropic medication on intake, only 24% of those patients received a timely initial psychiatric evaluation. *Id.* at 17. Dr. Metzner described the discussions he had with staff regarding the methodology used for this audit and requested that additional analysis be provided to him. *Id.* at 18. Further analysis of that data provided by Defendants showed the timeliness of being seen by a psychiatric provider for this population of plaintiffs was 39%. *Id.* Dr. Metzner's final recommendations for the provision included that Defendants repeat the audit and "include an assessment whether the prescribed psychotropic medications are administered to the [incarcerated individual] in a timely manner." *Id.*

Defendants' suggestion that Dr. Metzner's rating turned on his summary of discussions with the parties regarding patients prescribed benzodiazepines and "Plaintiffs' erroneous reading of this provision," *see* ECF 941 at 21, is therefore unsupported by Dr. Metzner's report itself. In his report, Dr. Metzner summarized the discussions he had with the parties regarding patients prescribed benzodiazepines and concluded that he disagreed with plaintiffs' counsel's position on this issue. ECF 929-2 at 11–12. Nothing in this discussion indicates that, *despite his stated disagreement*, he nevertheless based his assessment on this discussion, rather than Defendants'

---

[5] As Defendants acknowledge, sub-provision 25.b. "overlaps with Section 17c." ECF 941 at 24.

6

24% compliance rate, as demonstrated by their own audits and discussed in his recommendations for the next reporting cycle. Defendants' extensive discussion of this issue is therefore immaterial.

### B.  The Immediately Prior Reporting Period: July – December 2023

Dr. Metzner's April 2024 Report, examining the July – December 2023 reporting period, also found sub-provision 17.c. in partial compliance. ECF 875-2 at 9. Again, he reviewed the data and internal audits provided by Defendants, which demonstrated monthly compliance rates ranging from 82% to 100%, and a six-month aggregate rate of 89%. *Id.* at 9–10. Dr. Metzner concluded: "Review of the audits indicated the compliance issues were due to lack of escort officers and several delays were significant. One incarcerated individual required admission to the IMHU four days after the initial urgent referral (the time variance was 4 days)." *Id.* at 10.

Defendants' suggestion that Dr. Metzner concluded that these delays did not produce any adverse outcomes is misleading. The information contained in Dr. Metzner's April 2024 Report under the heading "February 2024 BCBIC status update"—on which Defendants now rely—is a verbatim quotation taken from Defendants' own February 2024 compliance report, not Dr. Metzner's conclusion. *See* Fathi Dec. ¶ 4 & Ex. 2; *see also* ECF 875-2 at 8 (noting that the "body of this report includes excerpts from the relevant audits regarding these provisions"). Dr. Metzner himself concluded that the delays were "significant," and he expressly noted that, after a four-day delay, one patient required admission directly to the IMHU—the jail's highest level of care for patients with the most acute needs. ECF 875-2 at 10. Regardless, as described further below, Defendants' assertion that actual harm or a "constitutional injury" is required to demonstrate a lack of compliance is inconsistent with the Settlement Agreement and the law.

7

### C.     Prior Monitoring Cycles and the 90% Dispute

Defendants also take issue with prior monitoring cycles. But the plain language of Paragraph 41 forecloses this second-guessing of a Monitor's historical compliance ratings. Nor would changing ratings prior to the two most recent monitoring cycles have any effect on Defendants' current state of compliance. Further, Defendants' objections appear to be based solely on the use of a 90% threshold for compliance—an issue that has no relevance to Dr. Metzner's two most recent ratings for sub-provision 17.c., which did not turn on the 90% threshold. Indeed, this quarrel has no effect on Defendants' current compliance ratings. Regardless, Defendants' objection to Dr. Metzner's use of a 90% threshold is without merit.

Paragraph 41(d) provides,

> Any such challenge may address the finding regarding substantial compliance during the most recent reporting period and/or, only if preserved by providing the notice required in subparagraph 41.b., any challenge to an adverse finding regarding substantial compliance during the immediately prior reporting period, if applicable, relating to the same substantive provision[.]

ECF 541-2 ¶ 41(d). By its plain language, therefore, assuming appropriate notice, the Settlement Agreement permits a party to challenge the "most recent" reporting period and the one "immediately prior." In other words, in general, Defendants may challenge Dr. Metzner's findings for the January–June 2024 reporting period and the July–December 2023 reporting period. That being said, Defendants previously challenged the January–June 2023 and July–December 2023 reporting periods and the Court declined to rule, but stated that it would entertain Defendants' arguments at a future date, if necessary. However, the same reasons that led the Court to defer a ruling then apply today—such a ruling will have no bearing on Defendants' compliance status. *See* Aug. 20, 2024 Hr'g Tr. 123:11–124:8.

8

Even if Defendants' challenge to earlier reporting periods were permissible, their arguments have no merit. Defendants assert that the *Plaintiffs* have imposed a 90% compliance requirement on the monitors. This is inaccurate. Throughout his term as the Court-Appointed Mental Health Monitor, Dr. Metzner has exercised his own professional judgment to consistently and explicitly apply this threshold, with no objection from Defendants. *See, e.g.*, ECF 755-2 at 17 (January 2022 Metzner report) (citing "the 90% target"); *id*. at 18 (describing "compliance" as "90% or greater"). Defendants' own compliance documents similarly use the 90% threshold. *See, e.g.*, ECF 844-9 at 4 (including chart with a "target" line at the 90% mark); ECF 844-8 at 3 (same).

Further, Defendants cite no authority for their contention that Dr. Metzner's decision, in the exercise of his professional judgment, to utilize a presumptive compliance threshold of 90% is impermissible or inappropriate. *See Braggs*, 2024 WL 866532, at *7 ("The EMT [External Monitoring Team], in exercise of its unique expertise, possesses the broad authority to create the performance measures and define substantial compliance for each performance measure." (internal quotation marks, citation omitted)). On the contrary, there is substantial authority that a 90% compliance threshold is not sufficiently protective of class members' health and safety. *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 324 (3d Cir. 1990) (rejecting defendant's contention that providing adequate services to 97% of class members constitutes substantial compliance with settlement agreement; "this inequitable and disconcerting principle" would "allow the County . . . to treat a few . . . class members in any fashion they want so long as they comply with the [settlement agreement] with regard to a substantial number of other . . . class members"); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 857 (D. Ariz. 2022) ("Even if only 5% of mentally ill prisoners do not have access to care, that is unconstitutional."). Indeed,

9

even Defendants require their medical and mental health contractors to meet much higher levels of compliance. In a recent Request for Proposals for medical and mental health services at the jail, Defendants included a requirement that the contractor meet compliance thresholds of 95% to 100% for performance measures tied to the *Duvall* Settlement Agreement. *See* ECF 884-3 ¶¶ 5–6; ECF 884-5 at 1, 4–7, 9.[6]

### III. The Settlement Agreement does not require the Court-Appointed Monitors to find a constitutional violation to find noncompliance with the Settlement Agreement.

As noted above, the Settlement Agreement provides that "substantial compliance" means

> (a) full compliance with the components of the relevant substantive provision of this Settlement Agreement; or (b) sufficient compliance with the components of the relevant substantive provision of this Settlement Agreement such as to remove significant threat of constitutional injury to the plaintiff class posed by any lack of compliance with the components of that substantive provision.

ECF 541-2 ¶ 39.[7]

Defendants fault Dr. Metzner for relying on the first definition. ECF 941 at 8. They appear to suggest that first definition is unfairly onerous and that the second definition is a lower standard, and equivalent to finding a constitutional violation. *Id.* at 7–8. But Dr. Metzner is entitled to rely on his professional judgment in determining whether Defendants have met the Settlement Agreement's definition of substantial compliance. And nothing in the Agreement suggests that the monitors must find a constitutional violation before they can find Defendants

---

[6] Defendants also recycle their argument that Dr. Metzner should aggregate data from two different six-month monitoring periods when doing so would push them over the 90% threshold. But as Defendants concede, Dr. Metzner concluded that this is not permissible under the Settlement Agreement. ECF 941 at 19-20. He is correct. *See* ECF 541-2 ¶¶ 34, 38.d. (providing that compliance reporting and monitoring proceed in six-month cycles).

[7] Defendants assert that this provision "follows the mandates of *Farmer v. Brennan*, 511 U.S. 825 832, 842 (1994), where the Court affirmed that prison officials must provide 'adequate' medical care." ECF 941 at 7. But *Farmer* did not directly address the provision of medical care.

noncompliant. Indeed, Defendants' arguments are contrary to the history of the case, the Settings Agreement's plain language, and established law.[8]

First, this Court has previously determined the Defendants were noncompliant with provisions of the Settlement Agreement without making independent findings of a new constitutional violation. *See, e.g.*, *Duvall v. Hogan*, No. CV ELH-94-2541, 2021 WL 2042295, at *16 (D. Md. May 21, 2021) (granting motion to enforce the Settlement Agreement "[b]ecause of defendants' failure to achieve compliance"). These rulings are the law of the case. *See* ECF 924 at 15–16 (discussing law of the case doctrine).

Second, because consent decrees "are generally construed as contracts for purposes of enforcement[,]" *Duvall*, 2021 WL 2042295, at *12, it is the language of the agreement itself that governs, not the constitutional standard. *See, e.g.*, *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37 (1975) ("[S]ince consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts[.]" (footnote omitted)).[9] Nothing in the Settlement Agreement's language suggests that, in defining "substantial compliance," the parties silently agreed that a constitutional violation must be established to find noncompliance. Indeed, such a provision would have been nonsensical because it would require

---

[8] Defendants contend that "the mental health monitor believes (for reasons unknown to the mental health monitor and the State) that he cannot rely upon the second standard set forth in the Agreement, but rather, find substantial compliance *only if* the State *fully complied* with each substantive provision" ECF 941 at 8 (emphasis in original). No citation is provided for this statement, and to the extent Defendants suggest that Dr. Metzner is holding them to a 100% compliance requirement, that is inaccurate. As Defendants repeatedly concede elsewhere in their brief, Dr. Metzner routinely finds substantial compliance upon a showing of compliance with regard to 90% of the cases sampled.

[9] This Court previously determined that the Settlement Agreement is appropriately considered a consent decree. *See Duvall*, 2021 WL 2042295, at *11–12.

11

the parties to re-litigate every constitutional violation, rendering the Settlement Agreement a nullity.

Third, even if a constitutional violation were a prerequisite to a finding of noncompliance with the Settlement Agreement—and it is not—Defendants misrepresent the relevant constitutional standard. Defendants suggest that a constitutional violation requires a finding of subjective deliberate indifference, citing cases governing the Eighth Amendment rights of convicted persons. *See* ECF 941 at 23. But the Plaintiff class in this case consists overwhelmingly of pretrial detainees, *see* ECF 894-6 at 3, whose claims are governed by a less demanding objective test under the Fourteenth Amendment. *See Short v. Hartman*, 87 F.4th 593, 609 (4th Cir. 2023) (holding the subjective deliberate indifference test is "irreconcilable" with Supreme Court precedent requiring an objective standard for claims brought by pretrial detainees), *cert. denied*, No. 23-1097, 2024 WL 2883766 (U.S. June 10, 2024); *see also Walters v. Watts*, No. CV BAH-22-2547, 2023 WL 8807065, at *3 (D. Md. Dec. 19, 2023) ("Pretrial detainees need not demonstrate that prison officials possessed any subjective deliberate indifference to properly allege a Fourteenth Amendment claim, as is required by Eighth Amendment claims brought by convicted detainees.").

Under the Fourteenth Amendment, "it is enough that the challenged action is not rationally related to a legitimate nonpunitive purpose or is excessive in relation to that purpose." *Short*, 87 F.4th at 609 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). *Short* thus recognized that it is "sufficient that the plaintiff show that the defendant's action or inaction was . . . 'objectively unreasonable[.]'" *Id.* at 611 (quoting *Kingsley*, 576 U.S. at 397).

The cases on which Defendants rely, therefore, are inapposite. Each turns on the Eighth Amendment's subjective deliberate indifference analysis that is inapplicable here. *See, e.g.*,

*Webb v. Hamidullah*, 381 F. App'x 159, 166–67 (4th Cir. 2008) (considering whether delay in provision of elective hernia surgery sufficient to demonstrate subjective deliberate indifference); *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (discussing subjective deliberate indifference predicated on delay in medical care).

Defendants also claim that the Constitution cannot be violated unless "there is some substantial harm to the patient," asserting that the delays in care documented by Dr. Metzner "did not harm the individuals." ECF 941 at 23. But as discussed above, Defendants' assertion of a lack of harm is based on their *own* reporting, not Dr. Metzner's conclusions. And Defendants are wrong on the law. It is settled law that the Eighth Amendment can be violated by a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event."). *A fortiori* the same is true of the more protective Fourteenth Amendment standard that governs the claims of pretrial detainees. *See Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) ("[N]o legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent.").

### IV. Defendants' objections regarding sub-provision 25.f.iii. are not ripe for resolution.

Defendants also object to Dr. Metzner's finding of partial compliance for sub-provision 25.f.iii. Their current objections, however, are not ripe for resolution under Paragraph 41.

Paragraph 41 sets forth a two-step procedure for challenging the findings by a Court-Appointed Monitor. First, a party provides notice of its disagreement with the Monitor's report

pursuant to ¶ 41.a. (Plaintiffs) or ¶ 41.b. (Defendants). ECF 541-2 at 17-18. Second, a party may challenge a *subsequent* finding of the Monitor that Defendants have, or have not, maintained substantial compliance with a provision of the Settlement Agreement for at least six months, as required by ¶ 40. *See id.* at 16-17 ¶¶ 41.c., 41.d. The Court then rules on this latter challenge. *Id.* ¶ 41.e.

Defendants have not previously provided notice of their disagreement with Dr. Metzner's findings regarding sub-provision 25.f.iii. Therefore, their current filing, at most, provides this notice, and they may follow the procedures set forth in Paragraph 41.e. following Dr. Metzner's next report. Only at that time will their disputes be ripe for resolution.[10] This Court previously recognized as much when it declined to rule on a prior set of objections filed by Defendants that did not follow this two-step procedure, instead requiring the parties to follow the procedure contemplated by Paragraph 41. *See* ECF 877; *see also* May 2, 2024 Status Hr'g Tr. 36:18-24.[11]

## CONCLUSION

Many of Defendants' complaints indicate their dissatisfaction that Dr. Metzner has previously found them compliant with some sub-provisions, but more recent reports have found only partial compliance. Compliance with the Settlement Agreement is not a one-and-done, check-the-box exercise, however. Variations between reporting cycles are to be expected. Indeed, the Settlement Agreement itself makes clear that substantial compliance requires

---

[10] Defendants claim that their December 12, 2024 letter provided the notice required by Paragraph 41.b. ECF 941 at 4. But that brief two-paragraph letter fails to comply with Paragraph 41.b.'s requirement that "such notice must identify the bases for the challenge *with supporting evidence*" (emphasis added). *See* ECF 941-2 at 2.

[11] Should the Court decide to rule on the merits of Defendants' objections, Plaintiffs request the opportunity for further briefing.

*sustained* compliance. ECF 541-2 ¶ 40. Defendants' piecemeal objections have no bearing on their overall compliance ratings, and have no merit. They should be rejected.

Dated: February 3, 2025                                Respectfully submitted,

/s/ David C. Fathi
David C. Fathi (Wash. 24893)*
Jennifer Wedekind (D.C. 1012362)**
ACLU National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
(202) 548-6603
dfathi@aclu.org
jwedekind@aclu.org

Corene T. Kendrick (Cal. 226642)**
ACLU National Prison Project
425 California St., Ste. 700
San Francisco, CA 94104
(202) 393-4930
ckendrick@aclu.org

Debra Gardner, No. 24239
Public Justice Center
201 North Charles St., Ste. 1200
Baltimore, MD 21201
(410) 625-9409
gardnerd@publicjustice.org

Toyja E. Kelley, Sr., Md. No. 26949
Troutman Pepper Locke LLP
701 8th St. N.W., Ste. 500
Washington, DC 20001
(202) 220-6939
toyja.kelley@troutman.com

Noah J. Mason (Tenn. 034341)*
Troutman Pepper Locke LLP
Terminus 200, Ste. 2000
3333 Piedmont Rd. NE
Atlanta, GA 30305
(404) 870-4648
noah.mason@troutman.com

15

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

*Counsel for Plaintiffs*